UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KAREN NUSSBAUM FRAGIN, in her capacity as Trustee for the ELANA B. NUSSBAUM TRUST, the MOSHE JONATHAN NUSSBAUM TRUST, the TAMAR MIRIAM NUSSBAUM TRUST, the DANIEL ZACHARY NUSSBAUM TRUST, and the SAMUEL ELIEZER NUSSBAUM TRUST,<br><br>            Plaintiff,<br><br>      -against-<br><br>LEONARD MEZEI, the ECONOMIC GROWTH GROUP, REPOTEX, INC., RON FRIEDMAN, and CATHERINE ILARDI,<br><br>            Defendants/Third-Party Plaintiffs,<br><br>      -against-<br><br>GARY S. FRAGIN,<br><br>            Third-Party Defendant. | Case No. 1:09-cv-10287-PGG<br><br>**DECLARATION OF**<br>**LEONARD MEZEI** |

    I, LEONARD MEZEI, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct:

    1.    I am a defendant in this action, and submit this declaration to oppose the motion for partial summary judgment by plaintiff Karen Fragin, as Trustee for various family trusts. The motion should be denied because the subject notes (**Exhibit 13**) do not state the actual agreement between the parties, Mrs. Fragin and her husband, third-party defendant Mr. Fragin, have misrepresented the actual agreement to the Court, and there are several factual issues in this case which need to be addressed.

    2.    Mr. Fragin, who directed the underlying investment on behalf of the various family trusts, and who was personally involved in Silar Advisors, L.P. ("Silar"), which structured and led the investment underlying the present dispute, is a sophisticated

and accredited investor with experience in hedge funds and securities. (Answer to Third-Party Complaint, ¶6). According to a recent filing with the Securities and Exchange Commission by a company of which Mr. Fragin is a director:

> Mr. Fragin has <u>more than 30 years of experience on Wall Street</u>. He is currently managing partner of Fragin Asset Management, L.P. and General Partner of Ducat Investment Group, L.P. <u>Mr. Fragin was the general partner and Chief Administrative / Operating Officer of Steinhardt Organization, one of the largest and most successful hedge funds in existence at that time. Prior to that, Mr. Fragin was a Partner, Director of Trading, and member of the Management Committee and Executive Committee at Oppenheimer and Co.</u> He holds a BE degree from Vanderbilt University, and an MBA from Columbia University. (**Exhibit 14**; emphasis added).

For Plaintiff Karen Fragin to now suggest that, in fact, her husband, Gary Fragin was not knowledgeable about the transaction in this case, or that he was not authorized to invest the money of the trusts for which she was trustee, is nonsense.

3. Mr. Fragin was a principal of Silar (<u>see</u> Mr. Fragin's Answer to the Third-Party Complaint, ¶ 7). Silar "led" the $38 million transaction underlying the $800,000 investment at issue – the Senior Repo. Mr. Fragin actively participated in the origination and negotiation of the Senior Repo, he understood the nature, purpose, and status of the Senior Repo, and even after leaving Silar he retained an interest in the underlying financing transaction.

4. Mr. Fragin used $800,000 of the Nussbaum Trusts' money to buy a participation position in the Senior Repo. The Fragins themselves acknowledge in the pleadings that they were buying a participation position in the Silar Senior Repo. The notes also reflect that they were purchasing a participation position. But now that Mrs. Fragin is, according to Mr. Fragin, "crazed" about the participation position not paying

off (**Exhibit 15**) – a position he bought using the children's trust money – Mr. and Mrs. Fragin are, I believe, misleading the Court as to what the actual agreement was and Mr. Fragin's role, and are attempting to exalt form over substance.  This fails to convey the true facts to the Court.

5. In fact, Mr. Fragin has told me, in sum and substance, that "we [the Fragins] have you [meaning me, Leonard Mezei] on a technicality," and that "you [meaning me] are sloppy on our paperwork," which I understand to mean that Mr. and Mrs. Fragin intend to take advantage of the mistakenly papered agreement.

6. To understand the significance of these remarks, the Court must understand the underlying transaction, which was basically as follows.  Certain non-performing assets (a mortgage portfolio and servicing rights) were purchased from the bankruptcy estate of an unrelated third party for approximately $50 million and assigned to a newly organized special purpose entity, Compass SPE ("Compass").  Compass had no material assets other than the portfolio.  To purchase the assets, Compass obtained financing from Mr. Fragin's company, Silar.  Of the $50 million transaction, Silar financed approximately $47 million – they funded this deal, and understood it well.

7. The financing had a multi-tier structure, which provided for a "waterfall," meaning that Compass' repayment of the financing (via liquidating the portfolio) flowed like a waterfall from senior lending tiers, and once a senior tier was fully satisfied, repayment would then go to junior lending tiers.

8. The senior tier was the Senior Repo, which was provided by Silar and financed approximately $38 million of $47 million provided by Silar to Compass for the

asset purchase.[1]  It was a "senior repo" (short for "senior repurchase") because Compass sold the assets to the lender (Silar), but retained a conditional right to repurchase the assets from the lender.  Silar had the right to "margin call" the collateral, i.e., in its discretion demand additional collateral immediately from Compass.[2]

9.  Compass' right to repurchase was conditioned on it making monthly 18% payments on the Senior Repo.  It is important for the Court to understand, as Mr. Fragin understood, that the only material way for Compass – which had no material assets for which to make repayments – to make the 18% payments to Silar was through liquidating the assets.  All of the economics flowed not from Compass (which, as an "SPE" had no material net worth other than the portfolio of non-performing assets), but from the liquidation of the portfolio.[3]  Thus, the concept of a Silar "foreclosure" on Compass is not as relevant as a traditional loan because whether Silar foreclosed or not, it only got paid when the portfolio liquidated.  If Compass did not make the 18% payments, Silar still would own the asset and would be in a comparable economic position, except for Compass no longer would have the right to repurchase the assets. Mr. Fragin was fully

---

[1]  Junior to it was a "Preferred" or Class B tier, also provided by Silar.  Mr. Fragin admits that he individually or through related entities owned some of the junior lending tier.  (Answer to Third-Party Complaint, ¶26).

[2]  Indeed, there were times when Silar did margin call the collateral – and any argument that Mr. Fragin did not understand the deal is belied by the fact that <u>Mr. Fragin himself signed a $3.5 million margin call notice</u>.  (**Exhibit 16**).

[3]  At the time of the transaction, the parties believed that the assets were significantly more valuable than the total financing and that ultimately everyone would be paid in full together with their 18%.  But the parties, including Mr. Fragin and Silar, also understood the risks, e.g., that liquidation of the assets might be impaired due to ongoing litigation concerning the portfolio – the purchase price reflected this.

aware there were no other material assets in Compass other than the portfolio, and that Compass' payment merely reflected the right to a repurchase.

10.     Simultaneous with the Senior Repo, Silar – Mr. Fragin's company – sold to Gottex ABI Master Fund Limited and Gottex ABL (Cayman) Limited ("Gottex") an approximately $37 million participation position in the Senior Repo.  Silar kept an approximately $1 million interest in the $38 million Senior Repo.  Silar and Mr. Fragin also owned the junior "Preferred" piece behind the Senior Repo, which were believed to be worth approximately $10 million.

11.     Under the participation agreement, as Compass paid 18% to Silar under the Senior Repo, Silar then would pay that 18% to Gottex in proportion to Gottex' participation position (e.g., 37/38ths).  Thus, as the 18% and principal went from Compass to Silar (via liquidation of the portfolio), that 18% and principal then flowed to the participants in the Senior Repo proportionate to their participation positions.

12.     Over time, as the non-performing assets were liquidated, those proceeds paid down the Senior Repo from $38 million to approximately $25 million.  Mr. Fragin, who was both highly sophisticated and deeply involved in this transaction,  knew  that the participation positions were paid only as the liquidation of assets proceeded, that Compass (because of its limited "SPE" status) had no material abilities to pay other than through the liquidations, and that the participation positions other than Silar's were not paid unless Silar paid them as Silar received payment on its position.

13.     Mr. Fragin originally had the idea, and encouraged me, to purchase a participation position in the Silar Senior Repo.  Mr. Fragin actively asked me about such a purchase, and even recommended another investor to me as a potential candidate to buy

a piece of the participation position. We spoke regularly. My wife and I had been close friends with Mr. and Mrs. Fragin, and Mr. Fragin and I have belonged to the same synagogue for many years; we used to speak at least weekly, in person, and/or on the telephone about both business and social affairs. Mr. Fragin was my business confidant.

14.     I did not know that Mr. Fragin also was interested in purchasing a participation position until Mr. Fragin – unsolicited by me – said he wanted "to get into the Gottex piece." By getting into the "Gottex piece," Mr. Fragin – an insider to the Senior Repo – was taking back what he and Silar had sold to Gottex. I also believe he perceived it as way to protect his junior "Preferred" interest.

15.     Mr. Fragin – an insider to the Senior Repo – held himself out as controlling the investment and funds. (<u>See</u>, <u>e.g.</u>, **Exhibit 17**, an email from Mr. Fragin explaining how the $800,000 should be attributed among the various trusts). My relationship with Mr. Fragin includes a long history of business dealings, which I believe he has profited several million dollars. Mr. Fragin often used a variety of family trusts to make those investments. But even when Mr. Fragin's investments came from different pockets, I always dealt with Mr. Fragin who I understood to control the family trusts and the funds being invested. (He admits as much in paragraph 15 of his Answer to Third-Party Complaint.) He put out to the community and to me that this was his family and his children; and since he had used family trusts in the past to make other investments, it gave the impression that was just another one of his pockets. Indeed, until this lawsuit, neither Mr. nor Mrs. Fragin ever asserted to me that the various family trusts were not

accredited investors, or that Mr. Fragin was not in control of the family trusts.[4]  And, at least until Mrs. Fragin began demanding repayment, it was Mr. Fragin that represented the Nussbaum Trusts concerning this matter.

16. Repotex was formed to purchase part or all of the Senior Repo participation position.  Repotex purchased $8,375,000 of the Gottex "piece."  The Nussbaum Trusts' then bought $800,000 of the participation position, were issued the notes, and were advanced $36,000 (which is actually greater than their proportionate interest).

17. Although Repotex issued term promissory notes to the Nussbaum Trusts, the notes do not state the actual terms of the agreement.  I delegated the task of putting the agreement to paper, but the actual agreement was "lost in translation" by the scrivener, who was removed from the dialogue.  The notes do, however, reflect in part the complexity, that the transaction was a purchase of a participation position in the Senior Repo, and that the notes were to pay only when Silar paid (i.e., a pass through):

   a. The notes have an 18% interest rate, mirroring Compass' 18% payments to Silar – thus, the Nussbaum Trusts would be paid proportionally to their $800,000 participation position in the Senior Repo in the same way that Compass paid Silar;

   b. Paragraph 2 of the notes provides "Borrower hereby warrants and covenants that the proceeds of this Note … <u>shall be used exclusively to purchase participation interest</u> (the "Participation Share") in a senior liquidating repurchase facility between [Silar and Compass]…" (Emphasis added);

   c. "At the end of each calendar month this Note is outstanding, Borrower [i.e., Repotex] shall determine (a) the total funds received by the Borrower from the <u>Participation Share</u> during such calendar month ("Investment

---

[4] Moreover, by affirming the notes Mrs. Fragin certifies that the Nussbaum Trusts are "a sophisticated investor with a proper understanding to evaluate and assess the risks" that they "conducted a due diligence process," and that they are "capable of evaluating the merits, risks and suitability of the purchase."  Notes, ¶6(a).

Cash Flow") and (b) the total interest payments required to be made with respect to such month by the Borrower pursuant to the Notes (collectively, "Interest Expense"). If the Investment Cash Flow for a particular month exceeds the Interest Expense for such month, the Borrower shall distribute such excess amount to the Holders of the Notes, on a pro rata basis determined by the principal amount outstanding under their respective Notes, as a principal payment on the Notes. <u>If the Investment Cash Flow for a particular month does not exceed the Interest Expense for such month, the Borrower shall not be required to make any principal payments with respect to the Notes with respect to such month</u>. In no event shall Borrower be required to make principal payments on the Notes in excess of the respective stated principal amounts thereof." (Notes, ¶4 at second paragraph; emphasis added) – it is obvious that this was supposed to be a pass through; and,

d.  "Lender [i.e., the Nussbaum Trusts] acknowledges that it has <u>assumed all risk of loss</u> in connection with its investment for the purchase of this Note." (Notes, ¶6(c); emphasis added).

18.  The notes should be reformed to reflect that the investment was for the purchase of a participation position in the Senior Repo, as the parties had agreed. The mistake in the notes is the concept of a "term." The actual understanding and agreement was that the Fragins, like other Repotex note holders, would only be paid when Repotex received money from Silar, i.e., when Silar paid Senior Repo participants. The agreement was not that Repotex pays note holders even if it does not receive its participation share from Silar. Fragin clearly knew that there was no source of payment other than Silar, and that Silar was paid from liquidation of the portfolio.

19.  To the extent the notes purport to obligate Repotex (or anyone else) to pay principal by a date certain (i.e., a maturity date), and/or that Repotex is liable for principal or interest when participation positions in the Senior Repo stop paying, those provisions should be stricken. Thus, "Maturity Date: June 1, 2010" and the definition of "Maturity Date" should be stricken. Subparagraph 3 of paragraph 4 of the notes (beginning "All unpaid principal…") should be stricken. Instead, the notes should reflect

829431  011147.0102

that interest and principal is due as Silar disbursed funds to participants in the Senior Repo and Repotex obtained those funds proportionate to its participation position. Or, add that the maturity date be extended if the underlying asset did not pay. That was the parties' agreement, as the Fragins well know.

20.     Once reformed, the breach of contract cause of action should be dismissed because Repotex has not breached the parties' actual agreement. Silar has not made further disbursements. Repotex would only be in breach if Silar had paid Repotex, and in turn Repotex did not pay the note holders.

21.     Since I was dealing only with close friends, and everyone understood what the actual agreement was, I did not review the papers before they were issued – it is likely I would have caught the mistake if I had. Indeed, I can recall three (3), if not more, occasions I have done business with Mr. Fragin where the papers were drafted by a third party, and we would later go back and forth revising the documents to reflect the actual "handshake" agreement. Our course of doing business is the handshake, rather than what the scrivener wrote, and then later modifying to accurately reflect the actual agreement.

22.     It is simply not credible for Mr. and Mrs. Fragin to assert that they did not fully understand the Senior Repo, what it means to own a participation position, that liquidation of the underlying assets might take longer or shorter than originally anticipated (e.g., due to an on-going litigation concerning the assets, of which Mr. Fragin was completely aware), that Compass would not and could not independently make material payments unless there was liquidation of assets, and that Repotex had no ability to pay unless it got distributions from Silar.

23. Silar, of which Mr. Fragin was a principal, prepared a detailed memorandum of the transaction (**Exhibit 18**), Mr. Fragin signed the $3.5 million margin call notice (Ex. 16), and Mr. Fragin retained a direct interest in the junior Preferred piece after he left Silar.  Prior to investing the $800,000 at issue, Mr. Fragin also was copied on emails and meeting invitations concerning the Senior Repo (**Exhibit 19**).  He was an insider.

24. Emails between the parties also reflect that the investment was to purchase a participation position in the Senior Repo, not term promissory notes, and that Mr. Fragin understood the nature, purpose and status of the Senior Repo and participation positions therein (**Exhibit 20**):

   a. From Mr. Fragin to me on March 7, 2008: "r u talking direct to gottex" (page marked DEFT00762);

   b. Between Mr. Fragin and me on March 25, 2010 concerning another possible purchaser of a participation position taking "a unit" (page marked DEFT00766);

   c. From Mr. Fragin to me on July 7, 2008: "What is happening w/the compass piece that Karen bot [sic; should read "bought"]…when does she get papered and where is the 1st months interest…." Payments on the investment only flowed as Compass paid Silar under the Senior Repo and Silar paid participants, and, as I stated: "Besides we just wait until Silar gets it from Compass/ USA.  And then when Silar remits to us."  (Pages marked DEFT00600-02).

25. And, Mrs. Fragin's complaint alleges that she was purchasing a participation position in the Senior Repo, not merely loaning $800,000 to Repotex.  By using terms like  "compass USA 18% paper," "Compass debt," "Compass debt to Gottex," the "Gottex' loan to Compass," "the Gottex loan," or "funds…to be loaned to Compass" (Complaint, ¶¶ 12, 13-21, 30-31, 49, 63-65, 71, 75, 77, 78, 86, 90), Mrs. Fragin is talking about the Silar Senior Repo and owning a participation position therein.

Moreover, allegations in the Complaint concerning the Fragin's alleged damages caused by foreclosure on the Senior Repo and my alleged misrepresentation concerning oversubscription would be totally irrelevant if there was only a simple $800,000 loan at issue.[5]

26. For Mrs. Fragin and Mr. Fragin, an insider to the Senior Repo and otherwise a sophisticated investor who according to an SEC filing was the principal of one of the largest Wall Street hedge funds (see Gary's answer to the Third-Party Complaint, ¶¶ 5-6), to "play dumb" and now claim that these Repotex notes were the actual deal, misleads this Court and contradicts Mrs. Fragin's own allegations.  In addition, I should have the opportunity to depose the Fragins on these issues.

27. The Court should not grant Mrs. Fragin summary judgment on notes that do not reflect the actual agreement of the parties, but were instead improperly papered.

[Continued on next page.]

---

[5] Even if I had represented that the position was completely bought out (which I did not), that representation would not have damaged Mrs. Fragin because it is economically immaterial that Repotex did not purchase all of participation position in the Senior Repo.  Payments by Silar to participants were disbursed pursuant to and in proportion to the participation positions.  If there was a foreclosure, that only means that Compass' right of repurchase was taken away.  It would have no impact on the underlying liquidation of the assets.  And ultimately, since all payments came from liquidation of the assets, the concept of foreclosure is not as relevant as a typical loan.  Mr. Fragin, a professional and sophisticated investor, clearly understands this.

829431   011147.0102

Lastly, I note that actions speak louder than words. Repotex had only a few other note holders, and their notes are virtually identical to those of the Nussbaum family. Yet, not a single other note holder has asserted similar claims on their notes, even after being solicited by Mr. Fragin to join their claims, because they know – like Mr. and Mrs. Fragin – that only when Silar pays is Repotex obligated to pay. Therefore, there has been no breach of the parties' actual agreement and understanding.

Executed:   August 13, 2010
            New York, New York

                                                    _____
                                                    Leonard Mezei