1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - -X
KAREN NUSSBAUM FRAGIN, in her
capacity as Trustee for the
ELANA B. NUSSBAUM TRUST, the
MOSHE JONATHAN NUSSBAUM TRUST,
the TAMAR MIRIAM NUSSBAUM TRUST,
the DANIEL ZACHARY NUSSBAUM TRUST,
and the SAMUEL ELIEZER NUSSBAUM TRUST,


    Plaintiff,       Judge Gardephe
               1:09-CV-10287-PGG
  -against-

LEONARD MEZEI, the ECONOMIC
GROWTH GROUP, REPOTEX, INC.,
RON FRIEDMAN, and CATHERINE ILARDI,


    Defendants/Third-Party
    Plaintiffs,

  -against-

GARY S. FRAGIN,

    Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - -  X


   DEPOSITION of GARY S. FRAGIN, taken pursuant
to Notice, held at the law offices of MOSES &
SINGER, LLP, 405 Lexington Avenue, 12th Floor, New
York, New York, 10174-1299, on Tuesday, April 12,
2011, at 10:00 a.m. before JEANNETTE MCCORMICK, a
Certified Court Reporter and a Notary Public.


Job No: 21447

2

APPEARANCES:

Attorneys for Plaintiff
HOGUET, NEWMAN, REGAL & KENNEY, LLP
10 East 40th Street
New York, New York 10016
(212) 689-8808
(212) 689-5101
BY:  FREDRIC S. NEWMAN, ESQ.
     fnewman@hnrklaw.com


Attorneys for Defendant Mezei
MOSES & SINGER, LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174-1299
(212) 554-7800
(917) 206-4343
BY:  SCOTT E. SILBERFEIN, ESQ.
     ssilberfein@mosessinger.com




Also Present:
    Leonard Mezei

3

I N D E X

WITNESS          EXAMINATION BY          PAGE

GARY S. FRAGIN

    MR. SILBERFEIN            11


E X H I B I T S


NUMBER              DESCRIPTION          PAGE

Exhibit 1      Complaint                    14

Exhibit 2      Answer and Third-Party Complaint    18

Exhibit 3      Answer to Third-Party Complaint    20

Exhibit 4      1/18/09 top e-mail from Fragin
               to Leeds/Gracin, Re Note due
               1/31/09                    161

4

GARY S. FRAGIN,
having been first duly
sworn/affirmed, according to
law testified as follows:


MR. NEWMAN:  Before we start, I object to Mr. Mezei's presence, and we will not go forward unless you get a ruling from the Court.  We have already litigated this issue with the judge when Greg Fragin wanted to be at a deposition, and -- so there's the phone.

MR. SILBERFEIN:  So it's your position that a party, a named party, Mr. Mezei, can't attend the deposition?

MR. NEWMAN:  My position is that Mr. Mezei cannot attend this deposition, that's correct.

MR. SILBERFEIN:  Okay.  I see this as nothing but a delay tactic, but I'm happy to call the Court and get a ruling.

MR. NEWMAN:  Be my quest.  And, by the way, put this on the record, it would have been courteous if you had told me in advance so we could have worked this out in advance.

5

MR. SILBERFEIN:  I appreciate your sarcasm, but there's absolutely no rule or even courtesy that I'm aware of to let the other party know that a party will be attending the deposition.

MR. NEWMAN:  Call the Court.

(Discussion off the record.)

(Phone call to Judge Gardephe.)

JUDGE'S CLERK:  Hello.  This is Jane.

MR. SILBERFEIN:  Hi, Jane.  This is Scott Silberfein of Moses & Singer.  We are here to take the deposition of Gary Fragin, and the plaintiffs have objected to Leonard Mezei, one of the named defendants, from attending today's deposition, and they have refused to go forward without a ruling from the Court.

MR. NEWMAN:  This is Fred Newman.  May I explain our position, please?

JUDGE'S CLERK:  Yes, briefly.

MR. NEWMAN:  Briefly.  Okay.  This issue has already been presented to the Court a few weeks ago when Greg Fragin, who is a lawyer for the family --

JUDGE'S CLERK:  Yes, I recall that.

2 (Pages 2 to 5)

6

MR. NEWMAN: And I don't think -- I mean, Mr. Mezei is a party, that is correct. His deposition has been taken, that is correct. However, he is the principal actor in the allegations that we have made and we think it is an unfair advantage for him to be sitting here during this deposition when the rules under which we have acted on all other depositions -- by the way, this is the last deposition. All discovery is closed. We don't -- and there have been no other auditors in any deposition up until now. We don't think it is correct. And if you want a shorthand for this, what's sauce for the goose is sauce for the gander.

MR. SILBERFEIN: You know, the parties have a right to attend the depositions. Greg Fragin, as the clerk indicated was aware, is not a party to this case, which makes this wholly inapplicable to whatever ruling may have been made in the past.

JUDGE'S CLERK: I'm sorry, Greg Fragin is the person being deposed?

MR. SILBERFEIN: No. Gary Fragin, his father, is being deposed. Greg Fragin is not

7

a party. There was an allegation made at the time of the deposition that Greg, who is a lawyer, was representing the parties in this case. However, there was no record of that. He's not counsel of record. Still is not counsel of record. And, therefore, we believe it's wholly in opposite. In other words, a party can attend the deposition. That's clear in the federal rules. The Court has already ruled that Greg Fragin cannot attend because, A, he wasn't a party, nor was he a counsel of record. And we believe we should be able to go forward today with Mr. Mezei in the room.

JUDGE'S CLERK: Okay. But Greg Fragin is not at issue at the moment. You're just drawing a contrast between him and Mr. Mezei. Is that correct?

MR. SILBERFEIN: That's correct because plaintiff's counsel had indicated that what's good for the goose is good for the gander, or whatever analogy and metaphor he might have used, and I was describing to the Court why I believe it's actually a different situation.

JUDGE'S CLERK: Okay. Well, the judge

8

is a bit busy at the moment working on something, but I will see if he is available to resolve this.

MR. SILBERFEIN: Thank you. Should we hold the line?

JUDGE'S CLERK: Yes. I'm just going to put you on hold for one minute and see if he will be able to resolve this.

MR. SILBERFEIN: Thank you for your help.

JUDGE GARDEPHE: Hello. This is Judge Gardephe. Who do I have on the line?

MR. SILBERFEIN: Hi, Judge. This is Scott Silberfein of Moses & Singer representing the defendants.

MR. NEWMAN: And Fred Newman, Hoguet, Newman, Regal & Kenney, representing the plaintiff.

JUDGE GARDEPHE: All right. I understand you are at a deposition.

MR. SILBERFEIN: We are, your Honor.

JUDGE GARDEPHE: And is the court reporter there?

MR. SILBERFEIN: Yes, she is.

JUDGE GARDEPHE: All right. So this is

9

on the record.

MR. SILBERFEIN: It is.

JUDGE GARDEPHE: Okay. What is the issue?

MR. SILBERFEIN: This is Scott Silberfein. We are here taking the deposition of the third-party defendant, Gary Fragin, and in attendance at the deposition is one of the named defendants, Leonard Mezei. And plaintiff has objected to the deposition going forward with Mr. Mezei in the room, and I did not agree to have him excused, and we, therefore, called your Honor.

JUDGE GARDEPHE: All right. So, Mr. Newman, what possible objection can you have to a party being at a deposition?

MR. NEWMAN: Your Honor, this is an unusual case because Mr. Mezei and Mr. Fragin have been long-time friends, members of the same synagogue, and it involves a very personal dispute between them over who said what to whom. And we had previously believed that this issue was decided when another member of the Fragin family, who is not a

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

10

party, was not permitted to be in the depositions. And I think that having Mr. Mezei here will do two things to the disadvantage of our -- of the litigation. One, it will raise the temperature level a lot higher than it should, and two, I don't think it's fair given the ground rules that were established. This is the last deposition. Discovery is closed.

Mr. Mezei and the deponent, Mr. Fragin, will be the primary witnesses at the trial. The issue in the case comes down to who said what to whom. And while Mr. Mezei is a party, that is correct, he certainly has no -- there's no benefit to him to sitting here when he can read the transcript just the way Mr. Fragin was able to read the transcript of Mr. Mezei's deposition.

JUDGE GARDEPHE: I'm not aware of any rule or case which authorizes me to rule that a party is not permitted to attend the deposition. So to the extent you're objecting to the presence of a party at the deposition, your objection is overruled.

Is there anything else?

11

MR. SILBERFEIN: Not from the defendant.

MR. NEWMAN: No, thank you, Judge.

JUDGE GARDEPHE: All right.

(Discussion off the record.)

EXAMINATION

BY MR. SILBERFEIN:

Q. Mr. Fragin, my name is Scott Silberfein from the law firm of Moses & Singer. And I'm here representing the defendants in an action brought by Karen Nussbaum Fragin against Leonard Mezei, the Economic Growth Group, Repotex, Inc., Ron Friedman and Catherine Ilardi.

Are you familiar with that action?

A. I am.

Q. Have you ever been deposed before?

A. Yes.

Q. On how many occasions?

A. Three or four occasions. I --

Q. When was the last -- I'm sorry, I didn't mean to cut you off.

A. I don't remember how many exactly.

Q. But approximately three or four?

A. Yes.

Q. When was the last time you were deposed?

12

A. Early '90s.

Q. And generally what was that case about?

A. That involved the Solomon Treasury Investigation and Steinhardt Partners where I was a general partner.

Q. And the deposition, if you can remember, before that, what did that entail?

A. The same thing, but that -- the deposition that I'm referring to, the last time was in front of a federal grand jury, I believe, and the one before that was at the SEC.

Q. And have you ever been deposed in connection with facts and circumstances other than the ones you just described?

A. I think a couple of times when I was early in my career, but I don't remember the specifics.

Q. Okay. As you haven't been deposed in a while, let me just give you a few ground rules, if you don't mind.

First of all, everything that we talk about need to be recorded by the court reporter. So I ask that you wait for me to finish my question, and I will do my best, obviously, to give you the same courtesy and wait for you to finish your answer.

If at any time you need a break, just let me

13

know, and we'll take one. I may ask that if there is a question pending that you answer that before we take the break. But other than that, you are the witness here, and we are going to work around your schedule and your needs.

If you don't understand one of my questions, please let me know. I will try to either rephrase it or ask it a different way so that we can make sure that we're talking about the same thing.

A. Excuse me. Of course. Can I amend a --

Q. A previous answer?

A. Yes.

Q. Absolutely.

A. The most recent time I was deposed was with regard to a suit that I brought against Fleet Bank in connection with an embezzlement by David Schick and Fleet Bank which took place -- the deposition I believe took place in the either late '90s or early 2000s.

Q. Thank you very much.

And as far as you can remember now, that was the last time you had been deposed?

A. Correct.

Q. Do you currently take any medications that would impair your ability to answer my questions

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

14

honestly and fully today?

A. No.

Q. I'm going to show you what has been marked as Gary 1.

(Whereupon, Defendant's Deposition Exhibit No. Gary 1 was marked for Identification.)

BY MR. SILBERFEIN:

Q. And ask you to take a look at that approximately 19-page exhibit.

A. Okay.

Q. Have you ever seen that document before?

A. I have.

Q. When was the first time you saw that document?

A. I don't recall. Either slightly before or slightly after it was filed.

Q. And did you have conversations with anyone regarding the contents of that document?

A. I had conversations with my wife and conversations with my attorney.

Q. And your attorney being Mr. Newman?

A. Correct.

Q. When did you retain Mr. Newman for representation in this matter?

15

A. I don't recall the date.

Q. Was it before --

A. Obviously prior to the deposition being -- I mean, the complaint being filed.

Q. Approximately how long before the complaint was filed did you retain Mr. Newman?

A. I don't recall.

Q. Is your arrangement with Mr. Newman reduced to a writing? In other words, do you have a written retainer agreement with Mr. Newman?

MR. NEWMAN: I think I'm going to object at this point. You have gotten into attorney-client matters that I don't think are any of your business. I'm sorry, but I am going to instruct him not to answer.

MR. SILBERFEIN: I am not asking about the sum and substance or any of the terms of any relationship between the two of you. I am trying to establish when you were retained, Mr. Newman. I am certainly allowed to inquire about that.

MR. NEWMAN: I don't see why, but you can continue to ask, but I cut off that question. Try another question.

MR. SILBERFEIN: Well, the reason I am

16

asking is because he said he had some conversations with you. If it was before you were retained, then it can't be shielded by the attorney-client privilege.

MR. NEWMAN: Okay.

MR. SILBERFEIN: It's certainly why I am asking about the question. If it turns out to be attorney-client privileged communications, I am not going to inquire further. But until that is clear, I am trying to establish the time-line.

MR. NEWMAN: Ask another question.

BY MR. SILBERFEIN:

Q. Do you know when -- did Ms. Fragin, your wife, retain Mr. Newman?

A. Yes.

Q. Did you retain Mr. Newman at the same time?

A. I don't recall.

Q. And do you know when Mrs. Fragin retained Mr. Newman?

A. Can I amend one of my -- I probably retained Mr. Newman for the first time some time in the early '70s. Mr. Newman and I were roommates after he graduated from Columbia Law School and I graduated from Columbia Business School. We have been very

17

close friends for the last 40-plus years. And the first case that I ever retained him for I can't say that I remember, but certainly he has been my attorney and has represented me continuously since somewhere around 1970.

Q. Okay.

A. So, anything that I have ever said to him has been attorney-client.

Q. Fair enough. And I appreciate the explanation, and we can move on.

Did you have conversations with Mr. Newman regarding the factual allegations in the complaint?

A. I don't understand why my conversations with Mr. Newman are not shielded by attorney-client privilege.

Q. I am not asking what you said. I am asking if you had conversations with him regarding the complaint.

MR. NEWMAN: He just wants a yes or no.

Q. Absolutely. I'm not looking for --

A. Yes.

Q. And as far as you know, did your wife have conversations with Mr. Newman regarding the complaint?

A. I think you will have to ask my wife.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

18

Q. I'm going to show you what has been marked as Gary 2, and ask that you also take a look at this document.

(Whereupon, Defendant's Deposition Exhibit No. Gary 2 was marked for Identification.)

A. Um-mm.

Q. Have you ever seen this document before?

A. I'm sure I have.

Q. And when was the first time that you saw this document?

A. I don't recall. I assume slightly after it was filed.

Q. And was that the first time that you were aware that you were being sued in connection with this case?

MR. NEWMAN: I object to the form of that question. I object to the form. You can try to correct it.

MR. SILBERFEIN: I am going to have him answer. He understood the question.

A. I don't remember the first time that Mr. Mezei alleged that --

MR. NEWMAN: That's not the question. The question is when was the first time you

19

became aware that you were sued. Is this document the first time you became aware?

THE WITNESS: I don't remember.

MR. SILBERFEIN: Mr. Newman, I would ask, and I caution you now, to please stop coaching the witness. Excuse me. Let me finish. He was answering my question as he understood it. I appreciate you clarifying it or coaching him, but he was answering my question, and I don't appreciate that.

MR. NEWMAN: Your question was defective and unintelligible. I am trying to help move this along into the substance. He couldn't -- obviously, he couldn't have known -- I am not coaching the witness -- he couldn't have known he was being sued until he was being sued. He answered that question.

MR. SILBERFEIN: I beg to differ with you, and in fact he may have known beforehand. So it's certainly possible that the witness knows something slightly different than you, Mr. Newman, and I want the witness' testimony and not yours.

MR. NEWMAN: Could you read back the

20

ultimate question, please, the one to which I objected to?

(Whereupon, the question was read back as follows:)

"QUESTION: And was that the first time that you were aware that you were being sued in connection with this case?"

MR. NEWMAN: That's the question. Was this document the first time --

MR. SILBERFEIN: But we're already past this. I'm happy to move forward. All I have said is please stop coaching the witness. I am happy to move forward.

BY MR. SILBERFEIN:

Q. Mr. Fragin, I am showing you what's been marked as Gary 3, and ask if you have seen this document before?

(Whereupon, Defendant's Deposition Exhibit No. Gary 3 was marked for Identification.)

A. Yes.

Q. Did you read this document before it was filed on your behalf?

A. I'm sure I did.

Q. Do you agree with the admissions and denials

21

in this document?

A. As far as I recall, yes.

Q. Earlier, you mentioned your -- part of your work history at Steinhardt, and I want to go back a little bit through your education, which I know you already mentioned, included Columbia.

Where did you go to college?

A. I graduated from Vanderbilt University. Where did I go? For the first two years of college I went to the United States Military Academy at West Point. The second two years I went to Vanderbilt, where I graduated with a bachelor of engineering degree. And then I went to Columbia Graduate School of Business where I graduated with an MBA.

Q. And in what year did you graduate from Vanderbilt?

A. '68.

Q. And from Columbia School of Business?

A. '70.

Q. Do you have any other certifications or licenses other than your bachelor's degree and master's degree?

A. Today?

Q. Yes.

A. No.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

22

Q. At any point have you had any other licenses?

A. Yes.

Q. And what were they or what was it?

A. Various licenses with regard to the securities business and the New York Stock Exchange. I had a Series 7, which wasn't called the Series 7 I don't believe in those days. I had a principal license. I don't recall all, you know, the names. I was a licensed -- I just don't recall them all.

Q. And did the licenses that you acquired require a test?

A. Some of them did and some of them didn't.

Q. And for the ones that didn't, what did they require for the issuance of the license?

A. I don't remember. But some of them were -- in other words, a license to trade options grandfathered in a lot of people who were already in the business prior to the advent of publicly traded options.

Q. And I believe you testified that you don't have any of these licenses currently; is that correct?

A. Correct.

Q. When was the last time that you had a license?

23

A. I don't recall.

Q. Have you ever had any certifications or received any certifications from any school or classes that you may have attended?

A. Certifications?

Q. Yes. Sometimes a school will issue you a certification for completing a three-day course in some topic.

A. No.

Q. Have you had any continuing education?

A. Are you talking --

Q. Formal?

A. No.

Q. Did there come a time when you met Karen Nussbaum?

A. Obviously.

Q. And when was that?

A. In August of 1966 -- excuse me -- of 1996.

Q. And you married, correct?

A. Yes.

Q. And when did you marry?

A. In April of 1997.

Q. And did she already have kids prior to your marriage?

A. Yes.

24

Q. How many?

A. Five.

Q. What are their names? I'm not trying to test you. I'm just trying to get the information down.

A. Now or when we got --

Q. However you would like to do it.

A. Their names are Elana B. Nussbaum, Moshe Jonathan Nussbaum, Tamar Miriam Nussbaum, Daniel Zachary Nussbaum and Samuel Eliezer Nussbaum.

Q. And how old is Elana today, approximately?

A. 31 or 32.

Q. And Moshe?

A. Elana I think is 32. Moshe goes by Jonathan, and I believe he's 30.

Q. Tamar?

A. 28, I believe.

Q. Daniel?

A. 21.

Q. And Samuel?

A. 18.

Q. And did you also come into the marriage to Karen with kids?

A. Four.

Q. And what are their names, again currently or whatever is easiest?

25

A. Michael Fragin, Gregory Fragin, Jessica Fragin Foxbrunner, and Samuel Fragin.

Q. And how old are they?

A. Michael is 37. Greg is 35. Jessica is 30. And Sam is 19.

Q. And have any of your children from -- prior to your marriage with Karen been in the business with you at any point?

A. Prior to my marriage with Karen?

Q. No. I mean your kid before. I don't know if you have adopted Karen's kids or not, but I am trying to separate the kids. You came into the marriage with from Karen's -- they may all be your kids?

A. I have not adopted Karen's kids.

Q. So has Michael ever done professional business with you?

A. Yes.

Q. And has Greg?

A. Yes.

Q. Has Jessica?

A. No.

Q. And has Samuel?

A. No.

Q. Have any of the five kids of Karen's done

7 (Pages 22 to 25)

26

professional business with you?

A. No.

Q. Please describe the types of business or businesses Michael has done with you professionally.

A. Michael and I work together at a firm that -- which is primarily a family office called Ducat Investment Group.

Q. And is that the one area that Michael has worked with you professionally?

A. Many years ago briefly we worked together on a telephone company, telephone reseller.

Q. Of long-distance services?

A. Correct.

Q. And what kind of business or businesses has Greg worked on with you?

A. Greg and I were -- worked together at a firm called Silar, S-I-L-A-R, and we worked together at Ducat Investment Group.

Q. What is Michael's education?

A. Michael graduated from Yeshiva University. He has -- I believe he has a master's in Jewish history from Yeshiva University, as well, and he has a master's in business from Columbia.

Q. And Greg's education?

A. Greg has a bachelor of Talmudic law at Mir

27

Yeshiva in Jerusalem. He has a law degree from Columbia and an MBA from Columbia.

Q. During your time at Columbia School of Business did you work?

A. Did I?

Q. Yes.

A. I worked over a summer.

Q. And where did you work, if you remember?

A. L.F. Rothschild & Company.

Q. After graduation from Columbia School of Business, did you assume your first full-time employment?

A. Post-business school?

Q. Yes.

A. Yes.

Q. And where was that?

A. Oppenheimer & Company.

Q. And where was Oppenheimer & Company located, in New York or somewhere else?

A. New York.

Q. And for how long were you at Oppenheimer?

A. Sixteen years.

Q. And when you first started at Oppenheimer, did you hold a title?

A. Yes.

28

Q. And what was that?

A. Coffee boy.

Q. And did you at some point get a new title at Oppenheimer?

A. Lots of them.

Q. And what was the last title you had at Oppenheimer upon your departure approximately 16 years later?

A. Executive vice president of the firm. Head of all trading, head of equity trading.

Q. In between coffee boy and executive vice president, what other titles did you hold?

A. The firm changed its structure from time to time. I became a special limited partner in 1979 -- excuse me -- in 1975. I became a general partner I believe in 1979. We sold the firm in 1982, and then I became executive vice president of whatever.

Q. And for how long did you serve as the executive vice president?

A. From 1982 until I left.

Q. And when did you leave?

A. In 1986.

Q. I believe you said that you were also head of equity trading; is that correct?

A. Correct.

29

Q. And what did you do as the head of equity trading?

A. I ran the equity trading department.

Q. And how many trades were run through Oppenheimer on a daily basis, do you have any recollection?

A. Thousands.

Q. And how much money was traded through Oppenheimer on a given day, year or otherwise?

A. Impossible for me to tell.

Q. Millions?

A. Millions of dollars worth?

Q. Yes.

A. For sure.

Q. Billions?

A. I'm speculating the same as you would be.

Q. Were you responsible for any employees that reported to you as executive vice president?

A. Yes.

Q. Approximately how many?

A. 150 to 175.

Q. And were they all in one department or several departments?

A. One department which was called trading.

Q. Was that equity trading and other trading?

8 (Pages 26 to 29)

30

A. It was equity trading, and then there were various pockets of equity trading.

Q. And did you ever run bond trading at Oppenheimer?

A. Very briefly, for about maybe two months the bond department reported to me when they were -- when somebody left and somebody else came.

Q. After leaving Oppenheimer in approximately 1986, where did you go?

A. Steinhardt.

Q. And what did you do at Steinhardt?

A. I was a general partner of Steinhardt Partners, and I was the Chief Administrative Officer of Steinhardt -- of the Steinhardt organization.

Q. And what general business was Steinhardt involved in?

A. Hedge fund.

Q. And in 19 -- this was approximately 1986 when you joined them?

A. Correct.

Q. And for how long were you at Steinhardt?

A. Nine years.

Q. Approximately until 1995 or so; is that accurate?

A. I left in the beginning of 1995.

31

Q. And was there a typical deal that you got involved in at Steinhardt?

A. Typical deal?

Q. Yes.

A. I don't know what that means.

Q. Generally, what did you do on a day-to-day basis at Steinhardt?

A. I ran the business of the firm.

Q. And were you in charge of traders at Steinhardt?

A. No.

Q. Did you have employees reporting to you?

A. Yes.

Q. Approximately how many?

A. 40 or 50.

Q. And what was the valuation of Steinhardt when you joined in 1986?

A. I have no idea what you're asking.

Q. Well, Steinhardt I assume had certain funds in 1986 when you joined?

A. That is not a valuation. That is assets under management.

Q. That's fine. So, what were the assets under management for all of Steinhardt's funds when you joined in 1986?

32

A. Approximately 900 million dollars.

Q. And what were they when you left in 1995?

A. At the end of 1994, maybe three billion three, three billion four.

Q. Why did you leave Oppenheimer for Steinhardt?

A. I wanted to.

Q. And why did you leave Steinhardt?

A. To retire.

Q. Did you retire?

A. For a while I did, yes.

Q. For how long were you retired?

A. Well, that's difficult to say because you would have to go into what's the definition of retirement and what's now. I had some personal assets which I always managed, so.

Q. So you continued to do that?

A. Yes, of course.

Q. When were you next employed?

A. I started a small firm called Fragin Asset Management, which exists to this day, and you could say that I was employed by Fragin Asset Management.

Q. And when was Fragin Asset Management incorporated or otherwise --

A. It's a limited partnership. It was formed in '96-ish.

33

Q. And did you then become employed by someone other than Fragin Asset Management?

A. I worked for something called -- what was the name of it --

MR. NEWMAN: I can't testify. I remember, but I can't testify.

THE WITNESS: What was his name? I was a partner at a hedge fund in Garden City, Long Island for about a year and a half.

I'm drawing a blank here. It was a -- the senior partner was a fellow named Jack Salzman, and the name of the fund was --

BY MR. SILBERFEIN:

Q. Something?

A. Kings Point Partners.

MR. NEWMAN: Good for you.

Q. And when were you at Kings Point?

A. I don't recall the dates.

Q. It was after 1996 when Fragin Asset Management was --

A. Yes.

Q. -- incorporated?

A. Yes.

Q. And I think you said it was approximately a year and a half; is that correct?

9 (Pages 30 to 33)

34

A. Approximately.

Q. And where did you -- where were you employed after Kings Point?

A. After Kings Point I started my own fund, which I ran for approximately a year, and then I of my own volition closed it.

Q. And what were the assets under management at Kings Point, approximately?

A. When I got there, about 50 million. When I left, about a 105 or 110 million. And that's it.

Q. And how about your own fund, what were the assets under management?

A. Twenty-nine million. That's an approximation.

Q. That's fine. And when you closed your own fund on your own volition, were you then employed by someone else?

A. No.

Q. What did you do after you closed your own fund?

A. Basically whatever I wanted to.

Q. And when did you close your own fund?

A. I don't recall the exact time, the exact dates.

Q. Was it in the 2000s?

35

A. Yes.

Q. And have you been employed at all since closing your own fund?

A. Yes.

Q. And by whom have you been employed?

A. Silar.

Q. And when were you employed by Silar?

A. Silar was formed in September of 2006, I believe, and I joined Silar about three or four months after the formation of Silar in I believe December of 2006.

Q. And how long did you remain at Silar?

A. Until November of 2007.

Q. And what kind of business was Silar engaged in?

A. Asset-backed lending.

Q. And had you had experience in asset-backed lending when you joined Silar?

A. No.

Q. Were you performing functions in furtherance of asset-backed lending while you were at Silar?

A. No.

Q. What were you responsible for at Silar?

A. Administration, dealing with investors.

Q. And while you were at Kings Point, were you

36

responsible for administration or something else?

A. Correct.

Q. Correct meaning, yes, administration?

A. Yes, administration. Again, dealing with investors, appraising capital.

Q. In 2006 or 2007, what did you understand asset-backed lending to mean?

A. You have an asset. It belongs to someone. They borrow money using that asset as collateral.

Q. How large was Silar when you joined in terms of number of employees?

A. Number of employees?

Q. Yes.

A. Counting the partners as employees?

Q. Sure.

A. As well? Five or six. Five, I believe.

Q. And two of them were you and your son Greg?

A. Correct.

Q. And when you joined in I will say late in 2006, did Silar have a certain number of assets under management?

A. When I joined? I don't recall whether they had some small amount of assets under management at that time, or I joined just prior to assets coming in again.

37

Q. And when you left in about November of 2007, did Silar have assets under management?

A. Yes.

Q. Approximately how much?

A. I don't remember. I would be guessing. I don't remember.

Q. Was it more than 10 million dollars?

A. Yes.

Q. Was it more than 50 million dollars?

A. I believe so.

Q. Was it more than a hundred million dollars?

A. I don't believe so.

MR. NEWMAN: Do you have a question pending?

MR. SILBERFEIN: I don't have a question pending. Do you need a break?

MR. NEWMAN: No. I just want to know what Mr. Mezei's note says.

MR. SILBERFEIN: You want to know? It's an attorney-client privileged communication.

MR. NEWMAN: You are going to take a position that every time he writes you a note that it's attorney-client privilege information?

MR. SILBERFEIN: I can't tell you that

10 (Pages 34 to 37)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

**38**

I'm going to take that position every time, but I certainly would expect that I would.

MR. NEWMAN: Every time there's a note, I will just request it, and then you can state your position with respect to the particular note. So with respect to note 1 --

MR. SILBERFEIN: Can you stop looking at it then if you know it's an attorney-client privileged, Mr. Newman?

MR. NEWMAN: I am 66 years old. I can hardly see your face.

MR. SILBERFEIN: Well, that may be.

MR. NEWMAN: Can you see what this says?

MR. SILBERFEIN: Actually, I probably can if I tried to.

MR. NEWMAN: Well, I can't see what his note says. Anyway, Mr. Mezei, if you would just write number one on that. I am asking for production of note number one. If you want to call it attorney-client privilege, that's fine. I respect your position. Now we can go forward.

MR. SILBERFEIN: So the note that you wrote to Mr. Fragin, I would ask the same,

**39**

that you mark that as number one or you can tell me what it says.

MR. NEWMAN: I will do better than that. I will give it to you.

MR. SILBERFEIN: Fair enough. I don't think this is a good use of anybody's time, Mr. Newman.

MR. NEWMAN: I agree.

BY MR. SILBERFEIN:

Q. What was your title with Silar when you first joined in late 2006?

A. I think we were partners. I was a partner.

Q. Was there a general partner of Silar?

A. Yes. You can't have a partnership without a general partner as far as I know.

Q. And who was the general partner?

A. Either we all were or Rob Leeds was, and the other three of us were -- I believe we were all general partners, but it's not that clear.

Q. Did the partnership structure change during your time at Silar?

A. Change?

Q. Meaning, were there additional partners added while you were there from late 2006 to November 2007?

**40**

A. I'm not sure whether -- there were two people who joined who eventually became partners. However, I don't recall what happened exactly when.

Q. And if you were all general partners when you joined, you all would have been general partners when you left in late 2007?

MR. NEWMAN: Object to the form.

THE WITNESS: Are you --

BY MR. SILBERFEIN:

Q. I am asking. You had testified that you thought that, other than these two individuals that may have ultimately become partners, that the setup may have been the same?

A. I don't recall the setup changing.

Q. Was Greg a general partner, assuming you were also --

A. His status was the same as mine.

Q. And when did Greg join Silar?

A. In September of -- when they first started.

Q. And is Greg still at Silar?

A. No. I told you Greg is my partner. He's with me at Ducat Investment.

Q. You can be partners at different entities. When did he cease to be a partner at Silar?

A. Same day as me.

**41**

Q. And that was in November of 2007?

A. Correct.

Q. And what did you do after leaving Silar in November of 2007 professionally?

A. Look to start Ducat.

Q. And when did Ducat start?

A. Somewhere in the summer of 2008.

Q. And what is the general business of Ducat?

A. We bought mortgage -- distressed mortgages.

Q. And what is your title at Ducat?

A. Partner.

Q. And Greg's title?

A. Partner.

Q. And you have assets under management currently at Ducat?

A. Correct.

Q. Approximately how many?

A. The assets have been winding down. Somewhere between 10 and 20 million dollars.

Q. And at its highest or its peak what were the amount of assets under management at Ducat?

A. Total assets or equity assets?

Q. Total assets.

A. 29 million. 28 million.

Q. Have you ever heard the term senior repo

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

42

before?

A. Senior repo? Yes.

Q. And have you been involved in repurchase agreements?

A. What's your time frame? Ever?

Q. Yes, ever.

A. Okay. I was involved in repos prior to going to Silar. And then Silar structured a repo totally different than I was ever involved in when Mezei bought the assets of USA Mortgage.

Q. What were the differences primarily between the repos you were aware of pre-Silar and the repos you were involved with after Silar?

A. The only repo that I was ever involved in was when I was at Steinhardt where we -- where we continuously and consistently financed our investments in U.S. and other treasury instruments in the overnight repo market.

Q. And what's the difference between a repo and a loan, if there is one?

A. A loan, as I understand it, is when someone gives you money and you agree to pay them back. A repo is when a borrower sells you the asset, which is the collateral, you -- with an agreement at some point in time to buy it back for the original price

43

plus interest.

Q. And if it's not purchased -- if it's not repurchased, what happens to the asset?

A. If the borrower, in effect, or the seller of the asset cannot repurchase it back?

Q. Yes.

A. The buyer keeps it.

Q. And you were familiar with this from before you went to Silar?

A. Strictly with regard to treasuries, U.S. treasuries and other government securities.

Q. Those government securities functioned the way we just spoke as a repo as opposed to a loan; is that correct?

A. That's one of the largest markets in the world.

Q. At Silar, what was your title other than partner if you had one?

A. I was the administrative guy.

Q. Did that mean you were the COO or CAO or something like that?

A. COO -- I might have been the COO. I don't know. It wasn't -- Silar didn't function -- it was a very small place. It didn't necessarily function that way.

44

Q. Were you an officer of Silar?

A. It was a partnership. I don't know what --

Q. People my have been designated different titles and different officers. Were you an authorized signatory on behalf of Silar, for example?

A. I imagine in some things I was. In other things I wasn't. I don't know.

Q. And did Silar have a business office?

A. Yes.

Q. Where was that located?

A. We were a subtenant of Mr. Mezei at 333 Seventh Avenue.

Q. Upon your departure from Silar, was there a written agreement for your separation from the company?

A. Yes.

Q. Did that prohibit you from doing any work in connection with Ducat for any certain period of time?

A. Not that I recall.

Q. Could you have started Ducat the next day assuming you were ready to do so?

A. Probably, but I don't recall.

Q. When did you first meet Mr. Mezei?

45

A. Soon after I moved to Riverdale.

Q. When did you move to Riverdale?

A. 1996, '7.

Q. So approximately 15 years?

A. Approximately.

Q. And how did you first meet Mr. Mezei?

A. Either we were introduced or I met him at the synagogue. I don't recall.

Q. And did there come a time that you began to talk business or shop with Mr. Mezei?

A. Yes.

Q. And how long after you had first met him did that start to take place?

A. I don't know.

Q. And did you continue to talk business or shop with Mr. Mezei up until effectively the commencement of this lawsuit?

A. Prior to the commencement of the lawsuit.

Q. Approximately how long before?

A. Perhaps five or six months before.

Q. Other than the senior repo that you mentioned at Silar dealing with Mr. Mezei, have you had other business arrangements with Mr. Mezei?

A. Yes.

Q. Approximately how many?

12 (Pages 42 to 45)

46

A. Four or five. I'm guessing.

Q. When was the first time that you and Mr. Mezei did business together?

A. I believe in September of 2005, I believe.

Q. And what nature was that business?

A. I lent him money.

Q. And did you lend him money personally or to one of his companies or something else?

A. When you deal with Mr. Mezei, it's not always so clear.

Q. Okay. And to whom did you lend the money as far as you know?

A. What I thought I was lending the money was to Mr. Mezei.

Q. And approximately -- sorry, I didn't mean to cut you off.

A. And then it turned out it was a -- it ended up when it was -- it ended up being a loan to his -- to one of his larger operating companies.

Q. What company is that?

A. Northern Leasing.

Q. And for approximately how much was that loan?

A. The original loan?

Q. Yes.

A. Two and a half million dollars I believe.

47

Q. Were there ever any increases in the principal amount to that loan made?

A. To that loan, I don't believe so. No.

Q. And have you been paid back on that loan?

A. No.

Q. Have you been paid back at all on that loan?

A. Yes.

Q. Approximately how much have you been paid back?

A. Approximately -- I think the loan eventually got, including accrued interest, close to 4 million. And I believe the balance that is left is somewhere around a million dollars. It's not so clear because over the last month Mr. Mezei is making payments, he has bounced three or four different checks.

Q. And was the loan in approximately September 2005 documented by some kind of promissory note or other written document?

A. I'm not sure when the loan was papered. It was --

Q. It eventually was papered?

A. Eventually it was papered.

Q. And who drafted that note, if you know?

A. I think my son Greg had something to do with it, but I don't believe he drafted it.

48

Q. He may have been involved in the papering somehow?

A. Yes.

Q. And approximately when was it papered?

A. I believe it was papered twice.

Q. Okay.

A. Originally, some time between September and December of 2005, and then again in a much more specific way in -- a couple of years ago. I am not sure exactly when.

Q. Please describe for me the circumstances on why it was repapered.

A. Well, when you deal with Mr. Mezei, you must understand that the word misunderstanding comes up on a regular basis. It's like and, the, but, misunderstanding. Always a misunderstanding.

When Mr. Mezei originally borrowed the money, it was to buy another company, I believe, in Maryland that did the same thing that he did in terms of leasing swipe machines, credit card swipe machines, to small businesses, small, medium-sized businesses. What Mr. Mezei said was that he was also borrowing money from Goldman Sachs and a place called Vardy, and that I would get paid back principal beginning when they did.

49

Q. Meaning Goldman and Vardy?

A. Right. Now, he says I remember it being Goldman, he says he remembers it being Vardy, whichever it was, he didn't do it. And I was -- you know, Mr. Mezei has a very charming manner about him, but Mr. Mezei's style is one of there's always a misunderstanding.

I am a believer that when a man walks into a bar and the drinking age is 21 and he's 19 and the bartender walks up and says what would you like and he said I would like a beer, and the bartender says are you 21, and he says don't I look 21, that that's a lie because to me a conversation with an intent to deceive is a lie. That is Mr. Mezei's style.

Mr. Mezei is constantly telling you stories with intent to deceive but without what he would refer to as the prerequisite words of a lie where he'd say I'm standing over here, but no you're standing over there.

So, it's difficult for me to go through all the various machinations and garbage that was flowed through on this loan.

What I will tell you is that in every single resolution of how it was going to be paid, he did not live up to any of his agreements. None. Zero.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

50

Like he is not doing it now today.

Q. And when did you first realize that Mr. Mezei dealt with misunderstandings as a general rule?

A. See, it was always a case of -- when you're very close friends with someone, the glass of water is half full. So, it was not until this transaction that I realized that, looking back, that I should have been much more suspicious of Mr. Mezei's style.

MR. NEWMAN: Before you ask a question, could you just use the words in "this transaction" and you pointed to something.

THE WITNESS: The transaction that is being litigated now.

BY MR. SILBERFEIN:

Q. And when was Goldman or Vardy supposed to start getting paid back principal for the September 2005 loan?

A. I'm not sure.

Q. Was it in 2006?

A. If I'm not sure, I'm not sure.

Q. I'm asking if that may help refresh your recollection?

A. It might have been 2006. 2007.

Q. When did the entire repayment of that loan -- when was that supposed to have occurred?

51

A. I don't know.

Q. That was originally in September of 2005, was it -- was there an annual interest rate assigned to that loan?

A. I believe 12 percent.

Q. Is Mr. Mezei or whoever the loan is responsible for paying back the loan in default?

A. Today?

Q. Yes. Based upon your understanding?

A. Both technically and financially.

Q. What does "technically" mean?

A. Mr. Mezei both orally and in writing agreed to transfer three pools of collateral into SPVs for our benefit.

Q. Who is our -- sorry to interrupt -- who is our?

A. The lender, the Fragin Family Partnership.

Q. Okay. Sorry.

A. And to the best of my knowledge as of this moment only one of those three pools have been transferred into the SPV. So he's technically in default there.

Q. Okay.

A. In addition, Mr. Mezei has said that we would get a wire on the 19th of every month for $200,000

52

in repayment of principal and interest of these loans. And that has not occurred. About six or eight months ago he stopped sending wires. He started sending checks. Then a few months or a few weeks, months later, he said he wasn't going to pay $200,000 anymore. He was going to pay $50,000 a week.

Q. As opposed to 200,000 a month?

A. Well, if you pay 200,000 on a particular day of the month as opposed to paying 50/50/50, obviously your payments are late. Okay? And now we have, I believe it was yesterday or the day before, it might have been Friday, we got back our third check marked insufficient funds on our checks.

To the best of my knowledge in New York State when you write a check that's insufficient funds, it's against the law. Isn't that your knowledge?

Q. I am not here to answer questions.

A. Okay.

Q. And who issued those checks?

A. I believe Northern Leasing.

Q. Earlier you mentioned the type of business I think that Northern Leasing was in. What is Northern Leasing's business?

A. What I mentioned was what Mr. Mezei

53

represented he needed the money for at the time. Northern Leasing's business, you would have to ask your client to your left because it's his company. Not mine.

Q. Did you have an understanding in September of 2005 when you made the loan what business Northern Leasing was -- what the business of Northern Leasing was?

A. I had an understanding that Mr. Mezei was going to use the money to purchase a company that was in competition with him in the credit card swipe machine business.

Q. Do you know if that purchase was ever consummated?

A. As far as I know it was.

Q. What was the next business arrangement that you and Mr. Mezei had following this loan?

MR. NEWMAN: Excuse me. Before you go to that, do you just want to define what SVP is in his answers?

THE WITNESS: Special purpose vehicle.

MR. NEWMAN: Thank you.

BY MR. SILBERFEIN:

Q. What was the next business arrangement or deal you had with Mr. Mezei?

14 (Pages 50 to 53)

54

A. I don't remember the order, but Mr. Mezei had a company called Compass in which he bought a package of property from I believe it was HUD, and they were in distress. He sold them out and he made a profit.

Q. And how were you involved?

A. I lent him, I believe, two million dollars, and -- for this purchase.

Q. Excuse me. I'm sorry. And what were the terms of that loan?

A. I believe it was 12 percent plus 3 percent of the profits.

Q. Is there any money outstanding owed to you for that deal?

A. I do not believe so, no.

Q. How much money were you paid with respect to your loan of two million dollars?

A. 12 percent plus 3 percent of the profits.

Q. So you received exactly what you were supposed to in that deal?

A. I believe so. However, being as I have never gotten an audited statement from Mr. Mezei in any loan, I would not know whether 3 percent of the profits is correct or not.

Q. When were you fully paid as far as you know

55

on this deal?

A. I don't remember when the exact dates were.

Q. Was it --

A. I believe I got the balance of my money in the summer or just after of 2008, I believe.

Q. I believe earlier you said you had four or five business deals. I think we have now spoken about two of them. If you don't remember when they happened, I am not going to ask you to give them to me in the order. What was the next one?

A. Some time in the fall of some year, Mr. Mezei for his company called First Funds borrowed, I don't remember what the amount was, the loan was I think an 18 percent loan. I am not sure what the -- and it was paid off I believe within three or four months. It was more or less a bridge loan until he could get permanent financing in place.

Q. So as far as you're concerned you were paid in full on that deal?

A. As far as I know, yes.

Q. Was there another business deal that you had with Mr. Mezei?

A. Yes.

Q. And what was that?

A. My IRA has been lent to Mr. Mezei. When I

56

say Mr. Mezei, I mean Mr. Mezei and/or his entities. He has a lot of entities.

Q. Okay. And when did that occur, the lending of the IRA?

A. The lending the IRA probably occurred about four years ago.

Q. And what were the terms of the lending of the IRA?

A. There were different terms.

Q. What are the terms -- sorry.

A. This was more a handshake.

Q. What did you understand the initial terms to be?

A. I don't remember.

Q. What were --

A. I think it was 10 percent.

Q. And did those terms change over time?

A. Yes.

Q. And what were the various changes?

A. Well, we -- after the initial handshake, came back and changed to where it was going to be a straight loan. He was going to start paying it back in -- this was a bit of a moving target, but in September of 2011, and he is supposed to pay, I believe, $50,000 a month starting in 2011.

57

Q. And that 50,000 would include principal and interest payments?

A. Yes.

Q. And for how long would he need to pay the $50,000?

A. The balance I believe in September of 2011 will be approximately a million six, and however long it takes to pay it off.

Q. And was the lending of the IRA business deal ever papered?

A. It has been papered. It was not initially papered.

Q. And how about the loan to First Funds, was that papered?

A. I believe so.

Q. Was that papered -- I'm sorry, I didn't mean to cut you off.

A. I don't remember.

Q. Was it papered at the time if it was papered?

A. I think so, yes.

Q. And how about the Compass buying property from HUD, that loan, was that papered?

A. It was papered. There was a basic agreement, yeah.

Q. Did you have any other business dealings

15 (Pages 54 to 57)

58

with --

A. I am trying to think if there were any other loans, but -- it's possible. I don't remember. It's possible.

Q. So based on what you have told me, it sounds like there's money outstanding on the loan to Northern Leasing?

A. Correct.

Q. Which is in default. And then the loan of the IRA, which is not yet in default?

A. Right.

Q. Payments are supposed to start a few months hence, correct?

A. Correct.

Q. And then obviously the loan or the investment is part of this litigation. Those were the three issues with Mr. Mezei from a business standpoint?

A. As far as I can recall right now, yes.

Q. I assume you're familiar with the term due diligence?

A. Correct.

Q. What do you understand due diligence to mean in the context of an investment or a loan?

A. To investigate all the details.

Q. And you generally employ due diligence while

59

at Ducat?

A. Yes.

Q. And is that saying that as the Chief Administration Officer you would want to make sure that your employees or --

A. I never said I was the Chief Administration Officer at Ducat.

Q. I'm sorry. What is your title at Ducat?

A. Partner.

Q. As a partner at Ducat, is it something that you would want the people investigating potential investments or loans to complete due diligence?

A. Yes.

Q. And without going through each of the places you have been, but is that the same for things like Silar and Oppenheimer in your --

A. Correct.

Q. -- history?

A. As long as one is doing things on an arm's length basis.

Q. Okay. And did you do due diligence on a loan to Northern Leasing?

A. Not on an arm's length basis, no.

Q. And how about the loan for the -- to Compass I guess for the property bought from HUD?

60

A. Not on an arm's length basis.

Q. How about for First Funds?

A. Not on an arm's length basis.

Q. And how about the lending of your IRA?

A. Not on an arm's length basis.

Q. And how about for the loan or the investment at issue in this litigation?

A. Not on an arm's length basis.

Q. You are familiar with the investment involved in this litigation from your time at Silar; is that correct?

A. To a degree.

Q. Well, what did you understand while you were at Silar before you and Mr. Mezei may have had a deal regarding the asset that was involved?

A. The asset was a pool of mortgages which was originally owned by a place called USA Mortgage, I believe. Some of them were direct investments in mortgages. Some of them were servicing agreements. But in Mr. Mezei's view the worth of this overall pool was somewhere between 160, 170 million and 500 million dollars.

Q. And who purchased these assets from USA Mortgage?

A. I believe Compass, a company controlled by

61

Mr. Mezei.

Q. And did Silar eventually own them, these assets?

A. I don't know.

Q. When did Compass purchase these assets?

A. I believe in the winter of 2007.

Q. And were you at Silar during that time?

A. Yes. I'm trying -- yes, in the winter of 2007.

Q. And that would mean, just so we are clear on what winter means, that would be November/December '07, January/February of '08, or would that be the --

A. No. The beginning of '07, early '07.

Q. And you were still at Silar during that period?

A. Correct, I was.

Q. I'm sorry?

A. Yes, I was.

Q. And for approximately how much did Compass buy these assets?

A. As I recall, a total of 53 million dollars.

Q. And how were you aware of the Compass entity that you mentioned? When did you first learn of them?

16 (Pages 58 to 61)

62

A. How was I aware? Do you mean of the deal itself?

Q. The existence of Compass as an entity.

A. Well, I think I said to you that earlier I had lent money to Compass to buy a package of Section 8 housing.

Q. But you didn't know when that was, so I am trying to understand --

A. That was prior to this happening.

Q. So the loan for the HUD stuff was before this deal?

A. Correct.

Q. And the loan that you had made, was that your first interaction with Compass?

A. Yes.

Q. And had you known of Compass before that loan?

A. No.

Q. And who ran Compass to the best of your knowledge at the time, at the time you made the loan?

A. Define "run."

Q. Who managed it?

A. Two people, Boris Piskin and David Blatt, with Mr. Mezei overseeing it along with his

63

son-in-law Ron Friedman.

Q. And when you lent money to Compass for the HUD property, who did you negotiate that deal with?

A. Len Mezei.

Q. And did you meet Boris Piskin in relation to that loan?

A. In passing.

Q. And how about David Blatt?

A. In passing.

Q. Have you come to know Boris Pishkin more since --

A. Piskin.

Q. Piskin. I'm sorry -- since the time you made the loan to Compass?

A. You know, I am not close to him, but I know him.

Q. And what is Mr. Piskin's involvement with any of your businesses today, if any?

A. None.

Q. And how about David Blatt?

A. None.

Q. How about Ron Friedman?

A. With our business?

Q. Yes.

A. None.

64

Q. When was the first time that you met Ron?

A. When he was a teenager.

Q. And how about when you met Mr. Piskin?

A. I just told you. I met him in passing.

Q. I am asking now when?

A. Somewhere around the time that I lent money to Compass.

Q. And that would be for the HUD property?

A. Correct.

Q. Would that be the same for David Blatt?

A. Yes.

Q. Had you heard of USA Commercial Mortgage Company prior to the purchase of its assets, some of its assets by Compass?

A. No.

Q. Had anyone else in Silar, as far as you know, been aware of USA Commercial Mortgage Company before Compass purchased some of its assets?

A. I wouldn't know what other people are aware of.

Q. Someone may have told you I heard of them before. Did anybody do that?

A. No.

Q. How did Silar get involved in that deal?

A. First, as I recall -- I could be mistaken --

65

as I recall, Mezei went to Rob Leeds to ask him to help analyze the asset. Mezei had financing, according to him, all lined up through -- through -- it begins with a C. It was a finance organization which he had done business with before. And they pulled out with about a week or two to go after Mr. Mezei had put up his deposit to bid on this. This was a competitive bid against, as I recall, Silver Horn -- Silver something, another asset-backed -- I mean, another fund who was bidding on the same asset. And they pulled out.

Q. "They" being the lender, the potential lender?

A. The other lender pulled out at the last moment. And Len was in trouble. He needed to get financing right away. He went to Rob Leeds. Rob Leeds, who was already familiar with the deal as I recall, because he was helping Lenny do the analysis, Rob Leeds got in touch with Gottex, a major international asset-backed lending fund, and Gottex signed on as the primary and senior lender.

Q. And who is Rob Leeds?

A. He was the managing partner of Silar.

Q. And was he there the entire time that you were at Silar?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

**66**

A. Yes.

Q. **And did he help recruit you to Silar?**

A. He offered me the job to go to Silar. He was managing partner.

Q. **Did you know Rob Leeds before going to Silar?**

A. No.

Q. **How did you learn of Silar's interest in you?**

A. How did I learn of Silar's interest in me?

Q. **Did Leeds approach you personally?**

A. Well, when they were forming Silar, you had Rob Leeds, an Asian fellow -- I'm not good with names -- and Greg, my son, who were the three guys who were forming it. And there were a lot of -- I mean, having had fairly extensive experience with offing memorandums and that kind of stuff. So they kept calling and asking me this question, that question, you know, what do you do about this, what do you do about that, and finally in I believe middle of December Rob Leeds said why don't you just come. And that's the way it happened.

Q. **What kind of offering memorandums were you looking at that point before you joined Silar but after it had been formed?**

A. What do you mean?

Q. **You mentioned offering memoranda?**

**67**

A. Offering memoranda to raise money. You need a private placement memorandum in order to raise money.

Q. **So you would review these and give them some advice based --**

A. Correct.

Q. **-- based upon your history and your experience?**

A. Correct.

Q. **Were you aware of this deal before you joined Silar in late 2007, the deal that is the subject of this litigation?**

A. I joined Silar in late 2006.

Q. **I apologize. So were you aware of the deal before you joined Silar in late 2006?**

A. What deal?

Q. **The deal that is the subject of this litigation.**

MR. NEWMAN: I am going to object to the form of that question because we're getting confused here. What is the subject of this litigation. I would ask you --

MR. SILBERFEIN: I think it's pretty clear what's the subject of this litigation. It's an investment -- it's an investment -- I

**68**

mean, it's clear. You are the plaintiff. You know what you're suing over.

MR. NEWMAN: I am asking you to be more precise in your terminology. That's all.

MR. SILBERFEIN: I think the witness and I were --

A. That is what I'm asking you.

Q. **This question -- but I think the -- so when did you first become aware of the deal that Silar was going to get involved with Compass regarding the assets bought from USA Commercial Mortgage Company?**

MR. NEWMAN: Thank you.

THE WITNESS: When it happened?

BY MR. SILBERFEIN:

Q. **Was that before or after you joined Silar?**

A. After.

Q. **And how was the deal structured? How was the deal that Silar ultimately participated in structured?**

A. As I recall, there was a senior financing that was provided by Gottex of 38 million dollars. There was a 10 million dollar preferred, which was provided nine and a half million by Silar fund, $200,000 by Rob Leeds personally, $200,000 by me personally, and $100,000 by -- I'm just looking to

**69**

see if I can -- by a third party, by another party whose name escapes me, but --

Q. **Was that person a Silar partner?**

A. No. It was an outside member, an outside friend of Rob's who, you know, had done business with Rob in the past.

Q. **And was there any other piece other than the senior and the preferred?**

A. Correct.

Q. **What was that?**

A. There was supposedly a five million dollar equity piece which Mr. Mezei was going to provide. He was putting in the equity. As it turned out, that wasn't the case because Mr. Mezei raised additional money to be part of his equity piece which, of course, he never told anybody, but that was his style.

Q. **So before -- your understanding was that there was a five million dollar equity piece as part of the original deal?**

A. Correct.

Q. **And was the 38 million dollar senior piece reduced to writing?**

A. Oh, yes.

Q. **And was the 10 million dollar preferred**

18 (Pages 66 to 69)

70

piece?

A. As far as I know, yes.

Q. And how was, if at all, the equity piece reduced to writing?

A. I don't know.

Q. How would the senior piece get paid back, if it was to get paid back in the deal, and I guess Gottex would be the 38 million?

A. I'm not sure.

Q. And did Silar have any portion of the senior piece?

A. No. Yes. One million dollars.

Q. Do you not know or you don't remember how -- sorry?

A. Supposedly. As I recall, there was 50-plus million dollars of servicing fees, accrued servicing fees, that were non-disputed that were going to be, once the deal was done, was going to -- were going to happen, and people were going to get paid. That's -- and some other fees. There was interest. There was servicing fees. There were all sorts of fees that were coming in.

Q. And where were the fees or the interest or any of the other revenue coming, who would that be coming from and who was to receive that money?

71

A. As I recall, that would be coming from these -- from these -- the mortgage company, from two -- the paying agent, which I believe was Silar, and then it would go to Gottex. You're asking about the senior piece?

Q. I assume they will get paid first; is that correct?

A. As far as I know.

Q. And was Silar's action as the paying agent pursuant to a contract or other written document?

A. I would guess so, but I was not involved.

Q. And the monies that would be coming from the mortgage company, would they be delivered -- was there a lockbox or some other mechanism to segregate the money coming from the mortgage company?

A. I don't know.

Q. And other than the accrued servicing fees that you mentioned and interest, how else was revenue to be generated from these assets?

A. Well, there were -- there were various claims on pieces of mortgage. There were direct participations in some mortgages.

Q. So when those were liquidated, then there would be monies sent from the mortgage company to Silar as the paying agent?

72

A. I would think, yes.

Q. Was there any straight interest rate to be paid by the mortgage companies to Silar as the paying agent?

A. Straight interest rate? I don't know what Silar got as the paying agent.

Q. I think you said earlier that the assets may have been 150 or 160 million dollars or greater?

A. No. What I said was Mr. Mezei articulated that he thought that those -- that the minimum those assets were worth were 150 to 160 million dollars.

Q. Did Rob Leeds agree with that assessment, do you know?

A. As far as I know, but I don't know the answer to that specifically.

Q. Did you agree with that assessment?

A. I have no idea.

Q. But yet you invested 200,000 of your own money in the preferred --

A. Correct.

Q. So did you do any due diligence for your $200,000 piece?

A. Not other than the fact that I was investing along with Rob who thought it was a great --

Q. I'm sorry. Did Gottex do due diligence?

73

A. They were in our office a lot.

Q. "Our office" you mean Silar's?

A. Silar slash Compass, which was also in the same place.

Q. Was there a lead manager of the senior repo under the documents, do you know?

A. A lead manager? What does that mean?

Q. I am asking you.

A. I don't know what it means.

Q. Was there a manager of the senior repo instead of the word lead, does that --

A. I don't know.

Q. Would any of the preferred pieces investors Silar, Rob Leeds, you or this other third party get paid until Gottex was paid?

A. To the best of my knowledge, no one was going to be paid until Gottex got paid.

Q. And that was how this was to work, meaning one layer would need to be taken out before the next layer would get taken out, et cetera?

A. As I understood it, Gottex was cash paid. The preferred was accrued. And the equity piece owned everything else.

Q. When Gottex -- did Gottex initially invest in the assets themselves or did they purchase a portion

19 (Pages 70 to 73)

74

of Silar's piece or something else?

A. I don't understand the question.

Q. Well, you said earlier that Silar -- Gottex was the preferred or the senior holder. Did it happen that Gottex was the senior holder initially or was it Silar was the initial holder and sold --

A. The deal didn't get done until Gottex put in their 37 or 38 million dollars because they were the overwhelming majority of the money.

Q. Okay. But that doesn't really answer my question. What I'm suggesting to you is, are there documents that suggest that Silar purchased all 38 and then sold 37 of the 38 or whatever the numbers were to Gottex?

A. I don't know the answer to that question.

Q. You weren't involved in that?

A. No.

Q. Do you know what the rate of return was on the preferred rate -- on the preferred piece?

A. Originally it was going to be accrued at I believe 27 and a half percent.

Q. You said initially. Was that at some point changed?

A. At some point it was moved up to 32 percent.

Q. And how about the senior repo, what rate was

75

that at?

A. I believe that was 18 percent.

Q. Was that ever changed?

A. I don't know.

Q. For your $200,000 piece, was it through an entity or was it you personally or was it somebody --

A. Me, personally.

Q. And do you know for Rob Leeds if it was the same or something different?

A. I believe it was him personally.

Q. And upon your departure from Silar, did you resolve this $200,000 piece in the preferred?

A. My piece?

Q. Yes, your piece.

A. I still own it to this day.

Q. Did you have any access to the information of a due diligence that was being performed by Gottex?

A. I didn't see it, if that's what you're asking.

Q. That's not what I'm asking. If you wanted to see it, could you have?

A. It's a hypothetical. I don't know.

Q. What documents was Silar providing to Gottex as part of the due diligence?

76

A. I don't know.

Q. You were a partner at Silar?

A. I was.

Q. As a partner at Silar, would you have been able to see the documents as it pertained to the due diligence?

A. In this area, I was not involved in the transaction.

Q. I understand you weren't involved, but -- that's what your claim is, but what I'm suggesting to you is if you wanted to be involved as a partner of Silar, were there any documents that you would not have been able to see?

A. I don't know.

Q. In your vast experience in the investment world, have you ever been denied access to documents as a partner of an entity?

A. Of course.

Q. Your own entity?

A. You mean an entity that I owned?

Q. Yes.

A. Of course.

Q. Really? So you are suggesting to me that your own entity would not share documents with you?

MR. NEWMAN: Objection. Argumentative.

77

He has answered your question.

MR. SILBERFEIN: I don't think he understands and I am asking it again.

A. No. I don't think you understand it. When I was a partner at a brokerage firm called Oppenheimer & Company, I was running the trading department, I couldn't walk into the corporate finance department and look at all their documents.

Q. I am talking about investments that you were responsible for. Were you ever --

A. You're making the assumption that I was responsible for the Gottex investment. I wasn't.

Q. Don't tell me what assumptions I'm making, Mr. Fragin. What I am asking you is a question?

A. I answered your question.

MR. NEWMAN: When we get to a stopping point, I would like to take a break, not this minute, but whenever you are ready.

MR. SILBERFEIN: I am happy to take a break now. Whatever you want.

MR. NEWMAN: If you've finished that particular topic, now would be a good time.

MR. SILBERFEIN: I am fine to take a break, Mr. Newman.

THE WITNESS: Am I done answering your

20 (Pages 74 to 77)

**78**

question?

Q. Yes.

(Recess from 11:40 to 11:48.)

BY MR. SILBERFEIN:

Q. Earlier we were discussing what you believed to be the non-disputed accrued servicing fees. Do you remember that, or at least you were told they were. Did there come a time where there was a lawsuit regarding those and other fees?

A. There came a time that there was a lawsuit.

Q. And what was your understanding of that lawsuit?

A. That there was a group headed by a woman who I believe were the investors in -- investors or mortgage holders, directors -- I am not sure how to characterize the group -- who within a short period of time filed a lawsuit.

Q. And within a short period of time from when?

A. From the time the deal closed.

Q. And how did that lawsuit impact the potential revenue streams to Silar or to Compass, whoever was holding those pieces?

A. I can't say that I am sure of that, but I believe a lot of the money went into escrow.

Q. And ultimately were non-disputed fees now

**79**

disputed?

A. Some I believe, yes, but I'm no expert on it.

Q. And from a practical effect, what is your understanding of what practical effect the lawsuit had on the revenue streams?

A. From a practical effect, it just slowed things down. That was my understanding.

Q. Were there any fees that were expecting to come in before the lawsuit now not going to come in at all?

A. Don't know.

Q. Up and through the time of the closing of the deal, did you participate in any conversations regarding the deal?

A. Yes.

Q. Did you have any conversations -- just so we are clear, did you have any conversations regarding the deal with counsel? I just don't want to get into a situation asking about any conversations about --

A. With my counsel?

Q. Yes. Or Silar's counsel or whoever else you would have been working with.

A. I might have had -- there was one a real tall guy, I don't remember his name, who was counsel

**80**

brought in, and I am sure I had some conversations with him. I don't recall that they were substantive.

Q. Okay.

A. I think it had -- he was a part owner of some hotel in Miami Beach that we might stay at, but, no. Other than that, no.

Q. I was just laying the groundwork so if I asked you about conversation, we don't get tripped up between anything that you may have felt was a conversation that you had that would be privileged between you and an attorney.

A. Okay.

Q. Who did you have conversations with regarding the deal before it closed?

MR. NEWMAN: Could I just ask you to define what you mean by the deal? Are you talking about this purchase of the assets? Compass deal? Is that what you are talking about? Which deal are you talking about?

MR. SILBERFEIN: I am only dealing with the subject of this lawsuit.

MR. NEWMAN: Can we use --

MR. SILBERFEIN: I am not going to put words in the witness' month who bought what

**81**

and what. He didn't remember exactly what entity bought what at what time, and that's fine.

A. Excuse me for one second?

Q. Sure.

A. When you say "the deal," it's confusing to me whether you're talking about Mezei's purchase of the Compass assets -- of the USA Mortgage assets out of the bankruptcy, or you're talking about my wife's children's trusts buying the, quote, securities, end quote, that they were supposed to have bought. Okay?

Q. Okay.

A. Those to me are different transactions.

Q. I would agree with you, and I am not talking about the investment by your wife's trusts at this point or your children's trusts that your wife --

A. If you would be specific which --

Q. At this point I am only talking about the purchase from -- of the mortgage-related investment by Compass from USA Home Corp.

MR. NEWMAN: Thank you very much.

THE WITNESS: Okay.

Q. So again, what conversations did you have regarding that deal at or before the time it closed?

21 (Pages 78 to 81)

82

A. The conversations that I was involved in were almost always limited to is Gottex going to come through with financing, is the -- the guys that Lenny originally had onboard to finance this deal, where they -- they were waffling. One guy I remember was off skiing. He didn't call back. These were things that Lenny was lamenting to me. Why was he lamenting to me? Because I was his friend. Well, I don't know if the guy's going to come through. I can't reach him.

Then there was a fellow who was representing Joe Lewis, who's an investor who developed a large project in the Orlando area, and Joe Lewis was a major investor, and he at the end of -- when we were close to closing might have wanted a piece of the senior financing. And I spoke to his representative whose name, of course, I can't remember again, to -- because Compass wanted it all.

Q. What did they want all of?

A. They wanted the whole piece of the -- my recollection is that Compass wanted the whole piece of the senior financing. It was not a syndicated thing where you got -- somebody took 10 million, somebody took 10 million and somebody else took 18 million. It was Compass took it all. And the guy

83

representing Joe Lewis said well wait a second, you have been talking to me and we want half of it. And I got involved to resolve that dispute. Okay?

Q. Okay.

A. But that is virtually the only part of it, other than being a sounding board for Lenny when he got nervous, are these guys who were the original commitment are they going to walk away, am I going to get this done, am I going to lose my deposit.

Q. And did you have any discussions with anyone regarding Silar's participation, whether it be at the senior level or the preferred level or somewhere else?

A. No.

Q. And did you have any discussions with anyone regarding the setting of the interest rates either for the senior or the preferred holders?

A. No.

Q. Did you have any e-mail communications with anyone regarding the setting of the interest?

A. Not that I recall, no.

Q. And did you have any e-mail communications regarding the portion that Silar would retain?

A. Not that I recall, no.

Q. Did you have any conversations or

84

communications regarding the equity piece with anyone?

A. Conversation? I just -- what I recollect is that Mezei was going to put in five million dollars of, quote, his money for the equity piece, which turned out not to be true.

Q. Did you have any conversations with Rob Leeds regarding the setting of the interest?

A. Not that I recall.

Q. Who negotiated the setting of the interest?

A. The 18 percent?

Q. On the senior rate, yes.

A. I don't know for a fact, but it could only be the borrower, who was Len Mezei, the lender, who was Gottex, and the intermediary, who was Rob Leeds.

Q. And would Rob Leeds also have been representing Silar in that discussion?

A. He was the managing partner, of course, he was representing Silar.

Q. And you never had discussion with Len about the interest rate?

A. Of substance, no.

Q. And that would be the same for the preferred piece as it was for the senior rate?

A. As far as I remember, yes, that's correct.

85

Q. Did you have any discussions with anyone regarding the 27 and a half percent interest rate being raised to 32 percent?

A. Yes.

Q. When did that occur?

A. Some time during the late summer of 2007.

Q. And what situation or facts came about to precipitate the raising of the interest rate by 4.5 percent?

A. That's an approximate number, by the way.

Q. Okay. Fair enough.

A. Okay. The conversation was one of we tried to get their interest rate up on the basis that the world was unravelling, some time during the spring of 2007 -- no. When did Bear Stearns -- 2008, I guess. But in 2007 you saw deterioration in the real estate market, and most of this collateral was real estate. If we could get more interest we tried.

Q. And who did you have those conversations with?

A. Rob Leeds led the conversation with Len Mezei and I was present.

Q. And so that concerned not just Silar but also your piece personally?

22 (Pages 82 to 85)

86

A. Correct.

Q. Was Gottex at that point still the senior lender?

A. As far as I know.

Q. Did there come a time when they weren't the senior lender?

A. Not that I am aware of, no.

Q. Are you familiar with the term margin call?

A. I am.

Q. And did there come a time that a margin call notice was sent with regard to this deal? And again, obviously, I'm not talking about --

A. That is exactly what we are talking about that there was a margin call.

Q. Fair enough. And who sent the margin call?

A. It was written by Rob Leeds. I believe I signed it.

Q. And to whom was that margin call notice sent?

A. To the powers that be at USA Mortgage -- Compass USA Mortgage, which I believe was Len Mezei, and/or Ron Friedman and/or David Blatt and/or Boris Piskin.

Q. And other than the housing market troubles or however you described --

A. I said real estate.

87

Q. I'm sorry. Real estate in 2007, what under the contract documents permitted Silar to issue a margin call notice?

A. I'm not sure of that.

Q. Was there any such authority at the time that the margin call notice was sent?

A. You just asked me that and I said I am not sure.

Q. Well, I asked you what provision. I am asking are you aware of any authority in the contract documents that would have permitted you to send a margin call notice?

A. I am not aware of the specifics. I believe that we were permitted.

Q. And did you receive a response to your margin call notice?

A. I don't remember.

Q. And did you have any conversations with Len Mezei regarding the margin call notice?

A. Yes.

Q. And was that before you sent the margin call notice or after you sent the margin call notice?

A. I don't know.

Q. And, in sum and substance, what were those conversations that you had with Len Mezei?

88

A. Oh come on guys, there's plenty of collateral. Oh, well, the collateral has gone down. What's the big deal? It's gone down from 250 million and to 225 million and I only owe 37 million dollars. Come on. What are you busting my hump for? And that's the way the conversation went.

Q. What effect, if any, does the default under the margin call notice have on the collection by the senior or the preferred piece?

A. I never mentioned any default, nor did you.

Q. I just did.

A. What default?

Q. Was there a default?

A. I don't know.

Q. What steps, if any, did Silar take in response to its margin call notice sent to the Compass entity?

A. What steps did they take?

Q. Yes, if any.

A. I don't know.

Q. In a normal -- forgetting -- in a generic case, if you sent a margin call notice, what do you expect to happen from the recipient in a margin call notice situation?

A. Normally, margin calls that I have been

89

experienced with, which are securities margin calls, the borrower has to put up more collateral.

Q. And if they failed to put up more collateral, what happens?

A. It's a fairly automatic thing. If somebody doesn't put up more collateral, his collateral is sold out. His investment is sold out.

Q. And did that happen in this case, meaning, your margin call notice to the Compass U.S. entity?

A. Not that I am aware, no.

Q. Was more collateral put up?

A. I'm not sure.

Q. Was its piece sold off?

A. No. To the best of my knowledge, nothing was sold off.

Q. On how many occasions was a margin call notice sent?

A. I don't recall.

Q. Are you familiar with the phrase mark to market?

A. Yes.

Q. And what is mark to market?

A. Mark to market is when you have a marketable security that you value it based on where it's trading at that time.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

90

Q. It's an accounting phrase, generally, in terms of how you value an asset?

A. I don't think that the first part of your question and the second part of your question go together.

Q. You don't believe it's an accounting term?

A. Mark to market, no, I don't believe it's an accounting term.

Q. It's just a valuation term?

A. That is the way I understand it, yes.

Q. And did how did Silar mark the senior repo piece of one million dollars?

A. At cost, as far as I know.

Q. And how about the preferred piece?

A. At cost, as far as I know.

Q. Did Silar ever write down their interest in Compass USA?

A. Ever?

Q. Yes.

A. Yes.

Q. When did that occur?

A. I don't remember the exact time.

Q. Was it while you were still at Silar?

A. No.

Q. Was it in 2010?

91

A. I think it was long before 2010.

Q. And you left Silar when?

A. November of 2007.

Q. So, some time in 2008 or '9 then, based upon your testimony, was when it was written down?

A. I correct. I believe it wasn't until 2009.

Q. And how about your piece personally, did you ever write that down?

A. How do I write it down? You mean did I have a conversation with myself and say by the way it's not worth what I paid for it?

Q. Well, either from an accounting standpoint or something else.

A. There's no accounting. What's the accounting?

Q. Do you have an investment?

A. I have an investment.

Q. And its value?

A. Correct.

Q. At your cost?

A. For whose purpose?

Q. Yours, and maybe your accountants or something else.

A. Well, I don't have a tax issue unless I sell it. Therefore -- and I haven't sold it. So I don't

92

use it to borrow money against. So there is no issue of collateral. And if I mark something in my own mind --

Q. Yes.

A. -- those are conversations between me and me.

Q. Have you ever made any representations to anyone else regarding the value of your piece?

A. No.

Q. Since leaving Silar?

A. Not that I recall, no.

Q. Were you involved in the marking of the value of the Silar assets at cost?

A. Any assets?

Q. These assets.

A. No.

Q. When Silar and Gottex completed this deal that we have been talking about, what was your expectation as a partner in Silar as to the time frame for realizing payment on the preferred piece?

A. That the likelihood was it wouldn't be out for even a year.

Q. At some point did that belief or understanding change?

A. Yes.

Q. And when did that first change?

93

A. Probably when the lawsuits were filed.

Q. And did that change your ultimate expectation of being paid or just the timing or both?

A. Paid or just the timing or both? I mean, it didn't take till -- the timing.

Q. Are you familiar with the expression money good?

A. Yes.

Q. So at this point even after the lawsuit did you believe that the preferred piece was still money good?

A. Yes.

Q. And by I -- obviously, then by the answer to that question obviously the senior piece was obviously money good at that point?

A. Correct.

Q. Did there come a time where you had the understanding that the preferred piece was no longer money good?

A. There was a time, yes.

Q. And when did that first occur?

A. Probably the fall of 2008, maybe the wintertime or the early 2009.

Q. And at that same time did you have an understanding regarding whether or not the senior

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

94

piece was money good?

A. I don't know.

Q. Who held the senior piece at that time in late '08, maybe early '09, do you know?

A. Who held in late --

Q. The senior piece in late '08 or early '09, the same time frame where you believe you first understood that the preferred piece was no longer money good?

A. What do I know now as to who held it?

Q. If those are different, then, yes.

A. Now.

Q. At the time, okay.

A. Now I believe that 10 million of that senior piece was held -- excuse me -- take that back. That 8,375,000 of that senior piece was held by this company Repotex. That 1.625 was held by either Silar or some entity that Silar purchased. That another one million was held by a Silar entity. And the balance was held by Gottex.

Q. And was the balance still -- I think before you said you believed it to be 38 million. Was it --

A. By the spring of 2008, I believe that was paid down to somewhere around 23 million dollars, a

95

little more than 23 million dollars.

Q. Gottex's piece was or the whole piece?

A. I am not sure whether it was just Gottex. I believe it was just Gottex piece. That meant Silar probably had another million dollars. I don't know whether as Gottex's piece was paid down Silar's piece was proportionately also paid down. I don't know that.

Q. And again, that piece would have to be paid off in total before the preferred piece would start to take?

A. Correct.

Q. Was there a time frame or expiration on the senior repo?

A. I didn't know that.

Q. You did not know that, is that what you said?

A. Correct.

Q. Was there actually a time limit on it that you ultimately later learned about?

A. Yes.

Q. And how long was that time frame?

A. I ultimately learned that it was one year.

Q. And when you say you learned, from whom did you learn that?

A. I learned it in discovery for the -- as part

96

of discovery in the lawsuit that my wife, as trustee for her children, filed against Mr. Mezei, et al.

Q. And was that from a document that you learned that or from oral testimony or somewhere else?

A. We learned it from documents.

Q. And what documents did you learn it from?

A. We got documents from a former employee at Silar, which showed us the paydown and extension agreement which was negotiated by Mr. Mezei -- this is what was told to us -- by Mr. Mezei and Mr. Friedman with Gottex slash Silar.

Q. Did the original closing documents contain any time mechanism on the senior repo?

A. I don't know. I never saw the original closing documents.

Q. And what is your understanding of the paydown and extension agreement and how it impacted the senior repo?

A. Mr. Mezei agreed to pay 6.75 million dollars to Gottex on April the 15th.

Q. Of what year?

A. 2008.

Q. Okay.

A. 3.25 million dollars on May the 1st.

Q. Also 2008?

97

A. 2008. And the balance on June the 1st, which was somewhere slightly in excess of 13 million dollars. On June the 1st, to take Gottex completely out, and Gottex's piece would have been sold to the -- to whoever came up with this 23 plus million dollars. Okay. However --

Q. I'm sorry. Just so, this was in the paydown extension agreement?

A. This was in the paydown extension agreement.

Q. I just wanted to make sure we are still talking about that.

A. However, that paydown extension agreement, the existence of it was never communicated to me. I was totally unaware that it existed. It was never -- it wasn't lived up to. And by the time that my wife as trustee for her children wired the money into Economic Growth Group, Mr. Mezei's company, they were already in default on the paydown extension agreement.

Now, the money went in, I subsequently learned, to a company called Repotex, which was formed by Mr. Mezei, et al., to act as -- I am quoting Mr. Mezei now -- as a pass through. I was never informed of the existence of Repotex. I didn't know about Repotex until my wife received

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

98

notes, the papering of her children's investment, some time in July of 2008. By that time, as I said, the Repotex slash Mezei entities were in default on their -- on their paydown and extension agreement, which Mr. Mezei never made us aware of, and I didn't become aware of it until after the lawsuit was filed in December of 2009. So, it was almost two years later that we even found out about any of this stuff. And then we subsequently in discovery discovered that while we got Repotex's notes, that my wife's children's money, the trust money, never went in to buy even Repotex notes. They went into EEG, Mr. Mezei's company. They stayed in EGG. So, in effect, Mr. Mezei put the money in his pocket. And despite the fact that they were already in default, that Repotex was already in default on the paydown and extension agreement by June 1st, Mr. Mezei, according to him, on June 3rd sold his notes, the ones he bought on May the 1st to my wife's trust. I thought that was a nice thing to do.

Q. When you acquired a piece of the preferred piece, did you have any understanding of when the senior repo would expire, if at all?

A. I didn't know. May I make a comment here?

99

Q. Sure.

A. When you are asking questions about mark to the market and margin call, and my experience in them, we're dealing with a history of marketable securities. This collateral was not marketable securities. So, all of the above, if you needed to raise money for margin call, you couldn't just go out and sell part of the collateral. It wasn't like selling IBM where it's settled two or three days later, or treasuries where it settled the next day. It didn't happen like that.

Q. Okay. Are you familiar with the term waterfall as it relates to investments?

A. As in Yellowstone Park?

Q. In terms of investments and payback.

A. Yes.

Q. Was there a waterfall situation involving the original closing documents of this deal?

A. I believe so. As I told you, I never saw the closing documents.

Q. As you sit here even today, do you have an understanding of the waterfall setup in this deal?

A. I believe so.

Q. And what was that?

A. That the first money came back to pay down

100

the senior piece. After the senior piece was paid, the preferred was going to be paid. After the preferred was paid, everything else accrued to the equity piece.

Q. And the amounts to be paid to each of those pieces included the principal amount plus the interest as, whatever the interest rate was; is that correct?

A. As far as I know.

Q. Who held the repurchase rights under this repo?

A. I'm sorry?

Q. A repo involves, as we discussed before, someone's ability to repurchase the asset; is that correct?

A. Correct.

Q. Who or which entity had the repurchase rights in this deal?

A. I assume it was Compass, but I can't say that I'm certain of that.

Q. And if Compass or whoever had that right lost its right by failure to make the required payments, would that affect the waterfall?

A. If Compass lost its rights -- don't know. Don't know.

101

Q. Is the senior piece affected at all by Compass losing its repurchase rights?

MR. NEWMAN: I object to the form of that question.

THE WITNESS: Is the senior piece affected at all by Compass losing its --

BY MR. SILBERFEIN:

Q. Repurchase rights.

A. I don't know. When you say that --

MR. NEWMAN: I object again to the question.

MR. SILBERFEIN: You already objected, Mr. Newman. He's trying to answer.

A. Can you be a little bit more specific about that question?

MR. SILBERFEIN: This is now another time where the witness was trying to answer, but for your interruption, we would have had an answer. I have no problem trying to rephrase or have him do it, but he's only doing it because you now interrupted --

A. No. That's not why. I didn't understand the question.

MR. NEWMAN: He said he didn't understand the question.

**26 (Pages 98 to 101)**

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

102

MR. SILBERFEIN: No. He actually said it out loud and was trying to answer the question until you objected, not once, but twice.

Q. Is the payback to the senior piece affected by the loss of Compass of its repurchase rights?

A. I don't know.

Q. When Gottex purchased its senior piece, I think it was 37 of the 38 --

A. Can I go back and answer that question?

Q. Which one, the one I just asked?

A. Yes. Could you repeat that question?

MR. SILBERFEIN: I would ask that you read it back. Thank you.

(Whereupon, the question was read back as follows:)

"QUESTION: Is the payback to the senior piece affected by the loss of Compass of its repurchase rights?"

A. Yes.

Q. How?

A. When, in my judgment, when someone -- when the senior lender takes back an asset that may be worth a lot more money, but the senior lender now owns that asset, that senior lender is concerned

103

only with getting his money back. So if an asset is worth a hundred million dollars or could be worth a hundred million dollars, and a senior lender is lent 40, that senior lender is concerned about selling that asset for 40 million dollars or more -- 40 million dollars. Because all he gets is what he's owed. So, therefore, if that asset is taken back by someone who just wants to get their money out, it's not necessarily true that that asset is going to be managed or liquidated in a way that is most beneficial to the overall asset pool.

So do I believe that the fact that Compass -- that Gottex would take back the asset is -- hurts everybody? Yes, I do.

Q. I don't think that was exactly my question. I asked about the senior piece as opposed to the preferred piece or other pieces, but I understand your answer. I don't think it was exactly -- I asked only about the senior piece and if it affected that. But your answer -- you know, is what it is.

Now, did I finish the question that preceded this one or did Mr. Fragin want to amend his answer before I finished that question? Either way I would like to know what my question was because I don't remember anymore.

104

(Record read back.)

MR. SILBERFEIN: Fair enough. Okay. Thank you.

BY MR. SILBERFEIN:

Q. When Gottex purchased its 37 million of the 38 million senior piece, how was Gottex contacted by Silar for that deal?

A. I don't know.

Q. Do you know any of the principals at Gottex?

A. No.

Q. Have you come to learn anybody -- the names of anyone at Gottex?

A. There was a guy named Hin who was at Gottex. The only reason I know Hin is because subsequent to this deal several months later he left Gottex to come to work for Silar. I know no one who worked at Gottex at the time who still is at Gottex or other than him was ever at Gottex.

Q. And to whom did Silar market the senior piece?

A. As far as I know, the only people that Rob spoke to -- I had nothing to do with marketing anything.

Q. Okay.

A. So, the only people that I know of that Rob

105

spoke to was this fellow who he had worked with and who now represented Joe Lewis who I mentioned and Gottex.

Q. Right.

A. I am not aware of anybody else.

Q. And were any marketing materials prepared by Silar for the marketing of the senior piece?

A. I don't know, but I would tend to doubt it because there wasn't time because, as I said earlier, Mr. Mezei, when he was bidding, had believed he had the financing all in place from --

Q. Whomever?

A. Yes.

Q. Under the documents, did Gottex have a right to sell any of its positions?

A. I don't know.

Q. Do you know if they did?

A. I don't know.

Q. Do you need a minute, Mr. Fragin?

A. No. I'm just going to e-mail my son to find out who it was that --

MR. NEWMAN: Don't do that.

THE WITNESS: Don't do that? I can't do that?

MR. NEWMAN: No. He wants your best

27 (Pages 102 to 105)

106

information.  He just wants you to testify.  If he wants you to do something else, he will ask you, and then we will take it under advisement.  Thank you.

THE WITNESS:  Okay.

BY MR. SILBERFEIN:

Q.  Did Silar -- strike that.

What fees or revenue did Silar earn as the paying agent under the -- under this deal?

A.  I'm not sure.

Q.  Do you have any sense in terms of total dollars received?

A.  No.  I'm not sure.

Q.  Do you have any sense of the percentage of the fees that Silar would have retained?

A.  I'm not sure.

Q.  But there was some piece that they --

A.  Yes.  I mean, it's -- I don't think I knew specifically, but I certainly don't remember.

Q.  And do you have an understanding even as of today the total number of dollars that Silar received as the paying agent on this deal?

A.  I don't know.

Q.  Do you know if it was larger or smaller than their one million dollar senior piece?

107

A.  I just told you I don't know.

Q.  You might not know the number, but you might have a sense?

A.  I don't.

Q.  You don't have any sense whatsoever?

A.  Don't remember.  Don't know.

Q.  And as a partner in Silar, did you ever receive any percentage of the fees that would have been earned as the paying agent?

A.  Well, not really, no.  No.  Because we would have -- I would have gotten a payout as of the end of the year 2007 once the year-ended, but I left in November of 2007.  So I never saw what Silar the management company might have made or not made.

Q.  And as part of your separation from Silar --

A.  Correct.

Q.  -- did you receive any compensation or --

A.  Did --

Q.  -- or when you left?

A.  Yes.

Q.  And --

MR. NEWMAN:  Excuse me.  Let him finish the question because you are going to drive her nuts.  Okay.

THE WITNESS:  Oh, I'm sorry.

108

Q.  Was there any dollar amount assigned, whether it be in the written document or in conversations that you may have had upon your separation, regarding this deal and its value?

A.  No.  But --

Q.  Okay.

A.  As part of the separation from Silar, I bought Rob Leeds' piece of the preferred.

Q.  And he had a $200,000 piece as you did?

A.  Correct.

Q.  To this date, do you own those two 200,000 dollar pieces?

A.  I do.

Q.  And you own that personally as opposed to in a trust or something else?

A.  200,000 I own personally and 200,000 I own in a Roth IRA, along with my two sons who are partners in that Roth IRA, my two oldest sons.

Q.  They are partners in the Roth IRA which as part of it has this $200,000 piece?

A.  Correct.

Q.  And upon your son's departure from Silar, did he receive any compensation for the valuation of this deal?

A.  Specifically, no.

109

Q.  Other than the two $200,000 pieces that we just discussed, do you or any of your family members, whether directly or indirectly, hold any other pieces to this deal?

MR. NEWMAN:  Objection.

THE WITNESS:  Obviously they own $800,000, my stepchildren's trusts own $800,000 of an essentially worthless piece of Repotex, which I believe has been now changed into the common stock of something.

BY MR. SILBERFEIN:

Q.  And other than the investments by your stepchildren's trusts, are there any other investments by you or your family members in the deal?

A.  In Compass?

Q.  Yes.

A.  No.

Q.  I think before you testified that you don't know exactly how the revenue came in and if it was to a lockbox, but basically the mortgage company would send money to Silar I think as paying agent.  Is that your understanding of how the monies were received?

A.  I believe so.

28 (Pages 106 to 109)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

110

Q. Was there any other revenue stream for this deal that would be coming into Silar?

A. I don't know.

Q. Were you ever told that there was any other revenue?

A. I don't know.

Q. You don't know if you were ever told that?

A. I don't -- if I don't know if there was any other revenue, I certainly don't know if it was told that there was other revenue, or else I would know there was other revenue. I don't know.

Q. When you left Silar, what was your understanding of the time horizon on which the senior repo would be paid back?

A. I told you, I didn't know that there was a -- as far as I knew -- I take it back. It wasn't an issue. I didn't know.

Q. Why wasn't it an issue for you?

A. I didn't know. It wasn't anything I was thinking about.

Q. But you took Rob Leeds' position when you left?

A. Correct.

Q. At that point did you still feel it was money good?

111

A. I did.

Q. And you didn't have -- but, although you thought that it was money good, you didn't necessarily have an understanding of how long it would take for that money good position to be paid off?

A. Correct. But it was certainly accruing at a high enough interest rate that I was happy enough to have it accrue.

Q. What was the interest rate at that point?

A. I said to you it started out 27 and a half and then it was raised. What the exact amount it was raised to, I can't say that I recall specifically, but somewhere around 32 percent.

Q. And it had already been raised by that point when you left Silar?

A. Correct.

Q. When you left Silar, did you have a sense of at what rate revenue was being received by Silar from the mortgage company?

A. No.

Q. Was it zero?

A. I just said I didn't know.

Q. Well, I asked at what rate. It doesn't mean if it was zero, you may have known that. It could

112

have been a different answer to the question.

A. I didn't know.

Q. Did you know that some revenue was being received?

A. Didn't know.

Q. You had no -- you're a partner at Silar but you have no idea whether or not any monies were being received as part of this deal?

A. As far as I knew, the money was coming in as it was supposed to come in. Okay? Lenny was very optimistic. Everybody seemed to be perfectly fine with the deal. As I recall at the time, the woman who was the leader of the, let's call them the dissidents, was in the process of being reprimanded and being held in contempt by the judge.

Q. When was that? I'm sorry. That was when you were leaving Silar?

A. A little before -- a little after -- somewhere around that time.

Q. And you were aware of that?

A. I was aware, yes, of that.

Q. That she was being slapped around by the judge?

A. That she was slapped around by the judge.

MR. NEWMAN: Not the judge in this case

113

who is a great guy.

THE WITNESS: Not this judge.

(Discussion off the record.)

BY MR. SILBERFEIN:

Q. When you were negotiating your severance, for lack of a better word, your separation from Silar, was it Rob Leeds' position that this was money good as well?

A. Was it Rob Leeds' position? Of course. It had to be because Rob Leeds had a position for the firm -- for the fund, which was other people's money, and it was marked at a hundred cents on the dollar. If Rob Leeds felt it wasn't money good, then he's guilty of criminal whatever. So, obviously, he had to believe that it was money good.

Q. And you believe Rob Leeds is someone of high integrity?

A. I don't think it's -- what I believe with regard to Rob Leeds' integrity is, you know, is necessarily relevant here.

Q. Maybe or maybe not, but I would still like an answer to my question.

A. Do I think he's someone of high integrity? No.

Q. I believe you testified you became acquainted

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

114

with Rob when you joined Silar or shortly before you joined Silar?

A. I became acquainted with Rob when I was introduced to Rob by Len Mezei.

Q. When was that?

A. Some time prior to September of -- right around September of 2006.

Q. Which is when Silar was formed?

A. Correct.

Q. And your son went there?

A. Correct.

Q. Okay. Have you had business relationships with Rob Leeds since your departure from Silar?

A. Only in trying to get my money out of Silar.

Q. Has Silar failed to live up to certain of its obligations to you?

A. One might look at it that way.

Q. Do you look at it that way?

A. Yes and no. It's been a very difficult time for Silar. It's been a very difficult time for asset-backed lending funds.

Q. Today, do you have an understanding of what the value of Silar is or its assets under management?

A. None whatsoever.

115

Q. Zero, or no information or no --

A. No information. Answering your question, I have no understanding what the value of the assets of Silar are.

Q. How much, approximately, are you owed by Silar?

A. A partnership of which I am the managing partner is owed approximately 170, $180,000, I believe.

Q. And is that the, quote, last piece of what they owe you from when you separated from them?

A. Yes. Can I expand on that answer?

Q. Sure.

A. That is because that particular piece was carved out as a designated investment and it was the last piece liquidated to pay me off. The balance of my investments in Silar were paid off long before that.

Q. And has this last piece been liquidated as far as you know?

A. It has been liquidated.

Q. But you have not been paid?

A. Correct.

Q. We have talked around this issue a little bit, but I just want to go back and talk about it a

116

little more fully. I think you testified that you met Mr. Mezei for the first time in Riverdale when you moved there approximately 15 years ago?

A. Correct.

Q. Over the last 13 or 14 years, I guess, up until the time prior to this lawsuit, can you describe to me your relationship with Len?

A. Close friends.

Q. You saw him socially?

A. Yes.

Q. You talked business?

A. All the time.

Q. Talked about your kids?

A. Yes.

Q. Your wives were friendly; is that true?

A. Yes. Not as friendly as we were.

Q. But you went out socially with each other as couples or as families?

A. Yes. Not as families. As couples.

Q. Do you know the members of Len's family?

A. Yes.

Q. Does he know the members of yours?

A. Yes.

Q. Prior to the circumstances giving rise to this litigation, what would you -- how would you

117

characterize your opinion of Len's integrity?

A. It's gone down. It has -- since the time of this original investment, it has basically fallen off a cliff.

Q. And that cliff I assume at the time, and correct me if I'm wrong, was relatively high. You were very good friends and you had a high perception of his integrity. Is that fair?

A. Yes.

Q. But since then, as you suggested, it's fallen off the cliff. Is that a "yes"?

A. Yes.

Q. Is that correct?

A. Yes.

Q. Why do you believe that Len has made good on certain of your investments with him but not others?

A. Number one, because he's making money. Number two, because they were much more straightforward kind of investments. The ones he has made good on, as I said -- of the total amount that I, x the $800,000 here for my wife's children -- of the total amount that I ever had with Len, maybe I have gotten back 60 percent. So, let's not look at the total thing and say oh well you got all your money back and the only thing you are

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

118

fighting about is a little bit. No. I haven't gotten all my money back. He's still got two and a half million plus of my money. Am I concerned about that? Do I think I have a good chance of getting it back? I am sure that it will take a tremendous amount of effort to get the rest of it back.

He called my son on Thursday and said instead of the agreement that we made, which he's violated and changed and amended and bounced checks on, now, we don't want to pay you -- we're not going to pay you from 200,000 to 50,000 -- 200,000 on a particular date to $50,000 a week, now we want to pay you $10,000 a week. So, in other words, to stretch it out another five times what it's supposed to be stretched out. And so -- and he said if you don't agree to that, we're not going to pay you at all, so.

Q. And who --

A. I hope I have answered your question.

Q. Sort of. From whom did you learn of that -- the sum and substance of that conversation?

A. From my son. However, I walked into his office while he was on the phone with Lenny on speaker phone, so I heard it straight from the horse's mouth so to speak.

119

Q. Your investment with Len, that was the loan to Northern Leasing --

A. There was a loan. It wasn't an investment. I didn't have an equity interest.

Q. The loan you made to Northern Leasing --

A. Correct.

Q. In what name was your loan made?

A. Fragin Family Partners.

Q. And how about your loan on the Compass HUD property?

A. There were three different pieces. There was, as I recall, Fragin Family Partners, the Monroe Fragin Trust, and Fragin Family Trust Number 2.

Now, subsequent to that time, Fragin Family Trust Number 2 has been folded into Fragin Family Partners. So it doesn't exist anymore.

Q. But each of those three entities got paid back what they were supposed to under that deal; is that correct?

A. Like I said to you, I never saw a Northern Leasing statement, but as far as I know, yes.

Q. And from which entity made the loan to First Funds?

A. I'm not sure, but I think that also was a combination.

120

Q. The Fragin Family Trust?

A. Those three entities.

Q. The same three entities?

A. I believe.

Q. And what entity holds your IRA, if any, was it you personally?

A. Me.

Q. And that is the entity, your IRA in your name that lent the money to Mr. Mezei?

A. Correct.

(Discussion off the record.)

(Lunch recess from 12:46 to 1:33.)

BY MR. SILBERFEIN:

Q. Before we took the lunch break, we had been discussing at one point I think SPE and you gave us the title of what an SPE is or SPV?

A. SPV.

Q. Was an SPE or SPV involved in the Compass transaction?

A. I don't know.

Q. And what's the purpose of an SPE or an SPV?

A. What I understand is an SPV is a vehicle, a special purchase vehicle, where you can put collateral, and that makes it easy for a lender to attach the collateral.

121

Q. And are other assets other than the collateral usually placed into the SPV?

A. I don't know.

Q. Have you used SPVs in your past transactions?

A. Ever?

Q. Yes.

A. Yes. I mentioned an SPV because that was -- you're asking me about the Northern Leasing loan from Mezei -- I mean to Mezei -- and the only time I've ever used an SPV that I recall is on this loan for Mezei. Now I heard the term when I was at Silar.

Q. But you didn't at the time nor it sounds like now have an understanding of what other assets would have been placed into an SPV or not?

A. Correct.

Q. And specifically on this deal you don't know what would have been placed into the SPV or not?

A. Which deal?

Q. The Compass deal.

A. I have no idea.

Q. If other assets were going to be able to be part of the payback to the senior piece, would it have been your expectation that it would have been placed in the SPV as well?

31 (Pages 118 to 121)

122

A. I don't know that there was an SPV, so it's difficult for me to answer. I have no idea.

Q. And have you ever seen the contracts involving Gottex and the senior piece and Compass?

A. You asked me that already earlier and I said no.

Q. Were you aware, while you were at Silar, of any other ways that the senior piece would have been paid off by the mortgage company other than the liquidation of its assets or the servicing fees?

MR. NEWMAN: I object. The form of that question is wrong. It's too limited.

MR. SILBERFEIN: Your objection could be objection. You don't need to expand upon it. And any attempt to expand upon it, I can only take as a way of trying or sending a signal to the witness. I don't suggest you do it, but that is the only way I can take it. You can say objection, and that's all you need to say, or you can direct the witness not to answer. But you can't go into why it's too limiting or what that means, I don't even know, but it's improper.

MR. NEWMAN: I object to the form of the question. I am giving you a chance to

123

properly phrase it. And I was trying to give you a little hint as to where your question was wrong. But it's okay with me. If you can answer the question, be my guest.

THE WITNESS: Can you repeat the question?

MR. SILBERFEIN: I can't repeat it, but I can have it read back.

(Whereupon, the question was read back as follows:)

"QUESTION: Were you aware, while you were at Silar, of any other ways that the senior piece would have been paid off by the mortgage company other than the liquidation of its assets or the servicing fees?"

THE WITNESS: No.

BY MR. SILBERFEIN:

Q. I would like to move our discussion now to the other say deal that we had some confusion about, which would ultimately be the $800,000 at issue --

MR. NEWMAN: That's where you went wrong.

MR. SILBERFEIN: He's already testified. I already have it on the record.

Q. So the deal that's the 800,000 at issue in

124

this litigation?

A. Plus interest, plus legal fees, plus punitive damages.

Q. Fine. There wasn't really a question there, so I strike the witness' testimony.

When did you first have discussions regarding investment of approximately $800,000 in principal for what you understood to be a portion of either the senior or the preferred piece?

A. I never had a discussion with anybody about the investment into a preferred piece. And the first discussion -- you're talking about of my wife's trusts going in there?

Q. I am asking about the $800,000.

A. The first time that this was ever mentioned was at the Young Israel of Riverdale on or around Memorial Day when Lenny said to me that they have a guy who is taking Gottex out.

Q. Prior to that conversation, had you had any conversations with Mr. Mezei regarding taking Gottex out?

A. Yes.

Q. And what in general were the sum and substance of those conversation?

A. I always told him get rid of Gottex.

125

Q. Why did you believe that to be wise?

A. Because Gottex was the 800 pound gorilla in the room. By 2008 things were deteriorating for those kind of funds. And Gottex had -- there was a piece in the paper or maybe two different pieces of the paper about two or three months earlier, or maybe even earlier than that, saying that Gottex had invested in another fund, I believe, and had been defrauded. And they were getting redemptions. When you are a fund and you are getting redemptions, there's pressure on that fund to get their money back. That's just the way it is. And garbage flows downhill. If you are going to -- if Gottex is going to be your lender and they're getting squeezed, you're going to get squeezed.

Now, if you say to me well it's all paper, it's all this, it's all that, now you're going to get squeezed, you got squeezed. You got squeezed.

As a matter of fact, if you take a look, Mr. Mezei and his business today told me -- has told me Merrill Lynch went out of business, this one went out of business, the bank that begins with an S got taken over by Banco Santander, and he's getting squeezed. It happens.

Q. When did you first have these conversations

32 (Pages 122 to 125)

126

with Mr. Mezei regarding Gottex?

A. We always had these conversations.

Q. While you were still at Silar you had these conversations?

A. Mostly -- yes. Probably while I was at Silar, and we would talk all the time.

Q. About Gottex and taking them out?

A. No, I didn't say that. I said we would talk all the time.

Q. But we were just discussing Gottex and your advice to take them out. I know that you had 15, or at that point 12 years of a relationship with Mr. Mezei.

A. That is why I said we would talk all the time.

Q. So I am asking specifically with regard to taking Gottex out.

A. Taking Gottex out, Mr. Mezei knew my feeling forever. Get rid of them as quickly as you can get rid of them.

Q. And that would have been from the inception of the deal?

A. Within four months of the inception of the deal.

Q. And did you have e-mail communications with

127

Mr. Mezei about taking Gottex out?

A. Minor. It's possible, but, you know.

Q. Did you have conversations with Rob Leeds about taking Gottex out?

A. No.

Q. Did you have conversations with Greg Fragin about taking Gottex out?

A. I might have.

Q. As you sit here now, do you recall any conversations with Greg about taking Gottex out?

A. No.

Q. And based upon your conversations with Mr. Mezei regarding taking Gottex out, were you under the impression that any steps were being undertaken to take Gottex out?

A. No, not until the conversation I told you about Memorial Day.

Q. And what was your understanding at that point of what was being done?

A. He said that he had someone who wanted the whole thing, and he wanted to take -- he was going to buy Gottex's whole thing. And then he brought up to me if you have any pockets that might be interested to, you know, if you have any money that you might be interested in part of it, I can get you

128

in but you have to hurry.

Q. And who was the person or the entity that wanted the whole thing?

A. He didn't tell me.

Q. Did you ask --

A. I --

Q. I'm sorry, I didn't mean to cut you off.

A. Yes, I believe I did ask and he was reluctant to tell me.

Q. Did he ultimately tell you?

A. No, he never told me.

Q. So as you sit here today, do you know which entity that was supposed to be?

A. Yes.

Q. And who was that?

A. Something called Paradigm.

Q. And how did you learn of Paradigm if Mr. Mezei was not the one that told you?

A. Subsequent -- Mr. Mezei has never told me -- just like Mr. Mezei has never told me anything about this deal. Anything that I have learned I have learned outside of Mr. Mezei. I saw an offering circular that Paradigm had sent out to a mailing list.

Q. And when was this?

129

A. When did I see it?

Q. Yes.

A. At least, at least a year after my wife's trust put the money in. I would say probably a year and a half after. Someone that they were soliciting for an investment gave it to me.

Q. And I believe it's your testimony that Mr. Mezei offered you an opportunity to get in on the deal if you acted quickly or something to that effect?

A. Correct.

Q. And did you respond to that offer?

A. I asked him what's happening. He said, well, I got a guy, he wants to take it all. I said how long you think it will be. He said not even a year, but on the outside two years. So I said how is everything going. And he told me everything is going great. Everything is great. So I said to him I will speak to Karen. We might be interested. And then we had a subsequent conversation, it might have been the next day, and he -- I said Karen would do this for her kids' trusts. And I said to him specifically -- I remember this like it was yesterday, I said this is Karen's kids' money. Quote, I don't want to get a divorce over this, end

33 (Pages 126 to 129)

130

quote. At which time he said, no, not a chance, everything is perfect. Wonderful. Perfect.

Q. Is Karen's kids' trust different than your kids' trusts or money for you?

A. Is my shirt different than your shirt?

Q. For you. The way you feel. I am not asking --

A. I have no control over Karen's kids' trusts. I spoke to Karen. Karen is the trustee for Karen's kids trusts, as was communicated to Mr. Mezei in e-mails.

Q. I am not asking about control, per se. What I'm asking you is do you feel the same way about an investment if it was for your kids' trust or if it was for Karen's kids' trusts?

A. If you are asking me if I am looking -- if I am willing to take any more risk for Karen's kids than my own kids, it's not my decision. Whatever risk Karen is willing to take for her children, that is her decision. Whatever I am willing to take for my children is my decision. However, my children's trusts have a lot more money.

Q. Do you treat Karen's kid as your own?

A. For the most part, yes.

Q. For what part don't you?

131

MR. NEWMAN: Objection.

MR. SILBERFEIN: He just said for the most part. I am asking what part he doesn't.

MR. NEWMAN: I am objecting.

BY MR. SILBERFEIN:

Q. Okay. You can answer.

A. For what part don't I -- they have a father. So, you know, before I got married to Karen, a wise friend of mine said to me, I just want to tell you the most difficult thing in the world is raising someone else's child. So, obviously, with my kids where a parent is concerned, I have a final say. With Karen's children where a parent is concerned, I certainly don't. I have an ability to voice an opinion to my wife, but it's not up to me.

Q. Do you believe that you treated Karen's kids as you would treat or have treated your own?

A. As I have already said to you, when my kids went to high school I picked where they went to high school. When my stepkids went to high school, I didn't have anything to say. When my kids got married, I had a lot to say about who they married. When my stepkids got married, I had much, much less to say about how they got married.

So did I treat them -- I feel I treat them as

132

well as I possibly could being a stepparent. However, I'm not their parent.

Q. What do Karen's kids call you as a name? Do they call you Gary or something else?

A. They call me Totty.

Q. And what does that mean?

A. It's Yiddish for father.

MR. NEWMAN: Is this going somewhere that's relevant? I am going to ask you to try to get back to this litigation.

MR. SILBERFEIN: This is part of the litigation, but I appreciate your comment.

BY MR. SILBERFEIN:

Q. So you testified about one conversation and then a second conversation with Mr. Mezei maybe the next day. And it sounds like in the interim you had discussed this with Karen?

A. I did.

Q. The verbatim quote that you gave me earlier as part of your second conversation with Mr. Mezei. What else did you tell him in that conversation, if anything?

A. What else did I tell him?

Q. Did you tell him they would do it, not do it? Did you discuss the details of the investment?

133

A. I said I believe that Karen would like to do $800,000 in total for all five of her kids' trusts.

Q. Did you ask to see any documents before agreeing to have the trust invest the $800,000?

A. Documents with regard to what? I didn't ask, no.

Q. Did you speak to anyone, Mr. Mezei or otherwise, regarding how the assets were performing?

A. Yes.

Q. And who did you speak to?

A. Mr. Mezei.

Q. And were those conversations the two that you just relayed to me or were there additional conversations?

A. There might have been one or two additional conversations, but always that everything was going terrific.

Q. And that was good enough for you?

A. Yes. Can I expand on that answer?

Q. Feel free.

A. Okay. Understand, when we had this discussion, what I spoke to my wife about regarding her children's trust, and what I spoke to Len about was buying the Compass notes, not buying anything called Repotex. I never heard of anything called

34 (Pages 130 to 133)

134

Repotex. Len never mentioned anything called Repotex. And as a matter of fact, when I asked for the wire instructions, which I got from Cathy Ilardi his secretary, he gave me wire instructions to send it to EGG. And I specifically asked why am I sending the money to EGG rather than to Gottex. And he said I am putting the money together and then we are going to do it in one transaction.

Now, Repotex existed at the time. If I was going to put the money in and buy Repotex notes, why didn't I wire it to Repotex? Because Mr. Mezei did not want me to know. Had I known about the existence of Repotex, this transaction never would have taken place. Had I known he wasn't taking Gottex out, which he represented to me, this transaction never would have taken place. This was absolute falsehood. This was misrepresentation from start to finish. He didn't want me to know, and he did everything he possibly could to make sure that I didn't know. As a matter of fact, the money went in June the 3rd. I never heard of Repotex until mid to end of July.

Q. How did you first learn of them?

A. Either -- I am not sure which I learned first, the fact that he didn't take out Gottex or

135

the existence of Repotex. The existence of Repotex we got when I sent, I think, two e-mails, might have been one, might have been three, asking where is -- where are the notes? Where's the papering here? I want the Compass notes that we bought, that my stepchildren's trust bought. And there's an e-mail, some sort of an e-mail trail where I think Len sends an e-mail to Ron Friedman to send the notes. And when we got the notes, I looked at the Federal Express package and it says Repotex. Surprise.

I called Len, and I believe I said -- I don't know if you are allowed to say dirty words on the thing.

Q. Say what you said.

A. And I said to him, "What the Fuck is Repotex? "And then Len began his usual, oh misunderstanding, Repotex is a pass-through. We just started Repotex. So that the money just goes into Repotex and passes through to -- so I said what do you need this for? You got one guy who bought out Gottex. Oh, we didn't take out Gottex. I said what do you mean you didn't take out Gottex. And he said -- I said then give her her money back. And he said I already sent it in. I said I thought you told me when you gave me EGG wire instructions that you were putting it

136

all together and taking Gottex out in one piece. None of it was true. Absolute lies from start to finish. And the facts -- the facts support exactly what I'm saying.

Q. Did there come a time when you had conversations with Mr. Mezei about other investors in taking Gottex out?

A. Taking Gottex out? No.

Q. Other investors in acquiring a piece of the senior repo?

A. No.

Q. Did you ever refer Mr. Mezei to any other investors with regard to the Compass deal?

A. Nothing to do with Compass. Benny Kest once mentioned to me that he was looking to do various things. What was I doing. I mentioned Len Mezei to him.

Q. When was this?

A. Prior to all this happening.

Q. "All this" meaning the 800,000?

A. Correct.

Q. Was it after Compass had purchased the assets?

A. I was no longer at Silar. So it was probably some time in 2008. Now, Benny Kest lost his mother

137

and then subsequently his father. The Kest family is an extremely well-to-do family. And I think what he said to me was that he had a lot of cash. I don't remember the conversation verbatim.

Q. You don't recall with Mr. Kest?

A. That's what I just said.

Q. And so did you ever have a conversation with Mr. Mezei about him? Did you ever a conversation with Mr. Mezei about Mr. Kest?

A. I don't recall. Yes, I did.

Q. And when was that?

A. Some time in the spring where he told me --

Q. Who is "he"?

A. Where Len Mezei told me that Kest was taking a unit. And I believe I wrote back and I said what's a unit. I don't recall any other further e-mails with regard to that.

Q. And in your discussions with Mr. Mezei about taking Gottex out, did you ever suggest any other potential entities or individuals to Mr. Mezei that may be in position to take out Gottex?

A. Not that I recall. And I never discussed Kest with regard to Gottex either because I had no idea until Mezei came to me and told me that they were taking Gottex out and that he was

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

138

oversubscribed, that his guy wanted it all.

Q. And his guy was Paradigm as you later learned?

A. I believe that -- I mean, who knows. His guy didn't exist. So it didn't make any difference because there was nobody who made a commitment who took out one dollar of Gottex's stuff after the first six and three-quarter million that took place on April the 15th. On May the -- I'm sorry. I misspoke. On May the 1st -- this is what I learned later from a former partner at Silar was on May the 1st they needed three and three-quarter -- three and a quarter million dollars of payment to Gottex as part of their paydown and extension agreement.

Len had raised no more money at that time except for $300,000 from somebody, which I subsequently learned in discovery. So, he and Silar were going to split that payment. Silar put in half. Len put in the balance of half minus the $300,000. That money went in from him from EGG.

Q. Based upon your two conversations in Riverdale, I guess it was the one at the Young Israel and then the one possibly the following --

A. Probably in the same place.

Q. Possibly the following day. What was your

139

understanding of what was being purchased or what were you getting in exchange for the money to be invested?

A. Gottex's 18 percent note.

Q. So it would be a part of the senior repo?

A. It would be a part of the senior repo, correct.

Q. By receiving the Repotex notes, did you receive something other than a portion of the senior repo?

A. What?

Q. Did you still receive your portion of the senior repo?

A. No. My children's trusts received a note that said each one of the five in the proportionate amounts of money that they put in received notes from something called Repotex, which as I said before I had never heard of, nor certainly my wife had never agreed to buy.

Q. As you sit here today, do you have an understanding of what Repotex owns or doesn't own?

A. Today?

Q. Yes.

A. I don't know what they own.

Q. Do you or did you believe that Repotex owned

140

a portion of the senior repo?

A. When I was doing the -- when we were doing this deal?

Q. No. You've already made it clear that you didn't know of Repotex. So I am asking you what your understanding at some other point when you learned of Repotex was whether Repotex owned senior repo, preferred, something completely unrelated, or something else?

A. From what I understand subsequent in discovery, Repotex with the money that Mezei raised on April the 15th and May the 1st bought the Gottex 18 percent notes.

Now, let us understand you seem to be talking about a repo as a repo and a loan are different things. A repo is a financing vehicle. As a matter of fact, the IRS treats a repo as if it is interest. Now you would say well wait a second a repo means that if I have treasuries and you want to borrow -- and I want to borrow money, I give you my treasuries, you give me cash. I buy them back the next day. It would seem like that would be a capital transaction if a repo were a sale and resale. It's not a capital transaction. The IRS views it as a lending transaction. So all it is is

141

another way to make a loan, in effect, a secured loan. That's the way I understood it when I was doing them at Steinhardt strictly in the treasury market.

Q. And how does that relate to what my question was?

A. Well, you keep saying the repo, the senior repo, as if it's not -- you know, it wasn't notes.

Q. Maybe that's the way you take it. I don't think I said that at all.

A. Okay.

Q. So I will go back to my question. What did you believe you were receiving in exchange of the $800,000?

A. The notes that Gottex owned, or a proportionate share of those notes when Gottex was taken out.

Q. And if Gottex was to be taken out, as you understood, would you have received Gottex notes or something else?

A. The Compass notes. As a matter of fact, my e-mail to them when I told -- when I sent telling them that wires were coming in from my wife's kids' trusts. I wrote 18 percent Compass notes.

Q. And that you believe represents the senior

36 (Pages 138 to 141)

142

piece that you believed you were getting?

A. Correct.

Q. While we were discussing this before you said, I think you used the term oversubscribed?

A. Correct.

Q. What does that mean?

A. He had a buyer who had an appetite bigger than the amount of supply.

Q. And if it was oversubscribed, what was your understanding of why you could still purchase a piece?

A. Because he was my friend. He was helping me out and getting me in.

Q. I believe you testified that by the money staying in EGG it was never sent anywhere else. Is that fair?

A. That's correct.

Q. Did EGG ever transfer money to Repotex?

A. Yes. Very interesting that you should ask that question because according to Mezei and Friedman, Repotex -- and according to the bank statements, Repotex paid interest in July, August, September, October. They paid interest for months. Yet, Mr. Mezei's argument is that Repotex was no real operating company. It was a pass-through.

143

Well, guess what, nothing was passed through because there was no interest paid from -- there was no money paid from Compass. So if Repotex had only an asset of owning the Compass notes and Compass never paid any money, how did Repotex pay this so-called "interest." You know how? EGG kept taking money and putting it into Repotex which Repotex then sent to the noteholders. Except they never told the noteholders, any of them, that these notes were not earning any money because the asset was never paying. So what EGG did under Mr. Mezei's wonderful direction was take the money and then use that $800,000 to pay the interest to the people who had put, including us, including my wife's kids, and pay the interest on the money that was owed going forward. So he took new money to pay off the old money. The Bernie Madoff of Riverdale sitting right next to you. That is called an Ponzi scheme.

Q. And did you ever ask where the interest was coming from?

A. We never knew that it wasn't paying, but Mr. Mezei continued --

Q. It's a simple yes or no question, Mr. Fragin. Did you ever ask --

A. What?

144

Q. Where the interest was coming from?

A. You mean whether or not he was operating an Ponzi scheme?

Q. No. The question is very clear, Mr. Fragin. You're very artful with your words. I'm asking you a very simple question. Did you ever ask where the interest was coming from?

A. It came from Repotex.

Q. Did you ever ask -- I would like an answer to my question, please.

A. I said the money came from Repotex.

Q. Did you ever ask Mr. Mezei where the money was coming from?

A. It came from Repotex. It said Repotex on it.

Q. Why don't you answer my question because you don't like to give me the answer?

A. I don't know. What's your question?

MR. NEWMAN: I object as badgering.

MR. SILBERFEIN: Direct your witness to answer the question. It's a very simple question. You didn't object once to the question.

MR. NEWMAN: I know. And how many times did you ask it?

MR. SILBERFEIN: Because he's not giving

145

me an answer. Not an answer I want or don't want. I want an answer.

THE WITNESS: Give me the question.

MR. SILBERFEIN: I'll have it read back for you.

(Whereupon, the question was read back as follows:)

"QUESTION: Did you ever ask Mr. Mezei where the money was coming from?"

A. We didn't feel it was necessary to ask. The answer is no because it was coming from an account which was labeled Repotex.

Q. And you didn't object to receiving money from Repotex even though you didn't understand that you were purchasing Repotex notes; is that correct?

A. I objected immediately and said give her the money back.

Q. But you retained the interest from Repotex?

A. What choice did I have? The only reason that I didn't sue immediately was because my wife is much less -- was much less upset than I was. I knew I had been lied to.

Q. Who controls Karen's kids' trusts?

A. Karen and one of her sisters.

Q. There's co-trustees?

37 (Pages 142 to 145)

146

A. Yes.

Q. And what is Karen's sister's name that is the co-trustee?

A. I don't remember which one is the co-trustee. I believe it's Nancy Markovich, but it might be Linda Sandell.

Q. Were Nancy or Linda whoever is the co-trustee involved in the decision to invest this $800,000?

A. You have to ask Karen that. I don't know.

Q. Did you speak to either one of them regarding the $800,000?

A. Not that I'm aware.

Q. Did you ever represent to Mr. Mezei that you were acting as the agent for the trust?

A. Acting as the agent?

Q. Yes.

A. I'm not sure what that means.

Q. So is the answer no then?

A. I never represented that I was acting, period, for the trust. I always told him that's up to Karen. She's the trustee.

Q. I believe you testified that you learned that the money was to be wired to an account for EGG from Catherine Ilardi?

A. I got an e-mail from Cathy Ilardi.

147

Q. You received that e-mail?

A. Yes.

Q. And what did you do following that e-mail with regard to the payment?

A. I had a conversation with Lenny on the phone, and I said why are we wiring the money to EGG rather than Gottex.

Q. And then how did it come about that the money was wired to EGG?

A. Karen made arrangements for the kids' trusts at Charles Schwab to wire the money, except for a $10,000 check for one of the kids, I believe it was Sam Nussbaum, which she gave me and I sent either by Fed Ex or by hand to Cathy Ilardi.

Q. And after your conversation with Mr. Mezei regarding EGG as the recipient of the money, did you tell Karen to send the money to EGG?

A. I gave her the wire instructions. I forwarded the wire instructions that I got.

Q. Are you aware of any communications that Len may have had with your wife during those two days' worth of conversations regarding the investment?

A. I'm not aware that they were or weren't.

Q. Are you aware that Karen and Len ever had any discussions regarding this investment?

148

A. Not that I'm aware. Oh, I'm sorry. I want to amend that. Are you talking about prior to making the investment or subsequent?

Q. Any time.

A. Oh, yes. They had a lot of conversations.

Q. And what is your understanding of what was said between the two of them?

A. Karen said to Len, you know, and Len -- she was concerned about the money and concerned about what was happening. And Len assured her that everything was okay and everything was fine and he did everything perfectly, you know, the old -- he gave her the old would you think that I -- that's, of course, long before we ever found all this stuff in discovery, particularly the fact that he, A, never put her money into the investment, put her money into his pocket, or that he was running a Ponzi scheme.

Q. At the time that the $800,000 was transferred -- strike that.

After the $800,000 was transferred, what was your understanding of who owned the senior repo?

A. Of who owned the senior repo? That it was divided between overwhelmingly the -- whoever the party was that wanted to buy Gottex out and perhaps

149

my stepchildren's trusts, and maybe some other small investors that Lenny might have, you know, wanted to give something to.

Q. Did you ever ask to see any documents confirming that understanding?

A. No, because there would be no documents that would exist given the fact that you were buying an already existing item. In other words, Repotex was a new company. There are different rules, different securities law rules with regard to starting a new company than there are with buying an existing security. If you are buying an existing security, something is already out there in public or even private, the rules are one way. But if you are buying something that's brand new, the rules are totally different, totally different. There is much, much disclosure with the former. In this case there was no disclosure.

Q. And did you ask to see any of the disclosure that you would normally see?

A. As I said to you, you are buying something that was already there.

Q. That's not my question. It's again a yes or no question. Did you ask to see any of the disclosure that you would expect to see?

38 (Pages 146 to 149)

**150**

A. In terms of what?

Q. Whether it was the old deal or the new deal?

A. I didn't know there was a new deal. I couldn't ask for the new deal.

Q. Did you ask for anything for the old deal?

A. No.

Q. And when you learned that the money was to go to EGG, did you ask to see any documentation?

A. No.

Q. And when you received the Repotex notes, did you ask to see any documentation?

A. Yes.

Q. What documentation did you ask to see?

A. I asked to see the formation agreements for Repotex.

Q. Did you do that orally or in writing?

A. Orally.

Q. And to whom did you make that request?

A. Len Mezei.

Q. Did you ever put that request in writing?

A. No.

Q. Did you ever put any due diligence request in writing to Mr. Mezei regarding this deal?

A. No. We trusted Mr. Mezei, obviously in error.

**151**

Q. After you received interest payments from Repotex, did you ask to see any due diligence?

A. Number one, as it turns out, we didn't receive interest payments from Repotex.

Q. The checks that you received for interest, on whose --

MR. NEWMAN: Let him finish his answer.

MR. SILBERFEIN: He's not answering the question.

MR. NEWMAN: Wait until he answers and then say you didn't answer my question.

THE WITNESS: When you received interest payments from Repotex, we did not receive interest payments from Repotex. We received money that was paid from Repotex supposedly looking like interest, but being that Repotex didn't get paid any interest, you couldn't have received any interest from Repotex.

BY MR. SILBERFEIN:

Q. The checks you received were on a check drawn against a Repotex account?

A. The one time I believe that they got checks. The other two times were wires. I think they got three payments. Two were wires. One was a check. Or maybe two and one that it said Repotex on the

**152**

check, I believe.

Q. And the wires, do you have any recollection of where those --

A. From Repotex.

Q. And did you understand -- have an understanding of whether interest payments were to be made on a monthly basis, regardless of whether or not the assets were being liquidated and causing a revenue stream or even if they weren't, you were supposed to be paid interest?

A. We were supposed to be paid interest. It says it clearly in the notes.

Q. And was that the same way the senior repo would be paid as you used -- like in the old deal?

A. I don't know how the senior repo was paying in the old deal. I think I told you that earlier.

Q. So you believed in exchange for the 800,000 that there were to be monthly payments regardless of whether or not revenue was being generated by the underlying asset. Is that correct?

A. I don't know if I thought about it quite like that. However, the notes clearly say that you are going -- and that's what I believed.

Q. But you had an understanding before the notes were actually drafted because the notes came later.

**153**

A. Right.

Q. So what was your understanding at the time you made the investment?

A. End of the month we are going to get paid. Every month. Interest. No principal. Interest.

Q. And when was principal to be paid?

A. On the outside, according to Mr. Mezei, two years. He said it will probably be a lot shorter than that, but on the outside two years, and that's what the notes say, which I believe were drafted by your firm.

Q. So, you believe that -- now understanding that Repotex in your words is a new deal, that this new deal may reflect a different payment obligation as the senior repo was under, quote, the old deal?

A. A different payment obligation?

Q. Yes. Meaning how the senior repo was to be paid in the old deal versus how you were to be paid in the new deal.

A. Well, at the time the deal, I certainly couldn't have felt that way because I didn't know of the existence of Repotex. But now, the Repotex notes that were sent to us represented what I was told by Lenny was going to happen except for the fact that they were a totally different entity.

39 (Pages 150 to 153)

154

May I expound on that? The Repotex, which according to Mr. Mezei's testimony both in filings in front of the court and in his deposition, he said was exactly the same, a pass-through, exactly the same as if you bought Compass notes.

Now, let's examine that for a second. If you bought a Compass note and Compass didn't pay, according to the note, a noteholder would have the ability to foreclose on Compass. However, with regard to Repotex, a noteholder in Repotex was a noteholder of a company controlled by Len Mezei which was a creditor of another company controlled by Len Mezei. So there was no way that a Repotex noteholder could take any action against the collateral which was in Compass. Now, who in the world would lend money to someone who is then going to turn around and say I am going to watch it, I will lend it to my right pocket and put it in my left pocket, and in case you want to foreclose, you can talk to my right pocket about foreclosing on my left pocket.

In addition, who ran Repotex? When one asks, Len conveniently can't remember who ran Repotex, except there's a guy named Greg Price, whose name is on the notes. Who was paying Greg Price? Compass.

155

Mezei was -- Greg Price was employed by Mezei. How was he supposed to protect the interests of the so-called Repotex noteholders? The whole thing was a sham.

MR. SILBERFEIN: Can I have last question read back, please?

(Whereupon, the question was read back as follows:)

"QUESTION: Yes. Meaning how the senior repo was to be paid in the old deal versus how you were to be paid in the new deal."

MR. SILBERFEIN: I ask the parts of that response that are not responsive to my question be stricken.

A. I said can I expound, and you didn't say no.

MR. NEWMAN: Don't argue with him. Let him do whatever he wants.

THE WITNESS: I can't wait until you ask in front of the judge.

BY MR. SILBERFEIN:

Q. Anything else you want to say before I ask a question?

A. Lots but --

Q. Go ahead. We're here. We're on your dime.

MR. NEWMAN: No. Gary, please don't.

156

Let's wait for the next question.

Q. As you sit here today, do you believe the Repotex notes to adequately reflect the deal that you had with Mr. Mezei?

A. No.

Q. In what ways do they not?

A. I never spoke to Mr. Mezei about Repotex prior to the deal. My wife never agreed to invest her children's money in Repotex. So they can't possibly reflect what we expected to do.

Q. And when was the first time that you complained about the notes in writing, if at all?

A. I think a day or two after I got the -- I saw the notes that my wife got in a Fed Ex envelope.

Q. I think you testified that you may have had a conversation --

A. Correct.

Q. -- you said some language. I am asking in writing?

A. I don't remember whether it was in writing or it was orally. I made it clear that I wanted our money back.

Q. As you sit here today, do you remember putting any I'll say complaint in writing to Mr. Mezei or anyone else regarding the notes that

157

you received?

A. I don't recall.

Q. Are you aware of whom the other noteholders are of Repotex?

A. I can't give you chapter and verse who they are, but yes, I have a list which I got from discovery. Mr. Mezei never gave it to me.

Q. And have you contacted any of those other noteholders?

A. I have spoken to Benny Kest and briefly with Mark Mandell.

Q. And two of them are either individuals or representing entities that would be Repotex noteholders?

A. As far as I know.

Q. And what did you and Mr. Kest talk about?

A. That, what are you going to do. What are you going to do.

Q. And at what point did you have this first conversation with Mr. Kest?

A. I don't remember.

Q. Was it after the lawsuit had been commenced?

A. I believe so.

Q. And have you had additional conversations with Mr. Kest or just the one conversation?

40 (Pages 154 to 157)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

158

A. I have had additional conversations.

Q. And when was the last time you spoke to Mr. Kest?

A. Sunday morning.

Q. As in two days ago?

A. As in two days ago.

Q. And what did you and Mr. Kest discuss as it regards Repotex?

A. He asked me how it's going.

Q. And what did you say?

A. I said I am being deposed on Tuesday.

Q. And was there anything else discussed regarding Repotex on that call -- or on that conversation? I'm sorry.

A. Yes.

Q. What else?

A. He asked me if -- he asked me well what's the time. I said this is the last -- the end of discovery. And then we want a trial.

Q. Have you encouraged Mr. Kest to sue Mr. Mezei or any of the other defendants?

A. No.

Q. And when was the first time you spoke to Mr. Mandell about Repotex?

A. I don't remember.

159

Q. Was that an in-person conversation or by phone?

A. No. It was an in-person conversation, but there are other factors here with regard to Mr. Mandell, that we had very few conversations.

Q. When was the last time you spoke to Mr. Mandell regarding Repotex?

A. Monday morning.

Q. And what was discussed on Monday morning?

A. We were on the train together. And I was refreshing my memory with regard to coming to this deposition. I happened to be sitting directly across in those seats that --

Q. I'm aware.

A. -- from Mark, and we talked first about his moving to Muncie. He's moving out. And then I was reading the -- Mezei's deposition, and I started to laugh and he looked up. I said to him that Mezei's caddy Danny Redder, an attorney, is spreading around and has told many people in Riverdale that the reason that Len was able to take Karen's money and never put it in the deal but instead put it in his pocket is that Mezei advanced the money on May the 1st for Karen's children.

Q. To whom? Who did he advance the money to?

160

A. In other words, he advanced the money to Repotex because Karen's children didn't have the cash at the time and they needed to raise the money so they're going to put it in in June, so he advanced the money for them, in effect, he lent them the money and he was just paid back. So I was reading his deposition where he agrees that we spoke the first time Memorial Day, and I started to laugh at how exactly he advanced the money on May 1st when we never spoke about the deal until Memorial Day. Then I just said he must be a novy, he must be a prophet because he just was able to see in the future. I thought that was just a remarkable, remarkable explanation.

And then Mark Mandell said what do you mean. So I said Karen's kids' money never went into the deal. It went to Lenny and he kept it.

Q. Have you spoken to any other noteholders?

A. No.

Q. Did you encourage Mr. Mandell to sue Mr. Mezei or any of Mr. Mezei's entities?

A. No.

Q. Have you encouraged him to sue any of the other defendants?

A. I'm sorry?

161

Q. Have you encouraged him to sue any of the other defendants in this case?

A. No.

(Whereupon, Defendant's Deposition Exhibit No. Gary 4 was marked for Identification.)

(Discussion off the record.)

BY MR. SILBERFEIN:

Q. Over the investment -- between your time at Oppenheimer and Steinhardt and at Silar and Ducat and whatever else I am missing in between, the Fragin family, have you had occasion to make investments that didn't pay off the way you thought they would?

A. Sure.

Q. The original Compass deal, I mean the purchase from bankruptcy, do you believe that to be an investment that just didn't pay off?

A. Are you talking about our investment or are you talking about Mezei's original Compass?

Q. The Compass investment in purchasing the assets out of bankruptcy.

A. I don't know whether it will eventually pay off or not.

Q. As you sit here today, you don't have any

41 (Pages 158 to 161)

162

opinion on whether you believe it's --

A. I don't think it's going to pay off for Len Mezei.

Q. Do you think it will pay off for the senior repo?

A. I have no idea.

Q. Do you think it will pay off for the preferred?

A. Like I said, I have no idea. As I understand it today, the case is in court in Nevada and things do not look good. In addition, subsequent to making the investment which went into Repotex rather than Compass, my wife, her children or me have never received, other than the notes themselves and the three interest payments, have never received one single bit of information from Mr. Mezei or his entities. As a matter of fact, the only way we knew that I believe they went into bankruptcy is because I got a K-1 for Karen's kids from the accountants. He never told us another word. Not a word.

Q. I show you what's been marked as Gary 4. I ask that you take a look at this. Have you ever seen this e-mail string before?

A. This is not a Gary e-mail.

Q. I didn't suggest it was. I asked if you've

163

ever seen this e-mail string before?

A. I don't know whether I have seen it or not.

Q. I don't know if you need time to read it, but I'd like you to read it. If you have already done so, just let me know.

A. I think I have read it, but go ahead.

Q. Do you have an understanding of what the subject matter was of these three e-mails?

A. The subject matter I believe of this is the balance of the money that was owed to my son, Greg, after having as his separation from Silar.

Q. And in the middle e-mail, the 12:23 p.m. one, there is a reference to looks like Rob Leeds is letting Greg know to let you know about a distribution to Repotex this week. Have you ever heard about that distribution to Repotex?

A. There was a distribution which I found out about at the -- because when Compass filed for bankruptcy, I believe it was Compass filed for bankruptcy -- I believe when you file for bankruptcy you have to list your income and disbursements for the prior year, and there was a $350,000 payment from Compass to Repotex some time in February of 2009, and that money was never paid to, no portion of that money was ever paid to Karen's children. So

164

that's when I found out about it.

Now, the reason that he says, excuse me, prior pursuant to all the senior debt is because we had a meeting on December the 19th of 2008, which Fred Newman was at, where we were discussing getting the rest of our investment back from Silar. And in the conversation, that's when we first found out the details of the Repotex/Compass transaction that took place the prior -- six or seven months earlier.

Q. And do you have any understanding of why or why not this $350,000 that was paid to Repotex was or was not distributed to the senior debtholders?

A. According to Mr. Mezei, I forget whether it was a filing -- I think it was part of this filing. What he said was that we weren't entitled to it because we got -- I mean made some ridiculous calculation about how much money was paid and how much we got paid and this and that. However, what he said was that that money was money that he had advanced. Remember I told you EGG was paying the so-called interest, what they called interest which was not interest, from June through to that date, and he took the 353, as I understand it, and in effect paid himself back. Now, I never heard of a pass-through that can borrow money. So, how in the

165

world if they was just a pass-through, Repotex, what's he able to borrow money because pass-through has no assets.

Q. Didn't you get the benefit of that issue by receiving interest in the first place?

A. That is exactly like saying that didn't the investors at Bernie Madoff get the benefit of him paying them from new investors that were coming? We got part of our own money back.

Q. Had you ever advanced money to an entity in hopes of getting paid back because they had a debt to someone else?

A. You mean did anybody ever borrow money from me?

Q. Yes. Did anybody ever advance money on your behalf that you then paid back to them? Hey, here's 20 bucks, I will get you next week.

A. I've given people $20 in the past, yes.

Q. And they -- before you had given to it to them, they may have given someone else the $20 on your behalf?

A. No. No.

Q. You think that's a foreign concept?

A. I think the concept of paying people and not telling them that it's not interest because the

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

166

money is not coming in is criminal. That's what I think. And so does the law.

Q. Did you ever have any conversations or communications with either Len or Ron regarding the sloppiness, I think is the term, regarding the sloppiness of the notes?

A. The sloppiness of the notes?

Q. Yes.

A. I don't know.

Q. Did you ever have a conversation or a communication with Len or Ron regarding having them on a technicality?

A. No. What I said to them was -- what I said to them was that because Repotex was a new entity, in effect, a private placement, and because my stepchildren's trusts were not, not accredited investors, that he's required to give them the money back. That's the law. That's the securities law. What are you talking about. This, that, you know. And that's the basis on which we originally, my wife originally filed the suit. However, that's long before we found out that rather than even put the money in the deal he just put it in his pocket. That he stole the money. That all the rest of this stuff with all the interest that he paid was never

167

interest. That all the various paydown and extension agreement had already -- had already expired by the time he took her money. All of the rest of this stuff was found out later.

Q. Do you believe that you have any responsibility for the blame that your -- the trust may not have been paid back in this case?

MR. NEWMAN: Objection. You can answer if you can.

THE WITNESS: I believe that -- I believe that I feel responsible because I believed what Lenny told me. I should have realized that he was a liar.

BY MR. SILBERFEIN:

Q. Any other responsibility? Is that a "no"?

A. That's a "no."

Q. Did the information that Mr. Mezei gave you in those few conversations differ in any way from your understanding of what the deal was at the time? You understood how the senior repo theoretically was -- you understood the deal from your time at Silar; is that correct?

A. Theoretically.

Q. And did you ask if the deal had been changed in any way?

168

A. No, because Mr. Mezei told me that he was taking out Gottex, buying the Gottex notes. If we were buying the Gottex notes and they had been changed, I would have expected him to tell me.

Q. Did you ask?

A. No, not specifically. No.

Q. Was Ron Friedman a party to either of those conversations that may have happened at Young Israel?

A. No.

Q. When was the first time you spoke to Ron regarding the investment in what ultimately was in Repotex?

A. What ultimately wasn't in Repotex, as I said to you earlier, because money never went to Repotex. It went to EGG and stayed there.

Q. You've made your position perfectly clear.

A. Okay. I would appreciate it when you ask me the question you wouldn't indicate that it went into the Repotex. It didn't.

Q. You're claiming you have Repotex notes. Either way, you have Repotex notes or you don't have Repotex notes. That's up to the court to decide. What I'm asking you is when you first had conversations with Ron Friedman about this deal?

169

A. When they weren't paying on time.

Q. And that was the first time you had any communication --

A. No. I had conversation --

Q. Let me finish my question.

A. Sorry.

Q. I believe my question was conversation. I just wanted to make sure the record is clear if you had any other communications with Ron Friedman regarding this deal before then.

A. Regarding us putting the $800,000 in? No. With regard to Compass? Yes. Many.

Q. Compass meaning the old deal?

A. Correct.

Q. So, did you have any conversations with Ron between the time when you left Silar and the $800,000 was sent to EGG?

A. Yes.

Q. You did?

A. Yes.

Q. About the new deal or the old deal?

A. There was no new deal. The old deal.

Q. And what were the sum and substance of those conversations?

A. Just banter about how are things going.

43 (Pages 166 to 169)

170

Everything is going great. And isn't, pardon me, isn't David Blatt an asshole. Yes. It makes it very difficult to ba-ba-ba. That kind of stuff.

Q. The next time you spoke to him specifically before the new deal was in regard to when you weren't getting paid. Is that what you had testified to?

A. When the trusts were not getting paid.

Q. Earlier several times you talked about a private placement. What do you understand a private placement to be?

A. Something that's not a public deal. But any time -- there are specific rules with regard to private placements as to, you know, depending on how many people you solicit, the rules change. And it would be impossible to think that Repotex was a, you know, other than a private placement, I would think, because, you know, there are certain rules if the four of us were sitting down to make a partnership. That would be one thing. However, if you have a private deal where you're soliciting people, and even in Mr. Mezei's deposition he talks about Paradigm who raises money, and they were out there raising money from a bunch of people. So you would have to say that this was a private transaction,

171

but, unfortunately, it didn't conform.

Any time I've ever done a fund which is a private placement, it requires a private placement memorandum, and it requires a positive -- the sponsor is required to make sure that all the investors are accredited investors. You have to respond that way in writing or else you're -- you know, you got problems.

Q. Are you aware of any of the noteholders in Repotex either in writing or orally to you objecting that they were not accredited investors?

A. Yes.

Q. Who did that?

A. Elana Nussbaum, Jonathan Nussbaum, Miriam, I mean Tamar Nussbaum, Daniel Nussbaum and Sam Nussbaum.

Q. And they objected to you --

A. They are not accredited investors.

Q. So you are just stating a fact, whether it's a complaint or not, you're saying that they are not accredited investors?

A. The trustee on their behalf, not only complained to me, but complained to your client.

Q. And you are an accredited investor?

A. I am.

172

Q. And when your other entities made loans to Len in the past, were those entities accredited investors?

A. They were not doing transactions.

Q. That's not my question. Were they accredited investors?

A. Some of them were. Some of them weren't.

Q. Which ones were?

A. Fragin Family Partners.

Q. And which ones were not?

A. Fragin Family Trust Number 2, and the Monroe Fragin Trust.

Q. And in those other transactions when you forwarded the money to Mr. Mezei, in whatever form, check, cash, wire, otherwise --

A. Right.

Q. -- before the money was delivered, did Mr. Mezei know from whom that money was coming?

A. Yes, but -- yes.

Q. It wasn't after the fact when it went to be papered that's when it was determined what entity the money came from?

A. He always knew where the money was coming from because he saw the wire.

Q. Did he know before the wire hit is my

173

question?

A. Yes. I told him. I would say I'm going to do this much for this and this much for this and this much for this.

Q. So, it's your testimony that the papering of other deals with Mr. Mezei, all the information was already known to Mr. Mezei at the time, it was just papered later?

MR. NEWMAN: Objection. His testimony is what it is.

THE WITNESS: Could you repeat the question?

MR. NEWMAN: Can you ask the question without re-characterizing his testimony?

MR. SILBERFEIN: I am not re-characterizing. I am asking what his testimony is. It could be a present now question. It doesn't necessarily reflect a past question.

Q. Do you believe that Mr. Mezei always knew all the terms of the deal and from whom the money was coming from at the time the deals were papered?

A. I believe so.

Q. At the outset of this case, at least from my point of view, there were some attempts to settle

44 (Pages 170 to 173)

174

this in a non -- and I am not asking about settlement, per se, but attempts to settle this outside a traditional litigation. Are you familiar with that?

A. We made numerous attempts.

Q. Let me be more specific.

MR. NEWMAN: Let me just say we have no objection to discussing settlement, having Mr. Fragin testify to settlement, but I think we have to have an understanding that that's what's happening here.

Q. I just want to know -- I agree. What I'm suggesting -- I'm not really getting into talking settlement. I am talking about avenues other than litigation. I am speaking specifically about Bet-Din.

A. Yes.

Q. And I'm not asking for numbers and offers and demand and counteroffers. I'm just asking your client's understanding of what mechanisms may have been in place, weren't in place, what he may have agreed to in terms of having it resolved there, and that's what I am trying to understand.

A. What was your question? There were settlement discussions prior to filing of the

175

lawsuit. He wouldn't settle.

Q. What's a Bet-Din?

A. It's a rabbinic court.

Q. And have you used a rabbinic court before?

A. Well, I'm divorced, and so I used it in my divorce.

Q. Have you used it for commercial transactions?

A. No.

Q. And do you believe that this transaction could have been settled in Bet-Din?

A. Could have been.

Q. Should it have been based upon your understanding?

MR. NEWMAN: Objection.

THE WITNESS: I'm not capable of answering that question.

Q. Would you have had any objection to this being resolved in the Bet-Din?

A. Not up to me. I'm not the litigant.

Q. So if you were the litigant you would have -- the decision then would have been yours?

A. I can't answer in hypotheticals.

Q. Well, you can answer it. I understand that you believe it to be hypothetical, but you can answer it.

176

MR. NEWMAN: What's the question?

THE WITNESS: If I were the litigant -- if grandma had wheels she would be a trolley car. I don't know what you are asking me.

Q. Well, your answer suggested that you couldn't make that decision here because you're not the litigant.

A. Yes.

Q. But if you were the litigant, then you would have had the decision to make; is that correct?

A. It would seem. Who else would --

Q. Who is David Jacobs?

A. That's the guy who brought the other hundred thousand whose name I couldn't remember.

Q. So he had the other preferred piece?

A. By the way, the name of the place where Lenny had the financing in place was Cap Source.

Q. And that was for the original underlying Compass deal purchasing the assets from --

A. Correct. Correct. Correct.

Q. And David Jacobs is the third individual that purchased a --

A. I think it's David Jacob. No S.

Q. And he's the third person that --

A. Correct. He bought 100,000, which to the

177

best of my knowledge he still has.

Q. And who is Hin Tai Kin?

A. Hin is the guy that I told you about who worked at Gottex and who came to work at Silar.

Q. And do you believe him to have any information regarding the investment of $800,000?

A. I don't believe he knows anything about it.

Q. Do you believe David Jacob knows anything about it?

A. I don't think so. But I have no basis to know yes or no.

Q. Do you have any understanding of whether Robert Leeds has anything to know about the $800,000?

A. Yes.

Q. What is the basis for your understanding?

A. Robert Leeds was in that meeting that I described on December the 19th, 2008, and was -- when he heard along with -- he was there with Jay Gracin -- and when he heard that my stepchildren's trusts had bought part of this, was horrified. That's my description of his reaction. As was Jay Gracin.

Q. And who is that?

A. He was then a partner of Rob Leeds. Lawyer.

45 (Pages 174 to 177)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

178

Q. Still at Silar?

A. They were both at Silar.

Q. And before that December meeting, do you have any understanding of what Rob Leeds would have known or not known regarding the $800,000 investment?

A. I have no basis to know.

Q. When did Greg Fragin first know about the $800,000 investment?

A. Probably around the same time it was being done. I'm guessing.

Q. Is he the type -- is your relationship with him the type that you would usually discuss investments of this sort with him?

A. Yes.

Q. And does he assist you, among other ways, in reviewing or in papering deals for you?

A. We work together. Yes.

Q. And to the best of your knowledge did Greg ask for any due diligence from Len or any of the other defendants regarding the $800,000 to be invested?

A. No.

Q. And to the best of your knowledge did Karen ask for any due diligence?

A. Not that I'm aware. We all trusted Len.

179

Q. Are you aware that Greg ever discussed with Len how the Repotex notes were drafted?

A. No. I'm not aware that he ever discussed it.

Q. Are you aware of any conversations that Len had with Greg regarding the investment before it was made?

A. I'm not aware.

Q. What steps do you believe Karen should have taken, if any, with regard to seeking repayment?

A. What steps she should have taken? If it was up to me, I would encourage -- I would have encouraged her to file an action more expeditiously.

Q. And you filed an action before -- Karen filed an action before knowing, as you have described, the full extent of all the facts; is that true?

A. Correct.

Q. As a partner in Silar, I believe you testified that Silar at some point may have had 50 million dollars in assets under management; is that --

A. I said I thought it was somewhere between fifty and a hundred when I left.

Q. When you left, is that what you said?

A. Correct. There were two Silar funds, domestic and offshore. I am talking about the two

180

together.

MR. SILBERFEIN: Why don't we take a break for two minutes.

(Recess from 3:06 to 3:13.)

BY MR. SILBERFEIN:

Q. At the time that the $800,000 was invested, who did you understand would be taking out Gottex's piece?

A. Whoever Len said wanted to buy it.

Q. Did you think that taking Gottex out with whomever would be buying it was going to be advantageous?

A. Yes.

Q. And if one entity became the new 800 pound gorilla, would that have been any different than Gottex still being in the picture?

A. Sure.

Q. Why?

A. Number one, because Len had no relationship with Gottex. Rob Leeds had some relationship, but not really much of one. And Gottex was, you know, an institution out there who was being pressured with redemptions, so they needed cash. Whereas whoever the new guy was, presumably would be friendly hands.

181

Q. But you didn't know that they would be?

A. I didn't know that. I would have found it difficult to imagine that Len would be engineering to have somebody come take it out who is going to be hostile to him.

Q. But it's possible?

A. Anything is possible.

Q. You didn't know otherwise?

A. Correct.

Q. And whoever it was, whether Gottex was still in the piece or not in the piece or whoever it was, was the $800,000 investment affected in any way in terms of the payment, payback of the senior repo?

A. First of all, when you say if Gottex was in the picture or not in the picture at this point, as I articulated earlier I think in no uncertain terms, there is no possible way that my wife would have put her kids' money in this transaction had Gottex been continued to be involved. No possible way. So it couldn't be whoever it is, Gottex or this guy or that guy, because it couldn't have been Gottex.

Q. You can answer the question now.

A. Okay. Would it be different? Who knows. Gottex certainly was not a company that -- I don't know. My answer is, I don't know.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

182

Q. Under the waterfall, how could it have been any different for any of the senior repo holders?

A. Depends on how people behave.

Q. Under the documents, could it have been any different?

A. Under the documents could it have been any different? As I said, deals don't necessarily go strictly based on the documents because if one party or another is defaulting, then you try and do what's best to try and realize the most -- the biggest return from the assets if I might give you an example.

Q. But that would have been the same whether it be Paradigm or Gottex or anyone else?

A. Not necessarily.

Q. That's the point, right? In other words, you don't know that you would -- you would earn the same exact position whether Gottex was there or not --

A. Except I knew who Gottex was, and I made specific request and I said under no circumstances Gottex.

Q. Did you ever put that in writing?

A. I had 20 conversations with him, 50 conversations with regard to Gottex, and as a matter of fact I have an e-mail from him that said you were

183

right about Gottex.

Q. But that has nothing to do with whether or not Gottex was still with --

A. There was no question --

Q. Excuse me. Let me finish my question.

A. Oh, sorry.

Q. I don't appreciate the sarcasm. It's unnecessary.

A. I wasn't being sarcastic. I said I'm sorry.

Q. Mr. Fragin, you might think you're funny here, but it's not funny. And it's not flippant and it's serious. And you are the one that's --

A. What I don't appreciate is a lecture from you on my behavior. You want to ask me questions, ask me questions.

Q. Then don't treat me as a kid.

A. Don't behave like one.

MR. NEWMAN: Gentlemen. Gentlemen. I think we're about finished. Let's try to get through the day. Is there another question?

MR. SILBERFEIN: Yes, but your client interrupted my question, Mr. Newman. So someone is acting like a kid. I'd appreciate it if you'd caution your witness and not me.

Let the record reflect that the witness

184

and counsel just slapped each other five based upon the comment.

MR. NEWMAN: That is not true. I gave him a slap on the wrist. Let the record reflect accurately that's what happened. I was following your direction.

MR. SILBERFEIN: With your sarcasm.

BY MR. SILBERFEIN:

Q. As you sit here today, what is your understanding as to the amounts outstanding on the senior repo?

A. I don't know.

Q. What portion of the senior repo do you believe to be owned by Repotex?

A. I'm aware of what might have been paid down from this or that. However, I believe that Repotex put in a grand total of $8,375,000. And if you divide that by the total outstanding, that would seem to be the number.

Q. So it's approximately 8.375, but I think you testified earlier of 23 million, give or take?

A. What I thought it was somewhere north of 23 million dollars.

Q. And do you have any reason to believe that Repotex did not receive its proportionate share of

185

any monies coming into the senior repo?

A. I don't know.

Q. Do you have any reason to believe any documentation, any information to suggest?

A. I don't know if I have reason to believe or not believe. I don't know. I am totally unaware.

Q. So you have no evidence to suggest that they didn't receive their proportionate share; is that correct?

A. From the senior repo?

Q. Correct.

A. I have no evidence one way or the other.

Q. And do you have any evidence to suggest that the trust did not receive their proportionate share of any monies that came into Repotex?

A. The notes don't say anything about proportionate share. The notes say that they were going to get paid a certain amount of money each month, which they didn't get.

MR. SILBERFEIN: Can you please read back my question, and maybe this time the witness will answer it.

(Whereupon, the question was read back as follows:)

"QUESTION: And do you have any evidence

47 (Pages 182 to 185)

186

to suggest that the trust did not receive their proportionate share of any monies that came into Repotex?"

A. As I said, I don't have any evidence one way or the other.

Q. During discovery in this case, has any information been shared with you to suggest that Repotex did not receive its proportionate share of the senior repo?

A. I don't recall.

Q. What documents did you review in preparation for today's deposition?

A. The complaints, however -- well, when you say review, at all?

Q. Specifically for preparation for today.

A. Well, I started reviewing five or six weeks ago or seven or eight weeks ago when you guys started cancelling at the last minute several times. And the only one that I reviewed just before coming here was Mr. Mezei's deposition.

Q. And how about for your other dates of your deposition?

A. I believe I reviewed Mezei's declaration to the court. I reviewed -- I reviewed stuff -- those are the two primary things.

187

Q. What else made up the various stuff that you may have looked at?

A. I think I looked at the complaint. I think I -- that's about it.

Q. And without revealing any of the conversations specifically if you had any, did you have conversations with counsel in preparation for today's deposition?

A. Yes.

Q. Did you have conversations with your wife with regards to today's deposition?

A. Yes.

Q. Did you learn anything in Mr. Mezei's deposition that you had not already been aware of?

A. No, not that I recall. Oh, yes. Can I amend my answer?

Q. Of course you can.

A. Yes.

Q. And what was that?

A. Well, if you read Mr. Mezei's deposition, he barely heard of Compass. He was watching this stuff at 20,000 feet. So that he really -- he really wasn't involved in the day-to-day.

Now, when I was there, he was involved everyday. So when I was in the same floor of the

188

same building, he was involved every single day. So that's something that I found enlightening. I wonder if the rest of the purchasers of the Repotex notes know that he solicited them and then didn't pay attention to the investment. I thought that was kind of interesting.

Q. Do your stepkids' trusts own any real estate?

A. I don't know.

Q. Do they own any real estate in Israel?

A. I don't know.

Q. Do you own any real estate in Israel?

A. Do I?

Q. Yes.

A. Yes.

Q. Do you own any real estate in the United States?

A. Yes.

Q. Where in the United States? In what state?

A. New York.

Q. Any other state?

A. Florida.

Q. Any other country other than Israel?

A. No.

Q. Is the real estate you own in New York in your personal name or in the name of a trust or

189

something else?

A. My name.

Q. And in Florida?

A. My name.

Q. Israel?

A. My name.

MR. SILBERFEIN: I don't think I have any further questions.

MR. NEWMAN: We're done.

(Whereupon, the deposition was concluded at 3:25 p.m.)

- - -

48 (Pages 186 to 189)

190

A C K N O W L E D G E M E N T

STATE OF NEW YORK    )
                                  :ss
COUNTY OF NEW YORK    )


        I, GARY FRAGIN, the witness herein, having read the foregoing testimony of the pages of this deposition, do hereby certify it to be a true and correct transcript, subject to the corrections, if any, shown on the attached page.



                _____
                        GARY FRAGIN


Sworn and subscribed to before
me, this        day
of            , 2011.

_____
        Notary Public

---

191

C E R T I F I C A T E

        I, JEANNETTE McCORMICK, a Certified Shorthand Reporter and Notary Public, certify that the foregoing is a true and accurate Computerized Transcript of the Deposition within.

        I further certify that I am neither attorney, of counsel for, nor related to or employed by any of the parties to the action in which the Depositions are taken, and further that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in the action.



JEANNETTE McCORMICK, CSR

---

192

INSTRUCTIONS TO WITNESS


    Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.
    After doing so, please sign the errata sheet and date it.
    You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.
    It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

---

193

E R R A T A


    I wish to make the following changes, for the following reasons:

PAGE LINE
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE:_____
REASON:_____
___ ___ CHANGE: _____
REASON:_____
___ ___ CHANGE: _____
REASON:_____
___ ___ CHANGE: _____
REASON:_____

_____  _____
    WITNESS' SIGNATURE          DATE

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

**A**

ability 13:25
  100:14 131:14
  154:9
able 7:13 8:8
  10:17 76:5,13
  121:22 159:21
  160:12 165:2
absolute 134:17
  136:2
absolutely 5:2
  13:13 17:20
Academy 21:10
access 75:17
  76:16
account 145:11
  146:23 151:21
accountants
  91:22 162:19
accounting 90:1
  90:6,8 91:12
  91:14,15
accredited
  166:16 171:6
  171:11,18,21
  171:24 172:2,5
accrue 111:9
accrued 47:11
  70:16 71:17
  73:22 74:20
  78:6 100:3
accruing 111:7
accurate 30:24
  191:5 192:16
accurately 184:5
acquainted
  113:25 114:3
acquired 22:10
  98:22
acquiring 136:9
act 97:22
acted 6:8 129:9
acting 146:14,15
  146:19 183:23
action 11:10,14
  71:9 154:14
  179:12,13,14
  191:10,14

actor 6:4
added 39:23
addition 51:24
  154:22 162:11
additional 39:23
  69:15 133:13
  133:15 157:24
  158:1
adequately
  156:3
administration
  35:24 36:1,3,4
  59:4,6
administrative
  30:13 43:19
admissions
  20:25
adopted 25:11
  25:15
advance 4:24,25
  159:25 165:15
advanced
  159:23 160:1,5
  160:9 164:20
  165:10
advantage 6:6
advantageous
  180:12
advent 22:18
advice 67:5
  126:11
advisement
  106:4
affect 100:23
age 49:9
agent 71:3,9,25
  72:4,6 106:9
  106:22 107:9
  109:22 146:14
  146:15
ago 5:23 26:10
  48:9 52:3 56:6
  116:3 158:5,6
  186:17,17
agree 9:12 20:25
  39:8 42:22
  72:12,16 81:15
  118:16 174:12

agreed 51:12
  96:19 139:19
  156:8 174:22
agreeing 133:4
agreement 15:10
  42:24 44:15
  57:23 96:9,17
  97:8,9,12,19
  98:4,17 118:8
  138:14 167:2
agreements 42:4
  49:25 60:19
  150:14
agrees 160:7
ahead 155:24
  163:6
al 96:2 97:22
allegation 7:1
allegations 6:5
  17:12
alleged 18:23
allowed 15:20
  135:12
amend 13:10
  16:21 103:22
  148:2 187:15
amended 118:9
amount 36:23
  41:21 47:2
  55:13 100:6
  108:1 111:12
  117:20,22
  118:6 142:8
  185:18
amounts 100:5
  139:16 184:10
analogy 7:22
analysis 65:19
analyze 65:2
and/or 56:1
  86:21,21,21
annual 51:3
answer 3:14,15
  12:24 13:2,11
  13:25 15:15
  18:21 52:18
  72:14 74:10,15
  93:13 101:13

101:17,19
  102:2,10
  103:18,20,22
  112:1 113:22
  115:12 122:2
  122:21 123:4
  131:6 133:19
  144:9,15,16,20
  145:1,1,2,11
  146:18 151:7
  151:11 167:8
  175:22,23,25
  176:5 181:22
  181:25 185:22
  187:16
answered 19:17
  77:1,15 118:19
answering 19:7
  19:9 77:25
  115:2 151:8
  175:16
answers 53:20
  151:10
anybody 64:22
  69:16 104:11
  105:5 124:10
  165:13,15
anybody's 39:7
anymore 52:6
  103:25 119:16
Anyway 38:18
apologize 67:14
appetite 142:7
appraising 36:5
appreciate 5:1
  17:9 19:8,10
  132:12 168:18
  183:7,13,23
approach 66:9
appropriate
  192:5
approximate
  85:10
approximately
  11:23 14:10
  15:5 24:10
  28:7 29:20
  30:8,18,23

31:14 32:1
  33:24 34:1,5,8
  37:4 41:17
  45:4,5,19,25
  46:15,22 47:8
  47:10,16 48:4
  57:7 61:20
  115:5,8 116:3
  124:7 184:20
approximation
  34:14
April 1:19 23:22
  96:20 138:9
  140:12
area 26:8 76:7
  82:13
argue 155:16
argument
  142:24
Argumentative
  76:25
arm's 59:19,23
  60:1,3,5,8
arrangement
  15:8 53:16,24
arrangements
  45:23 147:10
artful 144:5
articulated 72:9
  181:16
Asian 66:11
asked 80:9 87:7
  87:9 102:11
  103:16,19
  111:24 122:5
  129:13 134:2,5
  150:14 158:9
  158:17,17
  162:25
asking 15:16
  16:1,7 17:16
  17:16 31:18
  38:19 40:10
  50:21 64:5
  66:16 68:3,7
  71:4 73:8
  75:20,21 77:3
  77:14 79:19

87:10 99:2
121:8 124:14
126:16 130:7
130:12,13,16
131:3 135:3
140:5 144:5
156:18 168:24
173:16 174:1
174:18,19
176:4
**asks** 154:22
**assessment**
72:12,16
**asset** 32:19,21
32:22 33:2,19
36:8,9 42:23
43:3,5 60:15
60:16 65:2,11
90:2 100:14
102:23,25
103:1,5,7,9,11
103:13 143:4
143:10 152:20
**assets** 31:21,23
32:15 34:7,12
36:20,23,24
37:2 41:14,18
41:21,22,22,23
42:10 60:23
61:3,5,21
64:13,14,18
68:11 71:19
72:7,11 73:25
80:18 81:8,8
92:12,13,14
114:23 115:3
121:1,14,22
122:10 123:15
133:8 136:23
152:8 161:22
165:3 176:19
179:19 182:11
**asset-backed**
35:16,17,21
36:7 65:9,20
114:21
**asshole** 170:2
**assigned** 51:3

108:1
**assist** 178:15
**assume** 18:12
27:11 31:19
58:19 71:6
100:19 117:5
**assuming** 40:15
44:23
**assumption**
77:11
**assumptions**
77:13
**assured** 148:10
**attach** 120:25
**attached** 190:11
192:11
**attempt** 122:15
**attempts** 173:25
174:2,5
**attend** 4:15,17
6:17 7:8,11
10:21
**attendance** 9:8
**attended** 23:4
**attending** 5:5,15
**attention** 188:5
**attorney** 14:21
14:22 17:4
80:12 159:19
191:9,12
192:13
**Attorneys** 2:2,8
**attorney-client**
15:13 16:4,8
17:8,14 37:20
37:23 38:9,21
**audited** 54:22
**auditors** 6:12
**August** 23:18
142:22
**authority** 87:5
87:10
**authorized** 44:5
**authorizes** 10:20
**automatic** 89:5
**available** 8:2
**Avenue** 1:19
2:10 44:13

**avenues** 174:14
**aware** 5:3 6:18
10:19 18:15
19:1,2 20:6
42:12 61:23
62:1 64:17,19
67:10,14 68:9
86:7 87:10,13
89:10 98:5,6
105:5 112:20
112:21 122:7
123:11 146:12
147:20,23,24
148:1 157:3
159:14 171:9
178:25 179:1,3
179:4,7 184:15
187:14
**a.m** 1:20

**B**

**B** 1:4 3:8 24:7
**bachelor** 21:12
26:25
**bachelor's** 21:21
**back** 19:25 20:4
21:4 42:22,25
43:5 47:4,6,9
48:24 50:7,16
51:7 52:13
56:21,22 70:6
70:7 82:6
94:15 99:25
102:10,14,16
102:23 103:1,7
103:13 104:1
110:14,16
115:25 117:23
117:25 118:2,5
118:6 119:18
123:8,10
125:12 132:10
135:23 137:15
140:21 141:12
145:4,7,17
155:6,8 156:22
160:6 164:6,24
165:9,11,16

166:18 167:7
185:21,24
**badgering**
144:18
**balance** 47:12
55:4 57:6
94:20,21 97:1
115:16 138:19
163:10
**Banco** 125:23
**bank** 13:15,17
125:22 142:21
**bankruptcy** 81:9
161:17,22
162:18 163:19
163:20,20
**banter** 169:25
**bar** 49:9
**barely** 187:21
**bartender** 49:10
49:11
**based** 51:9 58:5
67:5,7 89:24
91:4 127:12
138:21 175:12
182:8 184:2
**basic** 57:23
**basically** 34:21
109:21 117:3
**basis** 29:5 31:7
48:15 59:20,23
60:1,3,5,8
85:13 152:7
166:20 177:10
177:16 178:6
**ba-ba-ba** 170:3
**Beach** 80:6
**Bear** 85:15
**beer** 49:11
**beg** 19:19
**began** 45:9
135:16
**beginning** 30:25
48:25 61:14
**begins** 65:4
125:22
**behalf** 20:23
44:5 165:16,21

171:22
**behave** 182:3
183:17
**behavior** 183:14
**belief** 92:22
**believe** 7:7,12,24
12:10 13:18
22:7,20 24:14
24:16 26:21
28:16,23 35:9
35:10 36:16
37:10,12 39:18
46:4,4,25 47:3
47:12,25 48:5
48:18 51:5
52:12,21 54:3
54:7,11,15,21
55:4,5,6,15
56:25 57:6,15
60:18,25 61:6
66:18 71:3
74:21 75:2,11
78:14,24 79:2
86:16,20 87:13
90:6,7 91:6
93:10 94:7,14
94:24 95:4
99:19,23
103:12 109:9
109:25 113:15
113:16,18,25
115:9 117:15
120:4 125:1,8
128:8 129:7
131:16 133:1
135:11 137:15
138:4 139:25
141:13,25
142:14 146:5
146:22 147:12
151:22 152:1
153:10,12
156:2 157:23
161:17 162:1
162:18 163:9
163:19,20
167:5,10,11
169:7 173:20

173:23 175:9
175:24 177:5,7
177:8 179:8,17
184:14,16,24
185:3,5,6
186:23
**believed** 9:23
78:5 94:22
105:11 142:1
152:17,23
167:12
**believer** 49:8
**belongs** 36:8
**beneficial**
103:11
**benefit** 10:15
51:14 165:4,7
**Benny** 136:14,25
157:10
**Bernie** 143:17
165:7
**best** 12:23 51:19
52:15 62:19
73:16 89:14
105:25 177:1
178:18,23
182:10
**better** 39:3
113:6
**Bet-Din** 174:16
175:2,10,18
**bid** 65:7,8
**bidding** 65:10
105:10
**big** 88:3
**bigger** 142:7
**biggest** 182:10
**billion** 32:3,4
**Billions** 29:15
**bit** 8:1 21:5
56:23 101:14
115:25 118:1
162:16
**blame** 167:6
**blank** 33:10
**Blatt** 62:24 63:8
63:20 64:10
86:21 170:2

**board** 83:6
**bond** 30:3,6
**Boris** 62:24 63:5
63:10 86:21
**borrow** 36:9
92:1 140:19,20
164:25 165:2
165:13
**borrowed** 48:17
55:12
**borrower** 42:23
43:4 84:14
89:2
**borrowing** 48:23
**bought** 41:9
42:10 54:2
59:25 68:11
80:25 81:2,11
98:19 108:8
135:5,6,20
140:12 154:5,7
176:25 177:21
**bounced** 47:15
118:9
**boy** 28:2,11
**brand** 149:15
**break** 12:25 13:3
37:16 77:17,20
77:24 120:14
180:3
**bridge** 55:16
**briefly** 5:20,21
26:10 30:5
157:10
**brokerage** 77:5
**brought** 11:10
13:15 80:1
127:22 176:13
**bucks** 165:17
**building** 2:9
188:1
**bunch** 170:24
**business** 15:14
16:25 21:14,18
22:5,18 25:7
25:17 26:1,3
26:14,23 27:4
27:11 30:15

31:8 35:14
41:8 44:9
45:10,15,23
46:3,5 52:22
52:24 53:2,6,7
53:12,16,24
55:7,21 57:9
57:25 58:17
63:23 65:5
69:5 114:12
116:11 125:20
125:21,22
**businesses** 26:4
26:14 48:21,22
63:18
**busting** 88:5
**busy** 8:1
**buy** 42:25 48:18
61:21 62:5
98:12 127:22
134:10 139:19
140:21 148:25
180:9
**buyer** 43:7 142:7
**buying** 57:21
81:10 133:24
133:24 149:7
149:11,12,15
149:21 168:2,3
180:11

_____

**C**
_____

**C** 2:1 65:4 190:1
191:1,1
**caddy** 159:19
**calculation**
164:17
**call** 4:21 5:6,8
38:21 82:6
86:8,10,14,15
86:18 87:3,6
87:12,16,19,21
87:22 88:8,16
88:22,23 89:9
89:16 99:3,7
112:13 132:3,4
132:5 158:13
**called** 9:13 22:6

26:6,17 29:24
32:19 33:3
48:24 54:2
55:12 60:17
77:5 97:21
118:7 128:16
133:25,25
134:1 135:11
139:17 143:18
164:21
**calling** 66:16
**calls** 88:25 89:1
**cancelling**
186:18
**CAO** 43:20
**Cap** 176:17
**capable** 175:15
**capacity** 1:3
**capital** 36:5
140:23,24
**car** 176:4
**card** 48:20 53:11
**career** 12:16
**carefully** 192:3
**carved** 115:15
**case** 6:19 7:4
9:19 10:12,20
12:2 17:2
18:16 20:7
50:4 69:14
88:22 89:8
112:25 149:17
154:19 161:2
162:10 167:7
173:24 186:6
191:13
**cash** 73:21 137:3
140:21 160:3
172:15 180:23
**Catherine** 1:10
11:13 146:24
**Cathy** 134:3
146:25 147:14
**causing** 152:8
**caution** 19:5
183:24
**cease** 40:24
**cents** 113:12

**certain** 31:19
36:20 44:19
100:20 114:15
117:16 170:18
185:18
**certainly** 10:14
15:20 16:6
17:3 19:21
38:2 106:19
110:9 111:7
131:14 139:18
153:20 181:24
**certification**
23:7
**certifications**
21:20 23:2,3,5
**Certified** 1:20
191:3
**certify** 190:9
191:4,8
**cetera** 73:20
**chance** 118:4
122:25 130:1
**change** 39:20,22
56:17 92:23,25
93:2 170:15
193:9,11,13,15
193:17,19
**changed** 28:13
56:21 74:23
75:3 109:9
118:9 167:24
168:4
**changes** 56:19
192:9 193:5
**changing** 40:14
**chapter** 157:5
**characterize**
78:16 117:1
**charge** 31:9
**Charles** 147:11
**charming** 49:5
**check** 52:14,16
147:12 151:20
151:24 152:1
172:15
**checks** 47:15
52:4,14,20

118:9 151:5,20
151:22
**Chief** 30:13 59:3
59:6
**child** 131:11
**children** 25:6
96:2 97:16
117:22 130:19
130:21 131:13
159:24 160:2
162:13 163:25
**children's** 81:10
81:17 98:1,11
130:21 133:23
139:14 156:9
**choice** 145:19
**Chrysler** 2:9
**circular** 128:23
**circumstances**
12:13 48:11
116:24 182:20
**City** 33:8
**claim** 76:10
**claiming** 168:21
**claims** 71:20
**clarifying** 19:8
**classes** 23:4
**clear** 7:9 16:10
39:19 46:10
47:13 61:10
67:24 68:1
79:17 140:4
144:4 156:21
168:17 169:8
**clearly** 152:12
152:22
**clerk** 5:9,20,25
6:18,22 7:15
7:25 8:6
**client** 53:3
171:23 183:21
**client's** 174:20
**cliff** 117:4,5,11
**close** 17:1 34:22
47:11 50:5
63:15 82:15
116:8
**closed** 6:10 10:9

34:6,15,19
78:19 80:15
81:25
**closing** 35:3
79:12 82:15
96:12,15 99:18
99:20
**coaching** 19:6,9
19:15 20:12
**coffee** 28:2,11
**collateral** 36:9
42:24 51:13
85:17 88:2,2
89:2,3,6,6,11
92:2 99:5,8
120:24,25
121:2 154:15
**collection** 88:8
**college** 21:7,9
**Columbia** 16:24
16:25 21:6,13
21:18 26:23
27:2,2,3,10
**combination**
119:25
**come** 23:14
24:21 45:9
63:10 66:20
78:8 79:9,9
82:2,10 86:5
86:10 88:1,5
93:17 104:11
104:16 112:10
136:5 147:8
181:4
**comes** 10:12
48:14
**coming** 36:24
70:22,24,25
71:1,12,15
110:2 112:9
141:23 143:20
144:1,7,13
145:9,11
159:11 165:8
166:1 172:18
172:23 173:22
185:1 186:19

**commenced**
157:22
**commencement**
45:16,18
**comment** 98:25
132:12 184:2
**commercial**
64:12,17 68:11
175:7
**commitment**
83:8 138:6
**common** 109:10
**communicated**
97:13 130:10
**communication**
37:20 166:11
169:3
**communicatio...**
16:9 83:19,22
84:1 126:25
147:20 166:4
169:9
**companies** 46:8
46:19 72:3
**company** 26:11
27:9,17,18
44:16 46:20
48:18 53:3,10
54:2 55:12
60:25 64:13,17
68:11 71:2,13
71:15,24 77:6
94:17 97:18,21
98:13 107:14
109:21 111:20
122:9 123:14
142:25 149:9
149:11 154:11
154:12 181:24
**Compass** 54:2
57:21 59:24
60:25 61:5,20
61:23 62:3,5
62:14,16,19
63:2,14 64:7
64:14,18 68:10
73:3 78:21
80:19 81:8,21

82:18,21,25
86:20 88:17
89:9 90:17
100:19,21,24
101:2,6 102:6
102:18 103:12
109:16 119:9
120:18 121:20
122:4 133:24
135:5 136:13
136:14,22
141:21,24
143:3,4,4
154:5,7,7,9,15
154:25 161:16
161:20,21
162:13 163:18
163:19,23
169:12,13
176:19 187:21
**compensation**
107:17 108:23
**competition**
53:11
**competitive** 65:8
**complained**
156:12 171:23
171:23
**complaint** 3:12
3:14,15 15:4,5
17:12,18,24
156:24 171:20
187:3
**complaints**
186:13
**complete** 59:12
**completed** 92:16
**completely** 97:3
140:8
**completing** 23:7
**Computerized**
191:5
**concept** 165:23
165:24
**concerned** 55:18
85:24 102:25
103:4 118:3
131:12,13

148:9,9
**concluded**
189:11
**confirming**
149:5
**conform** 171:1
**confused** 67:21
**confusing** 81:6
**confusion**
123:19
**connection**
12:12 13:16
18:15 20:7
44:19
**consistently**
42:16
**constantly** 49:15
**consummated**
53:14
**contacted** 104:6
157:8
**contain** 96:12
**contempt** 112:15
**contents** 14:19
**context** 58:23
**continue** 15:23
45:15
**continued** 32:16
143:22 181:19
**continuing**
23:10
**continuously**
17:4 42:16
**contract** 71:10
87:2,11
**contracts** 122:3
**contrast** 7:17
**control** 130:8,12
**controlled** 60:25
154:11,12
**controls** 145:23
**conveniently**
154:23
**conversation**
49:13 80:9,11
84:3 85:12,22
88:6 91:10
118:21 124:19

124:24 127:16
129:20 132:14
132:15,20,21
137:4,7,8
147:5,15
156:16 157:20
157:25 158:14
159:1,3 164:7
166:10 169:4,7
**conversations**
14:18,20,21
16:2 17:11,13
17:17,23 79:13
79:16,17,19
80:1,14 81:24
82:1 83:25
84:7 85:20
87:18,25 92:5
108:2 124:20
125:25 126:2,4
127:3,6,10,12
133:12,14,16
136:6 138:21
147:22 148:5
157:24 158:1
159:5 166:3
167:18 168:8
168:25 169:15
169:24 179:4
182:23,24
187:6,7,10
**COO** 43:20,22
43:22
**Corp** 81:21
**corporate** 77:7
**correct** 4:18 6:2
6:4,13 7:18,19
10:14 13:23
14:23 18:19
22:22,23 23:19
26:13 28:24,25
30:20 33:25
36:2,3,18 41:2
41:16 43:14
54:24 58:8,13
58:14,21 59:17
60:11 61:17
62:12 64:9

67:6,9 69:9,21
71:7 72:20
84:25 86:1
91:6,19 93:16
95:12,17 100:8
100:15,16
107:16 108:10
108:21 110:23
111:7,17 114:9
114:11 115:23
116:4 117:6,13
119:6,19
120:10 121:16
129:11 136:21
139:7 142:2,5
142:17 145:15
152:20 156:17
167:22 169:14
176:10,20,20
176:20,25
179:16,24
181:9 185:9,11
190:10
**corrections**
190:10 192:4,6
**cost** 90:13,15
91:20 92:12
**counsel** 7:5,6,12
7:20 79:18,21
79:22,25 184:1
187:7 191:9,12
**counteroffers**
174:19
**Counting** 36:14
**country** 188:22
**COUNTY** 190:4
**couple** 12:15
48:9
**couples** 116:18
116:19
**course** 13:10
23:7 32:17
69:16 76:18,22
82:17 84:18
113:9 148:14
187:17
**court** 1:1,20
4:10,21 5:6,17

5:22 7:9,23
8:22 12:21
154:3 162:10
168:23 175:3,4
186:24 192:16
**courteous** 4:24
**courtesy** 5:3
12:24
**co-trustee** 146:3
146:4,7
**co-trustees**
145:25
**credit** 48:20
53:11
**creditor** 154:12
**criminal** 113:14
166:1
**CSR** 191:19
**currently** 13:24
22:21 24:24
41:15
**cut** 11:21 15:23
46:16 57:17
128:7

— **D** —

**D** 3:1 190:1
**daily** 29:5
**damages** 124:3
**Daniel** 1:5 24:8
24:17 171:15
**Danny** 159:19
**date** 15:1 108:11
118:12 164:22
192:8 193:23
**dates** 33:18
34:24 55:2
186:21
**David** 13:16
62:24 63:8,20
64:10 86:21
170:2 176:12
176:21,23
177:8
**day** 29:9 32:20
40:25 44:22
52:9,12 75:16
99:10 124:17

127:17 129:21
132:16 138:25
140:22 156:13
160:8,10
183:20 188:1
190:19
**days** 22:7 99:9
147:21 158:5,6
192:14
**day-to-day** 31:6
187:23
**deal** 31:1,3 46:9
48:13 53:25
54:14,20 55:1
55:19,21 57:9
60:15 62:1,11
63:3 64:24
65:17 67:10,11
67:14,16,17
68:9,17,18
69:20 70:7,18
74:7 78:19
79:13,14,18
80:15,17,19,20
81:6,25 82:4
86:11 88:3
92:16 99:18,22
100:18 104:7
104:15 106:9
106:22 108:4
108:24 109:4
109:15 110:2
112:8,12
119:18 121:17
121:19,20
123:19,25
126:22,24
128:21 129:9
136:13 140:3
150:2,2,3,4,5
150:23 152:14
152:16 153:13
153:14,15,18
153:19,20
155:10,11
156:3,8 159:22
160:10,17
161:16 166:23

167:19,21,24
168:25 169:10
169:13,21,21
169:22,22
170:5,12,21
173:21 176:19
**dealing** 35:24
36:4 45:22
80:21 99:4
**dealings** 57:25
**deals** 55:7 173:6
173:22 178:16
182:7
**dealt** 50:3
**debt** 164:3
165:11
**debtholders**
164:12
**deceive** 49:14,16
**December** 35:11
48:8 66:19
98:7 164:4
177:18 178:3
**decide** 168:23
**decided** 9:24
**decision** 130:18
130:20,21
146:8 175:21
176:6,10
**declaration**
186:23
**deemed** 192:16
**default** 51:7,22
58:9,10 88:7
88:10,12,13
97:18 98:3,16
98:16
**defaulting** 182:9
**defective** 19:11
**defendant** 1:15
2:8 9:7 11:1
**defendants** 5:14
8:15 9:9 11:10
158:21 160:24
161:2 178:20
**Defendants/T...**
1:12
**Defendant's**

14:5 18:4
20:18 161:4
**define** 53:19
62:22 80:17
**definition** 32:13
**defrauded** 125:9
**degree** 21:13,21
21:22 27:1
60:12
**delay** 4:20
**delivered** 71:13
172:17
**demand** 174:19
**denials** 20:25
**denied** 76:16
**department** 29:3
29:22,24 30:6
77:6,7
**departments**
29:23
**departure** 28:7
44:14 75:12
108:22 114:13
**depending**
170:14
**Depends** 182:3
**deponent** 10:10
**deposed** 6:23,25
11:16,25 12:12
12:17 13:14,22
158:11
**deposing** 192:13
**deposit** 65:7
83:9
**deposition** 1:18
4:12,15,17 5:5
5:12,15 6:3,7
6:10,12 7:2,8
8:20 9:7,8,11
9:17 10:9,18
10:22,24 12:6
12:8 13:17
14:5 15:3 18:4
20:18 154:3
159:12,17
160:7 161:4
170:22 186:12
186:20,22

187:8,11,14,20
189:10 190:9
191:6 192:3,11
192:14,15
**depositions** 6:9
6:17 10:2
191:11
**describe** 26:3
48:11 116:7
179:14
**described** 12:14
86:24 177:18
179:14
**describing** 7:23
**description** 3:11
177:22
**designated** 44:3
115:15
**despite** 98:15
**details** 58:24
132:25 164:8
**deteriorating**
125:3
**deterioration**
85:16
**determined**
172:21
**developed** 82:12
**differ** 19:19
167:18
**difference** 42:19
138:5
**differences**
42:11
**different** 7:24
13:8 19:23
40:23 42:9
44:3,4 47:15
56:9 75:10
81:14 94:11
112:1 119:11
125:5 130:3,5
140:15 149:9,9
149:16,16
153:14,16,25
180:15 181:23
182:2,5,7
**difficult** 32:12
49:20 114:19

114:20 122:2
131:10 170:3
181:3
**diligence** 58:20
58:22,25 59:12
59:21 72:21,25
75:18,25 76:6
150:22 151:2
178:19,24
**dime** 155:24
**direct** 60:18
71:21 122:20
144:19
**direction** 143:12
184:6
**directly** 109:3
159:12
**directors** 78:15
**dirty** 135:12
**disadvantage**
10:4
**disbursements**
163:21
**disclosure**
149:17,18,19
149:25
**discovered**
98:10
**discovery** 6:10
10:9 95:25
96:1 98:9
138:17 140:11
148:15 157:7
158:19 186:6
**discuss** 132:25
158:7 178:12
**discussed** 100:13
109:2 132:17
137:22 158:12
159:9 179:1,3
**discussing** 78:5
120:15 126:10
142:3 164:5
174:8
**discussion** 5:7
11:4 84:17,20
113:3 120:11
123:18 124:10

124:12 133:22
161:7
**discussions**
83:10,15 85:1
124:6 137:18
147:25 174:25
**dispute** 9:22
83:3
**disputed** 79:1
**dissidents**
112:14
**distress** 54:4
**distressed** 41:9
**distributed**
164:12
**distribution**
163:15,16,17
**DISTRICT** 1:1
1:1
**divide** 184:18
**divided** 148:24
**divorce** 129:25
175:6
**divorced** 175:5
**document** 14:12
14:15,19 18:3
18:8,11 19:2
20:9,17,22
21:1 47:18
71:10 96:3
108:2
**documentation**
150:8,11,13
185:4
**documented**
47:17
**documents** 73:6
74:12 75:24
76:5,12,16,24
77:8 87:2,11
96:5,6,7,12,15
99:18,20
105:14 133:3,5
149:4,6 182:4
182:6,8 186:11
**doing** 44:18 50:1
59:19 101:21
136:16 140:2,2

141:3 172:4
192:7
**dollar** 68:22
69:11,19,22,25
106:25 108:1
108:12 113:13
138:7
**dollars** 29:12
32:1 37:7,9,11
41:19 46:25
47:13 54:7,17
60:22 61:22
68:21 70:12,16
72:8,11 74:8
84:4 88:5
90:12 94:25
95:1,5 96:19
96:24 97:3,6
103:2,3,5,6
106:12,21
138:13 179:19
184:23
**domestic** 179:25
**doubt** 105:8
**downhill** 125:13
**drafted** 47:23,25
152:25 153:10
179:2
**drawing** 7:17
33:10
**drawn** 151:20
**drinking** 49:9
**drive** 107:23
**Ducat** 26:6,18
40:22 41:5,6,8
41:10,15,21
44:19,22 59:1
59:7,8,10
161:10
**due** 3:17 58:19
58:22,25 59:12
59:21 72:21,25
75:18,25 76:5
150:22 151:2
178:19,24
**duly** 4:2

———————
**E**
———————

200

E 2:1,1,12 3:1,8 190:1,1,1 191:1,1 193:1
earlier 21:3 52:22 55:6 62:4 72:7 74:3 78:5 105:10 122:5 125:6,7 132:19 152:16 164:9 168:15 170:9 181:16 184:21
early 12:1,15 13:18 16:22 61:14 93:23 94:4,6
earn 106:8 182:17
earned 107:9
earning 143:10
easiest 24:25
East 2:3
easy 120:24
Economic 1:9 11:12 97:17
education 21:5 23:10 26:19,24
EEG 98:13
effect 43:4 79:3 79:4,6 88:7 98:14 129:10 141:1 160:5 164:24 166:15
effectively 45:16
effort 118:6
EGG 98:13 134:5,6 135:25 138:20 142:15 142:18 143:6 143:11 146:23 147:6,9,16,17 150:8 164:20 168:16 169:17
eight 52:3 186:17
either 13:7,18 14:16 39:17 45:7 83:16

91:12 94:17 103:23 124:8 134:24 137:23 146:10 147:13 157:12 166:4 168:7,22 171:10
Elana 1:4 24:7 24:10,13 171:14
Eliezer 1:6 24:9
else's 131:11
embezzlement 13:16
employ 58:25
employed 32:18 32:21 33:1 34:2,16 35:2,5 35:7 155:1 191:9,13
employee 96:7 191:12
employees 29:17 31:12 36:11,12 36:14 59:5
employment 27:12
encourage 160:20 179:11
encouraged 158:20 160:23 161:1 179:12
ended 46:17,18
engaged 35:14
engineering 21:12 181:3
enlightening 188:2
entail 12:7
entire 50:24 65:24
entities 40:23 56:1,2 98:3 119:17 120:2,3 137:20 157:13 160:21 162:17 172:1,2
entitled 164:15

entity 61:23 62:3 75:6 76:17,19 76:20,24 81:2 88:17 89:9 94:18,19 100:17 119:22 120:5,8 128:2 128:13 153:25 165:10 166:14 172:21 180:14
envelope 156:14
equity 28:10,24 29:1,3,25 30:1 30:2 41:22 69:12,13,15,19 70:3 73:22 84:1,5 100:4 119:4
errata 192:5,7 192:10,13
error 150:25
escapes 69:2
escrow 78:24
ESQ 2:5,12
essentially 109:8
establish 15:19 16:11
established 10:8
estate 85:17,18 86:25 87:1 188:7,9,11,15 188:24
et 73:20 96:2 97:22
eventually 40:2 47:10,21,22 61:2 161:23
everybody 103:14 112:11
everyday 187:25
evidence 185:7 185:12,13,25 186:4
Ex 147:14 156:14
exact 34:23,23 55:2 90:22 111:12 182:18

exactly 11:22 40:3 48:10 54:19 81:1 86:13 103:15 103:18 109:20 136:3 154:4,4 160:9 165:6
EXAMINATI... 3:2 11:6
examine 154:6
example 44:6 182:12
excess 97:2
exchange 22:5 139:2 141:13 152:17
excuse 13:10 19:6 23:18 28:15 53:18 54:9 81:4 94:15 107:22 164:2 183:5
excused 9:13
executive 28:9 28:11,17,19 29:18
exhibit 3:12,14 3:15,17 14:6 14:10 18:5 20:19 161:5
exist 119:16 138:5 149:7
existed 97:14 134:9
existence 62:3 97:13,24 134:13 135:1,1 153:22
existing 149:8,11 149:12
exists 32:20
expand 115:12 122:14,15 133:19
expect 38:2 88:23 149:25
expectation 92:18 93:2

121:24
expected 156:10 168:4
expecting 79:8
expeditiously 179:12
experience 35:17 66:14 67:8 76:15 99:3
experienced 89:1
expert 79:2
expiration 95:13
expire 98:24
expired 167:3
explain 5:19
explanation 17:10 160:14
expound 154:1 155:15
Express 135:10
expression 93:6
extension 96:8 96:17 97:8,9 97:12,19 98:4 98:17 138:14 167:2
extensive 66:14
extent 10:22 179:15
extremely 137:2
e-mail 3:17 83:19,22 105:20 126:25 135:6,7,8 141:22 146:25 147:1,3 162:23 162:24 163:1 163:12 182:25
e-mails 130:11 135:2 137:17 163:8

_____

F

F 191:1
face 38:12
fact 19:20 72:23

84:13 98:15
103:12 125:19
134:2,20,25
140:17 141:21
148:15 149:7
153:25 162:17
171:19 172:20
182:25
**factors** 159:4
**facts** 12:13 85:7
136:3,3 179:15
**factual** 17:12
**fail** 192:15
**failed** 89:3
114:15
**failure** 100:22
**fair** 10:7 17:9
39:5 85:11
86:15 104:2
117:8 142:16
**fairly** 66:14 89:5
**fall** 55:11 93:22
**fallen** 117:3,10
**falsehood**
134:17
**familiar** 11:14
43:8 58:19
60:9 65:17
86:8 89:19
93:6 99:12
174:3
**families** 116:18
116:19
**family** 5:24 9:25
26:6 51:17
109:2,14
116:20 119:8
119:12,13,14
119:15 120:1
137:1,2 161:12
172:9,11
**far** 13:21 17:22
21:2 39:15
46:12 53:15
54:25 55:18,20
58:18 64:16
70:2 71:8
72:14 84:25

86:4 90:13,15
100:9 104:21
110:16 112:9
115:20 119:21
157:15
**father** 6:25
131:7 132:7
137:1
**February**
163:23
**Fed** 147:14
156:14
**federal** 7:9 12:10
135:9
**feel** 110:24 130:6
130:13 131:25
133:20 145:10
167:11
**feeling** 126:18
**fees** 70:16,17,20
70:21,22,23
71:17 78:6,9
78:25 79:8
106:8,15 107:8
122:10 123:15
124:2
**feet** 187:22
**fellow** 33:11
66:11 82:11
105:1
**felt** 80:10 113:13
153:21
**fifty** 179:22
**fighting** 118:1
**file** 163:20
179:12
**filed** 14:17 15:4
15:6 18:13
20:23 78:17
93:1 96:2 98:6
163:18,19
166:21 179:13
179:13
**filing** 164:14,14
174:25
**filings** 154:2
**final** 131:12
**finally** 66:18

**finance** 65:4
77:7 82:4
**financed** 42:16
**financially** 51:10
191:13
**financing** 55:17
65:2,16 68:20
82:3,16,22
105:11 140:16
176:17
**find** 105:20
**fine** 31:23 34:15
38:22 77:23
81:3 112:11
124:4 148:11
**finish** 12:22,24
19:7 103:21
107:22 134:18
136:3 151:7
169:5 183:5
**finished** 77:21
103:23 183:19
**firm** 11:9 26:5
26:16 28:9,13
28:16 31:8
32:19 77:5
113:11 153:11
**first** 4:2 12:20
14:14 16:22
17:2 18:10,14
18:22,25 19:2
20:5,9 21:9
27:11,23 39:10
40:19 44:25
45:6,12 46:2
50:2 55:12
57:13 60:2
61:24 62:14
64:1,25 68:9
71:6 90:3
92:25 93:21
94:7 99:25
116:2 119:22
124:6,12,15
125:25 134:23
134:25 138:8
156:11 157:19
158:23 159:15

160:8 164:7
165:5 168:11
168:24 169:2
178:7 181:14
**five** 24:2 25:25
36:16,16 45:20
46:1 55:7
69:11,19 84:4
118:14 133:2
139:15 184:1
186:16
**Fleet** 13:15,17
**flippant** 183:11
**floor** 1:19
187:25
**Florida** 188:21
189:3
**flowed** 49:21
**flows** 125:12
**fnewman@hn...**
2:6
**folded** 119:15
**following** 53:17
138:23,25
147:3 184:6
193:5,6
**follows** 4:4 20:4
102:16 123:10
145:7 155:8
185:24
**foreclose** 154:9
154:19
**foreclosing**
154:20
**foregoing** 190:8
191:5
**foreign** 165:23
**forever** 126:19
**forget** 164:13
**forgetting** 88:21
**form** 18:17,18
40:7 67:20
101:3 122:11
122:24 172:14
**Formal** 23:12
**formation** 35:10
150:14
**formed** 32:24

35:8 66:23
97:22 114:8
**former** 96:7
138:11 149:17
**forming** 66:10
66:13
**forward** 4:9 5:16
7:13 9:11
20:11,13 38:23
143:16
**forwarded**
147:19 172:14
**found** 98:8
148:14 163:17
164:1,7 166:22
167:4 181:2
188:2
**four** 11:19,23
24:23 32:4
35:9 46:1
47:15 55:6,15
56:6 126:23
170:19
**Foxbrunner**
25:2
**Fragin** 1:3,14,18
3:3,17 4:1,11
5:12,23 6:18
6:22,24,25
7:10,15 9:8,19
9:25 10:10,17
11:8,11 16:14
16:19 20:15
25:1,1,2,2
32:19,21,22
33:2,19 38:25
51:17 77:14
103:22 105:19
119:8,12,13,13
119:14,15
120:1 127:6
143:23 144:4
161:12 172:9
172:11,12
174:9 178:7
183:10 190:7
190:15
**frame** 42:5

92:19 94:7
95:13,21
**Fred** 5:18 8:16
  164:5
**FREDRIC** 2:5
**free** 133:20
**Friday** 52:13
**Friedman** 1:10
  11:12 63:1,22
  86:21 96:11
  135:8 142:21
  168:7,25 169:9
**friend** 69:5 82:9
  131:9 142:12
**friendly** 116:15
  116:16 180:25
**friends** 9:20 17:1
  50:5 116:8
  117:7
**front** 12:9 154:3
  155:19
**Fuck** 135:15
**full** 50:6 55:19
  179:15
**fully** 14:1 54:25
  116:1
**full-time** 27:11
**function** 43:23
  43:24
**functioned**
  43:12
**functions** 35:20
**fund** 30:17 33:8
  33:12 34:4,11
  34:16,20,22
  35:3 65:10,20
  68:23 113:11
  125:8,10,11
  171:2
**funds** 31:19,24
  52:14,16 55:12
  57:13 60:2
  114:21 119:23
  125:4 179:24
**funny** 183:10,11
**further** 16:10
  137:16 189:8
  191:8,11

**furtherance**
  35:20
**future** 160:13

—————
**G**
—————
**G** 190:1
**gander** 6:15 7:21
**garbage** 49:21
  125:12
**Garden** 33:8
**Gardephe** 1:7
  5:8 8:11,12,19
  8:22,25 9:3,15
  10:19 11:3
**Gary** 1:14,18 3:3
  4:1 5:12 6:24
  9:7 14:4,6 18:2
  18:5 20:16,19
  132:4 155:25
  161:5 162:21
  162:24 190:7
  190:15
**general** 12:5
  28:15 30:12,15
  39:13,15,16,19
  40:4,5,15 41:8
  50:3 124:23
**generally** 12:2
  31:6 58:25
  90:1
**generated** 71:19
  152:19
**generic** 88:21
**Gentlemen**
  183:18,18
**getting** 50:16
  67:20 103:1
  118:4 125:9,10
  125:14,23
  139:2 142:1,13
  164:5 165:11
  170:6,8 174:13
**give** 12:18,23
  39:4 55:9 67:4
  123:1 135:23
  140:20,21
  144:16 145:3
  145:16 149:3

157:5 166:17
182:11 184:21
**given** 10:7 29:9
  149:7 165:18
  165:19,20
**gives** 42:22
**giving** 116:24
  122:25 144:25
**glass** 50:5
**go** 4:8 5:16 7:13
  21:4,7,9 30:9
  32:13 38:23
  49:20 53:18
  65:6 66:3 71:4
  90:4 99:7
  102:10 115:25
  122:21 141:12
  150:7 155:24
  163:6 182:7
**goes** 24:13
  135:18
**going** 8:6 9:11
  13:4 14:3
  15:11,15 16:9
  18:1,20 37:21
  38:1 42:7
  49:24 52:5,6
  53:10 55:9
  56:21,22 59:14
  66:5 67:19
  68:10 69:12
  70:17,18,18,19
  73:16 74:20
  79:9 80:24
  82:2,9 83:8,8,9
  84:4 100:2
  103:9 105:20
  107:23 118:10
  118:16 121:22
  124:13 125:13
  125:13,15,17
  127:21 129:17
  129:18 132:8,9
  133:16 134:8
  134:10 138:18
  143:15 152:23
  153:4,24
  154:16,17

157:17,18
158:9 160:4
162:2 169:25
170:1 173:2
180:11 181:4
185:18
**Goldman** 48:23
  49:1,3 50:15
**good** 7:21,21
  33:16 39:6
  66:11 77:22
  93:7,11,15,19
  94:1,9 110:25
  111:3,5 113:7
  113:13,15
  117:7,15,20
  118:4 133:18
  162:11
**goose** 6:15 7:21
**gorilla** 125:2
  180:15
**gotten** 15:12
  54:22 107:11
  117:23 118:2
**Gottex** 65:19,21
  68:21 70:8
  71:4 72:25
  73:15,17,21,24
  73:24 74:3,5,7
  74:14 75:18,24
  77:12 82:2
  84:15 86:2
  92:16 94:20
  95:3,4 96:11
  96:20 97:3
  102:8 103:13
  104:5,6,9,12
  104:13,15,17
  104:17,18
  105:3,14 122:4
  124:18,20,25
  125:2,4,7,13
  126:1,7,10,17
  126:18 127:1,4
  127:7,10,13,15
  134:6,15,25
  135:20,21,22
  136:1,7,8

137:19,21,23
137:25 138:13
140:12 141:15
141:16,18,19
147:7 148:25
168:2,2,3
177:4 180:10
180:16,20,21
181:10,14,18
181:20,21,24
182:14,18,19
182:21,24
183:1,3
**Gottex's** 95:2,6
  97:4 127:22
  138:7 139:4
  180:7
**government**
  43:11,12
**Gracin** 177:20
  177:23
**graduate** 21:13
  21:15
**graduated** 16:24
  16:24 21:8,12
  21:14 26:20
**graduation**
  27:10
**grand** 12:10
  184:17
**grandfathered**
  22:17
**grandma** 176:3
**great** 72:24
  113:1 129:18
  129:18 170:1
**greater** 72:8
**Greg** 4:11 5:23
  6:17,22,25 7:2
  7:10,15 25:4
  25:19 26:15,16
  26:25 36:17
  40:15,18,20,21
  47:24 66:12
  127:6,10
  154:24,25
  155:1 163:10
  163:14 178:7

178:18 179:1,5
**Gregory** 25:1
**Greg's** 26:24
  41:12
**ground** 10:7
  12:18
**groundwork**
  80:8
**group** 1:10
  11:12 26:7,18
  78:13,16 97:17
**Growth** 1:10
  11:12 97:17
**guess** 59:25 70:7
  71:11 85:16
  116:5 138:22
  143:1
**guessing** 37:5
  46:1 178:10
**guest** 123:4
**guilty** 113:14
**guy** 43:19 79:25
  82:5,25 104:13
  113:1 124:18
  129:14 135:20
  138:1,2,4
  154:24 176:13
  177:3 180:24
  181:20,21
**guys** 66:12 82:3
  83:7 88:1
  186:17
**guy's** 82:9

**H**

**H** 3:8
**half** 33:9,25
  46:25 50:6
  68:23 74:21
  83:2 85:2
  111:11 118:3
  129:5 138:19
  138:19
**hand** 147:14
**hands** 180:25
**handshake**
  56:11,20
**happen** 70:19

74:5 88:23
  89:8 99:11
  153:24
**happened** 40:3
  55:9 66:20
  68:13 159:12
  168:8 184:5
**happening** 62:9
  129:13 136:19
  148:10 174:11
**happens** 43:3
  89:4 125:24
**happy** 4:20
  20:11,13 77:19
  111:8
**head** 28:9,10,23
  29:1
**headed** 78:13
**heard** 41:25
  64:12,21
  118:24 121:11
  133:25 134:21
  139:18 163:16
  164:24 177:19
  177:20 187:21
**hedge** 30:17 33:8
**held** 1:18 94:3,5
  94:10,15,16,17
  94:19,20
  100:10 112:15
**Hello** 5:9 8:11
**help** 8:10 19:12
  50:21 65:2
  66:2
**helping** 65:18
  142:12
**Hey** 165:16
**Hi** 5:10 8:13
**high** 111:8
  113:16,23
  117:6,7 131:19
  131:19,20
**higher** 10:6
**highest** 41:20
**Hin** 104:13,14
  177:2,3
**hint** 123:2
**history** 21:4

26:22 59:18
  67:7 99:4
**hit** 172:25
**Hoguet** 2:3 8:16
**hold** 8:5,7 27:24
  28:12 109:3
**holder** 74:4,5,6
**holders** 78:15
  83:17 182:2
**holding** 78:22
**holds** 120:5
**Home** 81:21
**honestly** 14:1
**Honor** 8:21 9:14
  9:18
**hope** 118:19
**hopes** 165:11
**horizon** 110:13
**Horn** 65:9
**horrified** 177:21
**horse's** 118:25
**hostile** 181:5
**hotel** 80:6
**housing** 62:6
  86:23
**HUD** 54:3 57:22
  59:25 62:10
  63:3 64:8
  119:9
**hump** 88:5
**hundred** 37:11
  103:2,3 113:12
  176:13 179:22
**hurry** 128:1
**hurts** 103:13
**hypothetical**
  75:23 175:24
**hypotheticals**
  175:22

**I**

**IBM** 99:9
**idea** 31:18 72:17
  112:7 121:21
  122:2 137:24
  162:6,9
**Identification**
  14:7 18:6

20:20 161:6
**Ilardi** 1:10 11:13
  134:3 146:24
  146:25 147:14
**imagine** 44:7
  181:3
**immediately**
  145:16,20
**impact** 78:20
**impacted** 96:17
**impair** 13:25
**imperative**
  192:12
**impossible** 29:10
  170:16
**impression**
  127:14
**improper**
  122:23
**inapplicable**
  6:20
**inception** 126:21
  126:23
**include** 57:1
**included** 21:6
  100:6
**including** 47:11
  143:14,14
**income** 163:21
**incorporated**
  32:23 33:22
**increases** 47:1
**indicate** 168:19
**indicated** 6:18
  7:20
**indirectly** 109:3
**individual**
  176:21
**individuals**
  40:11 137:20
  157:12
**information**
  24:4 37:24
  75:17 106:1
  115:1,2 162:16
  167:17 173:6
  177:6 185:4
  186:7

**informed** 97:24
**initial** 56:12,20
  74:6
**initially** 57:11
  73:24 74:5,22
**inquire** 15:21
  16:9
**institution**
  180:22
**instruct** 15:15
**instructions**
  134:3,4 135:25
  147:18,19
  192:1
**instruments**
  42:17
**insufficient**
  52:14,16
**integrity** 113:17
  113:19,23
  117:1,8
**intent** 49:13,16
**interaction**
  62:14
**interest** 43:1
  47:11 51:3
  52:1 57:2 66:7
  66:8 70:20,23
  71:18 72:2,5
  83:16,20 84:8
  84:10,21 85:2
  85:8,13,18
  90:16 100:7,7
  111:8,10 119:4
  124:2 140:17
  142:22,23
  143:2,6,13,15
  143:19 144:1,7
  145:18 151:1,4
  151:5,12,14,16
  151:17,18
  152:6,10,11
  153:5,5 162:15
  164:21,21,22
  165:5,25
  166:25 167:1
**interested**
  127:24,25

129:19 191:14
**interesting**
142:19 188:6
**interests** 155:2
**interim** 132:16
**intermediary**
84:15
**international**
65:20
**interrupt** 51:15
**interrupted**
101:21 183:22
**interruption**
101:18
**introduced** 45:7
114:4
**invest** 73:24
133:4 146:8
156:8
**invested** 72:18
125:8 139:3
178:21 180:6
**investigate**
58:24
**investigating**
59:11
**Investigation**
12:4
**investing** 72:23
**investment** 26:7
26:18 40:22
58:15,23 60:6
60:9 67:25,25
76:15 77:12
81:16,20 89:7
91:16,17 98:1
115:15 117:3
119:1,3 124:7
124:11 129:6
130:14 132:25
147:22,25
148:3,16 153:3
161:9,18,19,21
162:12 164:6
168:12 177:6
178:5,8 179:5
181:12 188:5
**investments**

42:17 59:12
60:18 77:9
99:13,15
109:12,14
115:17 117:16
117:19 161:13
178:13
**investor** 82:12
82:14 171:24
**investors** 35:24
36:5 73:13
78:14,14 136:6
136:9,13 149:2
165:7,8 166:17
171:6,6,11,18
171:21 172:3,6
**involved** 12:3
30:16 31:2
42:3,7,9,13,14
48:1 54:6 60:9
60:15 64:24
68:10 71:11
74:16 76:7,9
76:11 82:1
83:3 92:11
120:18 146:8
181:19 187:23
187:24 188:1
**involvement**
63:17
**involves** 9:21
100:13
**involving** 99:17
122:4
**in-person** 159:1
159:3
**IRA** 55:25 56:4
56:5,8 57:9
58:10 60:4
108:17,18,19
120:5,8
**IRS** 140:17,24
**Island** 33:9
**Israel** 124:16
138:23 168:9
188:9,11,22
189:5
**issuance** 22:14

**issue** 4:10 5:21
7:16 9:4,24
10:12 23:6
60:7 87:2
91:24 92:2
110:17,18
115:24 123:20
123:25 165:4
**issued** 52:20
**issues** 58:17
**item** 149:8

---

**J**

**Jack** 33:11
**Jacob** 176:23
177:8
**Jacobs** 176:12
176:21
**Jane** 5:9,10
**January/Febr...**
61:12
**Jay** 177:19,22
**JEANNETTE**
1:20 191:3,19
**Jerusalem** 27:1
**Jessica** 25:1,4,21
**Jewish** 26:21
**job** 1:22 66:3
**Joe** 82:12,13
83:1 105:2
**join** 40:18
**joined** 30:19
31:17,20,25
35:9,18 36:10
36:19,22,24
39:11 40:2,5
66:22 67:10,13
67:15 68:15
114:1,2
**Jonathan** 1:4
24:8,13 171:14
**judge** 1:7 4:11
5:8 7:25 8:11
8:11,13,19,22
8:25 9:3,15
10:19 11:2,3
112:15,23,24
112:25 113:2

155:19
**JUDGE'S** 5:9,20
5:25 6:22 7:15
7:25 8:6
**judgment**
102:22
**July** 98:2 134:22
142:22
**June** 97:1,3
98:17,18
134:21 160:4
164:22
**jury** 12:10

---

**K**

**K** 190:1
**Karen** 1:3 11:11
23:14 24:22
25:7,9 129:19
129:21 130:9,9
130:19 131:8
132:17 133:1
145:24 146:9
146:21 147:10
147:17,24
148:8 178:23
179:8,13
**Karen's** 25:11
25:13,15,25
129:24 130:3,8
130:9,15,17,23
131:13,16
132:3 145:23
146:2 159:21
159:24 160:2
160:16 162:19
163:25
**keep** 141:7
**keeps** 43:7
**Kenney** 2:3 8:17
**kept** 66:16 143:6
160:17
**Kest** 136:14,25
137:1,5,9,14
137:23 157:10
157:16,20,25
158:3,7,20
**kid** 25:10 130:23

183:16,23
**kids** 23:23 24:22
25:11,12,14,15
25:25 116:13
129:22,24
130:3,4,8,10
130:14,15,17
130:18 131:11
131:16,18,21
132:3 133:2
141:23 143:14
145:23 147:10
147:12 160:16
162:19 181:18
**Kin** 177:2
**kind** 26:14 35:14
47:17 66:15,21
117:19 125:4
170:3 188:6
**Kings** 33:15,17
34:3,4,8 35:25
**knew** 106:18
110:16 112:9
126:18 143:21
145:21 162:17
172:23 173:20
182:19
**know** 5:4 6:16
13:1,7 16:14
16:19 17:22
21:5 22:8
25:10 31:5
37:17,19 38:9
39:15 43:23
44:2,8 45:14
46:12 47:23
49:5 51:1
53:13,15 54:23
54:25 55:20
61:4 62:7
63:10,15,15
64:16,19 66:5
66:17 68:2
69:5 70:2,5,13
71:8,16 72:5
72:13,14,14
73:6,9,12
74:15,18 75:4

75:9,23 76:1
76:14 79:11
82:9 84:13
86:4 87:23
88:14,20 90:13
90:15 94:2,4
94:10 95:5,8
95:15,16 96:14
97:25 98:25
100:9,24,25
101:9 102:7
103:20,24
104:8,9,14,16
104:21,25
105:8,16,17,18
106:23,24
107:1,2,6
109:20 110:3,6
110:7,8,9,10
110:11,15,17
110:19 111:23
112:2,3,5
113:19 115:20
116:20,22
119:21 120:20
121:3,17 122:1
122:23 126:11
127:2,24
128:12 131:8
134:12,18,20
135:12 139:24
140:5 141:8
143:6 144:17
144:23 146:9
148:8,12 149:2
150:3 152:15
152:21 153:21
157:15 161:23
163:2,3,5,14
163:14 166:9
166:19 170:14
170:17,18
171:8 172:18
172:25 174:12
176:4 177:11
177:13 178:6,7
180:21 181:1,2
181:8,25,25

182:17 184:12
185:2,5,6
188:4,8,10
**knowing** 179:14
**knowledge**
51:19 52:15,17
62:20 73:16
89:14 177:1
178:18,23
**known** 19:15,16
19:20 62:16
111:25 134:12
134:14 173:7
178:4,5
**knows** 19:22
138:4 177:7,8
181:23
**K-1** 162:19

_____

**L**

**L** 190:1
**labeled** 145:12
**lack** 113:6
**lamenting** 82:7,8
**language** 156:18
**large** 36:10
82:12
**larger** 46:19
106:24
**largest** 43:15
**late** 13:18 36:19
39:11,24 40:6
52:11 67:11,13
67:15 85:6
94:4,5,6
**laugh** 159:18
160:8
**law** 1:18 4:4
11:9 16:24
26:25 27:1
52:17 149:10
166:2,18,18
**lawsuit** 45:17,18
78:9,10,12,17
78:20 79:4,9
80:22 93:9
96:1 98:6
116:6 157:22

175:1
**lawsuits** 93:1
**lawyer** 5:23 7:3
177:25
**layer** 73:19,20
**laying** 80:8
**lead** 73:5,7,11
**leader** 112:13
**learn** 61:24 66:7
66:8 95:24
96:6 104:11
118:20 128:17
134:23 187:13
**learned** 95:19,22
95:23,25 96:3
96:5 97:21
128:21,22
134:24 138:3
138:10,17
140:7 146:22
150:7
**leasing** 46:21
48:20 52:21,23
53:7,7 58:7
59:22 119:2,5
119:21 121:8
**Leasing's** 52:24
53:2
**leave** 28:21 32:5
32:7
**leaving** 30:8
41:3 92:9
112:17
**lecture** 183:13
**led** 85:22
**Leeds** 39:17 65:1
65:16,17,19,22
66:5,9,11,19
68:24 72:12
73:14 75:9
84:7,15,16
85:22 86:16
108:8 110:21
113:7,9,10,13
113:16,19
114:13 127:3
163:13 177:13
177:17,25

178:4 180:20
**Leeds/Gracin**
3:17
**left** 28:20 30:7
30:25 32:2
34:10 37:1
40:6 47:12
53:3 91:2
104:15 107:12
107:19 110:12
110:22 111:16
111:18 154:19
154:21 169:16
179:22,23
**legal** 124:2
**Len** 63:4 65:15
84:14,20 85:22
86:20 87:18,25
114:4 116:7
117:15,23
119:1 133:23
134:1 135:7,11
135:16 136:16
137:14 138:15
138:19 147:20
147:24 148:8,8
148:10 150:19
154:11,13,23
159:21 162:2
166:4,11 172:2
178:19,25
179:2,4 180:9
180:19 181:3
**lend** 46:7,11
154:16,18
**lender** 51:17
65:12,13,14,21
84:14 86:3,6
102:23,24,25
103:3,4 120:24
125:14
**lending** 35:16,18
35:21 36:7
46:13 56:3,5,7
57:9 60:4
65:20 114:21
140:25
**length** 59:20,23

60:1,3,5,8
**Lenny** 65:18
82:4,7 83:6
112:10 118:23
124:17 147:5
149:2 153:24
160:17 167:12
176:16
**lent** 46:6 54:7
55:25 62:5
63:2 64:6
103:3 120:9
160:5
**Len's** 116:20
117:1
**Leonard** 1:9
2:18 5:13 9:9
11:11
**letting** 163:14
**let's** 112:13
117:23 154:6
156:1 183:19
**level** 10:5 83:12
83:12
**Lewis** 82:12,13
83:1 105:2
**Lexington** 1:19
2:10
**liar** 167:13
**license** 22:8,14
22:16,25
**licensed** 22:9
**licenses** 21:21
22:1,4,10,21
**lie** 49:13,14,17
**lied** 145:22
**lies** 136:2
**likelihood** 92:20
**limit** 95:18
**limited** 28:14
32:24 82:2
122:12
**limiting** 122:22
**Linda** 146:6,7
**line** 8:5,12 193:8
**lined** 65:3
**liquidated** 71:23
103:10 115:16

206

115:19,21
152:8
**liquidation**
122:10 123:14
**list** 128:24 157:6
163:21
**litigant** 175:19
175:20 176:2,7
176:9
**litigated** 4:10
50:13
**litigation** 10:4
58:16 60:7,10
67:12,18,22,24
116:25 124:1
132:10,12
174:3,15
**little** 21:5 95:1
101:14 112:18
112:18 115:24
116:1 118:1
123:2
**live** 49:25 114:15
**lived** 97:15
**LLP** 1:19 2:3,9
**loan** 42:20,21
43:13 46:18,22
46:23 47:2,3,4
47:6,10,16,19
49:22 50:17,24
51:4,6,7 53:6
53:17 54:10,17
54:23 55:13,14
55:16 56:22
57:13,22 58:6
58:9,15,23
59:21,24 60:6
62:10,13,17,21
63:6,14 119:1
119:3,5,7,9,22
121:8,10
140:15 141:1,2
**loans** 52:2 58:3
59:12 172:1
**located** 27:18
44:11
**lockbox** 71:14
109:21

**long** 15:5 27:21
28:18 30:21
32:11 33:9
35:12 45:12,19
57:4,8 59:19
91:1 95:21
111:4 115:17
129:15 148:14
166:21
**longer** 93:18
94:8 136:24
**long-distance**
26:12
**long-time** 9:20
**look** 14:9 18:2
41:5 49:12
77:8 114:17,18
117:24 125:19
162:11,22
**looked** 135:9
159:18 187:2,3
**looking** 17:20
38:8 50:7
66:22 68:25
130:16 136:15
151:16
**looks** 163:13
**lose** 83:9
**losing** 101:2,6
**loss** 102:6,18
**lost** 100:21,24
136:25
**lot** 10:6 22:17
56:2 66:13
73:1 78:24
102:24 130:22
131:22 137:3
148:5 153:8
**Lots** 28:5 155:23
**loud** 102:2
**lunch** 120:12,14
**Lynch** 125:21
**L.F** 27:9

────────
**M**
────────
**M** 190:1
**machinations**
49:21

**machine** 53:12
**machines** 48:20
48:21
**Madoff** 143:17
165:7
**mailing** 128:23
**major** 65:20
82:14
**majority** 74:9
**making** 47:14
77:11,13
117:17 148:3
162:11
**man** 49:8
**managed** 32:15
62:23 103:10
**management**
31:22,24 32:20
32:21,22 33:2
33:20 34:7,12
36:21,23 37:2
41:14,21
107:14 114:24
179:19
**manager** 73:5,7
73:10
**managing** 65:23
66:4 84:18
115:7
**Mandell** 157:11
158:24 159:5,7
160:15,20
**manner** 49:5
**margin** 86:8,10
86:14,15,18
87:3,6,12,15
87:19,21,22
88:8,16,22,23
88:25 89:1,9
89:16 99:3,7
**mark** 39:1 89:19
89:22,23 90:7
90:11 92:2
99:2 157:11
159:15 160:15
**marked** 14:3,6
18:1,5 20:16
20:19 52:14

113:12 161:5
162:21
**market** 42:18
85:17 86:23
89:20,22,23
90:7 99:3
104:19 141:4
**marketable**
89:23 99:4,5
**marketing**
104:22 105:6,7
**markets** 43:15
**marking** 92:11
**Markovich**
146:5
**marriage** 23:24
24:21 25:7,9
25:13
**married** 23:19
131:8,22,22,23
131:24
**marry** 23:21
**Maryland** 48:19
**master's** 21:22
26:21,23
**materials** 105:6
**matter** 14:25
125:19 134:2
134:20 140:16
141:21 162:17
163:8,9 182:24
**matters** 15:13
**MBA** 21:14 27:2
**McCORMICK**
1:20 191:3,19
**mean** 6:2 11:20
15:4 25:10
36:7 43:20
46:15 51:11
56:1 57:16
58:22 61:10
62:1 65:10
66:14,24 68:1
73:2,7 76:20
80:17 91:9
93:4 106:18
111:24 121:9
128:7 132:6

135:21 138:4
142:6 144:2
160:15 161:16
164:16 165:13
171:15
**meaning** 36:3
39:23 49:1
73:18 89:8
136:20 153:17
155:9 169:13
**means** 31:5
61:11 73:9
122:22 140:18
146:17
**meant** 95:4
**mechanism**
71:14 96:13
**mechanisms**
174:20
**medications**
13:24
**medium-sized**
48:21
**meet** 44:25 45:6
63:5
**meeting** 164:4
177:17 178:3
**member** 9:25
69:4
**members** 9:20
109:3,14
116:20,22
**memoranda**
66:25 67:1
**memorandum**
67:2 171:4
**memorandums**
66:15,21
**Memorial**
124:17 127:17
160:8,10
**memory** 159:11
**mentioned** 21:3
21:6 45:21
52:22,25 61:24
66:25 71:18
88:10 105:2
121:7 124:15

134:1 136:15
136:16
**Merrill** 125:21
**met** 23:14 45:7
45:12 64:1,3,4
116:2
**metaphor** 7:22
**Mezei** 1:9 2:8,18
4:14,17 5:14
6:2 7:14,17
9:10,11,19
10:3,10,13
11:11 18:23
38:18 42:9
44:12,25 45:6
45:10,16,22,23
46:3,9,14
47:14 48:13,17
48:22 49:5,15
50:2 51:6,12
51:24 52:25
53:9,17,25
54:1,22 55:11
55:22,25 56:1
56:1 58:17
60:14 61:1
62:25 63:4
65:1,2,7 69:12
69:14 72:9
84:4,14 85:22
86:20 87:19,25
96:2,9,10,19
97:22,23 98:3
98:5,14,18
105:10 114:4
116:2 120:9
121:9,9,11
124:20 125:20
126:1,13,18
127:1,13
128:18,19,20
128:22 129:8
130:10 132:15
132:20 133:7
133:11 134:11
136:6,12,16
137:8,9,14,18
137:20,24

140:11 142:20
143:22 144:12
145:8 146:13
147:15 150:19
150:23,24
153:7 154:11
154:13 155:1,1
156:4,7,25
157:7 158:20
159:23 160:21
162:3,16
164:13 167:17
168:1 172:14
172:18 173:6,7
173:20
**Mezei's** 4:8
10:18 37:18
49:6,14 50:8
60:20 81:7
97:17 98:13
142:24 143:11
154:2 159:17
159:18 160:21
161:20 170:22
186:20,23
187:13,20
**Miami** 80:6
**Michael** 25:1,4
25:16 26:4,5,8
26:20
**Michael's** 26:19
**mid** 134:21
**middle** 66:19
163:12
**Military** 21:10
**million** 32:1
34:9,10,13
37:7,9,11
41:19,24,24
46:25 47:11,13
54:7,17 57:7
60:21,22 61:22
68:21,22,23
69:11,19,22,25
70:8,12,16
72:8,11 74:8
82:23,24,25
84:4 88:4,4,4

90:12 94:14,19
94:22,25 95:1
95:5 96:19,24
97:2,5 103:2,3
103:5,6 104:5
104:6 106:25
118:3 138:8,13
179:19 184:21
184:23
**Millions** 29:11
29:12
**mind** 12:19 92:3
**mine** 40:17 53:4
131:9
**minimum** 72:10
**Minor** 127:2
**minus** 138:19
**minute** 8:7 77:18
105:19 186:18
**minutes** 180:3
**Mir** 26:25
**Miriam** 1:5 24:8
171:14
**misrepresenta...**
134:17
**missing** 161:11
**misspoke** 138:10
**mistaken** 64:25
**misunderstan...**
48:14,16,16
49:7 135:16
**misunderstan...**
50:3
**moment** 7:16 8:1
51:20 65:15
**Monday** 159:8,9
**money** 29:8 36:9
42:22 46:6,7
46:11,13 48:17
48:23 53:1,10
54:13,16 55:4
58:6 62:5 63:2
64:6 67:1,3
69:15 70:25
71:15 72:19
74:9 78:24
84:5 92:1 93:6
93:10,15,19

94:1,9 97:17
97:20 98:11,11
98:14 99:7,25
102:24 103:1,8
109:22 110:24
111:3,5 112:9
113:7,12,13,15
114:14 117:17
117:25 118:2,3
120:9 125:11
127:24 129:4
129:24 130:4
130:22 134:6,7
134:10,20
135:18,23
138:15,20
139:2,16
140:11,20
142:14,18
143:3,5,6,10
143:12,15,16
143:17 144:11
144:12 145:9
145:13,17
146:23 147:6,8
147:11,16,17
148:9,16,17
150:7 151:15
154:16 156:9
156:22 159:21
159:23,25
160:1,3,5,6,9
160:16 163:10
163:24,25
164:17,19,19
164:25 165:2,9
165:10,13,15
166:1,17,23,24
167:3 168:15
170:23,24
172:14,17,18
172:22,23
173:21 181:18
185:18
**monies** 71:12,24
109:23 112:7
185:1,15 186:2
**Monroe** 119:12

172:11
**month** 47:14
51:25 52:8,10
56:25 80:25
153:4,5 185:19
**monthly** 152:7
152:18
**months** 30:5
35:10 45:20
52:3,4,5 55:16
58:12 104:15
125:6 126:23
142:23 164:9
**morning** 158:4
159:8,9
**mortgage** 41:9
42:10 60:17,24
64:12,17 68:11
71:2,13,15,21
71:24 72:3
78:15 81:8
86:19,20
109:21 111:20
122:9 123:14
**mortgages** 41:9
60:16,19 71:22
**mortgage-rela...**
81:20
**Moses** 1:18 2:9
5:11 8:14 11:9
**Moshe** 1:4 24:7
24:12,13
**mother** 136:25
**mouth** 118:25
**move** 17:10
19:12 20:11,13
45:2 123:18
**moved** 45:1
74:24 116:3
**moving** 56:23
159:16,16
**Muncie** 159:16

_____
**N**
_____
**N** 2:1 3:1 190:1,1
**name** 11:8 33:4
33:7,12 69:2
79:25 82:17

119:7 120:8
132:3 146:2
154:24 176:14
176:16 188:25
188:25 189:2,4
189:6
**named** 4:14 5:14
9:9 33:11
104:13 154:24
**names** 22:8 24:3
24:7,24 66:12
104:11
**Nancy** 146:5,7
**nature** 46:5
**necessarily**
43:24 103:9
111:4 113:20
173:18 182:7
182:15
**necessary**
145:10 192:4
**need** 12:21,25
37:16 57:4
67:1 73:19
105:19 122:14
122:19 135:19
163:3
**needed** 53:1
65:15 99:6
138:12 160:3
180:23
**needs** 13:5
**negotiate** 63:3
**negotiated** 84:10
96:9
**negotiating**
113:5
**neither** 191:8
**nervous** 83:7
**Nevada** 162:10
**never** 54:21 59:6
69:16 84:20
88:10 96:14
97:13,15,24
98:5,11 99:19
107:13 119:20
124:10 128:11
128:19,20

133:25 134:1
134:13,16,21
137:22 139:18
139:19 142:15
143:4,8,10,21
146:19 148:16
156:7,8 157:7
159:22 160:10
160:16 162:13
162:15,20
163:24 164:24
166:25 168:15
**new** 1:1,19,19
2:4,4,10,10
22:5 27:19,20
28:3 52:15
143:16 149:9
149:10,15
150:2,3,4
153:13,14,19
155:11 165:8
166:14 169:21
169:22 170:5
180:14,24
188:19,24
190:3,4
**Newman** 2:3,5
4:7,16,22 5:6
5:18,18,21 6:1
8:16,16,17
9:16,18 11:2
14:22,24 15:6
15:8,10,11,20
15:22 16:5,12
16:15,17,20,22
16:23 17:11,14
17:19,23 18:17
18:24 19:4,11
19:23,25 20:8
33:5,16 37:13
37:17,21 38:3
38:10,11,14,17
39:3,7,8 40:7
50:9 53:18,22
67:19 68:3,12
76:25 77:16,21
77:24 80:16,23
81:22 101:3,10

101:13,24
105:22,25
107:22 109:5
112:25 122:11
122:24 123:21
131:1,4 132:8
144:18,23
151:7,10
155:16,25
164:5 167:8
173:9,13 174:7
175:14 176:1
183:18,22
184:3 189:9
**nice** 98:20
**nine** 30:22 68:23
**non** 174:1
**non-disputed**
70:17 78:6,25
**normal** 88:21
**normally** 88:25
149:20
**north** 184:22
**Northern** 46:21
52:21,23,24
53:2,6,7 58:7
59:22 119:2,5
119:20 121:8
**Notary** 1:20
190:23 191:4
**note** 3:17 37:18
37:22 38:3,6,6
38:18,20,24
47:17,23 139:4
139:14 154:7,8
**noted** 192:10
**noteholder**
154:8,10,11,14
**noteholders**
143:8,9 155:3
157:3,9,14
160:18 171:9
**notes** 98:1,10,12
98:19 133:24
134:10 135:4,5
135:8,9 139:8
139:16 140:13
141:8,15,16,19

141:21,24
143:4,9 145:15
150:10 152:12
152:22,24,25
153:10,23
154:5,25 156:3
156:12,14,25
162:14 166:6,7
168:2,3,21,22
168:23 179:2
185:16,17
188:4
**notice** 1:18
86:11,18 87:3
87:6,12,16,19
87:22,22 88:8
88:16,22,24
89:9,17
**November** 35:13
37:1 39:24
41:1,4 91:3
107:13
**November/De...**
61:11
**novy** 160:11
**number** 3:11
36:11,12,20
38:19,20 39:1
85:10 106:21
107:2 117:17
117:18 119:13
119:15 151:3
172:11 180:19
184:19
**numbers** 74:13
174:18
**numerous** 174:5
**Nussbaum** 1:3,4
1:4,5,5,6 11:11
23:15 24:7,8,8
24:9,9 147:13
171:14,14,15
171:15,16
**nuts** 107:24

_____
**O**
_____
**O** 190:1
**object** 4:7 15:11

18:17,18 40:7
67:19 101:3,10
122:11,24
144:18,21
145:13
**objected** 5:13
9:10 20:2
101:12 102:3
145:16 171:17
**objecting** 10:23
131:4 171:10
**objection** 9:16
10:24 76:25
109:5 122:13
122:14,19
131:1 167:8
173:9 174:8
175:14,17
**obligation**
153:14,16
**obligations**
114:16
**obviously** 12:23
15:3 19:14
23:16 52:11
58:15 86:12
93:13,14,15
109:6 113:15
131:11 150:24
**occasion** 161:12
**occasions** 11:18
11:19 89:16
**occur** 56:3 85:5
90:21 93:21
**occurred** 50:25
52:2 56:5
**October** 142:23
**offer** 129:12
**offered** 66:3
129:8
**offering** 66:21
66:25 67:1
128:22
**offers** 174:18
**office** 26:6 44:9
73:1,2 118:23
**officer** 30:13
44:1 59:4,7

209

**officers** 44:4
**offices** 1:18
**offing** 66:15
**offshore** 179:25
**oh** 69:24 88:1,2
  107:25 117:24
  135:16,20
  148:1,5 183:6
  187:15
**okay** 4:19 5:21
  7:15,25 9:3
  12:17 14:11
  16:5 17:6 42:7
  46:11 48:6
  51:18,23 52:11
  52:19 56:3
  59:21 74:10
  80:4,13 81:12
  81:13,23 83:3
  83:4 85:11,12
  94:13 96:23
  97:6 99:12
  104:2,24 106:5
  107:24 108:6
  112:10 114:12
  123:3 131:6
  133:21 141:11
  148:11 168:18
  181:23
**old** 24:10 25:3
  38:11 143:16
  148:12,13
  150:2,5 152:14
  152:16 153:15
  153:18 155:10
  169:13,21,22
**oldest** 108:18
**onboard** 82:4
**once** 70:18 102:3
  107:12 136:14
  144:21
**ones** 12:13 22:13
  98:19 117:19
  172:8,10
**operating** 46:19
  142:25 144:2
**opinion** 117:1
  131:15 162:1

**Oppenheimer**
  27:17,18,21,23
  28:4,7 29:5,9
  30:4,8 32:5
  59:16 77:5
  161:10
**opportunity**
  129:8
**opposed** 43:13
  52:8,10 103:16
  108:14
**opposite** 7:7
**optimistic**
  112:11
**options** 22:16,19
**oral** 96:4
**orally** 51:12
  150:16,17
  156:21 171:10
**order** 54:1 55:10
  67:2
**organization**
  30:14 65:4
**original** 42:25
  46:23 69:20
  83:7 96:12,14
  99:18 117:3
  161:16,20
  176:18 192:12
**originally** 48:7
  48:17 51:2
  60:17 74:20
  82:4 166:20,21
**Orlando** 82:13
**outset** 173:24
**outside** 69:4,4
  128:22 129:16
  153:7,9 174:3
**outstanding**
  54:13 58:6
  184:10,18
**overall** 60:20
  103:11
**overnight** 42:18
**overruled** 10:24
**overseeing** 62:25
**oversubscribed**
  138:1 142:4,9

**overwhelming**
  74:9
**overwhelmingly**
  148:24
**owe** 88:4 115:11
**owed** 54:13
  103:7 115:5,8
  143:15 163:10
**owned** 60:17
  73:23 76:20
  139:25 140:7
  141:15 148:22
  148:23 184:14
**owner** 80:5
**owning** 143:4
**owns** 102:25
  139:21

———————
**P**
———————
**P** 2:1,1
**package** 54:3
  62:5 135:10
**page** 3:2,11
  190:11 193:8
**pages** 190:8
**paid** 47:4,6,8
  48:24 49:24
  50:16 54:16,25
  55:15,18 70:6
  70:7,19 71:6
  72:3 73:15,15
  73:17,17,21
  91:11 93:3,4
  94:25 95:6,7,9
  100:1,2,3,5
  110:14 111:5
  115:17,22
  119:17 122:9
  123:13 142:22
  142:23 143:2,3
  143:5 151:15
  151:17 152:10
  152:11,14
  153:4,6,18,18
  155:10,11
  160:6 163:24
  163:25 164:11
  164:17,18,24

  165:11,16
  166:25 167:7
  170:6,8 184:15
  185:18
**paper** 125:5,6,16
**papered** 47:19
  47:21,22 48:4
  48:5 57:10,11
  57:12,14,16,19
  57:19,22,23
  172:21 173:8
  173:22
**papering** 48:1
  98:1 135:4
  173:5 178:16
**Paradigm**
  128:16,17,23
  138:2 170:23
  182:14
**pardon** 170:1
**parent** 131:12
  131:13 132:2
**Park** 99:14
**part** 21:3 58:16
  69:15,19 75:25
  80:5 83:5 90:3
  90:4 95:25
  99:8 107:15
  108:7,20 112:8
  121:23 127:25
  130:24,25
  131:3,3,7
  132:11,20
  138:14 139:5,6
  164:14 165:9
  177:21
**participate**
  79:13
**participated**
  68:18
**participation**
  83:11
**participations**
  71:22
**particular** 38:6
  52:9 77:22
  115:14 118:12
**particularly**

  148:15
**parties** 6:16 7:3
  191:10
**partner** 12:5
  28:14,15 30:12
  33:8,11 39:12
  39:13,15,16
  40:15,21,24
  41:11,13 43:18
  59:9,10 65:23
  66:4 69:3 76:2
  76:4,11,17
  77:5 84:18
  92:18 107:7
  112:6 115:8
  138:11 177:25
  179:17
**partners** 12:4
  30:13 33:15
  36:14 39:12,19
  39:23 40:2,4,5
  40:12,23
  108:17,19
  119:8,12,16
  172:9
**partnership**
  32:24 39:14,20
  44:2 51:17
  115:7 170:19
**parts** 155:12
**party** 4:14,14
  5:4,4 6:2,19
  7:1,8,11 9:17
  10:1,14,21,23
  69:1,1 73:14
  148:25 168:7
  182:8
**pass** 97:23
**passed** 143:1
**passes** 135:18
**passing** 63:7,9
  64:4
**pass-through**
  135:17 142:25
  154:4 164:25
  165:1,2
**pay** 42:22 52:5,6
  52:9 56:24

57:4,8 96:19
99:25 115:16
118:10,10,13
118:16 143:5
143:13,14,16
154:7 161:13
161:18,23
162:2,4,7
188:5
**payback** 99:15
102:5,17
121:23 181:13
**paydown** 96:8
96:16 97:7,9
97:12,18 98:4
98:17 138:14
167:1
**paying** 51:7
52:10 56:22
71:3,9,25 72:4
72:6 106:9,22
107:9 109:22
143:11,21
152:15 154:25
164:20 165:8
165:24 169:1
**payment** 92:19
138:13,18
147:4 153:14
153:16 163:22
181:13
**payments** 47:14
52:11 57:2
58:12 100:22
151:1,4,13,14
151:24 152:6
152:18 162:15
**payout** 107:11
**peak** 41:20
**pending** 13:2
37:14,16
**people** 22:17
40:1 44:3
59:11 62:24
64:19 70:19
104:21,25
143:13 159:20
165:18,24

170:15,21,24
182:3
**people's** 113:11
**percent** 51:5
54:11,11,18,18
54:23 55:14
56:16 74:21,24
75:2 84:11
85:2,3,9
111:14 117:23
139:4 140:13
141:24
**percentage**
106:14 107:8
**perception**
117:7
**perfect** 130:2,2
**perfectly** 112:11
148:12 168:17
**performed**
75:18
**performing**
35:20 133:8
**period** 44:19
61:16 78:16,18
146:20
**permanent**
55:17
**permitted** 10:1
10:21 87:2,11
87:14
**person** 6:23 69:3
128:2 176:24
**personal** 9:22
32:14 188:25
**personally** 46:7
66:9 68:24,25
75:6,8,11
85:25 91:7
108:14,16
120:6
**pertained** 76:5
**phone** 4:12 5:8
118:23,24
147:5 159:2
**phrase** 89:19
90:1 123:1
**picked** 131:19

**picture** 180:16
181:15,15
**piece** 69:7,12,15
69:19,22 70:1
70:3,6,11 71:5
72:22 73:22
74:1,19 75:5
75:13,14,15
82:15,20,21
84:1,5,24
85:25 88:9
89:13 90:12,14
91:7 92:7,19
93:10,14,18
94:1,3,6,8,15
94:16 95:2,2,4
95:6,7,9,10
97:4 98:22,23
100:1,1,4
101:1,5 102:5
102:8,18
103:16,17,19
104:6,20 105:7
106:17,25
108:8,9,20
109:8 115:10
115:14,16,19
121:23 122:4,8
123:13 124:9
124:11 125:5
136:1,9 142:1
142:11 176:15
180:8 181:11
181:11
**pieces** 71:21
73:13 78:22
100:6 103:17
108:12 109:1,4
119:11 125:5
**Pishkin** 63:10
**Piskin** 62:24
63:5,12,13
64:3 86:22
**Piskin's** 63:17
**place** 13:17,18
43:24 45:13
48:23 55:17
60:17 73:4

105:11 134:14
134:16 138:8
138:24 164:9
165:5 174:21
174:21 176:16
176:17
**placed** 121:2,15
121:18,25
**placement** 67:2
166:15 170:10
170:11,17
171:3,3
**placements**
170:14
**places** 59:14
**plaintiff** 1:7 2:2
8:18 9:10 68:1
**plaintiffs** 1:12
5:13
**plaintiff's** 7:20
**please** 5:19 13:7
19:5 20:1,12
26:3 48:11
144:10 155:6
155:25 185:20
192:3,7
**plenty** 88:1
**plus** 43:1 54:11
54:18 97:5
100:6 118:3
124:2,2,2
**pocket** 98:14
148:17 154:18
154:19,20,21
159:23 166:23
**pockets** 30:2
127:23
**point** 15:12
21:11 22:1
25:8 28:3
33:15,17 34:3
34:4,8 35:25
42:25 66:22
74:22,24 77:17
81:17,19 86:2
92:22 93:9,15
110:24 111:10
111:15 120:15

126:12 127:18
140:6 157:19
173:25 179:18
181:15 182:16
**pointed** 50:11
**Ponzi** 143:18
144:3 148:18
**pool** 60:16,21
103:11
**pools** 51:13,20
**portion** 70:10
73:25 83:23
124:8 139:9,12
140:1 163:24
184:13
**position** 4:13,16
5:19 37:22
38:1,5,22
110:21 111:5
113:7,9,10
137:21 168:17
182:18
**positions** 105:15
**positive** 171:4
**possible** 9:16
19:21 58:3,4
127:2 181:6,7
181:17,19
**possibly** 132:1
134:19 138:23
138:25 156:10
**Post-business**
27:13
**potential** 59:11
65:12 78:20
137:20
**pound** 125:2
180:14
**powers** 86:19
**practical** 79:3,4
79:6
**preceded** 103:21
**precipitate** 85:8
**precise** 68:4
**preferred** 68:22
69:8,25 72:19
73:13,22 74:4
74:19,19 75:13

211

83:12,17 84:23
88:9 90:14
92:19 93:10,18
94:8 95:10
98:22 100:2,3
103:17 108:8
124:9,11 140:8
162:8 176:15
**preparation**
186:11,15
187:7
**prepared** 105:6
**prerequisite**
49:17
**presence** 4:8
10:23
**present** 2:17
85:23 173:17
**presented** 5:22
**president** 28:9
28:12,17,19
29:18
**pressure** 125:11
**pressured**
180:22
**presumably**
180:24
**pretty** 67:23
**previous** 13:11
**previously** 9:23
**pre-Silar** 42:12
**price** 42:25
154:24,25
155:1
**primarily** 26:6
42:11
**primary** 10:11
65:21 186:25
**principal** 6:4
22:7 47:2
48:25 50:16
52:1 57:1
100:6 124:7
153:5,6
**principals** 104:9
**prior** 15:3 22:18
23:23 25:6,9
36:24 42:7

45:18 62:9
64:13 114:6
116:6,24
124:19 136:19
148:2 156:8
163:22 164:3,9
174:25
**private** 67:2
149:14 166:15
170:10,10,14
170:17,21,25
171:3,3
**privilege** 16:4
17:15 37:23
38:21
**privileged** 16:8
37:20 38:10
80:11
**probably** 16:21
38:15 44:24
56:5 93:1,22
95:5 126:5
129:4 136:24
138:24 153:8
178:9
**problem** 101:19
**problems** 171:8
**process** 112:14
**production**
38:20
**professional**
25:16 26:1
**professionally**
26:4,9 41:4
**profit** 54:5
**profits** 54:12,18
54:24
**prohibit** 44:18
**project** 82:13
**promissory**
47:17
**properly** 123:1
**property** 54:3
57:21 59:25
63:3 64:8
119:10
**prophet** 160:12
**proportionate**

139:15 141:16
184:25 185:8
185:14,17
186:2,8
**proportionately**
95:7
**protect** 155:2
**provide** 69:12
**provided** 68:21
68:23
**providing** 75:24
**provision** 87:9
**public** 1:20
149:13 170:12
190:23 191:4
**publicly** 22:18
**pulled** 65:6,11
65:14
**punitive** 124:2
**purchase** 53:10
53:13 54:8
61:5 64:13
73:25 80:18
81:7,20 120:23
142:10 161:17
**purchased** 43:2
60:23 64:18
74:12 94:18
102:8 104:5
136:22 139:1
176:22
**purchasers**
188:3
**purchasing**
145:15 161:21
176:19
**purpose** 53:21
91:21 120:21
**pursuant** 1:18
71:10 164:3
**put** 4:23 8:7 65:7
74:7 80:24
84:4 89:2,3,6
89:11 98:14
120:23 129:4
134:10 138:18
138:19 139:16
143:14 148:16

148:16 150:20
150:22 154:18
159:22,22
160:4 166:22
166:23 181:17
182:22 184:17
**putting** 69:13
134:7 135:25
143:7 156:24
169:11
**p.m** 163:12
189:11

———————
**Q**
———————
**quarter** 138:13
**quest** 4:22
**question** 12:22
13:2 15:24,24
16:7,12 18:18
18:21,24,25
19:7,10,11,18
20:1,3,5,8
37:13,15 50:9
66:16,17 67:20
68:8 74:2,11
74:15 77:1,14
77:15 78:1
90:4,4 93:14
101:4,11,15,23
101:25 102:3
102:10,12,15
102:17 103:15
103:21,23,24
107:23 112:1
113:22 115:2
118:19 122:12
122:25 123:2,4
123:6,9,11
124:4 141:5,12
142:20 143:23
144:4,6,10,15
144:17,20,21
144:22 145:3,6
145:8 149:23
149:24 151:9
151:11 155:6,7
155:9,14,22
156:1 168:19

169:5,7 172:5
173:1,12,13,18
173:19 174:24
175:16 176:1
181:22 183:4,5
183:20,22
185:21,23,25
**questions** 13:6
13:25 52:18
99:2 183:14,15
189:8
**quickly** 126:19
129:9
**quite** 152:21
**quote** 81:10,11
84:5 115:10
129:25 130:1
132:19 153:15
**quoting** 97:23

———————
**R**
———————
**R** 2:1 191:1
193:1,1
**rabbinic** 175:3,4
**raise** 10:5 67:1,2
99:7 160:3
**raised** 69:14
85:3 111:12,13
111:15 138:15
140:11
**raises** 170:23
**raising** 85:8
131:10 170:24
**ran** 29:3 31:8
34:5 62:19
154:22,23
**rate** 51:3 72:2,5
74:18,19,25
84:12,21,24
85:2,8,13
100:7 111:8,10
111:19,24
**rates** 83:16
**reach** 82:10
**reaction** 177:22
**read** 10:16,17
19:25 20:3,22
102:14,15

104:1 123:8,9 145:4,6 155:6 155:7 163:3,4 163:6 185:20 185:23 187:20 190:8 192:3
**reading** 159:17 160:7
**ready** 44:23 77:18
**real** 79:24 85:17 85:18 86:25 87:1 142:25 188:7,9,11,15 188:24
**realize** 50:2 182:10
**realized** 50:7 167:13
**realizing** 92:19
**really** 74:10 76:23 107:10 124:4 174:13 180:21 187:22 187:22
**reason** 15:25 104:14 145:19 159:21 164:2 184:24 185:3,5 192:5 193:10 193:12,14,16 193:18,20
**reasons** 193:6
**recall** 5:25 14:16 15:1,7 16:18 18:12 21:2 22:8,9 23:1 33:18 34:23 36:22 40:3,14 44:21,24 45:8 58:18 61:22 64:25 65:1,8 65:18 68:20 70:15 71:1 80:2 83:21,24 84:9 89:18 92:10 111:13 112:12 119:12

121:10 127:9 137:5,10,16,22 157:2 186:10 187:15
**receipt** 192:14
**receive** 70:25 87:15 107:8,17 108:23 139:9 139:12 151:4 151:13 184:25 185:8,14 186:1 186:8
**received** 23:3 54:19 97:25 106:12,22 109:24 111:19 112:4,8 139:14 139:16 141:19 147:1 150:10 151:1,5,12,14 151:18,20 157:1 162:14 162:15
**receiving** 139:8 141:13 145:13 165:5
**recess** 78:3 120:12 180:4
**recipient** 88:23 147:16
**recollect** 84:3
**recollection** 29:6 50:22 82:21 152:2
**record** 4:23 5:7 7:4,5,6,12 9:1 11:4 104:1 113:3 120:11 123:24 161:7 169:8 183:25 184:4
**recorded** 12:21
**recruit** 66:2
**Redder** 159:19
**redemptions** 125:9,10 180:23
**reduced** 15:8

69:23 70:4
**refer** 49:17 136:12
**reference** 163:13
**referring** 12:9
**reflect** 153:14 156:3,10 173:18 183:25 184:5
**refresh** 50:21
**refreshing** 159:11
**refused** 5:16
**Regal** 2:3 8:17
**regard** 13:15 22:4 43:10 86:11 113:19 126:16 133:5 136:13 137:17 137:23 147:4 149:10 154:10 159:4,11 169:12 170:5 170:13 179:9 182:24
**regarding** 14:19 17:12,17,23 60:15 68:10 78:9 79:14,17 80:14 81:25 83:11,16,20,23 84:1,8 85:2 87:19 92:7 93:25 108:4 124:6,20 126:1 127:13 133:8 133:22 146:10 147:16,22,25 150:23 156:25 158:13 159:7 166:4,5,11 168:12 169:10 169:11 177:6 178:5,20 179:5
**regardless** 152:7 152:18
**regards** 158:8 187:11

**regular** 48:15
**relate** 141:5
**related** 191:9
**relates** 99:13
**relation** 63:5
**relationship** 15:18 116:7 126:12 178:11 180:19,20
**relationships** 114:12
**relative** 191:12
**relatively** 117:6
**relayed** 133:13
**relevant** 113:20 132:9
**reluctant** 128:8
**remain** 35:12
**remarkable** 160:13,14
**remember** 11:22 12:6,16 13:21 17:3 18:22 19:3 22:15 27:8 33:6 37:5 37:6 49:2 54:1 55:2,8,13 56:14 57:18 58:3 70:13 78:7 79:25 81:1 82:6,17 84:25 87:17 90:22 103:25 106:19 107:6 129:23 137:4 146:4 154:23 156:20,23 157:21 158:25 164:20 176:14
**remembers** 49:3
**repapered** 48:12
**repayment** 50:24 52:1 179:9
**repeat** 102:12 123:5,7 173:11
**rephrase** 13:7 101:20

**repo** 41:25 42:2 42:8,14,18,19 42:23 43:13 45:21 73:5,10 74:25 90:11 95:14 96:13,18 98:24 100:11 100:13 110:14 136:10 139:5,6 139:10,13 140:1,8,15,15 140:16,17,18 140:23 141:7,8 148:22,23 152:13,15 153:15,17 155:10 162:5 167:20 181:13 182:2 184:11 184:13 185:1 185:10 186:9
**reported** 29:18 30:6
**reporter** 1:20 8:23 12:21 191:4
**reporting** 31:12
**repos** 42:7,12,12
**Repotex** 1:10 11:12 94:17 97:21,24,25 98:3,12,16 109:9 133:25 134:1,2,9,10 134:11,13,21 135:1,1,10,15 135:17,17,18 139:8,17,21,25 140:5,7,7,11 142:18,21,22 142:24 143:3,5 143:7,7 144:8 144:11,14,14 145:12,14,15 145:18 149:8 150:10,15 151:2,4,13,14 151:15,16,18

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

151:21,25
152:4 153:13
153:22,22
154:1,10,10,13
154:22,23
155:3 156:3,7
156:9 157:4,13
158:8,13,24
159:7 160:2
162:12 163:15
163:16,23
164:11 165:1
166:14 168:13
168:14,15,20
168:21,22,23
170:16 171:10
179:2 184:14
184:16,25
185:15 186:3,8
188:3
**Repotex's** 98:10
**Repotex/Com...**
164:8
**represent**
146:13
**representation**
14:25
**representations**
92:6
**representative**
82:16
**represented**
17:4 53:1
105:2 134:15
146:19 153:23
**representing** 7:3
8:15,17 11:10
82:11 83:1
84:17,19
157:13
**represents**
141:25
**reprimanded**
112:14
**repurchase** 42:3
43:5 100:10,14
100:17 101:2,8
102:6,19

**repurchased**
43:3
**request** 38:4
150:18,20,22
182:20
**require** 22:11,14
**required** 100:22
166:17 171:5
**requires** 171:3,4
**resale** 140:24
**reseller** 26:11
**resolution** 49:24
**resolve** 8:3,8
75:13 83:3
**resolved** 174:22
175:18
**respect** 38:5,6
38:22 54:16
**respond** 129:12
171:7
**response** 87:15
88:16 155:13
**responsibility**
167:6,15
**responsible**
29:17 35:23
36:1 51:7
77:10,12
167:11
**responsive**
155:13
**rest** 118:6 164:6
166:24 167:4
188:3
**retain** 14:24
15:6 16:15,17
83:23
**retained** 15:20
16:3,19,21
17:2 106:15
145:18
**retainer** 15:10
**retire** 32:8,9
**retired** 32:11
**retirement**
32:14
**return** 74:18
182:11 192:12

**revealing** 187:5
**revenue** 70:24
71:19 78:21
79:5 106:8
109:20 110:1,5
110:9,10,11
111:19 112:3
152:9,19
**review** 67:4
186:11,14
**reviewed** 186:19
186:23,24,24
**reviewing**
178:16 186:16
**re-characteriz...**
173:14,16
**rid** 124:25
126:19,20
**ridiculous**
164:16
**right** 6:17 8:19
8:25 9:15 11:3
49:2 58:11,18
65:16 100:21
100:22 105:4
105:14 114:6
143:17 153:1
154:18,20
172:16 182:16
183:1
**rights** 100:10,17
100:24 101:2,8
102:6,19
**rise** 116:24
**risk** 130:17,19
**Riverdale** 45:1,2
116:2 124:16
138:22 143:17
159:20
**Rob** 39:17 65:1
65:16,16,19,22
66:5,11,19
68:24 69:6
72:12,24 73:14
75:9 84:7,15
84:16 85:22
86:16 104:21
104:25 108:8

110:21 113:7,9
113:10,13,16
113:19 114:1,3
114:4,13 127:3
163:13 177:25
178:4 180:20
**Robert** 177:13
177:17
**Rob's** 69:5
**Ron** 1:10 11:12
63:1,22 64:1
86:21 135:8
166:4,11 168:7
168:11,25
169:9,15
**room** 7:14 9:12
125:3
**roommates**
16:23
**Roth** 108:17,18
108:19
**Rothschild** 27:9
**rule** 5:2 10:20,20
50:3
**ruled** 7:10
**rules** 6:8 7:9
10:7 12:18
149:9,10,14,15
170:13,15,18
**ruling** 4:9,21
5:16 6:20
**run** 29:4 30:3
62:22
**running** 77:6
148:17

_____

**S**

**S** 1:14,18 2:1,5
3:3,8 4:1
125:22 176:23
**Sachs** 48:23
**sale** 140:23
**Salzman** 33:12
**Sam** 25:5 147:13
171:15
**Samuel** 1:6 24:9
24:19 25:2,23
**Sandell** 146:6

**Santander**
125:23
**sarcasm** 5:2
183:7 184:7
**sarcastic** 183:9
**sauce** 6:14,15
**saw** 14:14 18:10
85:16 96:14
99:19 107:13
116:9 119:20
128:22 156:13
172:24
**saying** 59:3
125:7 136:4
141:7 165:6
171:20
**says** 37:18 38:14
38:18 39:2
49:2,3,10,11
49:12 135:10
152:12 164:2
**schedule** 13:5
**scheme** 143:18
144:3 148:18
**Schick** 13:16
**school** 16:24,25
21:13,18 23:3
23:6 27:3,10
27:13 131:19
131:20,20
**Schwab** 147:11
**Scott** 2:12 5:11
8:14 9:5 11:8
**se** 130:12 174:2
**seats** 159:13
**SEC** 12:11
**second** 21:11
81:4 83:1 90:4
132:15,20
140:18 154:6
**secretary** 134:4
**Section** 62:6
**secured** 141:1
**securities** 22:5
43:11,12 81:10
89:1 99:5,6
149:10 166:18
**security** 89:24

149:12,12
**see** 4:19 8:2,7
15:22 38:12,14
38:17 50:4
69:1 75:19,22
76:5,13 129:1
133:3 149:4,19
149:20,24,25
150:8,11,13,14
151:2 160:12
**seeking** 179:9
**seen** 14:12 18:8
20:16 122:3
162:23 163:1,2
**segregate** 71:14
**sell** 91:24 99:8
105:15
**seller** 43:4
**selling** 99:9
103:4
**sells** 42:23
**send** 87:12
109:22 134:4
135:8 147:17
**sending** 52:3,4
122:16 134:6
**sends** 135:7
**senior** 33:11
41:25 42:2
45:21 65:21
68:20 69:8,22
70:6,10 71:5
73:5,10 74:4,5
74:25 82:16,22
83:12,17 84:12
84:24 86:2,6
88:9 90:11
93:14,25 94:3
94:6,14,16
95:14 96:13,18
98:24 100:1,1
101:1,5 102:5
102:8,17,23,24
102:25 103:3,4
103:16,19
104:6,19 105:7
106:25 110:14
121:23 122:4,8

123:13 124:9
136:10 139:5,6
139:9,13 140:1
140:7 141:7,25
148:22,23
152:13,15
153:15,17
155:9 162:4
164:3,12
167:20 181:13
182:2 184:11
184:13 185:1
185:10 186:9
**sense** 106:11,14
107:3,5 111:18
**sent** 71:24 86:11
86:15,18 87:6
87:21,22 88:16
88:22 89:17
128:23 135:2
135:23 141:22
142:15 143:7
147:13 153:23
169:17
**separate** 25:12
**separated**
115:11
**separation** 44:15
107:15 108:3,7
113:6 163:11
**September** 35:8
40:19 46:4
47:16 48:7
50:16 51:2
53:5 56:24
57:6 114:6,7
142:23
**Series** 22:6,6
**serious** 183:12
**serve** 28:18
**services** 26:12
**servicing** 60:19
70:16,16,21
71:17 78:6
122:10 123:15
**setting** 83:16,20
84:8,10
**settle** 173:25

174:2 175:1
**settled** 99:9,10
175:10
**settlement** 174:2
174:8,9,14,25
**setup** 40:12,14
99:22
**seven** 164:9
186:17
**Seventh** 44:13
**severance** 113:5
**sham** 155:4
**share** 76:24
141:16 184:25
185:8,14,17
186:2,8
**shared** 186:7
**sheet** 192:6,7,10
192:13
**shielded** 16:3
17:14
**shirt** 130:5,5
**shop** 45:10,15
**short** 78:16,18
**shorter** 153:8
**shorthand** 6:14
191:4
**shortly** 114:1
**show** 14:3 18:1
162:21
**showed** 96:8
**showing** 20:15
**shown** 190:11
**sign** 192:7
**signal** 122:16
**signatory** 44:5
**SIGNATURE**
193:23
**signed** 65:21
86:17
**signing** 192:9
**Silar** 26:17 35:6
35:7,8,9,10,12
35:14,18,21,23
36:10,20 37:2
39:10,13,21
40:18,20,24
41:3 42:8,8,13

43:9,17,23
44:1,5,9,14
45:22 59:16
60:10,14 61:2
61:7,15 64:16
64:24 65:23,25
66:2,3,5,10,22
67:11,13,15
68:9,15,18,23
69:3 70:10
71:3,25 72:3,6
73:3,14 74:3,6
74:12 75:12,24
76:2,4,12
78:21 83:23
84:17,19 85:24
87:2 88:15
90:11,16,23
91:2 92:9,12
92:16,18 94:18
94:18,19 95:4
96:8,11 104:7
104:16,19
105:7 106:7,8
106:15,21
107:7,13,15
108:7,22
109:22 110:2
110:12 111:16
111:18,19
112:6,17 113:6
114:1,2,8,13
114:14,15,20
114:23 115:4,6
115:17 121:12
122:7 123:12
126:3,6 136:24
138:11,17,18
161:10 163:11
164:6 167:22
169:16 177:4
178:1,2 179:17
179:18,24
**Silar's** 66:7,8
71:9 73:2 74:1
79:22 83:11
95:6
**Silberfein** 2:12

3:5 4:13,19 5:1
5:10,11 6:16
6:24 7:19 8:4,9
8:13,14,21,24
9:2,5,6 11:1,7
11:8 14:8
15:16,25 16:6
16:13 18:20
19:4,19 20:10
20:14 33:13
37:15,19,25
38:8,13,15,24
39:5,9 40:9
50:14 53:23
67:23 68:5,14
77:2,19,23
78:4 80:21,24
101:7,12,16
102:1,13 104:2
104:4 106:6
109:11 113:4
120:13 122:13
123:7,17,23
131:2,5 132:11
132:13 144:19
144:25 145:4
151:8,19 155:5
155:12,20
161:8 167:14
173:15 180:2,5
183:21 184:7,8
185:20 189:7
**Silver** 65:8,9
**simple** 143:23
144:6,20
**Singer** 1:19 2:9
5:11 8:14 11:9
**single** 49:23
162:16 188:1
**sisters** 145:24
**sister's** 146:2
**sit** 99:21 127:9
128:12 139:20
156:2,23
161:25 184:9
**sitting** 6:7 10:15
143:17 159:12
170:19

| | | | | |
|---|---|---|---|---|
| **situation** 7:24 79:19 85:7 88:24 99:17 | **sorry** 6:22 11:20 15:14 46:15 51:15,18 54:9 56:10 57:16 59:8 61:18 63:13 70:14 72:25 87:1 97:7 100:12 107:25 112:16 128:7 138:9 148:1 158:14 160:25 169:6 183:6,9 | **speculating** 29:16 | 149:10 | 117:19 |
| **six** 36:16 45:20 52:2 57:7 138:8 164:9 186:16 | | **split** 138:18 | **state** 38:5 52:15 188:18,20 190:3 192:4 | **stream** 110:1 152:9 |
| | | **spoke** 43:13 82:16 104:22 105:1 130:9 133:22,23 156:7 158:2,23 159:6 160:7,10 168:11 170:4 | | **streams** 78:21 79:5 |
| **Sixteen** 27:22 | | | **statement** 54:22 119:21 | **Street** 2:3 |
| **skiing** 82:6 | | | **statements** 142:22 | **stretch** 118:14 |
| **slap** 184:4 | | | **States** 1:1 21:10 188:16,18 | **stretched** 118:15 |
| **slapped** 112:22 112:24 184:1 | | | | **stricken** 155:14 |
| | | **spoken** 55:7 157:10 160:18 | **stating** 171:19 | **strictly** 43:10 141:3 182:8 |
| **slash** 73:3 96:11 98:3 | | | **status** 40:17 | **strike** 106:7 124:5 148:20 |
| | **sort** 118:20 135:7 178:13 | **sponsor** 171:5 | **stay** 80:6 | |
| **slightly** 14:16,17 18:12 19:22 97:2 | | **spreading** 159:19 | **stayed** 98:13 168:16 | **string** 162:23 163:1 |
| | **sorts** 70:21 | **spring** 85:14 94:24 137:12 | **staying** 142:15 | **structure** 28:13 39:20 |
| **sloppiness** 166:5 166:6,7 | **sounding** 83:6 | | **Stearns** 85:15 | |
| | **sounds** 58:5 121:13 132:16 | **SPV** 51:21 120:16,17,18 120:21,22 121:2,7,10,15 121:18,25 122:1 | **Steinhardt** 12:4 21:4 30:10,11 30:12,14,14,15 30:21 31:2,7 31:10,16,19 32:5,7 42:15 141:3 161:10 | **structured** 42:8 68:17,19 |
| **slowed** 79:6 | | | | **stuff** 62:10 66:15 98:9 138:7 148:14 166:25 167:4 170:3 186:24 187:1 187:21 |
| **small** 32:19 36:23 43:24 48:21,21 149:1 | **Source** 176:17 | | | |
| | **SOUTHERN** 1:1 | | | |
| | **so-called** 143:5 155:3 164:21 | | | |
| **smaller** 106:24 | | **SPVs** 51:13 121:4 | **Steinhardt's** 31:24 | **style** 49:6,14 50:8 69:17 |
| **socially** 116:9,17 | **space** 192:5 | | | |
| **sold** 28:16 54:4 74:6,13 89:7,7 89:13,15 91:25 97:4 98:18 | **SPE** 120:15,16 120:18,21 | **squeezed** 125:14 125:15,18,18 125:18,24 | **stepchildren's** 109:7,13 135:6 149:1 166:16 177:20 | **subject** 67:11,17 67:21,24 80:22 163:8,9 190:10 192:9 |
| | **speak** 118:25 129:19 133:7 133:10 146:10 | | | |
| | | **ss** 190:3 | **stepkids** 131:20 131:23 188:7 | |
| **solicit** 170:15 | | **ssilberfein@m...** 2:12 | | **subscribed** 190:18 |
| **solicited** 188:4 | **speaker** 118:24 | | **stepparent** 132:1 | |
| **soliciting** 129:5 170:21 | **speaking** 174:15 | **standing** 49:18 49:19 | | **subsequent** 104:14 119:14 128:19 129:20 140:10 148:3 162:11 |
| | **special** 28:14 53:21 120:23 | **standpoint** 58:17 91:12 | **steps** 88:15,18 127:14 179:8 179:10 | |
| **Solomon** 12:3 | | | | |
| **somebody** 30:7,7 75:7 82:23,24 82:24 89:5 138:16 181:4 | **specific** 48:9 81:18 101:14 170:13 174:6 182:20 | **standpoint** | **stock** 22:5 109:10 | |
| | | **start** 4:7 41:5,6 45:13 50:16 56:22 58:12 95:10 134:18 136:2 | | **subsequently** 97:20 98:9 137:1 138:17 |
| **someone's** 100:14 | **specifically** 72:15 106:19 108:25 111:14 121:17 126:16 129:23 134:5 168:6 170:4 174:15 186:15 187:6 | | **stole** 166:24 | |
| | | | **stop** 19:5 20:12 38:8 | **substance** 15:17 19:13 84:22 87:24 118:21 124:24 169:23 |
| **son** 36:17 47:24 66:12 105:20 114:10 118:7 118:22 163:10 | | **started** 27:23 32:19 34:4 40:19 44:22 52:4 111:11 135:17 159:17 160:8 186:16 186:18 | | |
| | | | **stopped** 52:3 | |
| | | | **stopping** 77:16 | |
| | | | **stories** 49:15 | |
| **sons** 108:17,18 | | | **straight** 56:22 72:2,5 118:24 | **substantive** 80:3 |
| **son's** 108:22 | **specifics** 12:16 87:13 | | | **subtenant** 44:12 |
| **son-in-law** 63:1 | | | **straightforward** | **sue** 145:20 |
| **Soon** 45:1 | | **starting** 56:25 | | |

216

158:20 160:20 160:23 161:1
**sued** 18:15 19:1 19:16,17 20:6
**suggest** 74:12 122:17 137:19 162:25 185:4,7 185:13 186:1,7
**suggested** 117:10 176:5
**suggesting** 74:11 76:10,23 174:13
**suing** 68:2
**suit** 13:15 166:21
**sum** 15:17 87:24 118:21 124:23 169:23
**summer** 27:7 41:7 55:5 85:6
**Sunday** 158:4
**supply** 142:8
**support** 136:3
**supposed** 50:15 50:25 54:20 56:24 58:12 81:11 112:10 118:14 119:18 128:13 152:10 152:11 155:2
**supposedly** 69:11 70:15 151:15
**sure** 13:9 18:9 20:24 29:14 36:15 40:1 47:19 48:10 50:18,20,20 55:14 59:4 70:9 78:15,23 80:1 81:5 87:4 87:8 89:12 95:3 97:10 99:1 106:10,13 106:16 115:13 118:5 119:24 134:19,24

146:17 161:15 169:8 171:5 180:17
**Surprise** 135:10
**suspicious** 50:8
**SVP** 53:19
**swipe** 48:20,20 53:11
**Sworn** 190:18
**sworn/affirmed** 4:3
**synagogue** 9:21 45:8
**syndicated** 82:22
**S-I-L-A-R** 26:17

––––––––––
**T**
––––––––––

**T** 3:8 190:1 191:1,1 193:1
**tactic** 4:20
**Tai** 177:2
**take** 5:12 13:1,3 13:24 14:9 18:2 37:21 38:1 45:13 77:17,19,23 88:15,18 93:5 94:15 95:11 97:3 103:13 106:3 110:16 111:5 118:5 122:16,18 125:19 126:11 127:15,21 129:14 130:17 130:19,20 134:25 135:21 135:22 137:21 141:9 143:12 154:14 159:21 162:22 180:2 181:4 184:21
**taken** 1:18 6:3 73:19,20 103:7 125:23 134:14 134:16 141:17 141:18 179:9

179:10 191:11
**takes** 57:8 102:23
**talk** 12:20 45:10 45:15 115:25 126:6,8,14 154:20 157:16
**talked** 115:24 116:11,13 159:15 170:9
**talking** 13:9 23:11 77:9 80:18,19,20 81:7,9,15,19 83:2 86:12,13 92:17 97:11 124:12 140:14 148:2 161:19 161:20 166:19 174:13,14 179:25
**talks** 170:22
**tall** 79:24
**Talmudic** 26:25
**Tamar** 1:5 24:8 24:15 171:15
**target** 56:23
**tax** 91:24
**technicality** 166:12
**technically** 51:10,11,21
**teenager** 64:2
**telephone** 26:11 26:11
**tell** 29:10 37:25 39:2 49:23 77:13 128:4,9 128:10 131:9 132:21,23,24 147:17 168:4
**telling** 49:15 141:22 165:25
**temperature** 10:5
**tend** 105:8
**term** 41:25 58:19 86:8

90:6,8,9 99:12 121:11 142:4 166:5
**terminology** 68:4
**terms** 15:17 36:10 48:20 54:10 56:7,9 56:10,12,17 90:2 99:15 106:11 150:1 173:21 174:22 181:13,16
**terrific** 133:17
**test** 22:11 24:3
**testified** 4:4 22:20 40:10 109:19 113:25 116:1 123:23 132:14 142:14 146:22 156:15 170:7 179:18 184:21
**testify** 33:5,6 106:1 174:9
**testimony** 19:24 91:5 96:4 124:5 129:7 154:2 173:5,9 173:14,17 190:8
**thank** 8:4,9 11:2 13:20 53:22 68:12 81:22 102:14 104:3 106:4
**theoretically** 167:20,23
**thing** 12:8 13:9 48:19 82:23 89:5 98:20 117:24,25 127:21,22 128:3 131:10 135:13 155:3 170:20
**things** 10:3 44:7 44:8 59:15,19

79:7 82:7 125:3 136:16 140:16 162:10 169:25 186:25
**think** 6:1,6,13 10:2,7 12:15 15:11,13 17:25 24:13 33:24 39:6,12 47:10 47:24 52:23 55:7,13 56:16 57:20 58:2 62:4 67:23 68:5,8 72:1,7 77:2,4 80:5 90:3 91:1 94:21 102:9 103:15,18 106:18 109:19 109:22 113:18 113:23 116:1 118:4 119:24 120:15 129:15 135:2,7 137:2 141:10 142:4 148:13 151:23 152:16 156:13 156:15 162:2,4 162:7 163:6 164:14 165:23 165:24 166:2,5 170:16,17 174:9 176:23 177:10 180:10 181:16 183:10 183:19 184:20 187:3,4 189:7
**thinking** 110:20
**third** 52:13 69:1 73:14 176:21 176:24
**third-party** 1:15 3:14,15 9:7
**thirty** 192:13
**thought** 40:11 46:13 72:10,24 98:20 111:3 135:24 152:21

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

217

160:13 161:13 179:21 184:22 188:5
**thousand** 176:14
**Thousands** 29:7
**three** 11:19,23 32:3,4,4 35:9 39:18 47:15 51:13,20 55:15 58:16 66:12 99:9 119:11,17 120:2,3 125:6 135:3 138:12 138:12 151:24 162:15 163:8
**three-day** 23:7
**three-quarter** 138:8,12
**Thursday** 118:7
**till** 93:5
**time** 7:2 11:25 12:9,25 13:14 13:22 14:14 16:17,22,22 18:10,14,22,25 19:2 20:5,9 22:24 23:14 27:3 28:13,14 34:23 36:24 37:22 38:1,3 39:7,21 42:5 42:25 44:20 45:9 46:2 48:7 53:1 55:11 56:17 57:19 60:10 61:7 62:20,20 63:13 64:1,6 65:24 77:22 78:8,10 78:17,18,19 79:12 81:2,25 85:6,14 86:5 86:10 87:5 89:25 90:22 91:4 92:18 93:17,20,24 94:3,7,13 95:13,18,21

96:13 97:15 98:2,2 101:17 104:17 105:9 110:13 112:12 112:19 114:6 114:19,20 116:2,6,12 117:2,5 119:14 121:9,13 124:15 126:6,9 126:15 130:1 134:9 136:5,25 137:12 138:15 148:4,19 151:22 153:2 153:20 156:11 158:2,18,23 159:6 160:3,8 161:9 163:3,23 167:3,19,21 168:11 169:1,2 169:16 170:4 170:13 171:2 173:7,22 178:9 180:6 185:21
**times** 12:15 118:14 144:23 151:23 170:9 186:18
**time-line** 16:11
**timing** 93:3,4,5
**title** 27:24 28:3,6 39:10 41:10,12 43:17 59:8 120:16
**titles** 28:12 44:4
**today** 7:13 14:1 21:23 24:10 50:1 51:8 63:18 99:21 106:21 114:22 125:20 128:12 139:20,22 156:2,23 161:25 162:10 184:9 186:15
**today's** 5:15 186:12 187:8

187:11
**told** 4:24 40:21 58:5 64:4,21 69:16 78:7 96:10 99:19 107:1 110:4,7 110:9,15 124:25 125:20 125:20 127:16 128:11,18,19 128:20 129:17 135:24 137:12 137:14,24 141:22 143:8 146:20 152:16 153:24 159:20 162:20 164:20 167:12 168:1 173:2 177:3
**top** 3:17
**topic** 23:8 77:22
**total** 41:22,23 61:22 95:10 106:11,21 117:20,22,24 133:2 184:17 184:18
**totally** 42:8 97:14 149:16 149:16 153:25 185:6
**Totty** 132:5
**touch** 65:19
**trade** 22:16
**traded** 22:18 29:8
**traders** 31:9
**trades** 29:4
**trading** 28:10,10 28:24 29:2,3 29:24,25,25 30:1,2,3 77:6 89:25
**traditional** 174:3
**trail** 135:7
**train** 159:10
**transaction** 50:6

50:11,12 76:8 120:19 134:8 134:13,16 140:23,24,25 164:8 170:25 175:9 181:18
**transactions** 81:14 121:4 172:4,13 175:7
**transcript** 10:16 10:18 190:10 191:6 192:14 192:15
**transfer** 51:13 142:18
**transferred** 51:21 148:20 148:21
**treasuries** 43:10 43:11 99:10 140:19,21
**treasury** 12:3 42:17 141:3
**treat** 130:23 131:17,25,25 183:16
**treated** 131:16 131:17
**treats** 140:17
**tremendous** 118:5
**trial** 10:11 158:19
**tried** 38:16 85:12,19
**tripped** 80:9
**trolley** 176:3
**trouble** 65:15
**troubles** 86:23
**true** 84:6 103:9 116:15 136:2 179:15 184:3 190:9 191:5
**trust** 1:4,4,5,5,6 98:11,20 108:15 119:13 119:13,15 120:1 129:4

130:3,14 133:4 133:23 135:6 146:14,20 167:6 172:11 172:12 185:14 186:1 188:25
**trusted** 150:24 178:25
**trustee** 1:3 96:1 97:16 130:9 146:21 171:22
**trusts** 81:10,16 81:17 109:7,13 124:13 129:22 130:4,8,10,15 130:22 133:2 139:14 141:24 145:23 147:10 149:1 166:16 170:8 177:21 188:7
**try** 13:7 15:24 18:19 132:10 182:9,10 183:19
**trying** 15:19 16:11 19:12 24:3,4 25:12 58:2 61:8 62:8 101:13,17,19 102:2 114:14 122:16 123:1 174:23
**Tuesday** 1:19 158:11
**turn** 154:17
**turned** 46:17 69:13 84:6
**turns** 16:7 151:3
**Twenty-nine** 34:13
**twice** 48:5 102:4
**two** 10:3,6 15:18 21:9,11 30:5 36:17 40:1,11 46:25 54:7,17 55:8 62:24 65:6 71:3 98:7

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

99:9 108:11,17
108:18 109:1
117:18 118:2
125:5,6 129:16
133:12,15
135:2 138:21
147:21 148:7
151:23,24,25
153:7,9 156:13
157:12 158:5,6
179:24,25
180:3 186:25
**type** 52:22
178:11,12
**types** 26:3
**typical** 31:1,3

**U**

**ultimate** 20:1
93:2
**ultimately** 40:12
68:18 78:25
95:19,22
123:20 128:10
168:12,14
**Um-mm** 18:7
**unaware** 97:14
185:6
**uncertain**
181:16
**underlying**
152:20 176:18
**understand** 8:20
13:6 17:13
36:6 42:21
48:14 56:12
58:22 60:13
62:8 74:2 76:9
77:4 90:10
101:22,25
103:17 120:22
133:21 140:10
140:14 145:14
152:5 162:9
164:23 170:10
174:23 175:23
180:7
**understanding**

51:9 53:5,9
69:18 78:11
79:4,7 92:23
93:18,25 96:16
98:23 99:22
106:20 109:23
110:13 111:4
114:22 115:3
121:14 127:18
139:1,21 140:6
142:10 148:6
148:22 149:5
152:6,24 153:2
153:12 163:7
164:10 167:19
174:10,20
175:13 177:12
177:16 178:4
184:10
**understands**
77:3
**understood**
18:21 19:8
73:21 94:8
124:8 141:2,19
167:20,21
**undertaken**
127:15
**unfair** 6:6
**unfortunately**
171:1
**unintelligible**
19:12
**unit** 137:15,16
**United** 1:1 21:10
188:15,18
**University** 21:8
26:20,22
**unnecessary**
183:8
**unravelling**
85:14
**unrelated** 140:8
**unusual** 9:19
**upset** 145:21
**USA** 42:10 60:17
60:23 64:12,17
68:11 81:8,21

86:19,20 90:17
**use** 39:6 50:10
53:10 80:23
92:1 143:12
**usual** 135:16
**usually** 121:2
178:12
**U.S** 42:17 43:10
89:9

**V**

**valuation** 31:16
31:21 90:9
108:23
**value** 89:24 90:2
91:18 92:7,11
108:4 114:23
115:3
**Vanderbilt** 21:8
21:11,16
**Vardy** 48:24
49:1,3 50:15
**various** 22:4
30:2 49:21
56:19 71:20
136:15 167:1
187:1
**vast** 76:15
**vehicle** 53:21
120:22,23
140:16
**verbatim** 132:19
137:4
**verse** 157:5
**versus** 153:18
155:10
**vice** 28:9,11,17
28:19 29:18
**view** 60:20
173:25
**views** 140:25
**violated** 118:8
**virtually** 83:5
**voice** 131:14
**volition** 34:6,16

**W**

**W** 190:1

**waffling** 82:5
**wait** 12:22,24
83:1 140:18
151:10 155:18
156:1
**walk** 77:7 83:8
**walked** 118:22
**walks** 49:8,10
**want** 6:13 19:23
21:4 37:17,19
38:21 53:19
59:4,11 77:20
79:18 82:19
83:2 103:22
115:25 118:10
118:12 129:25
131:9 134:12
134:18 135:5
140:19,20
145:1,2,2
148:1 154:19
155:21 158:19
174:12 183:14
**wanted** 4:11
32:6 34:21
75:21 76:11
82:15,18,20,21
97:10 127:20
127:21 128:3
138:1 148:25
149:2 156:21
169:8 180:9
**wants** 17:19
103:8 105:25
106:1,2 129:14
155:17
**wasn't** 7:11 22:6
43:23 44:8
52:5 69:14
77:12 91:6
97:15 99:8
105:9 110:16
110:18,19
113:13 119:3
124:4 134:14
141:8 143:21
168:14 172:20
183:9 187:23

**watch** 154:17
**watching** 187:21
**water** 50:5
**waterfall** 99:13
99:17,22
100:23 182:1
**way** 4:23 6:9
10:17 13:8
43:13,25 48:9
66:20 85:10
88:6 90:10
91:10 103:10
103:23 114:17
114:18 122:16
122:18 125:12
130:6,13 141:1
141:2,9 149:14
152:13 153:21
154:13 161:13
162:17 167:18
167:25 168:22
171:7 176:16
181:12,17,19
185:12 186:4
**ways** 122:8
123:12 156:6
178:15
**week** 52:7 65:6
118:12,13
163:15 165:17
**weeks** 5:23 52:5
186:16,17
**well-to-do** 137:2
**went** 21:10,11
21:13 43:9
65:1,16 78:24
88:6 97:20
98:12,12
114:10 116:17
123:21 125:21
125:21 131:19
131:19,20
134:20 138:20
160:16,17
162:12,18
168:15,16,19
172:20
**weren't** 74:16

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

76:9 86:5 147:23 152:9 164:15 169:1 170:6 172:7 174:21
**West** 21:10
**we'll** 13:1
**we're** 13:9 20:10 67:20 99:4 118:10,16 155:24,24 183:19 189:9
**whatsoever** 107:5 114:25
**wheels** 176:3
**whichever** 49:4
**wholly** 6:20 7:7
**wife** 14:20 16:15 17:22,25 81:17 96:1 97:16,25 131:15 133:22 139:18 145:20 147:21 156:8 156:14 162:13 166:20 181:17 187:10
**wife's** 81:9,16 98:11,20 117:21 124:13 129:3 141:23 143:14
**willing** 130:17 130:19,20
**winding** 41:18
**winter** 61:6,8,11
**wintertime** 93:23
**wire** 51:25 134:3 134:4,11 135:25 147:11 147:18,19 172:15,24,25
**wired** 97:16 146:23 147:9
**wires** 52:3 141:23 151:23 151:24 152:2
**wiring** 147:6

**wise** 125:1 131:8
**wish** 193:5
**witness** 3:2 13:4 19:3,6,15,22 19:24 20:12 33:7 40:8 50:12 53:21 68:5,13 77:25 80:25 81:23 101:5,17 105:23 106:5 107:25 109:6 113:2 122:17 122:20 123:5 123:16 124:5 144:19 145:3 151:12 155:18 167:10 173:11 175:15 176:2 183:24,25 185:22 190:7 192:1 193:23
**witnesses** 10:11
**wives** 116:15
**woman** 78:13 112:12
**wonder** 188:3
**wonderful** 130:2 143:11
**word** 48:14 73:11 113:6 162:20,20
**words** 7:8 15:9 22:16 49:17 50:10 80:25 118:13 135:12 144:5 149:8 153:13 160:1 182:16
**work** 13:4 21:4 26:5 27:4,8 44:18 73:18 104:16 177:4 178:17
**worked** 4:25 26:9,10,15,16 26:17 27:7 33:3 104:16

105:1 177:4
**working** 8:1 79:23
**world** 43:16 76:16 85:14 131:10 154:16 165:1
**worth** 29:12 60:20 72:11 91:11 102:24 103:2,2 147:22
**worthless** 109:8
**wouldn't** 64:19 92:20 168:19 175:1
**wrist** 184:4
**write** 38:19 52:16 90:16 91:8,9
**writes** 37:22
**writing** 15:9 51:12 69:23 70:4 150:16,20 150:23 156:12 156:19,20,24 171:7,10 182:22
**written** 15:9 44:15 47:18 71:10 86:16 91:5 108:2
**wrong** 117:6 122:12 123:3 123:22
**wrote** 38:25 137:15 141:24

—————————
**X**
—————————
**x** 1:2,16 3:1,8 117:21

—————————
**Y**
—————————
**yeah** 57:24
**year** 21:15 29:9 33:9,25 34:5 55:11 92:21 95:22 96:21 107:12 129:3,4

129:15 163:22
**years** 17:1 21:9 21:11 26:10 27:22 28:8 30:22 38:11 45:4 48:9 56:6 98:7 116:3,5 126:12 129:16 153:8,9
**year-ended** 107:12
**Yellowstone** 99:14
**Yeshiva** 26:20 26:22 27:1
**yesterday** 52:12 129:24
**Yiddish** 132:7
**York** 1:1,19,19 2:4,4,10,10 22:5 27:19,20 52:15 188:19 188:24 190:3,4
**Young** 124:16 138:22 168:8

—————————
**Z**
—————————
**Zachary** 1:5 24:9
**zero** 49:25 111:22,25 115:1

—————————
**$**
—————————
**$10,000** 118:13 147:12
**$100,000** 68:25
**$180,000** 115:8
**$20** 165:18,20
**$200,000** 51:25 52:6 68:24,24 72:22 75:5,13 108:9,20 109:1
**$300,000** 138:16 138:20
**$350,000** 163:22 164:11
**$50,000** 52:6

56:25 57:5 118:12
**$8,375,000** 184:17
**$800,000** 109:7,8 117:21 123:20 124:7,14 133:2 133:4 141:14 143:13 146:8 146:11 148:19 148:21 169:11 169:17 177:6 177:14 178:5,8 178:20 180:6 181:12

—————————
**0**
—————————
**07** 61:12,14,14
**08** 61:12 94:4,6
**09** 94:4,6

—————————
**1**
—————————
**1** 3:12 14:4,6 38:7
**1st** 96:24 97:1,3 98:17,19 138:10,12 140:12 159:24 160:9
**1.625** 94:17
**1/18/09** 3:17
**1/31/09** 3:18
**1:09-CV-1028...** 1:8
**1:33** 120:12
**10** 2:3 37:7 41:19 56:16 68:22 69:25 82:23,24 94:14
**10:00** 1:20
**100,000** 176:25
**10016** 2:4
**10174-1299** 1:19 2:10
**105** 34:10
**11** 3:5
**11:40** 78:3
**11:48** 78:3

**110** 34:10
**12** 1:19 51:5
  54:11,18
  126:12
**12th** 1:19
**12:23** 163:12
**12:46** 120:12
**13** 97:2 116:5
**14** 3:12 116:5
**15** 45:4 116:3
  126:11
**15th** 96:20 138:9
  140:12
**150** 29:21 72:8
  72:11
**16** 28:7
**160** 60:21 72:8
  72:11
**161** 3:18
**170** 60:21 115:8
**175** 29:21
**18** 3:14 24:20
  55:14 75:2
  82:24 84:11
  139:4 140:13
  141:24
**19** 25:5 30:18
  49:9
**19th** 51:25 164:4
  177:18
**19-page** 14:10
**1966** 23:18
**1970** 17:5
**1975** 28:15
**1979** 28:14,16
**1982** 28:16,20
**1986** 28:22 30:9
  30:18 31:17,20
  31:25
**1994** 32:3
**1995** 30:23,25
  32:2
**1996** 23:18 33:19
  45:3
**1997** 23:22

— 2 —
**2** 3:14 18:2,5

119:13,15
  172:11
**20** 3:15 41:19
  165:17 182:23
**20,000** 187:22
**200,000** 52:8,9
  72:18 108:11
  108:16,16
  118:11,11
**2000s** 13:19
  34:25
**2005** 46:4 47:17
  48:8 50:17
  51:2 53:6
**2006** 35:8,11
  36:6,20 39:11
  39:24 50:19,23
  67:13,15 114:7
**2007** 35:13 36:6
  37:1 39:25
  40:6 41:1,4
  50:23 61:6,9
  67:11 85:6,15
  85:16 87:1
  91:3 107:12,13
**2008** 41:7 55:5
  85:15 91:4
  93:22 94:24
  96:22,25 97:1
  98:2 125:3
  136:25 164:4
  177:18
**2009** 91:6 93:23
  98:7 163:24
**2010** 90:25 91:1
**2011** 1:20 56:24
  56:25 57:6
  190:20
**206-4343** 2:11
**21** 24:18 49:9,12
  49:12
**212** 2:4,5,11
**21447** 1:22
**225** 88:4
**23** 94:25 95:1
  97:5 184:21,22
**250** 88:3
**27** 74:21 85:2

111:11
**28** 24:16 41:24
**29** 41:24

— 3 —
**3** 3:15 20:16,19
  54:11,18,23
**3rd** 98:18 134:21
**3.25** 96:24
**3:06** 180:4
**3:13** 180:4
**3:25** 189:11
**30** 24:14 25:4
  192:14
**31** 24:11
**32** 24:11,13
  74:24 85:3
  111:14
**333** 44:13
**35** 25:4
**353** 164:23
**37** 25:4 74:8,13
  88:4 102:9
  104:5
**38** 68:21 69:22
  70:8 74:8,12
  74:13 94:22
  102:9 104:6

— 4 —
**4** 3:17 47:11
  161:5 162:21
**4.5** 85:8
**40** 31:15 103:4,5
  103:5
**40th** 2:3
**40-plus** 17:1
**405** 1:19 2:10

— 5 —
**50** 31:15 34:9
  37:9 179:18
  182:23
**50,000** 57:1
  118:11
**50-plus** 70:15
**50/50/50** 52:10
**500** 60:21

**53** 61:22
**554-7800** 2:11

— 6 —
**6.75** 96:19
**60** 117:23
**66** 38:11
**68** 21:17
**689-5101** 2:5
**689-8808** 2:4

— 7 —
**7** 22:6,6 45:3
**70** 21:19
**70s** 16:23

— 8 —
**8** 62:6
**8,375,000** 94:16
**8.375** 184:20
**800** 125:2 180:14
**800,000** 123:25
  136:20 152:17

— 9 —
**9** 91:4
**90s** 12:1 13:18
**900** 32:1
**917** 2:11
**96-ish** 32:25

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

# MOSES & SINGER LLP

THE CHRYSLER BUILDING
405 Lexington Avenue, NY, NY 10174-1299
Tel: 212.554.7800    Fax: 212.554.7700
www.mosessinger.com

Raymond Torres
Direct: 212.554.7561 Fax: 212. 554.7700
rtorres@mosessinger.com

April 18, 2011

**VIA FIRST CLASS MAIL**

Sheryl B. Galler, Esq.
Hoguet Newman Regal & Kenney, LLP
10 East 40th Street
New York, NY 10016

Re:    **Fragin, in her capacity as Trustee v. Mezei, et al.;**
       **No. 1:09-CV-10287-PGG**

Dear Ms. Galler:

Enclosed please find the original and one copy of the transcript of Gary Fragin that was taken on April 12, 2011.  Copies of the exhibits from that deposition are enclosed.

Please take notice that, pursuant to Rule 30(e) of the Federal Rules of Civil Procedure, the transcript should be read by or to Plaintiff, and any changes in form or substance which she desires to make shall be entered at the end of the original deposition transcript with a statement of the reasons given by her for making them.  The original transcript shall then be signed by Plaintiff before any officer authorized to administer an oath (e.g., a notary), and returned to the undersigned.

Please take further notice that if Plaintiff fails to sign and return the deposition within thirty (30) days, it may be used as fully as though signed, and no changes to the transcript may be made by her more than thirty (30) days after the date of this notice.

Very truly yours,

Raymond Torres
Paralegal

Enclosures

869801v1  011147.0102