UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KAREN NUSSBAUM FRAGIN and NANCY
MARKOVITCH, in their capacity as Trustees for
the ELANA B. NUSSBAUM TRUST, the
MOSHE JONATHAN NUSSBAUM TRUST, the
TAMAR MIRIAM NUSSBAUM TRUST, the
DANIEL ZACHARY NUSSBAUM TRUST, and
the SAMUEL ELIEZER NUSSBAUM TRUST,

                    Plaintiffs,

        -against-

LEONARD MEZEI, the ECONOMIC GROWTH
GROUP, REPOTEX, INC. and RON
FRIEDMAN,

                Defendants/Third-Party
                Plaintiffs,

        -against-

GARY S. FRAGIN,

               Third-Party Defendant.

Case No. 1:09-cv-10287-AJN

**Oral Argument Requested**

# MEMORANDUM OF DEFENDANTS/THIRD-PARTY PLAINTIFFS
# IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

MOSES & SINGER LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Tel:    (212) 554-7800
Fax:   (212) 554-7700
*Attorneys for Defendants/Third-Party Plaintiffs*

On the brief:

    Scott E. Silberfein, Esq. (ssilberfein@mosessinger.com)
    Jordan Greenberger, Esq. (jgreenberger@mosessinger.com)

<u>**TABLE OF CONTENTS**</u>

I.  PRELIMINIARY STATEMENT & SUMMARY ........................................ 1

    A.    Summary Of Facts ................................................................... 1

    B.    Summary Of Argument .......................................................... 5

II. STANDARD ON MOTION FOR SUMMARY JUDGMENT ................... 7

III. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ............... 8

    A.    Securities Laws Claims (Count I) ......................................... 8

        1.    The Trusts' Participation Position In The Senior Repo Is Not A "Security" ................................................................ 8

            a.    The Family Resemblance Test ................................... 8

            b.    Factor 1: Motivation Of The Parties ......................... 10

            c.    Factor 2: Plan Of Distribution .................................. 12

            d.    Factor 3: The Reasonable Expectations Of The Investing Public ................................................... 13

        2.    Even If A Security, Registration Was Not Required (Complaint, ¶¶ 36, 58-59) ....................................................... 14

            (1)    The Number Of Offerees ................................. 15

            (2)    The Sophistication Of The Offerees ................ 16

            (3)    The Manner Of The Offering ........................... 17

        3.    Even If A Security, Defendants Did Not "Make" Any Statements To The Trustees For Rule 10b-5 Purposes (Complaint, ¶ 60) ............... 17

        4.    Even If A Security, There Was No Reasonable Reliance Or A Material Misrepresentation That Caused Damages ............... 19

        5.    There Is No Federal Question ...................................... 20

    B.    Fraud (Count II), Fraudulent Inducement (Count III), And Negligent Misrepresentation (Count IV) ..................................... 20

        1.    There Was No Reasonable Reliance .............................. 20

            a.    The Failure To Do Due Diligence Is Fatal ................ 21

            b.    There Was No Direct Reliance; Only Third-Party Reliance ....... 22

            c.    There Was No "Indirect Reliance" ............................ 23

        2.    The Alleged Representations Were Not False ................ 25

        3.    The Alleged Misrepresentations Were Not Material And Did Not Cause The Senior Repo To Stop Paying ..................... 25

        4.    The Alleged Damages Are Duplicative Of The Breach Of Contract Claim (Fraudulent Inducement Claim Only) ......................... 28

     5.     There Was No Privity (Negligent Misrepresentation Claim Only)......... 28

C.     Conversion (Count V) ..................................................................... 28

D.     Breach Of Contract (Count VI).......................................................... 29

     1.     The Repotex Notes Are Unenforceable ................................. 29

     2.     No Agreement Has Been Breached ....................................... 30

E.     Mr. Friedman Did Not Aid And Abet ............................................. 31

F.     Lack Of Standing (Samuel Eliezer Nussbaum Trust - $10,000)........................ 31

G.     Third Party Claims Against Mr. Fragin............................................. 32

IV.    CONCLUSION......................................................................................... 33

# TABLE OF AUTHORITIES

## FEDERAL CASES

Abbey v. 3F Therapeutics, Inc.,
  2011 WL 651416 (S.D.N.Y. Feb. 22, 2011) ............................................................. 19

Ackoff-Ortega v. Windswept Pac. Entertainment Co.,
  130 F. Supp. 2d 440 (S.D.N.Y. 2000) ...................................................................... 6

Amusement Industry, Inc. v. Stern,
  693 F. Supp. 2d 327 (S.D.N.Y. 2010) ..................................................................... 23

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986) ................................................................................................... 8

AUSA Life Insurance Co. v. Ernst & Young,
  206 F.3d 202 (2d Cir. 2000) ............................................................................... 19, 26

Ballard & Cordell Corp. v. Zoller & Dannenberg Exploration, Ltd.,
  544 F.2d 1059 (10th Cir. 1976) .............................................................................. 16

Banco Espanol De Credito v. Security Pacific National Bank,
  973 F.2d 51 (2d Cir. 1992) ................................................................................ passim

Barron Partners, LP v. LAB123, Inc.,
  593 F. Supp. 2d 667 (S.D.N.Y. 2009) ............................................................... 25, 26

Bass v. Janney Montgomery Scott, Inc.,
  210 F.3d 577 (6th Cir. 2000) ............................................................................... 9, 12

Benedict v. Amaducci,
  1995 WL 413206 (S.D.N.Y. July 12, 1995) .................................................. 9, 11, 12

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986) ................................................................................................... 7

Cement & Concrete Workers District Council Welfare Fund v. Lollo,
  148 F.3d 194 (2d Cir.1998) ................................................................................. 5, 23

Central Bank of Denver, N. A. v. First Interstate Bank of Denver, N. A.,
  11 U.S. 164 (1994) ................................................................................................... 18

Crigger v. Fahnestock and Co., Inc.,
  443 F.3d 230 (2d Cir. 2006) .................................................................................... 21

de Abreu v. Bank of America Corp.,
  812 F. Supp. 2d 316 (S.D.N.Y. 2011) ................................................................. 7, 31

Direction Associate, Inc. v. Programming & System Inc.,
    412 F. Supp. 714 (S.D.N.Y. 1976) ........................................................15, 16

Disability Advocates, Inc. v. N.Y. Coalition for Quality Assisted Living, Inc.,
    2012 WL 1143588 (2d Cir. Apr. 6, 2012)...................................... 32

Emergent Capital Investment Management, LLC v. Stonepath Grp., Inc.,
    343 F.3d 189 (2d Cir.2003) ...................................................... 20

Equitable Life Assur. Social of U.S. v. Arthur Andersen,
    655 F. Supp. 1225 (S.D.N.Y. 1987)........................................... 12

ESI Montgomery Co., Inc. v. Montenay International Corp.,
    899 F. Supp. 1061 (S.D.N.Y. 1995)........................................... 15

Fromer v. Yogel,
    50 F. Supp. 2d 227 (S.D.N.Y. 1999)........................................... 32

Gallo v. Prudential Residential Services, Ltd. Pshp.,
    22 F.3d 1219 (2d Cir. 1994) ....................................................... 7

Gilligan, Will & Co. v. S.E.C.,
    267 F.2d 461 (2d Cir. 1959) ..................................................... 14

Greenberg v. Chrust,
    282 F. Supp. 2d 112 (S.D.N.Y. 2003).......................................... 25

Hirtenstein v. Tenney,
    252 F. Supp. 827 (S.D.N.Y. 1966) ............................................. 14

Ingenito v. Bermac Corp.,
    441 F. Supp. 525 (S.D.N.Y. 1977) ............................................. 15

Intelligent Digital Systems, LLC v. Visual Management Systems, Inc.,
    683 F. Supp. 2d 278 (E.D.N.Y. 2010) ...................................passim

Janus Capital Group Inc. v. First Derivative Traders,
    131 S. Ct. 2296 (June 13, 2011) ...........................................passim

Jaramillo v. Weyerhaeuser Co.,
    536 F.3d 140 (2d Cir. 2008) ....................................................... 7

King v. Crossland Sav. Bank,
    111 F.3d 251 (2d Cir. 1997) ..................................................... 20

Kolari v. N.Y. Presbyterian Hospital,
    455 F.3d 118 (2d Cir. 2006) ..................................................... 20

Lazard Freres & Co. v. Protective Life Ins. Co.,
    108 F .3d 1531, 1541 (2d Cir.1997)................................................................ 20

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992)................................................................................... 31

Matasushita Electric Industrial Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986)..................................................................................... 7

Missigman v. USI Northeast, Inc.,
    131 F. Supp. 2d 495 (S.D.N.Y. 2001).......................................................... 25

Neuwirth Investment Fund v. Swanton,
    422 F. Supp. 1187 (S.D.N.Y. 1975).............................................................. 16

Peerless Mills, Inc. v. American Telegraph & Telegraph Co.,
    527 F.2d 445 (2d Cir. 1975).................................................................6, 23, 24

Pension Committee of University of Montreal Pension Plan v. Banc of America Sec.,
    LLC,
    446 F. Supp. 2d 163 (S.D.N.Y. 2006)........................................................... 31

Piaubert, S.A. v. Sefrioui,
    208 F.3d 221, 2000 WL 194149 (9th Cir. 2000)......................................... 9, 12

Premier Microwave Corp. v. Comtech Telecommunication Corp.,
    1991 WL 12430 (S.D.N.Y. Jan. 28, 1991) ............................................passim

Reves v. Ernst & Young,
    494 U.S. 56 (1990)......................................................................................passim

Rosen v. Spanierman,
    894 F.2d 28 (2d Cir. 1990)..................................................................6, 24, 27

Rothman v. Gregor,
    220 F.3d 81 (2d Cir. 2000) ......................................................................... 19

Schlaifer Nance & Co. v. Estate of Warhol,
    119 F.3d 91 (2d Cir. 1997) ......................................................................... 20

Scotto v. Almenas,
    143 F.3d 105 (2d Cir. 1998) ........................................................................ 7

SEC v. Ralston Purina Co.,
    346 U.S. 119 (1953)..................................................................................5, 14

SEC v. Tecumseh Holdings Corp.,
    2009 WL 4975263 (S.D.N.Y. Dec. 22, 2009)............................................... 17

Shams v. Fisher,
    107 F. Supp. 2d 266 (S.D.N.Y. 2000).........................................................6, 26

Singer v. Livoti,
    741 F. Supp. 1040 (S.D.N.Y. 1990)............................................................passim

Slotkin v. Brookdale Hospital Center,
    377 F. Supp. 275 (S.D.N.Y. 1974) ...............................................................7, 32

TAB Partnership v. Grantland Financial Corp.,
    866 F. Supp. 807 (S.D.N.Y. 1994) ................................................................... 9

Terra Sec. Asa Konkursbo v. Citigroup, Inc.,
    450 Fed. Appx. 32 (2d Cir. 2011)............................................................5, 6, 21

Turtur v. Rothchild Registry International, Inc.,
    26 F.3d 304 (2d Cir. 1994).........................................................................23, 24

U.S. v. Arutunoff,
    1 F.3d 1112 (10th Cir.), cert. den ................................................................. 15

Vining v. Oppenheimer Holdings Inc.,
    08 Civ. 4435, NYLJ 1201473280939 (S.D.N.Y. Sep. 27, 2010)................... 18

Vorrius v. Harvey,
    570 F. Supp. 537 (S.D.N.Y. 1983) .....................................................8, 12, 13

**STATE CASES**

Afra v. Zamir,
    76 A.D.3d 56, 905 N.Y.S.2d 77 (1st Dept 2010) .......................................... 21

Ancell's World of Interiors, Inc. v. Trauner,
    264 A.D.2d 789, 695 N.Y.S.2d 401 (2d Dept 1999) ...........................7, 28, 29

City of N.Y. v. Lead Indust. Association, Inc.,
    222 A.D.2d 119, 644 N.Y.S.2d 919 (1st Dept 1996)..................................... 32

Colasacco v. Robert E. Lawrence Real Estate,
    68 A.D.3d 706, 890 N.Y.S.2d 114 (2d Dept 2009) ....................................... 20

Dolansky v. Frisillo,
    92 A.D.3d 1286, 939 N.Y.S.2d 210 (4 Dept 2012) ....................................... 21

East End Cement & Stone, Inc. v. Carnevale,
    73 A.D.3d 974, 903 N.Y.S.2d 420 (2d Dept 2010) ....................................... 22

Ehrlich v. Froehlich,
    72 A.D.3d 1010, 903 N.Y.S.2d 400 (2d Dept 2010) ................................22, 28

Escoett & Co. v Alexander & Alexander,
31 A.D.2d 791, 296 N.Y.S.2d 929 (1st Dept 1969)......................................................... 23

Galtieri v. Kramer,
232 A.D.2d 369, 648 N.Y.S.2d 144 (2d Dept 1996) ....................................................7, 29

Greenpoint Group, v. Zions First National Bank,
33 Misc. 3d 1214, 2011 WL 5061578 (Sup. Ct., Kings Co. Oct. 18, 2011) .................... 30

Havell Capital Enhanced Municipal Income Fund, L.P. v. Citibank, N.A.,
84 A.D.3d 588, 923 N.Y.S.2d 479 (1st Dept 2011)......................................................... 20

HSH Nordbank AG v UBS AG,
2012 NY Slip Op 02276 (1st Dept Mar. 27, 2012).......................................................... 21

Lenczycki v. Shearson Lehman Hutton, Inc.,
238 A.D.2d 248, 656 N.Y.S.2d 609 (1st Dept 1997)....................................................... 31

Mañas v VMS Assoc., LLC,
53 A.D.3d 451, 863 N.Y.S.2d 4 (1st Dept 2010) ............................................................ 28

Mas v. Two Bridges Associate by Nat. Kinney Corp.,
75 N.Y.2d 680, 555 N.Y.S.2d 669 (1990) ....................................................................... 32

Masella v. Leemilt's Flatbush Avenue, Inc.,
112 A.D.2d 1027, 493 N.Y.S.2d 24 (2d Dept 1985) ....................................................... 29

Mateo v. Senterfitt,
82 A.D.3d 515, 918 N.Y.S.2d 438 (1st Dept 2011)....................................................25, 28

McDermott v. City of N.Y.,
50 N.Y.2d 211, 428 N.Y.S.2d 643 (1980) ....................................................................... 33

Mehlman Management Corp. v. Fan,
121 A.D.2d 609, 503 N.Y.S.2d 642 (2d Dept 1986) ....................................................... 29

Orchard Hotel, LLC v. D.A.B. Group, LLC,
850044/2011, NYLJ 1202548529540, *8 (Sup. Ct., N.Y. Co. Mar. 28, 2012) ............. 30

Port Parties, Ltd. v. ENK Intern. LLC,
84 A.D.3d 685, 923 N.Y.S.2d 537 (1st Dept 2011)......................................................... 22

Richard Feiner & Co. v. Paramount Pictures Corp.,
2012 NY Slip Op 02593 (1st Dept Apr. 5, 2012)............................................................ 30

Sykes v. RFD Third Ave. 1 Assocs., LLC,
15 N.Y.3d 370, 372 (2010)............................................................................................... 28

Zaref v. Berk & Michaels, P.C.,
    192 A.D.2d 346, 595 N.Y.S.2d 772 (1st Dept 1993)..................................... 25

Zell & Ettinger v. Berglas,
    261 A.D.2d 613, 690 N.Y.S.2d 721 (2d Dept 1999) ...............................28, 29

## DOCKETED CASES

In re USA Commercial Mortg. Co.,
    No. 2:07-cv-00892-RCJ-GWF (D. Nev.)........................................................ 6

## FEDERAL STATUTES

15 U.S.C. § 77b ................................................................................................... 8

15 U.S.C. § 78c ................................................................................................... 8

15 U.S.C. § 78t ................................................................................................. 18

28 U.S.C. § 1367 .............................................................................................. 20

## FEDERAL RULES AND CODES

Fed. R. Civ. P. 56 .......................................................................................... 1, 7

Fed. R. Evid. 201 ............................................................................................... 6

17 C.F.R. § 230.500 *et seq.* (Regulation D)................................................... 17

17 C.F.R. § 240.10b-5 (Rule 10b-5)..........................................................5, 17, 18

## SECONDARY AUTHORITIES

Richard D. Bernstein, Barry P. Barbash and James C. Dugan, "Supreme Court Adopts
    Rule of Narrow Construction for Rule 10b-5", 6/23/2011 NYLJ (p.4, col.1) ................ 18

J. William Hicks, Limited Offering Exemptions: Regulation D, at chapters 7-8 (West
    Securities Law Handbook Series, 2011-2012 Ed.)....................................... 17

## LOCAL RULES

Local Rule 56.1 ........................................................................................passim

Defendants/third-party plaintiffs Leonard Mezei ("Mr. Mezei" or "Len"), Ron Friedman ("Mr. Friedman" or "Ron"), the Economic Growth Group ("EGG"), and Repotex, Inc. ("Repotex") (collectively, "Defendants" or "Movants"), by their attorneys, Moses & Singer LLP, respectfully submit this memorandum in support of Movants' motion, pursuant to Fed. R. Civ. P. 56, for summary judgment dismissing all of the claims of plaintiffs Karen Nussbaum Fragin ("Mrs. Fragin" or "Karen") and Nancy Markovitch ("Ms. Markovitch" or "Nancy") (with Karen, the "Trustees" or "Plaintiffs"), in their capacity as the co-trustees for Karen's children's trusts (the "Trusts"), or alternatively, granting Movants summary judgment on their third-party claims against Karen's husband, third-party defendant Gary Fragin ("Mr. Fragin" or "Gary").[1]

# I. PRELIMINIARY STATEMENT & SUMMARY

## A. Summary Of Facts

A complete statement of the undisputed materials facts are in the accompanying Local Rule 56.1 Statement ("56.1 St."). In sum, this action concerns $800,000 of Karen children's trusts funds that Karen sent to EGG on or about June 2, 2008 to purchase a participation position in the senior tier, or "Senior Repo," of an underlying $50 million transaction. 56.1 St., ¶¶ 1-5, 123-186.

The underlying $50 million deal involved the purchase of distressed assets (non-performing mortgages and related fees) out of bankruptcy that were then assigned to a special purpose entity, Compass SPE ("Compass"). *Id.*, ¶¶ 8-14. To purchase the assets, Compass obtained financing from Silar Advisors, L.P. ("Silar"), whose business was asset back lending.

---

[1] The Trustees' counsel represented at the March 20, 2012 Court conference that they would consider voluntarily dismissing their non-fraud causes of action. However, the Trusts subsequently advised that they would only dismiss those claims if Defendants agreed not to move for summary judgment. The Court granted Defendants additional pages to brief the motion because all six (6) causes of action remain. Doc. 70.

*Id.*, ¶¶ 15-64. The $50 million transaction had a three-tier structure called a "waterfall", under which junior tiers would not get paid until the senior tiers got fully paid. *Id.*, ¶¶ 18-64. The senior tier was the "Senior Repo" ($38 million), the mid-level tier was the "preferred" piece ($10 million), and the junior-tier was the "common" or "equity" piece ($2 million). *Id.*

Karen's husband, Gary, was an insider to the $50 million transaction: he negotiated it as a Silar partner, understood its subtleties, and he personally owned an interest the "preferred" piece that would only get paid under the "waterfall" when the Senior Repo got fully paid. *Id.*, ¶¶ 65-94. 173-74. Gary understood that the Senior Repo only got repaid when the underlying assets (which were owned by Silar under the "repo" or "repurchase" agreement) liquidated, and that although those assets were valued for greater than $50 million (the purchase price out of bankruptcy), the assets were impaired and there was a risk that the waterfall would not be repaid. *Id.*, ¶¶ 9-12, 25, 32-44, 65-94. For example, claims were made in Nevada federal court that could (and ultimately did) affect payments on the Senior Repo and the waterfall. *Id.*, ¶¶ 76-77, 84-88, 212-13.

Silar itself needed money for the deal, and an entity called "Gottex", in exchange for a participation interest in the $38 million Senior Repo piece, provided $37 million to Silar. *Id.*, ¶¶ 51-58. Gottex' participation interest was the "800 pound gorilla in the room," and Gary – who feared that Gottex could impair his "preferred" piece – spoke with Mr. Mezei for months about getting "rid of Gottex." *Id.*, ¶¶ 51-58, 90-94, 151, 173-74. In the Spring of 2008, Mr. Mezei undertook efforts to buy out Gottex' interest, obtaining $8.375 million from EGG and a handful of his close friends and acquaintances. *Id.*, ¶¶ 95-108. Len also spoke with a fund called "Paradigm," which expressed an absolute interest in buying out all of Gottex' participation

interest, but Paradigm ultimately did not do the deal after months of due diligence (and after the Trusts' $800,000 was sent). *Id.*, ¶¶ 95-99.

Gary and Len have a long social and business relationship. *Id.*, ¶¶ 111-120. Gary had done other deals with Len worth millions of dollars. *Id.*, ¶¶ 113-118. Gary, a sophisticated and accredited investor, used a number of "pockets" for those deals (e.g., family trusts), but in each instance the interaction was between Gary and Len. *Id.*, ¶¶ 114-117. Additionally, Gary and Len were close friends and business confidants who spoke at least weekly. *Id.*, ¶¶ 90-94, 111-12, 121. Gary knew that Len was trying to buy the Gottex piece of the Senior Repo. *Id.*, ¶¶ 90-94, 121-122. At or around Memorial Day 2008, either Gary approached Len about buying a piece, or Len approached Gary. *Id.*, ¶¶ 123-130. Under either scenario, Len did not know that the Trusts' $800,000 would be used until <u>after</u> Mr. Mezei's alleged misrepresentations. *Id.*, ¶¶ 125-30, 138, 158-161.

Neither Trustee spoke with Defendants prior to sending the money (via wire transfer and check, both signed by Karen) to EGG to purchase a participation interest in the Senior Repo. *Id.*, ¶¶ 137, 149-165. Karen did (and does) not understand the "technical" parts of the transaction, but her husband Gary, who brought the opportunity to the Trusts, did. *Id.*, ¶¶ 65-94, 121-122, 166-186. Gary and the Trusts say they would not have done the deal if they had known that Gottex was not fully bought out, but that information was not peculiarly within Defendants' knowledge and neither Gary nor the Trustees did any "due diligence" – although, Karen did receive advice from an independent financial advisor not to do the deal and Gary was an insider to the deal and could have obtained current information about the status of the Senior Repo. *Id.*, ¶¶ 81-82, 176-185, 212-13.

The interests the Trusts received are economically identical to owning a participation position in the Senior Repo. *Id.*, ¶¶ 187-209, 214. At the time the $800,000 was sent to EGG, EGG owned as a "place-holder" a $1.3 million participation interest in the Senior Repo via a Repotex note, and EGG gave the Trusts $800,000 of its existing interest. *Id.*, ¶¶ 139-146. Repotex had been formed to purchase the participation interest in the Senior Repo (i.e., the Gottex piece), and to administer payments to those people who had put money towards purchasing the participation interest. *Id.*, ¶¶ 100-101, 108-109, 204-210, 214. The economics of the Repotex notes were identical to owning a direct interest in the Senior Repo; Repotex was a "pass through" and the Repotex note holders were on par with Gottex so that any benefits Gottex received, the Repotex note holders received a proportionate share *Id.*, ¶¶ 187-209, 214. Judge Gardephe previously held that the Repotex notes are unenforceable because the Trusts did not know about Repotex and thus could not have had a meeting of the minds with Repotex. *Id.*, ¶¶ 216-221.

After the Trusts sent their $800,000, Repotex advanced the Trusts (more than) their proportionate share in payments Silar made to Senior Repo participants. *Id.*, ¶¶ 206-209. The Trusts have retained that money and did not object to receiving payments from Repotex. The Trusts, however, have not been further paid because the Senior Repo is no longer paying. *Id.*, ¶¶ 214-215.

Notably absent from this story is Mr. Friedman.[2] Karen does not know what role Ron played in the alleged fraud other than the fact that Ron signed a Paydown and Extension

_____

[2]     On or about August 3, 2010, Defendants served Plaintiff with a Rule 11 motion for sanctions concerning her allegations against named defendant Catherine Ilardi (Mr. Mezei's secretary) and Mr. Friedman (Mr. Mezei's son-in-law). The motion has not yet been filed with the Court. However, the parties entered into a stipulation of voluntary dismissal without

Agreement on the Senior Repo. *Id.*, ¶¶ 224-225. The existence and performance of the

Paydown and Extension Agreement is material to the junior lending tiers, not to the Senior Repo.

*Id.*, ¶¶ 45-50, 202-203. Nancy, the co-trustee, does not even know who Ron is. *Id.*, ¶ 227.

### B.    Summary Of Argument

As a matter of law, the Trusts can not succeed on their securities laws claim for the

issuance of unregistered securities to the Trusts without seeking an exemption and without

providing required disclosures, and for making material misrepresentations. Compl., ¶¶ 35-39,

52-61. The Trusts' participation interest in the Senior Repo is not a "security" under the "family

resemblance" test. *Banco Espanol De Credito v. Sec. Pac. Nat. Bank*, 973 F.2d 51 (2d Cir.

1992). Even if the Trusts had purchased a "security," registration of the Repotex notes was not

required because the issuance of the Repotex note was a private placement and the note holders

could fend for themselves. *S.E.C. v. Ralston Purina Co.*, 346 U.S. 119 (1953). Additionally, the

Trusts do not have a Rule 10b-5 claim because Gary – not Defendants – was the "maker" of all

of the statements to the Trusts. *Janus Capital Group Inc. v. First Derivative Traders*, 131 S.Ct.

2296 (June 13, 2011).

Nor can the Trusts establish the required "reasonable reliance" to support their securities

and common law fraud and misrepresentation based claims. The Trustees are attempting to

boot-strap onto Gary's alleged reliance, but it is well established that this type of third-party

reliance is insufficient. *Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*, 148

F.3d 194, 196 (2d Cir.1998). Moreover, Gary's alleged reliance, as a sophisticated businessman

and as the ultimate insider to the Senior Repo, was unreasonable as a matter of law. *Terra Sec.*

---

prejudice of Plaintiff's claims against Ms. Ilardi and of Ms. Ilardi's third-party claims against
Mr. Fragin, and Ms. Ilardi was removed from the caption. Docs. 49 and 71.

*Asa Konkursbo v. Citigroup, Inc.*, 450 Fed. Appx. 32 (2d Cir. 2011). Even if the Trustees could establish that they relied on Mr. Mezei's alleged statements via Gary, their reliance was not reasonable. *Peerless Mills, Inc. v. Am. Tel. & Tel. Co.*, 527 F.2d 445, 449-50 (2d Cir. 1975).

Additionally, the Trustees can not establish that Mr. Mezei's alleged misrepresentations were material, false or caused their loss, as a matter of law. *Rosen v. Spanierman*, 894 F.2d 28, 33-34 (2d Cir. 1990); *Shams v. Fisher*, 107 F. Supp. 2d 266, 283 (S.D.N.Y. 2000). The Trusts received the economics of owning a participation interest in the Senior Repo, and regardless of how the transaction was structured or whether Gottex was fully bought out, Plaintiff and the Trusts have no right to further payment because they have already received their proportionate share in Senior Repo distributions. At the time, Mr. Mezei believed that the entire Gottex piece would be bought and that participants would be paid, but the so-called "waterfall" has stopped due to, among other things, the real estate market melt-down in 2008 and the Nevada litigation (of which Mr. Fragin and his son were aware).[3] Mr. Mezei's alleged representations did not proximately cause the loss for securities purposes, and to the extent the Trustees have an enforceable agreement with any Defendant, there has been no breach of contract.

The Trustees' conversion claim fails as a matter of law. The only defendant to exercise dominion over the funds is EGG, and Karen authorized such dominion by signing $790,000 in wire transfer authorization forms from the Trusts' account and a $10,000 check from Karen's

---

[3] A description of the Nevada litigation and claims on the underlying non-performing mortgages (and related fees) is available at *In re USA Commercial Mortg. Co.*, No. 2:07-cv-00892-RCJ-GWF (D. Nev.) [Doc. 638, filed July 25, 2008]. 2nd Mezei Decl., Exs. G & H. The Court can take judicial notice (Fed. R. Evid. 201; *Ackoff-Ortega v. Windswept Pac. Entm't Co.*, 130 F. Supp. 2d 440, 444 (S.D.N.Y. 2000)) that in May-June 2008, the documents in the Nevada litigation concerning claims on the underlying assets that would affect payments under the "waterfall", and the expected settlement thereof, were publicly available. The information was not peculiarly within Defendants' knowledge.

personal account to EGG.  *Ancell's World of Interiors, Inc. v. Trauner*, 264 A.D.2d 789, 790-91 (2d Dept 1999); *Galtieri v. Kramer*, 232 A.D.2d 369 (2d Dept 1996).

The aiding and abetting claims against Mr. Friedman fail as a matter of law.  There is no underlying tort, and the Trustees can not even explain why Mr. Friedman is a defendant in this action.  *de Abreu v. Bank of Am. Corp.*, 812 F.Supp.2d 316, 322-31 (S.D.N.Y. 2011).

Gary is the one who spoke with his wife, and Defendants ought not bear the Trust's loss.  As between Defendants and Gary, Gary should be held accountable to the Trusts.  *Slotkin v. Brookdale Hospital Center*, 377 F.Supp. 275, 280 (S.D.N.Y. 1974).

## II.  STANDARD ON MOTION FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  *See also*, *Matasushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986); *Gallo v. Prudential Residential Servs., Ltd. Pshp.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  To defeat this motion for summary judgment, the Trustees and Mr. Fragin "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  They must set out specific facts showing a genuine issue for trial.  Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586.

Moreover, the Trustees and Mr. Fragin have the burden of proof at trial and their claims.  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  The Trustees and Mr. Fragin may not rely on conclusory allegations or unsubstantiated speculation.  *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). There is no issue for trial unless sufficient

evidence in the record exists favoring the party opposing summary judgment to support a jury

verdict in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).[4]

## III.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT

### A.    Securities Laws Claims (Count I)

####     1.    The Trusts' Participation Position In The Senior Repo Is Not A "Security"

Whether the participation position in the Senior Repo that the Trusts purchased is called a

Repotex note (Compl., ¶¶ 35-36, 53), "Compass USA 18% paper" (*id.*, ¶¶ 22, 26) or something

else, the Trusts did not purchase a "security." Thus, all of the securities laws claims must fail.

*Vorrius v. Harvey*, 570 F. Supp. 537, 539 (S.D.N.Y. 1983) ("The threshold inquiry herein rests

on whether the loan participation purchased by [plaintiff] rises to the level of a security. If it

does not, all the allegations founded on the federal securities laws fall.").

#### a.    *The Family Resemblance Test*

"It has long been recognized that the central purpose of the federal securities law 'is to

eliminate serious abuses in a largely unregulated securities market.'" *Singer v. Livoti*, 741

F.Supp. 1040, 1049 (S.D.N.Y. 1990). "In defining the scope of the market that it wished to

regulate, Congress painted with a broad brush." *Id.* at 1049. "But Congress did not 'provide a

broad remedy for all fraud.'" *Id.* at 1049.

Pursuant to the "family resemblance" test established by the Supreme Court in *Reves v.

Ernst & Young*, 494 U.S. 56, 65 (1990), there is a **rebuttable** presumption that notes and

participation interests are "securities," as defined by the 1933 and 1934 securities acts [15 U.S.C.

§ 77b (a)(1); 15 U.S.C.§ 78c (a)(10)]. *Banco Espanol*, 973 F.2d at 54-56; *Intelligent Digital*

---

[4]      To the extent the Trustees' and Mr. Fragin's opposition to this motion characterizes the
standard otherwise, the Court is respectfully directed to Karen's particularly pro-movant
statement of the standard in her brief in support of her (failed) motion for partial summary
judgment on the breach of contract claim. Doc. 35, at pp. 4-5.

*Sys., LLC v. Visual Mgmt. Sys., Inc.*, 683 F.Supp.2d 278 (E.D.N.Y. 2010) (note was not a security); *Benedict v. Amaducci*, 1995 WL 413206, at * 8-10 (S.D.N.Y. July 12, 1995) (same); *Singer*, 741 F.Supp. 1040 (same); *Premier Microwave Corp. v. Comtech Telecomm. Corp.*, 1991 WL 12430, * 5 (S.D.N.Y. Jan. 28, 1991) (same). *See also*, *Bass v. Janney Montgomery Scott, Inc.*, 210 F.3d 577 (6th Cir. 2000); *Piaubert, S.A. v. Sefrioui*, 208 F.3d 221, 2000 WL 194149 (Table) (9th Cir. 2000); *TAB P'ship v. Grantland Fin. Corp.*, 866 F. Supp. 807, 809-10 (S.D.N.Y. 1994) (loan agreement was not a "security" because defendants distributed no prospectus to plaintiffs or to other potential investors, agreement was not designed to be traded publicly, and agreement was negotiated one-on-one between the parties).

In *Reves*, the Supreme Court held that the "family resemblance" test was to be used in deciding whether an instrument denominated as a note is a "security." Under the test, the analysis begins with the presumption that notes are securities. However, because Congress was concerned with regulating the investment market, rather than creating a general federal cause of action for fraud, the Court's inquiry does not end there. *Reves*, 494 U.S. at 65. Rather, the presumption that a note is a security <u>may</u> <u>be</u> <u>rebutted</u> if the instrument bears a strong resemblance to an instrument on the judicially crafted list of notes that are not securities. *Id.*, at 64-65, 67. The enumerated notes that are not "securities" include:

> [T]he note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business…[and] notes evidencing loans by commercial banks for current operations. [494 U.S. at 65].

However, that list "is not 'graven in stone,' and is therefore capable of expansion." 494 U.S. at 66. Thus, in *Reves* the Supreme Court identified four factors for a Court to consider in determining whether the instrument at issue resembles one of the judicially enumerated

instruments that are recognized to not be securities. *Reves*, 494 U.S. at 66-67. As evident from

*Banco Espanol*, the family-resemblance test is not limited to an examination of notes, but also of

participation interests.

The four *Reves* factors to be considered are:

> (1)    the motivations that would prompt a reasonable buyer and seller to enter into the transaction;
>
> (2)    the plan of distribution of the instrument;
>
> (3)    the reasonable expectations of the investing public; and
>
> (4)    whether some factor, such as the existence of another regulatory scheme, significantly reduces the risk of the instrument, thereby rendering application of the securities laws unnecessary. *Id.*; *Banco Espanol*, 973 F.2d at 55.

All four factors do **not** need to be satisfied for the Court to find that the instrument is not a

security. *E.g.*, *Intelligent Digital*, 683 F. Supp. 2d at 285-86 ("Because the result of the court's

analysis of the first three factors weighs so heavily against a finding that the Note is a security,

the court need not consider the fourth factor"); *Premier Microwave*, 1991 WL 12430, at *5.

Defendants address only the first three factors below.

> b.    *Factor 1:  Motivation Of The Parties*

When the motivation of the transaction is to raise money for the general use of a business

enterprise or to finance capital investments, the motivation is likely to be deemed an investment,

and consequently, the note is more likely to be characterized as a security. *Reves*, 494 U.S. at 66.

If, on the other hand, the note is issued in connection with some commercial (as opposed to

investment) purpose, the note is less likely to be characterized as a security. *Id.* "Put succinctly,

investment motivation indicates a security, while commercial or consumer motivation indicates a

non-security." *Intelligent Digital*, 683 F.Supp.2d at 284.

*Banco Espanol*, wherein the underlying transaction was not for a "security" and therefore neither was the participation interest, instructs that when a participation interest is at issue, the Court should consider the motivation of the parties to both the underlying financing agreement (typically, the borrower/lender), and to the participation agreement (the lender/participant). 973 F.2d at 55. Here, the participation interests were effectively a "pass through," and the "waterfall" transaction was not to raise money for general business operations, but instead for the commercial purpose of purchasing the distressed assets out of bankruptcy and then liquidating those assets. 56.1 St., ¶¶ 9-11; *compare Reves*, 494 U.S. at 66, 68. The "repo" was not a capital transaction, but was "another way to make a loan". G. Fragin Depo., 140:14-141:8. Silar brought in Gottex as a participant to meet Silar's immediate cash needs for the deal, not for Silar's general business capital improvement. 56.1 St., ¶¶ 51-58. *Singer*, 741 F.Supp. at 1050 ("This transaction shows all of the economic context of a temporary loan to solve cash flow difficulties"); *Benedict*, 1995 WL 413206 at *9 (the seller's purpose was not to raise money for the general use of a business but rather to meet immediate cash obligations).

When the Trusts sent $800,000 to EGG to purchase a participation interest in the Senior Repo, Gary's motivation was to reduce Gottex' ability to "squeeze" Silar, thereby protecting his $400,000 interest in the "preferred" piece, and to buy the "the best and sweetest piece of the deal." 56.1 St., ¶¶ 83-94, 151. The Trustees' motive was to supplement Karen's children's income. K. Fragin Depo., 75:15-76:7.[5] The Trustees' and Gary's purpose was not to provide money for the general use of any business.

---

[5] The Trusts could not possibly have believed they were investing in Repotex because they did not yet know who Repotex was when they sent the money. 56.1 St., ¶¶ 137-138, 143.

Under the "plan of distribution" factor, the Court should consider whether "an instrument in which there is common trading for speculation or investment" is at issue. *Reves*, 494 U.S. at 66, 110 S.Ct. 945. If the instrument is offered and sold to a broad segment of the public, it is likely to be deemed a security. *Intelligent Digital*, 683 F.Supp.2d at 285; *Benedict*, 1995 WL 413206 at *10.

"[T]here was no public distribution…, and the investing public could not have formed expectations that this … would be governed by the securities laws." *Piaubert*, 2000 WL 194149 (Table) at *3. There was no "investing public" and no "common trading for speculation or investment." *Premiere Microwave*, 1991 WL 12430 at *5. No level of the transaction was ever "offered in a wholesale or potentially wholesale fashion." *Bass*, 210 F.3d at 585. The only participant, at first, was Gottex, and thereafter it was only Gottex and the Repotex note holders, who are a handful of Mr. Mezei's friends.

Distribution of participation positions in the Senior Repo was limited at all times. 56.1 St., ¶¶ 95-108, 123-127. *Banco Espanol*, 973 F.2d at 55. The Silar/Gottex deal was an isolated transaction wherein Silar agreed to pay to Gottex specified amounts. 56.1 St., ¶¶ 51-58. *Singer*, 741 F.Supp.2d at 1050; *Equitable Life Assur. Soc. of U.S. v. Arthur Andersen*, 655 F. Supp. 1225, 1243 (S.D.N.Y. 1987) (note evidencing an "isolated transaction" and not designed for public trading, held not to be a security) (pre-*Reves*); *Vorrius*, 570 F. Supp. at 540 (participation interest in loan was not a security where there was "no evidence of other participants or other persons who expressed interest in assuming additional segments of" the loan) (pre-*Reves*). The Repotex notes were similarly limited. Mr. Mezei approached friends, who provided money and then received Repotex notes. 56.1 St., ¶¶ 100-108; 2nd Mezei Decl., ¶¶ 7-21. There was no

broad marketing of the Repotex notes or participation positions in the Senior Repo. If Paradigm had bought a piece, that too would have been an isolated transaction. 56.1 St., ¶¶ 95-99.

    d.    *Factor 3:    The Reasonable Expectations Of The Investing Public*

There was no "investing public," *supra*, and thus the public could not have expectations, reasonable or unreasonable. Even if the targeted group is construed to be the "investing public," the participants reasonably expected that the transaction was for a participation position in the Senior Repo. 56.1 St., ¶¶ 105-109, 149-157. *Banco Espanol*, 973 F.2d at 55. There is no proof of any expectation that Gottex' participation position or the Repotex notes would be traded or speculated in as a security. *Premiere Microwave*, 1991 WL 12430 at *5. Senior Repo participants are effectively situated as a "lender" with an expectation that Silar, as the lead and paying agent, would pass through the money that was paid on the Senior Repo when the underlying assets liquidated. 56.1 St., ¶¶ 53-58, 158-189, 204-215. *Singer*, 683 F.Supp.2d at 285. Notably, the Trustees do not know how their participation interest would be repaid, but Gary as the ultimate insider to the Senior Repo understood that it was through liquidation of the assets. 56.1 St., ¶¶ 65-77, 83-87, 166-175.

***

These one time business transactions between sophisticated parties (Silar/Gottex; Repotex/Repotex note holders) are not the type of broad investment scenario that the securities laws were meant to mitigate. *Singer*, 683 F.Supp.2d at 285-86. The participation interests were not "used, pooled or marketed" in such a way to establish them as securities. *Banco Espanol*, 973 F.2d at 56. The securities laws were not enacted to protect the Senior Repo participants, especially Mr. Fragin who was an insider to, negotiated, and personally retained a junior interest in the underlying transaction. 56.1 St., ¶¶ 65-93. *Accord*, *Vorrius*, 570 F. Supp. at 540 (securities laws were not enacted to protect an employee of the borrower, who was in a position

not only to protect his investment but also to determine, in part, the success or failure of the borrower).

2.     <u>Even If A Security, Registration Was Not Required (Complaint, ¶¶ 36, 58-59)</u>

Even assuming, *arguendo*, that the Trusts purchased a "security," registration thereof was not required under the private placement exemption. The leading case on whether an issuance under the 1933 Act is a public (vs. private) offering is *S.E.C. v. Ralston Purina Co.*, 346 U.S. 119 (1953). In *Ralston Purina*, the Supreme Court stated that the applicability of the registration requirement for securities "should turn on whether the particular class of persons affected need the protection of the Act. An offering to those who are shown to be able to fend for themselves is a transaction not involving any public offering." 346 U.S. at 125. Accordingly, the focus of inquiry should be on the need of the offerees for the protections afforded by registration. *Id.* at 127.

The offerees in this case, including the Trusts, do not need such protection. "The governing fact is whether the persons to whom the offering is made are in such a position with respect to the issuer that they either actually have such information as a registration would have disclosed, or have access to such information." *Gilligan, Will & Co. v. S.E.C.*, 267 F.2d 461, 466 (2d Cir. 1959). While the number of offerees may not be decisive, it is "obviously relevant in applying the legislative purpose 'to exempt isolated transactions from the onerous burdens of registration requirements'." *Hirtenstein v. Tenney*, 252 F. Supp. 827, 830 (S.D.N.Y. 1966). Thus, courts should look to "all the surrounding circumstances." *Id.*

In looking at all the surrounding circumstances, courts have found that whether an offering is public depends on:

(1)     the number of offerees;

(2)     the sophistication of the offerees, including their access to the type of information that would be contained in a registration statement; and

(3)     the manner of the offering.

*ESI Montgomery Co., Inc. v. Montenay Int'l Corp.*, 899 F. Supp. 1061, 1065 (S.D.N.Y. 1995) (quoting *U.S. v. Arutunoff*, 1 F.3d 1112, 1118 (10th Cir.), *cert. den.* 510 U.S. 1017 (1993)); *also*, *Ingenito v. Bermac Corp.*, 441 F. Supp. 525, 540 (S.D.N.Y. 1977).

All of these factors, and the fact that Gary himself characterized this as a "private placement", favor a finding that the Repotex issuance was a private placement. 56.1 St., ¶ 142. The Repotex note holders did not (and do not) need the protection of the securities acts.

(1)     The Number Of Offerees

Including the Trusts' notes, there are a total of thirteen (13) Repotex notes, an objectively small number, all of which were issued to friends and acquaintances of Mr. Mezei. 2nd Mezei Decl., Ex. B; 56.1 St., ¶¶ 100-108.[6]  *Direction Assoc., Inc. v. Programming & Sys. Inc.*, 412 F. Supp. 714, 716 (S.D.N.Y. 1976) (plaintiff and non-suing shareholders totaled 12 in number). Mr. Mezei did not offer the opportunity to any other private individuals. Mr. Mezei spoke to a few institutional funds, but once Paradigm expressed affirmative interest in buying the entire Gottex piece, Mr. Mezei stopped offering the opportunity to anyone else. Mr. Mezei's conversations all were casual off-shoots of existing relationships. The transaction with the Repotex note holders "was a closely-knit arrangement among friends and acquaintances"; and with respect to the Trusts, involved a purchaser (Gary) "with sophisticated discernment about" the Senior Repo and underlying transaction. 56.1 St., ¶¶ 95-107; 2nd Mezei Decl., ¶¶ 7-21.

---

[6]     In addition to the five Repotex notes issued to the Nussbaum Trusts (total $800,000), the other eight (8) notes were for: $2 million, $1.3 million (EGG), $1 million (four times), $750,000, and $325,000. *See* 2nd Mezei Decl., Ex. B. Two of the notes are in the name of a husband and wife. *Id.*

*Ballard & Cordell Corp. v. Zoller & Dannenberg Exploration, Ltd.*, 544 F.2d 1059, 1064 (10th Cir. 1976).

(2)    <u>The Sophistication Of The Offerees</u>

The Repotex note holders "were able to fend for themselves and were not in need of the protection of the registration provision of the Act." *Direction Assoc.*, 412 F. Supp. at 716-17.

(a)    *The Nussbaum Trusts*

Gary, who is the only person to have spoken with Mr. Mezei about the transaction on behalf of the Trusts prior to the funds being sent to EGG, concededly is a sophisticated and accredited investor who negotiated the Senior Repo, was an insider to it, had access to information, and personally retained an interest in the junior lending tier that would only get paid after the Senior Repo was repaid under the "waterfall" structure. 56.1 St., ¶¶ 65-93, 123-130, 158-164; Answer to Third-Party Complaint, ¶¶ 6, 15, 56. He was the ultimate sophisticated offeree for this deal. Assuming, *arguendo*, the Trusts are not sophisticated by reason of their relationship with Mr. Fragin (and his son Greg, who is a lawyer and also was a partner at Silar), there is no question of material fact that the Trusts (and Mr. Fragin) did not perform any due diligence by not, e.g., contacting Gary's former business partners at Silar, contacting Gottex, further enquiring into the status of the Nevada litigation (which at the time was believed to eventually be resolved in favor of paying the Senior Repo), or speaking with the other Repotex note holders (at least one of whom Mr. Fragin knows). 56.1 St., ¶¶ 166-186. This factor weighs in Defendants' favor. *Neuwirth Inv. Fund v. Swanton*, 422 F. Supp. 1187, 1198 (S.D.N.Y. 1975).

(b)    *The Other Repotex Noteholders*

The other Repotex note holders (none of whom have made claims against Defendants) were provided detailed information by Mr. Mezei about the nature and status of the opportunity.

56.1 St., ¶¶ 100-108; 2nd Mezei Decl., ¶¶ 10-21.  The size of the other note holder's monetary

contributions suggests their sophistication.  2nd Mezei Decl., Ex. B.

(3)    <u>The Manner Of The Offering</u>

With respect to the non-Trust Repotex note holders, the offering was made to a handful

of people, personally by Mr. Mezei and based on his existing relationships with them.  56.1 St.,

¶¶ 100-108; 2nd Mezei Decl., ¶¶ 10-21.  There were no advertisements, brokers, cold-calling or

other general solicitations.  *Id.*; *compare*, *S.E.C. v. Tecumseh Holdings Corp.*, 2009 WL

4975263, *4 (S.D.N.Y. Dec. 22, 2009) (cold-calling campaign was a form of general solicitation

precluding the securities from qualifying from registration exemption).  With respect to the

Trusts, whether it was at their synagogue in the Bronx or on the phone, or whether Mr. Fragin

approached Mr. Mezei or vice versa, it is undisputed that the offering was between two very

close friends having a private conversation after they had spoken regularly about the Senior Repo

and about "getting rid" of Gottex.  56.1 St., ¶¶ 90-94, 111-130.[7]

3.    <u>Even If A Security, Defendants Did Not "Make" Any Statements To The Trustees For Rule 10b-5 Purposes (Complaint, ¶ 60)</u>

*Janus Capital Group Inc. v. First Derivative Traders*, 131 S.Ct. 2296 (June 13, 2011)

precludes the Trusts' claim that Defendants violated Rule 10b-5.  Rule 10b–5 prohibits

"mak[ing] any untrue statement of a material fact" in connection with the purchase or sale of

---

[7]    Rule 506 of "Regulation D" also provides a "safe harbor" from the registration requirement.  Any deviation from a term, condition or requirement of Regulation D was insignificant so that exemption from the registration requirement is preserved under Rule 508.  17 C.F.R. § 230.500 *et seq.*; *see generally*, J. William Hicks, Limited Offering Exemptions: Regulation D, at chapters 7-8 (West Securities Law Handbook Series, 2011-2012 Ed.).  Here, the offering was very limited, made to people who appeared to be accredited investors, and Gary had such knowledge and experience in financial and business matters (and specifically, the Senior Repo) that he was capable of evaluating the merits and risks of buying the Senior Repo piece.  Answer to Third Party Compl., ¶ 15; 56.1 St., ¶¶ 65-109, 114-120, 123-130, 151-154, 173-174.  An "accredited investor" is defined in Rule 501 of Regulation D.  *See*, 17 C.F.R. § 230.501(a)(6)-(7).

securities. 17 C.F.R. § 240.10b–5. *See also*, *Vining v. Oppenheimer Holdings Inc.*, 08 Civ. 4435,

NYLJ 1201473280939, at *12-13 (S.D.N.Y. Sep. 27, 2010) (Preska, J.) (explaining standard and

dismissing Rule 10b-5 claim for lack of *scienter*).

In *Janus Capital*, the Supreme Court adopted a rule of <u>narrow</u> construction for Rule 10b-

5 cases, and held that only the "maker" of a false or misleading statement—meaning a "person or

entity with ultimate authority over the statement"—can be liable under Rule 10b-5. *See also*,

Richard D. Bernstein, Barry P. Barbash and James C. Dugan, "Supreme Court Adopts Rule of

Narrow Construction for Rule 10b-5", 6/23/2011 NYLJ (p.4, col.1). As stated by Justice

Thomas of the Supreme Court:

> For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed. This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said. [131 S. Ct. at 2302].[8]

Accordingly, the *Janus Capital* court held that an investment adviser could not be held liable in a

private action under Rule 10b–5 for false statements included in its client's prospectuses.

---

[8]     The Supreme Court found that: "This rule follows from *Central Bank of Denver, N. A. v. First Interstate Bank of Denver, N. A.*, 511 U. S. 164 (1994), in which we held that Rule 10b–5's private right of action does not include suits against aiders and abettors. *See id.*, at 180. Such suits—against entities that contribute 'substantial assistance' to the making of a statement but do not actually make it—may be brought by the SEC, *see* 15 U. S. C. A. §78t(e), but not by private parties. A broader reading of 'make,' including persons or entities without ultimate control over the content of a statement, would substantially undermine *Central Bank*. If persons or entities without control over the content of a statement could be considered primary violators who 'made' the statement, then aiders and abettors would be almost nonexistent."

It is undisputed that Defendants did not "make" any statement to the Trustees. 56.1 St., ¶¶ 123-130, 158-165, 224-227. Only Mr. Fragin made any representations to his wife, Karen, about the transaction. *Id.* Defendants did not control Mr. Fragin. Under Rule 10b-5, the speaker, Mr. Fragin, takes credit/blame for what he ultimately said to his wife, not Defendants.

    4.    <u>Even If A Security, There Was No Reasonable Reliance Or A Material Misrepresentation That Caused Damages</u>

The Trustees must establish that in connection with the purchase or sale of securities, *inter alia*, Defendants made a false material representation or omitted to disclose material information, that that the Trusts reasonably or justifiably relied on the alleged misstatements or omissions of a material fact, and that the Trustees' reliance on Defendants' action was the proximate cause of their injury. *Abbey v. 3F Therapeutics, Inc.*, 2011 WL 651416, *7 (S.D.N.Y. Feb. 22, 2011); *see also*, *Rothman v. Gregor*, 220 F.3d 81, 89 (2d Cir. 2000) (stating elements of a securities fraud claim). Causation under Rule 10b-5 has two elements: transaction causation and loss causation. *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 209 (2d Cir. 2000). Loss causation (which is not even pleaded in the Complaint) is causation in the traditional "proximate cause" sense – the allegedly unlawful conduct caused the economic harm. *Id.* Transaction causation means that the violations in question caused the plaintiff to engage in the transaction in question. *Id.*

The Trusts can not establish reasonable reliance or a material representation/omission, as a matter of law, *infra*. Even if Mr. Mezei's alleged representations caused the Trusts to enter into the transaction, the Trusts can not establish "loss causation" because Mr. Mezei's alleged conduct did not cause the Senior Repo to stop paying, *infra*. The discussion below in relation to the common law claims applies to the securities fraud claim. *Abbey*, 2011 WL 651416 at *13 (granting summary judgment on common law fraud and securities laws claims for same reasons).

5. <u>There Is No Federal Question</u>

The Trustees' only basis for federal jurisdiction is their securities laws claim. Compl., p. 2 at ¶1. Because the Trusts have no securities law claims, the Court should not maintain supplemental jurisdiction to try in federal court those state law claims that it does not dismiss in this motion. *Kolari v. N.Y. Presbyterian Hosp.*, 455 F.3d 118, 121-22 (2d Cir. 2006); 28 U.S.C. § 1367(c). All of the common law claims should be dismissed too.

**B.      Fraud (Count II), Fraudulent Inducement (Count III), And Negligent Misrepresentation (Count IV)**

1. <u>There Was No Reasonable Reliance</u>

The Trusts' misrepresentation-based claims for securities fraud, common law fraud, fraudulent inducement, and negligent misrepresentation all require **reasonable reliance** by the Plaintiffs, which can not be established here as a matter of law. *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91 (2d Cir. 1997) (fraud); *Havell Cap. Enhanced Mun. Income Fund, L.P. v. Citibank, N.A.*, 84 A.D.3d 588, 589, 923 N.Y.S.2d 479, 481 (1st Dept 2011) (fraudulent inducement); *King v. Crossland Sav. Bank*, 111 F. 3d 251 (2d Cir. 1997) (negligent misrepresentation).

Reasonableness may be determined as a matter of law. *Colasacco v. Robert E. Lawrence Real Estate*, 68 A.D.3d 706, 708, 890 N.Y.S.2d 114, 117 (2d Dept 2009). In assessing reasonable reliance, the Court must "consider the entire context of the transaction". *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir.2003) (*citing Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F .3d 1531, 1541 (2d Cir.1997)).

Considering the entire context of the transaction, neither the Trusts nor Mr. Fragin reasonably relied, as a matter of law, on any representations by Defendants. It is undisputed that the Trustees did not speak to Defendants about the $800,000 transaction before Karen sent the

funds to EGG. 56.1 St., ¶¶ 123-130, 158-165, 224-227. The only communications were

between Mr. Mezei and Mr. Fragin, an accredited and sophisticated investor. *Id.* The Trusts can

not piggy-back on Mr. Fragin's reliance on the alleged representations, as a matter of law.

Instead, in these circumstances, the Trusts must try to rely on the doctrine of "indirect reliance."

However, the indirect reliance doctrine fails in this case as a matter of law because the Trustees

and Mr. Fragin failed to conduct any due diligence and can not prove that Mr. Mezei intended

for his alleged representations to be repeated to the Trustees.

a.     *The Failure To Do Due Diligence Is Fatal*

"[A] plaintiff … cannot demonstrate reasonable reliance without making inquiry and

investigation if he has the ability, through ordinary intelligence, to ferret out the reliability or

truth about an investment." *Crigger v. Fahnestock and Co., Inc.*, 443 F.3d 230, 234 (2d Cir.

2006). There is no justifiable reliance "where a party has the means to discover a falsehood by

the exercise of ordinary intelligence, and fails to make use of those means." *Dolansky v. Frisillo*,

92 A.D.3d 1286, 939 N.Y.S.2d 210, 213 (4 Dept 2012). When a sophisticated investor, like

Gary, is involved, the burden is on the investor to show either that: (i) he undertook an

independent investigation of accessible information relevant to the fraud and misrepresentation

claims — in particular, any information that might have shed light upon the alleged

misrepresentation or omission, or (ii) such information was unavailable or inaccessible to the

sophisticated investor through minimal diligence, both inside and outside the transaction at issue.

*Terra Sec. Asa Konkursbo v. Citigroup, Inc.*, 450 Fed. Appx. 32 (2d Cir. 2011); *also*, *HSH*

*Nordbank AG v UBS AG*, 2012 NY Slip Op 02276, at *7 (1st Dept Mar. 27, 2012); *Afra v.*

*Zamir*, 76 A.D.3d 56, 59, 905 N.Y.S.2d 77, 79 (1st Dept 2010).

It is undisputed that (i) neither Mr. nor Mrs. Fragin conducted any due diligence (other

than Mrs. Fragin asking her investment advisor, who advised against the transaction), and (ii) the

allegedly misrepresented information was not peculiarly within Defendants' knowledge. 56.1 St., ¶¶ 76-77, 81-82, 166-185, 202, 212-213. Instead, Mr. Fragin allegedly relied only on: (a) what Mr. Mezei said prior to Mr. Fragin advising that Karen wanted to invest the Trusts' funds, and (b) his insider knowledge, having negotiated the underlying deal and personally retaining an interest in the "preferred" piece. 56.1 St., ¶¶ 65-88, 121-127. Mr. Fragin was not out of touch with his former business partners at Silar. 56.1 St., ¶¶ 81-82. Information about claims on the assets in the Nevada litigation was publicly available (which at the time appeared would be resolved in favor of paying the waterfall; it was not until months later that payments stopped due to the Nevada litigation). The Fragins' failure to conduct basic due diligence is fatal to the Trusts claims.

The Trustees and Mr. Fragin can not raise any inference that the exercise of reasonable diligence would have been "fruitless." *Port Parties, Ltd. v. ENK Intern. LLC*, 84 A.D.3d 685, 923 N.Y.S.2d 537 (1st Dept 2011). Karen and Gary – an admitted sophisticated and accredited investor who was intimately involved with the underlying Senior Repo transaction – had the means available to them of knowing and understanding the nature and purpose of the investment and the status of the Senior Repo, but they did nothing and thus did not reasonably rely on the alleged misrepresentations. *E.g.*, *East End Cement & Stone, Inc. v. Carnevale*, 73 A.D.3d 974, 975, 903 N.Y.S.2d 420, 422 (2d Dept 2010).

          b.       *There Was No Direct Reliance; Only Third-Party Reliance*

The Trustees lack standing to assert fraud because Defendants did not speak with them prior to the $800,000 being sent to EGG. *Ehrlich v. Froehlich*, 72 A.D.3d 1010, 1011, 903 N.Y.S.2d 400, 402 (2d Dept 2010) (vendor could not be liable for fraud because he never made any representations to purchasers). This is a case of "third party reliance," under which a third party who did not rely on a fraudulent statement (the Trustees) attempts to use the reliance of a

party who did allegedly rely on the alleged statement (Mr. Fragin). *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 348, n.10 (S.D.N.Y. 2010) (cited in Karen's letter opposing Defendants' request for a pre-motion conference). It is well established that recovery is unavailable under a "third party reliance" theory. *Cement & Concrete Workers*, 148 F.3d at 196; *Escoett & Co. v Alexander & Alexander*, 31 A.D.2d 791, 296 N.Y.S.2d 929 (1st Dept 1969).

*Peerless Mills,* 527 F.2d at 448-51 is instructive because, like here, the plaintiffs acted under a "general atmosphere of trust and affection," asked "little or nothing about" the underlying transaction and neither sought nor received "any concrete information about the state of" affairs. 527 F.2d at 450. The Second Circuit affirmed, as "abundantly clear," the trial court's finding of fact that there was no reliance by the plaintiffs, who were the in-laws of the speaker of the alleged fraudulent representations. *Id.* Here, Karen relied upon her notion of Mr. Mezei's business acumen and their friendship, and on Gary's general explanation. 56.1 St., ¶¶ 162-180. *Accord, Janus Capital*, 131 S. Ct. at 2302 (the "maker" of a false or misleading statement under Rule 10b-5 is the "person or entity with ultimate authority over the statement").

c. <em>There Was No "Indirect Reliance"</em>

Under the indirect reliance doctrine, "a claim for fraud may lie even when a plaintiff does not directly rely on a fraudulent representation made by the defendant, if (1) the plaintiff received the information from someone who had received it from the defendant, and (2) the defendant intended the misrepresentation to be conveyed to [the plaintiff]." *Amusement Indus.*, 693 F. Supp. 2d at 348 (quoting *Turtur v. Rothchild Registry Int'l, Inc.*, 26 F.3d 304, 310 (2d Cir. 1994)).

The Trusts cannot establish "indirect reliance" because it is undisputed that the Trustees were not told and did not rely on what Mr. Mezei purportedly said. 56.1 St., ¶¶ 158-180. Karen does not know what Mr. Mezei allegedly said, and had only general conversations with Gary

about the transaction. 56.1 St., ¶¶ 160-164, 172. Karen trusted Mr. Mezei, and does not understand the "technicalities" of the transaction or what Mr. Mezei allegedly said to Mr. Fragin. 56.1 St., ¶¶ 158-179. Nancy merely assumed that Karen would not act irresponsibly with her children's money. Markovitch Depo., 36:9-37:11, 51:5-16.

Nor can the Trusts establish the second prong of the "indirect reliance" doctrine because the Trustees can not establish that Mr. Mezei intended for his communications to be conveyed to the Trusts. *E.g.*, *Turtur*, 26 F.3d at 310-12 (fraud claim failed where no evidence existed to show that the defendant in any way endorsed or encouraged plaintiff's reliance when making representations to a third party). To the contrary, the records conclusively establishes that Mr. Mezei's communications were to Mr. Fragin, and were made <u>before</u> Mr. Fragin claims that he told Mr. Mezei that the money was coming from the Trusts. 56.1 St., ¶¶ 124-129. Thus, even under the Fragins' version of the facts, Mr. Mezei could not, as a matter of law, have intended his alleged statements to be repeated to Karen because Mr. Mezei did not even know she and the Trusts were involved until <u>after</u> he made the alleged representations. 56.1 St., ¶¶ 124-29, 158-59.

There is no evidence that Mr. Mezei intended Mr. Fragin "to repeat the rosy picture" to his wife. *Peerless Mills*, 527 F.2d at 451. There is no evidence that Mr. Mezei knew that Nancy and Karen were the Trustees of the Trusts; instead, Mr. Mezei reasonably believed that Gary controlled the Trusts and there is no evidence that Mr. Mezei was aware that Mr. Fragin would repeat the alleged representations to his wife. 56.1 St., ¶¶ 113-120, 123-129, 158-161. *Rosen v. Spanierman*, 894 F.2d 28, 34 (2d Cir. 1990) (defendant only knew that plaintiff was purchasing painting for her daughter and son-in-law, who had negotiated transaction and to whom representation was made, which was insufficient to establish either defendant's intent that purchaser rely or actual reliance by purchaser).

### 2. The Alleged Representations Were Not False

Representations that are not false can not support fraud-based claims. *Greenberg v. Chrust*, 282 F.Supp. 2d 112, 117 (S.D.N.Y. 2003). Mr. Mezei's alleged representations to Mr. Fragin were not false, as a matter of law, because: (i) at the time, non-party Paradigm had indicated to Mr. Mezei that it would purchase the entire Gottex piece (56.1 St., ¶¶ 95-99); (ii) Mr. Mezei believed the Senior Repo would be paid in full (56.1 St., ¶¶ 139-141, 212-213); and (iii) the Trusts were purchasing, and received, a participation position in the Senior Repo (56.1 St., ¶¶ 149-157, 187-189, 206-214). The Trusts are not getting paid because no participants in the Senior Repo are getting paid. 56.1 St., ¶¶ 204-215.

With respect to the opportunity being "over subscribed", Mr. Mezei told Mr. Fragin that "someone wanted the whole thing." G. Fragin Depo., 127:20-21. But, at the time that was true. And, Mr. Mezei's expression of hope that Paradigm would buy the whole thing is not actionable. *Mateo v. Senterfitt* 82 A.D.3d 515, 517, 918 N.Y.S.2d 438, 440 (1st Dept 2011); *Zaref v. Berk & Michaels, P.C.*, 192 A.D.2d 346, 349, 595 N.Y.S.2d 772, 774 (1st Dept 1993).

### 3. The Alleged Misrepresentations Were Not Material And Did Not Cause The Senior Repo To Stop Paying

To support the fraud-based claims, the alleged misrepresentations must be material. *Barron Partners, LP v. LAB123, Inc.* 593 F. Supp. 2d 667, 672-73 (S.D.N.Y. 2009); *Missigman v. USI Northeast, Inc.*, 131 F. Supp. 2d 495, 515-16 (S.D.N.Y. 2001). "A misrepresentation is material to a fraud claim only if it is the type of misrepresentation likely to be deemed significant to a reasonable person considering whether to enter into the transaction." *Greenburg*, 282 F. Supp. 2d at 119. "A representation is immaterial where it is so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* An omission of fact is material if "a reasonable man would attach importance to its existence

or nonexistence in determining his choice of action in the transaction in question," or "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it." *Barron Partners*, 593 F. Supp. 2d at 672.

There is no evidence from which a reasonable juror could conclude that Mr. Mezei misrepresented a material fact to Gary or the Trustees, or that the alleged misrepresentations caused the Trusts' loss (i.e., caused the Senior Repo to stop paying). *Shams v. Fisher*, 107 F. Supp. 2d 266, 283 (S.D.N.Y. 2000) (granting defendant summary judgment on plaintiffs' fraud claim because plaintiffs offered no evidence suggesting that any comment by defendant was material to any plaintiff's decision to invest; defendant only stated it "was a good investment" and that her sister was "doing well" as a result of her investment). For the securities fraud claim, there is no "loss causation"; the Trusts do not even plead "loss causation" (they allege only "transaction causation"). Compl., ¶¶ 20, 47, 53-61; *AUSA Life Ins. Co.*, 206 F.3d at 216 (loss causation requires that the damage complained of be one of the foreseeable consequences of the misrepresentation).

The Trusts were delivered the economics of owning a participation interest in the Senior Repo, so that the Trusts are no worse off then: (i) if the entire Gottex piece had been bought out; and/or (ii) if the transaction had not been structured with Repotex as the direct purchaser of Gottex' piece and then administrating Senior Repo payments to the Repotex note holders in proportion to their contribution to Repotex. 56.1 St., ¶¶ 100-101, 108, 187-203, 204-215. No matter how the deal was structured, what percentage of Gottex was bought out, or what Mr. Mezei allegedly said, the Trusts are on par with Gottex (i.e., any benefits Gottex received, the Trusts received the same benefit proportionate to their $800,000 share). Repotex is a "pass

through", meaning the Trusts got paid when Silar paid participants on the Senior Repo. *Id..* The Senior Repo is not paying, and thus Silar is not paying participants (Gottex or Repotex). 56.1 St., ¶¶ 204-205, 214.[9] Mr. Mezei's alleged misrepresentations did not cause the Senior Repo to stop paying; the Nevada litigation did. 56. St., ¶¶ 212-213.

Whether Gottex was fully bought out, or the Trusts had a "direct" interest, they still have a participation interest in the Senior Repo and still would not be getting paid. The Trusts <u>did not rely to their detriment</u> on the alleged misrepresentations. *Rosen v. Spanierman*, 894 F.2d 28, 33-34 (2d Cir. 1990) (plaintiff who purchased painting for $15,000 from defendant, who represented it was an original, and then gifted the painting to her daughter and son-in-law, was "no worse off if the painting is not an original").

The Court also may infer that a reasonable investor would not find the alleged representations material. Indeed, neither Gary nor the Trustees can articulate how the representations were material. 56.1 St., ¶¶ 200-201. Bald allegations are insufficient. And actions speak louder than words: none of the other Repotex note holders has asserted claims (fraud or otherwise) against Defendants. 56.1 St., ¶ 215.

---

[9] Gary signed the multi-million dollar margin call notice and understood that "default" and "foreclosure" are not as relevant to a repurchase agreement where the "lender", Silar, buys the assets from the "borrower". 56.1 St., ¶¶ 37-44, 70-76; Greenberger Decl., Ex. 13. There is no collateral to seize because Silar already owned the assets. 56.1 St., ¶¶ 26-36. Additionally, the Trusts were buying the Gottex piece, and Gary knew that Gottex was not in privity with the "borrower" (Compass). 56.1 St., ¶¶ 65-75, 149-157. Thus, a "direct" relationship with Compass and/or the right to "foreclose" on collateral, rather than a participation interest in the Senior Repo via Repotex, could not have been material to Gary or the Trusts.

4. **The Alleged Damages Are Duplicative Of The Breach Of Contract Claim (Fraudulent Inducement Claim Only)**

The fraudulent inducement claim fails as a matter of law because the alleged damages are duplicative with the breach of contract claim. Compl., ¶¶ 81 and 99. *Mañas v VMS Assoc., LLC*, 53 A.D.3d 451, 454, 863 N.Y.S.2d 4 (1st Dept 2010).

5. **There Was No Privity (Negligent Misrepresentation Claim Only)**

The negligent misrepresentation claim fails as a matter of law because the Trusts are not in privity of contract, or a relationship so close as to approach that of privity, with any Defendant. *Sykes v. RFD Third Ave. 1 Assocs., LLC*, 15 N.Y.3d 370, 372 (2010); *Mateo v. Senterfitt*, 82 A.D.3d 515, 918 N.Y.S.2d 438, 440 (1st Dept 2011). With respect to Repotex, both Karen and Gary testified that they had no agreement with Repotex, and Judge Gardephe determined that there was no enforceable agreement between Repotex and the Trusts. Doc. 62, at pp. 11-12.

## C.   **Conversion (Count V)**

Conversion requires a showing that a defendant exercised unauthorized dominion or control over a plaintiff's property. *Ancell's World of Interiors, Inc. v. Trauner*, 264 A.D.2d 789, 790-91 (2d Dept 1999). The conversion claim fails as a matter of law because there is no question of material fact that the only defendant to have exercised dominion over the $800,000 is EGG, and Mrs. Fragin authorized such dominion. 56.1 St., ¶¶ 137-148.

EGG is the only defendant to exercise dominion over the $800,000. EGG is a separate corporate entity owned by a trust; no defendant has a beneficial interest in the trust. 56.1 St., ¶¶ 147-148. Accordingly, the conversion claim must be dismissed against every other defendant. *Ehrlich v. Froehlich*, 72 A.D.3d 1010, 1011, 903 N.Y.S.2d 400, 402-03 (2d Dept 2010); *Zell &*

*Ettinger v. Berglas*, 261 A.D.2d 613, 690 N.Y.S.2d 721 (2d Dept 1999); *Masella v. Leemilt's Flatbush Ave., Inc.*, 112 A.D.2d 1027, 1028, 493 N.Y.S.2d 24, 25 (2d Dept 1985).

The claim against EGG fails as a matter of law because Karen authorized EGG's dominion: she signed $790,000 in wire transfer authorizations to EGG and wrote a $10,000 check to EGG from her own (not the Trusts') bank account. 56.1 St., ¶137; Greenberger Decl., Ex. 11. Thus, EGG's dominion was authorized and the conversion claim must be dismissed. *Ancell's World*, 695 N.Y.S.2d at 402 (plaintiff authorized a credit to defendant, thus defendant obtained the allegedly converted property lawfully); *Galtieri v. Kramer*, 232 A.D.2d 369, 648 N.Y.S.2d 144 (2d Dept 1996) (affirming dismissal of conversion claim; "Once the defendant accepted the check tendered by the plaintiffs…the plaintiffs no longer had a possessory right to it."); *Mehlman Mgmt. Corp. v. Fan*, 121 A.D.2d 609, 610, 503 N.Y.S.2d 642, 643 (2d Dept 1986).

**D.    Breach Of Contract (Count VI)**

1.    The Repotex Notes Are Unenforceable

Judge Gardephe's decision denying the Trusts' motion for partial summary judgment on their breach of contract cause of action is fatal to the breach of contract claim. Doc. 52, at pp. 11-12. The only "contract" at issue is the Repotex notes. 56.1 St., ¶ 216. However, Judge Gardephe found:

> As is apparent from the deposition excerpts quoted above, **Plaintiff has consistently asserted that there was no agreement between the Nussbaum Trusts and Repotex** to purchase Repotex promissory notes. Plaintiff testified that she believed the Trusts were purchasing "Compass paper at 18 percent." When she and her husband received the Repotex notes, they were surprised to see the reference to Repotex, given that Mezei had never mentioned Repotex.
>
> In sum, **both the facts pleaded in the Complaint and Plaintiff's deposition testimony are entirely incompatible with a finding that the**

**Repotex Notes constitute an enforceable agreement between the Nussbaum Trusts and Repotex. \*\*\***

Based on the record before the Court, **there was no meeting of the minds as to the Nussbaum Trusts' purchase of Repotex promissory notes**. To the contrary, Plaintiff contended at her deposition that the Trusts' monies were procured through fraud.

Because **Plaintiff has not demonstrated that the Repotex Notes constitute enforceable agreements between the Nussbaum Trusts and Repotex**, Plaintiff's motion for summary judgment on her breach of contract claim will be denied. [Doc. 62 at pp. 11-12; emphasis added].

2.  No Agreement Has Been Breached

Even if the Repotex notes, reformed to reflect the parties' actual agreement,[10] are enforceable or there is some other unwritten contract, there has been no breach. The elements of a breach of contract claim are the existence of a contract, the claimant's performance thereunder, the defendant's breach thereof, and resulting damages. *Orchard Hotel, LLC v. D.A.B. Group, LLC*, 850044/2011, NYLJ 1202548529540, \*8 (Sup. Ct., N.Y. Co. Mar. 28, 2012).

The "waterfall" stopped and the Senior Repo stopped paying. 56.1 St., ¶ 212-214. Silar stopped making distributions to participants in February 2009. 56.1 St., ¶¶ 204-205, 214. Since then, Gottex has not been paid on its participation interest, Repotex has not been paid on its participation interest, and the other Repotex note holders (including EGG) have not been paid on their interests. Tellingly, no other Repotex note holders have made claims against Defendants.

---

[10]       "[T]he intention of the parties to a contract must be ascertained not from one provision but from the entire instrument." *Richard Feiner & Co. v. Paramount Pictures Corp.*, 2012 NY Slip Op 02593, \*5 (1st Dept Apr. 5, 2012); *see also, Greenpoint Group, v. Zions First Nat. Bank*, 33 Misc.3d 1214(A), 2011 WL 5061578 (Table) (Sup. Ct., Kings Co. Oct. 18, 2011) (plaintiff entitled to reform note to reflect interest rate actually agreed to, which was reflected in other documentation). Read as a whole (and considering the record), the Repotex notes plainly manifest the intention to grant the Trusts a participation position in the Senior Repo, notwithstanding the erroneous inclusion of an absolute two-year term. 56.1 St., ¶¶ 121-122, 149-157. The notes' 18% return, mirroring the 18% Senior Repo return, evidences that Repotex was merely a pass-through to administer payments to the Trusts. 56.1 St., ¶¶ 31-36; Greenberger Decl., Ex. 4 (at Exs. A-E).

56.1 St., ¶ 215.  The Trusts' proportionate share in that last Senior Repo distribution was already been paid to, and retained by, the Trusts.  56.1 St., ¶¶ 204-214.

### E.     Mr. Friedman Did Not Aid And Abet

Aiding and abetting fraud must be proven by clear and convincing evidence, and to survive summary judgment, Plaintiffs must have adduced sufficient evidence to meet this standard at trial.  *de Abreu.*, 812 F.Supp.2d at 322.  But other than bald allegations in the Complaint, the Trustees and Gary are unable to articulate, identify, or establish Mr. Friedman's role in and knowledge of the alleged torts.  56.1 St., ¶¶ 224-227.  *See*, *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 201-204 (S.D.N.Y. 2006) (aiding and abetting liability requires secondary violator to have actual knowledge of the primary violator's wrongdoing, and requires affirmative assistance to enable the fraud to proceed).  Even assuming, *arguendo*, that Mr. Mezei and/or the other Defendants acted tortiously, there is no evidence that Mr. Friedman had any knowledge of that intent.  *Lenczycki v. Shearson Lehman Hutton, Inc.*, 238 A.D.2d 248, 656 N.Y.S.2d 609, 610 (1st Dept 1997) (aiding and abetting conversion claim failed).  But, the other Defendants did not act tortiously, and thus, to the extent the claims are dismissed against the other Defendants, Mr. Friedman can not be liable for aiding and abetting because the first element of an aiding and abetting claim is the existence of a primary violation.  *de Abreu*, 812 F.Supp.2d at 322, 324-31.

### F.     Lack Of Standing (Samuel Eliezer Nussbaum Trust - $10,000)

The Samuel Eliezer Nussbaum Trust sent to EGG $60,000 by wire transfer, and alleges another $10,000 was sent on its behalf by check.  Compl., ¶ 23.  The $10,000 check was drawn on Karen's personal checking account and the Trust has not re-paid Karen.  56.1 St., ¶ 137; K. Fragin Depo., 71:4-7.  Thus, the Samuel Eliezer Nussbaum Trust has no standing to recover that $10,000 because it has not actually been injured in that amount.  *Lujan v. Defenders of Wildlife*,

504 U.S. 555, 560-67 (1992); *Disability Advocates, Inc. v. N.Y. Coalition for Quality Assisted Living, Inc.*, 2012 WL 1143588 (2d Cir. Apr. 6, 2012).  Karen sues only in her capacity as a Trustee, not individually.

G.     **Third Party Claims Against Mr. Fragin**

To the extent the main action is not dismissed, summary judgment should be entered in favor of Movants against Gary on the third-party fraud, contribution and indemnification claims. Movants should not bear the loss which was caused by Gary's representations or omissions to his wife.  *Mas v. Two Bridges Assoc. by Nat. Kinney Corp.*, 75 N.Y.2d 680, 689-91, 555 N.Y.S.2d 669, 674-75 (1990) (explaining contribution and indemnification claims); *Fromer v. Yogel*, 50 F. Supp. 2d 227, 240-41 (S.D.N.Y. 1999) (under "implied-in-law indemnity," indemnification can be implied under New York law when there is a great disparity in the fault of two tort-feasors, and one of the tort-feasors has paid for a loss that was primarily the responsibility of the other).

The instant action is analogous to *Slotkin*, 377 F.Supp. at 280.  In *Slotkin*, attorneys who had represented a hospital in an underlying medical malpractice action were permitted to assert cross-claims against the hospital (their former client) in a later lawsuit wherein plaintiffs claimed they were induced to settle for a low amount based on the hospital's attorney's misrepresentations in the malpractice action concerning the hospital's insurance coverage.  The attorneys were merely the conduit for false information furnished to them by the client/hospital concerning the hospital's insurance coverage.

To deny Defendants recovery of sums incurred due to Gary's acts would permit Gary to be unjustly enriched by insulating him from a claim by the Trusts, at Movants' expense.  "Simple fairness" requires that if Defendants are liable to the Trusts, Defendants should be indemnified because Gary is responsible for the Trusts entering into the transaction, which ultimately failed (for everyone in the waterfall).  *City of N.Y. v. Lead Indust. Ass'n, Inc.*, 222 A.D.2d 119, 124,

644 N.Y.S.2d 919 (1st Dept 1996) (quoting *McDermott v. City of N.Y.*, 50 N.Y.2d 211, 217, 428

N.Y.S.2d 643 (1980)).


## IV. <u>CONCLUSION</u>

Based on the undisputed facts, the Trusts' claims fail as a matter of law.  Defendants'

motion for summary judgment should be granted.


Dated: April 16, 2012
       New York, New York

MOSES & SINGER LLP
*Attorneys for Defendants/Third-Party Plaintiffs*

 /s/ Jordan Greenberger         
   Scott E. Silberfein
   Jordan Greenberger
The Chrysler Building
405 Lexington Avenue, 12th Floor
New York, New York 10174
Tel: (212) 554-7800
Fax: (212) 554-770
ssilberfein@mosessinger.com
jgreenberger@mosessinger.com
