UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KAREN NUSSBAUM FRAGIN and NANCY MARKOVITCH, in their capacity as Trustees for the ELANA B. NUSSBAUM TRUST, the MOSHE JONATHAN NUSSBAUM TRUST, the TAMAR MIRIAM NUSSBAUM TRUST, the DANIEL ZACHARY NUSSBAUM TRUST, and the SAMUEL ELIEZER NUSSBAUM TRUST, <br><br>    Plaintiff, <br><br>-against- <br><br>LEONARD MEZEI, the ECONOMIC GROWTH GROUP, REPOTEX, INC., and RON FRIEDMAN, <br><br>    Defendants/Third-Party Plaintiffs, <br><br>-against- <br><br>GARY S. FRAGIN, <br><br>    Third-Party Defendant. | Case No. 1:09-cv-10287-AJN <br><br>**DECLARATION OF <u>LEONARD MEZEI</u>** |

I, LEONARD MEZEI, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct:

1.    I am a defendant in this action, and respectfully submit this declaration in support of my and the other defendants'/third-party plaintiffs' motion for summary judgment ("2nd Mezei Decl.").

2.    I have personal knowledge of the facts set forth herein. Terms not defined herein have the same meaning as in the accompanying Local Rule 56.1 Statement.

Prior Declaration

3.    Annexed hereto as **Exhibit A** is a true and correct of my declaration with exhibits,

829431 011147.0102

dated August 13, 2010 ("1st Mezei Decl.").

4. I submitted the 1st Mezei Decl. in opposition to the Trusts' (denied) motion for partial summary judgment on the breach of contract claim. [Doc. 45].

5. Since the time the 1st Mezei Decl. was submitted, the facts stated therein have not changed. I thus re-affirm the accuracy of the 1st Mezei Decl.

6. For example, it is still true that none of the other Repotex note holders have asserted claims on their notes.

## The Repotex Note Holders

7. Annexed hereto as **Exhibit B** is a true and correct copy of all of the Repotex notes, other than those held by the Plaintiffs in this action.

8. Gary Fragin, an accredited investor, acted on behalf of the Plaintiffs regarding the purchase of a participation position in the Senior Repo (as further defined in the 1st Mezei Decl.).

9. Mr. Fragin and I had virtually no discussions concerning the $800,000 at issue in this case because he was well versed in the deal both as an insider to the transaction and because of our regular conversations about the deal. This is why he did not recognize the name Repotex on the notes.

10. Like Mr. Fragin, the other Repotex note holders (or their principals, in the case of the holders who are not individuals) were personal friends and acquaintances of mine at all relevant times.

11. In the Spring of 2008, when I presented the Senior Repo opportunity to them and provided them with all of the essential information, the meetings were in person and at my office, my home or their homes.

12. I did not broadly or widely advertise the opportunity, cold-call strangers, or

market Repotex notes.

13. Even after their participation interests in the Senior Repo stopped paying, I have conducted business with all but one of the Repotex note holders (and I am still friendly with that one person).

14. Repotex note holder <u>Benny Kest</u> approached me (at Mr. Fragin's suggestion) for general business advice. I have known Mr. Kest and his family for years. We each attended all of our children's weddings, bar mitzvah, etc. Our wives are friends, and we live in the same neighborhood. With respect to the Repotex notes, we met at both my house and at his house with his brother-in-law (a professional financial advisor) also present and acting as his advisor.

15. Repotex note holder <u>David Friedman</u> has been to my office many times and participated in previous deals, worth millions of dollars, that I have been involved with (and he still does new deals with me). My cousin introduced me to Mr. Friedman several years prior to 2008. With respect to the Repotex notes, Mr. Friedman came to my office, as he often does, to discuss our existing deals and other opportunities came up and were discussed, including the Repotex opportunity.

16. Repotex note holder <u>Marc Mandel</u> was a member of my synagogue, he has been to my house many times, and I know his family. Indeed, my son used to baby sit for his kids, and Mr. Mandel's kids then baby sat for my son's kids years later. Our wives know each other, and have participated in philanthropic activities together. With respect to the Repotex notes, Mr. Mandel overheard Mr. Kest and I talking and indicated that he was looking for an opportunity. We met at my house to discuss the transaction.

17. Repotex note holder <u>Mordechai Piller</u> is my cousin's nephew, and I met him through the same cousin that introduced me to David Friedman. I have several other business

transactions with him. With respect to the Repotex notes, similar to Mr. Friedman, Mr. Piller came to my office to discuss our existing deals and other opportunities came up during the conversation. There was no planned solicitation. We have an ongoing relationship.

18. Repotex note holders <u>Eastlawn Foundation</u> and <u>Westlawn Foundation</u> are controlled by the Landau brothers. I have done millions of dollars worth of business with the brothers over the years, and I believe them to be very sophisticated. I originally met the Landau brothers through my brother-in-law, and I speak with the brothers often. Both brothers will come to my office occasionally to discuss our business relationship, and I still have an ongoing business relationship with them. I do not recall meeting with the brothers when the two of them were not together. With respect to the Repotex notes, I do not specifically recall how the opportunity came up in our conversation, but it is likely that we were discussing our existing relationship and this opportunity came up during the conversation.

19. These conversations about the Senior Repo opportunity were casual offshoots of other ongoing activity and relationships. There was no solicitation of any other private person that I can recall. In other words, to the best of my recollection, I spoke to no other private candidates.

20. In **ALL** of the discussions with the other Repotex note holders, I had a lengthy meeting or meetings to explain in detail the underlying Senior Repo and the risks. Also, other than Mr. Mandel, I believed that all were accredited investors based on our prior transactions. Mr. Mandel was the only investor that I had not done business with before (though, after the Senior Repo transaction we have done another $500,000 of business together).

21. Because the above-mentioned private individuals all wanted and agreed to participate, I had only a few limited discussions with others (Paradigm and institutional hedge

funds) about the opportunity. I did call some institutional hedge funds and Paradigm (which was not out of the blue, since I had communicated with Jeff Michel of Paradigm before). However, I did not need to call more than a few because the above mentioned private individuals all agreed to participate. Additionally, Jeff Michel of Paradigm indicated to me that he wanted all of the Gottex piece, so I stopped all discussions with anyone else. Mr. Michel indicated that if there was less than approximately $13-15 million, Paradigm was not interested.

Economic Growth Group

22. Pursuant to a Stock Purchase Agreement, dated February 2, 2001, I sold 100% of defendant Economic Growth Group's ("EGG") stock to non-party Economic Growth Group Inc. Employee Stock Ownership Plan Trust (the "ESOP Trust"). A true and correct copy of that Stock Purchase Agreement is annexed hereto as **Exhibit C**. The ESOP Trust has been the sole shareholder of EGG since February 2, 2001. I am the Trustee of the ESOP Trust. I do not personally have a beneficial interest in the ESOP Trust, though my children do.

23. Weeks before the Trusts sent their $800,000 to EGG, EGG had put $1.3 million towards Repotex' purchase of Gottex' piece. EGG put in that $1.3 million as a "place-holder," based on my understanding at the time that other people would be interested in also purchasing a participation interest in the Senior Repo. It was not uncommon for EGG to put its own money into a transaction as a "place-holder" when it was expected that other people would be interested in buying into that deal.

24. At the time EGG put in its $1.3 million, and also at the time the Trusts sent their $800,000 to EGG, I believed that the Senior Repo piece would be paid in full.

Repotex

25. Repotex incorporated under Delaware law on March 28, 2008. Annexed hereto as

**Exhibit D** is a true and correct copy of the certificate of filing and the certificate of incorporation.

## The Compass/Silar/Gottex Transaction

26. Annexed hereto as **Exhibit E** is a true and correct copy of the Senior Repo closing check list and index of documents for the Compass/Silar/Gottex transaction. A true and correct copy of the paying agency agreement is annexed hereto as **Exhibit F**.

27. The transaction is further discussed in my 1st Mezei Decl. and in my deposition testimony. However, I would like to emphasize certain points.

28. *First*, the concept of a "default" is not relevant because the Senior Repo piece only paid when the assets were liquidated. The Senior Repo piece began operating in a technical "default" within months of the transaction, and Mr. Fragin knew that. Mr. Fragin signed the margin call notice, and I had multiple conversations with him about the concept of the margin call. Even though Mr. Fragin knew the Senior Repo was in technical "default," he still took an additional interest in the Preferred piece when he left Silar, which was junior to the Senior Repo in the "waterfall," and still had the Trusts buy the $800,000 interest. Mr. Fragin knew all along about the "default."

29. Mr. Fragin also states that had he known there was a default on the Payment and Extension Agreement, he would not have done the $800,000 transaction. But, Mr. Fragin also states that he did not know about the Payment and Extension Agreement in May/June 2008. It does not make sense that Mr. Fragin would consider as material a "default" on the Payment and Extension Agreement if he did not even know of the existence of the Payment and Extension Agreement.

30. Moreover, a default on the Payment and Extension Agreement was material <u>only</u>

to the junior "equity" piece, which Mr. Fragin had no interest in. A "default" on the Senior Repo did not affect the Senior Repo interest. Silar already owned the assets under the "repo." If Compass "defaulted" on the Senior Repo, it lost its right to repurchase and jeopardized its own interest in the junior "equity" piece. The Trusts' Senior Repo interest was not changed.

31. *Second*, Silar (Mr. Fragin's former company) retained the control and lead position on the Senior Repo. Any pressure Silar was getting from Gottex, the participant, was pressure on the personal relationship between Silar and Gottex. As the lead, I do not believe that Silar faced contractual pressure from Gottex to liquidate the assets at the potential loss of the Preferred piece (of which Mr. Fragin owned an interest).

32. Additionally, to the extent Gottex could pressure or was pressuring Silar to liquidate the assets to satisfy Gottex' participation interest, that pressure would have no adverse effect on co-participants in the Senior Repo (who would get paid their proportionate share at the same time as Gottex). Mr. Fragin claims that the Trusts would not have sent the $800,000 if they had known that Gottex was not being fully bought out. It does not make sense that Mr. Fragin would consider taking Gottex fully out as material *to the Trusts' purchase of a participation in the Senior Repo*: any pressure Gottex exerted to liquidate the assets and pay off the Senior Repo would similarly favor paying off the Trusts, as co-participants in the Senior Repo.

## The Nevada Litigation

33. Annexed hereto as **Exhibit G** is a true and correct copy of relevant portions of Doc. 638 in In re USA Commercial Mortg. Co., No. 2:07-cv-00892-RCJ-GWF (D. Nev., doc. filed July 25, 2008) [Doc. 638, pp. 1-25; Doc. 638-4, pp. 1-28]. This document explains the claims in the civil litigation on Compass' interests in the assets (which it had purchased out of bankruptcy), and efforts to resolve those claims in relation to the "waterfall" issue.

34. In the Summer of 2008, the parties, with the Court appointed receiver, finally negotiated and executed a settlement agreement, which provided for a $34.5 million payment to Compass on the "waterfall." Doc. 638, pp. 4-10 and 638-4 at pp. 2-28. The $34.5 million was greater than the outstanding balance of the Senior Repo, and thus, had it been paid the Senior Repo (and participants therein) would have been fully paid. However, the Court did not authorize the settlement, and the $34.5 million was never paid. *In re USA Commercial Mortg. Co.*, No. 2:07-cv-00892-RCJ-GWF (D. Nev.) 2008) [Doc. 695, filed Sep. 24, 2008] (a true and copy of which is **Exhibit H** hereto).

35. Embedded in the $34.5 million negotiated settlement in the Nevada litigation were certain "undisputed" fees. These "undisputed fees" were greater than the balance of the Senior Repo piece, which is why everyone – including Mr. Fragin – thought that the Senior Repo piece would still pay. It was not until well after June 2008 that those "undisputed" fees became "disputed."

[Continued on next page.]

WHEREFORE, the motion of Defendants/Third-Party Plaintiffs for summary judgment should be granted.

Executed on April 13, 2012 in Florida.

_____
Leonard Mezei