UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: [AUG 2 2 2012

------------------------------------------------------------------X

KAREN NUSSBAUM FRAGIN, ET AL.,

        Plaintiffs,

        -v-

LEONARD MEZEI, ET AL.,

        Defendants and Third-Party Plaintiffs,

        -v-

GARY S. FRAGIN,

        Third-Party Defendant.

------------------------------------------------------------------X

09 Civ. 10287 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

      Plaintiffs Karen Nussbaum Fragin and Nancy Markovitch bring this suit in their capacity as trustees for the trusts of Karen Fragin's five children ("the Trusts"). Defendants are Leonard Mezei, a former family friend of the Fragin family, Ron Friedman, Mr. Mezei's son-in-law, and Economic Growth Group ("EGG") and Repotex, Inc., two companies allegedly controlled by Mr. Mezei. Plaintiffs contend that the Trusts invested $800,000 based on misrepresentations and a material omission by Mr. Mezei. The core of the allegations is that the Trusts transferred these funds to EGG expecting them to be used for one investment, but that EGG and Mr. Mezei, aided by Mr. Friedman, put the funds to a different, unauthorized use, resulting in loss. More specifically, Plaintiffs claim that instead of receiving the investment as originally described by Mr. Mezei, the Trusts received notes ("the Notes") from Repotex. Plaintiffs further contend that even if, in fact, there is no economic difference between the Notes and the investment as originally described by Mr. Mezei, the Trusts are entitled to monthly payments under the terms

of the Notes but that Repotex has failed to make such payments since September 2008. Finally, Plaintiffs allege that the Notes are securities subject to the federal securities laws and that these laws were violated when Mr. Mezei made the aforementioned misrepresentations and material omission that induced the Trusts to invest and when Mr. Mezei and Repotex issued the Notes without proper registration. (Dkt. #1)

Defendants deny liability and assert third-party claims against Karen Fragin's husband, Gary Fragin. Defendants argue that Gary Fragin is in fact responsible for the Trusts' investment, that he held himself out as having full authority to invest the Trusts' money, and that he led Defendants to believe that he had fully informed Karen Fragin and the Trusts about the nature of the investment. (Dkt. #25)

Plaintiffs previously moved for partial summary judgment on their breach of contract claim, arguing that Repotex's admitted failure to make monthly payments since September 2008 required a grant of summary judgment in Plaintiffs' favor. (Dkt. #35) Judge Gardephe, who was previously assigned this case, denied Plaintiffs' motion. (Dkt. #62) Defendants now move for summary judgment on each of Plaintiffs' claims or, in the alternative, for summary judgment on Defendants' third-party claims against Gary Fragin. (Dkt. #78) For the reasons stated below, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

## I.   LEGAL STANDARD

Summary judgment is properly granted when, after reviewing the evidence in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000). For summary judgment purposes, a

genuine issue exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor.  *Id.*

In a summary judgment setting, "the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists."  *Gallo v. Prudential Residential Servs., Ltd. P'Ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence . . . on an essential element of the nonmovant's claim."  *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).  "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citations omitted).  "More specifically, it must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation."  *Id.* (citations omitted).

## II.    FACTS[1]

This action concerns $800,000 of the Trusts' funds sent to EGG on or about June 2, 2008 to purchase a participation position in the senior tier, or "Senior Repo," of an underlying financing transaction.  (Def. 56.1 ¶5)  The Trusts have not been repaid principal or interest since September 2008.  (Def. 56.1 ¶6)

---

[1] The following facts are undisputed unless otherwise noted.  If only one party's 56.1 Statement is cited, it is because the other party does not dispute the fact asserted or has offered no admissible evidence to refute that fact.  *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").  The Court notes that throughout Plaintiffs' responsive 56.1 Statement, they "deny knowledge and information sufficient to form a belief as to the truth of the statement." *See, e.g.*, Pl. 56.1 ¶54. Such a response is insufficient to create an issue of fact at the summary judgment stage. *See* Local Rule 56.1; *Buckman v. Calyon Sec. (USA) Inc.*, 817 F.Supp.2d 322, 328 n. 42 (S.D.N.Y. 2011).

### A.    Financing for the Underlying Asset Purchase

Underlying the Trusts' $800,000 investment is a complex web of financing used to purchase non-performing mortgages and related fees from the bankruptcy estate of a non-party for approximately $50 million. (Def. 56.1 ¶ 9)  These assets were thought to be worth approximately three times the $50 million that was paid. (Def. 56.1 ¶ 11)

The assets were purchased by a special purpose entity called Compass. (Def. 56.1 ¶ 9) However, Compass did not finance the purchase in full. (Mezei Depo. 42:20 – 43:11; G. Fragin Depo. 64:24 – 65:21)  Instead, a three-tier financing structure was employed, whereby Compass' repayment of the financing (whether through liquidation of the assets or receipt of fees) flowed like a waterfall from senior lending tiers to junior lending tiers. (Def. 56.1 ¶ 18)  Junior tiers were only paid once the senior tier was fully satisfied. (Def. 56.1 ¶ 18)  The three tiers, from senior to junior, were: (1) the Senior Repo ($38 million); (2) the "Preferred" piece ($10 million); and (3) the "Equity" or "Common" piece ($2 million). (Def. 56.1 ¶ 19)

The senior tier was originally financed by Silar and Gottex, both of which conduct asset backed lending. (Def. 56.1 ¶¶ 15, 52. 53; G. Fragin Depo. 65:12-21)  In order to fund the $38 million Senior Repo, Silar sold to Gottex an approximately $37 million participation position in the Senior Repo, while Silar kept an approximately $1 million interest and the lead manager position. (Def. 56.1 ¶¶ 52, 53)

The senior tier is called the Senior Repo because it involved a repurchase agreement. (Def. 56.1 ¶¶ 26, 29)  A "repurchase agreement" (or "repo") is one in which a party that owns assets acquires funds by selling the specified assets to another party under a simultaneous agreement to repurchase the same asset under certain terms. (Def. 56.1 ¶ 26)  In this case, the senior tier was a "repo" because Compass sold the assets to Silar, but retained a conditional right

4

to repurchase them.  (Def. 56.1 ¶ 29)  Compass' right to repurchase the assets was conditioned on it repaying the senior tier investment plus 18% interest.  (Def. 56.1 ¶ 31)

Junior to the $38 million Senior Repo was the Preferred piece.  (Def. 56.1 ¶ 59)  Silar and its partners purchased the Preferred piece for approximately $10 million.  (Def. 56.1 ¶ 60; G. Fragin Depo. 68:20 – 69:2)  Gary Fragin personally contributed $200,000 towards this purchase. (G. Fragin Depo. 68:17 – 69:2)  The return rate on the "preferred" piece initially was 28% and, under the waterfall, investors in the preferred piece were paid only after the Senior Repo (and participants therein) were fully paid principal and the 18% return.  (Def. 56.1 ¶ 61)

Finally, junior to both the Senior Repo and the preferred piece was the Equity piece, which was purchased for approximately $2 million.  (Def. 56.1 ¶ 62)  Under the waterfall, the Equity piece would not be paid back until the Senior Repo and Preferred piece were fully paid off.  (Def. 56.1 ¶ 63)

### B.    Buying Out Gottex

Purchase of the mortgage assets out of bankruptcy and execution of the documents underlying the Senior Repo occurred in February 2007.  (G. Fragin Depo. 61:5-14; Mezei Depo. 87:7-10; 2nd Mezei Decl. Ex. E)  Within four months of the deal closing, Gary Fragin and Mr. Mezei began discussing buying out Gottex's participation position.  (Def. 56.1 ¶ 90)  Gary Fragin strongly advocated for a complete buyout of Gottex's position.  (Def. 56.1 ¶¶ 91-93) Beginning in about the second quarter of 2008, Mr. Mezei began to look for investors to buy Gottex out.  (Mezei Depo. 107:11-22)  Mr. Mezei approached friends and business associates, including at least one investment entity known as Paradigm.  (Mezei Depo. 107:23 – 108:17)

The Senior Repo, which had a one year term, was set to expire in or around February 2008 – about the same time that Mr. Mezei began raising money to buy out Gottex.  (Def. 56.1 ¶

45; Mezei Depo. 107:11-22)  The Senior Repo was not fully paid after that year but had, through liquidation of the non-performing assets, been paid down from $38 million to approximately $25 million.  (Def. 56.1 ¶ 46)  Paradigm expressed interest in purchasing Gottex's remaining interest in its entirety.  (Mezei Depo. 110:19-22)  However, Mr. Mezei had already begun to raise money from other investors and told Paradigm that while it could purchase $13 million to $15 million of the Gottex piece, it could not own it all.  (Mezei Depo. 110:23 – 111:19)

During this same time frame (*i.e.*, on or about April 15, 2008), Silar and Compass entered into a "Paydown and Extension Agreement."  (Def. 56.1 ¶ 47)  The *extension* part of that agreement was that the term of the Senior Repo was extended for two consecutive periods of 180 days each.  (Def. 56.1 ¶ 49)  The *paydown* part of that agreement was that the Senior Repo would be paid down by (a) $6.75 million on April 15, 2008; (b) $3.25 million on May 1, 2008; and (c) $13,087,954 by June 1, 2008.  (Def. 56.1 ¶ 50)

The April 15, 2008 and May 1, 2008 paydowns were accomplished through Repotex, which was formed in March 2008 to purchase a portion of Gottex's position using money raised from the investors approached by Mr. Mezei.  (Def. 56.1 ¶¶ 100, 102)  The $6.75 million April 15, 2008 paydown was funded entirely by Repotex and was used to purchase a portion of Gottex's position in the Senior Repo.  (Def. 56.1 ¶ 100; Mezei Depo. 129:10 – 130:12, 142:11 – 143:22)  In exchange for their investments, the investors solicited by Mezei received notes issued by Repotex.  (2nd Mezei Decl. Ex. B; Mezei Depo. 151:23 – 152:14)  Mr. Mezei never disclosed the paydown and extension agreement to any of the Repotex investors.  (Mezei Depo. 122:21 – 123:2, 123:16-24; G. Fragin Depo. 96:12-13; Def. 56.1 ¶ 202)

6

The $3.25 million May 1, 2008 paydown was also partially funded by Repotex.  (Mezei Depo. 143:23 – 144:7)  More specifically, Repotex invested $1.625 million in return for a portion of Gottex's position in the Senior Repo.  (Mezei Depo. 143:23 – 144:7)  This money was raised through contributions from an individual investor, who contributed $325,000, and from EGG, which contributed $1.3 million.  (Mezei Depo. 143:23; 1st Mezei Decl. Ex. B)  The remainder of the May 1, 2008 paydown was financed by Silar through its purchase of a piece of Gottex's position.  (Mezei Depo. 130:20-25; 143:23 - 144:10)

### C.    Mr. Mezei and Gary Fragin Discuss The Trusts' Investment

On or around Memorial Day 2008, Mr. Mezei and Gary Fragin discussed Gary Fragin investing money to purchase a piece of Gottex's position.  (G. Fragin Depo. 124:14-18, 127:18 – 128:1; Mezei Depo. 133:3-21)  Although the parties agree that this conversation occurred, there is almost no agreement as to the content of the conversation.  While Mr. Mezei acknowledges that he was aware that the money to be invested would be coming from the Trusts, he asserts that he did not understand there to be any separation between Gary Fragin and the Trusts.  (Mezei Depo. 135:4 – 136:12)  Gary Fragin denies holding himself out as controlling the Trusts' investments or funds.  (Ansr. Third-Party Cmplt. ¶¶ 44, 52; G. Fragin Depo. 129:12 – 130:11)

The parties also disagree as to whether the Trusts' $800,000 investment commitment was made during this initial conversation or in a subsequent conversation.  (*Compare* G. Fragin Depo. 129:12 – 130:2 *with* Mezei Depo. 133:25 – 136:12)  However, it was ultimately agreed that the Trusts would invest $800,000.  (Mezei Depo. 134:17 – 135:3; G. Fragin Depo. 132:24 – 133-2)

Either during the Memorial Day 2008 conversation or prior thereto, Mr. Mezei told Gary Fragin that he had an investor (*i.e.*, Paradigm) who wanted to buy out Gottex entirely.  (Mezei

Depo. 114:18 – 116:9; G. Fragin Depo. 127:18 – 128:1, 129:12 – 130:2)  Plaintiffs assert that the

Trusts' investment was made at least partly in reliance on this statement.  (Cmplt. ¶¶ 17, 19, 71)

Gary Fragin obtained information about where to wire the money from Mr. Mezei's secretary, he

forwarded that information to Karen Fragin, and, on or about June 2, 2008, the Trusts sent

$800,000 to EGG.  (Def. 56.1 ¶137)  In approximately July or August 2008, Paradigm withdrew

its oral offer to buy out the Gottex piece.  (Mezei Depo. 113:22 – 114:17)

### D.    The Trusts Invest

On or about June 2, 2008, Karen Fragin authorized wire transfers from the Trusts'

accounts to EGG's account and sent a personal check for $10,000 on behalf of one of the trusts.

(Def. 56.1 ¶137)  Karen Fragin never spoke to the Defendants about the transaction prior to

sending the $800,000 to EGG.  (Def. 56.1 ¶158)  Instead, "the deal" was told to Karen Fragin by

Gary Fragin.  (Def. 56.1 ¶160)  That is, the nature and purpose of the investment was

communicated to her by Gary Fragin.  (Def. 56.1 ¶161)

Karen Fragin's intention behind investing the Trusts' money was to supplement her

children's income.  (K. Fragin Depo. 75:18 – 76:7)  She understood this to be "an investment

deal" whereby Mr. Mezei would "facilitate buying Compass USA 18 percent paper."  (K. Fragin

Depo. 74:15-21)  It was Gary Fragin who described the transaction to Karen Fragin as "Compass

18 percent paper."  (K. Fragin Depo. 79:22-25)  Karen Fragin understood this to mean that the

Trusts' money would be a loan, with a starting date, an ending date, and a monthly interest

payment for two years, at which point the Trusts would be fully repaid.  (K. Fragin Depo. 103:15

– 104:2)  Karen Fragin did not have an understanding of the Trusts' investment beyond this.  (K.

Fragin Depo. 103:15 – 104:2)

Prior to investing the Trusts' $800,000, Karen Fragin discussed the transaction with her cousin, Sam Shapiro ("Mr. Shapiro"), who had previously provided financial advice regarding the Trusts. (K. Fragin Depo. 45:6-19, 94:11-16)  Mr. Shapiro counseled against making the investment because "it was risky," as evidenced by the high interest rate (18%). (K. Fragin Depo. 95:6-23)  Karen Fragin nonetheless decided to move forward with the investment because "[she] trusted Len Mezei." (K. Fragin Depo. 96:11-14)  Neither Karen Fragin nor Gary Fragin conducted any due diligence prior to the Trusts' investment. (Def. 56.1 ¶176)

The parties disagree over how EGG's use of the Trusts' $800,000 should be described. However, regardless of whether EGG's investment is described as a $1.3 million participation position in the Senior Repo or a $1.3 million Repotex note, EGG reduced its investment by $800,000, and the Trusts received Repotex notes for the same amount. (Def. 56.1 ¶¶140, 141; P. 56.1 1 ¶¶140, 141)  The Notes have a two-year term. (K. Fragin Aff. Ex. A-E)

Karen Fragin received the Notes in approximately July 2008. (K. Fragin Depo 107:18 – 108:19)  Neither Gary Fragin nor Karen Fragin had heard of Repotex before they received the Notes. (Def. 56.1 ¶143)  Upon receiving the Notes, Gary Fragin called Mr. Mezei saying that the Notes did not reflect the deal. (G. Fragin Depo. 134:23 – 136:4; K. Fragin Depo 113:3-8)  The Trusts nonetheless accepted three interest payments beginning in July 2008, for a total of $36,000. (K. Fragin Depo. 119:23 - 120:1)  Despite the fact that, on the face of the notes, the Trusts are entitled to monthly interest payments with all accrued interest and unpaid principal to be paid in full by June 1, 2010, (K. Fragin Aff. Ex. A-E), the Trusts have received no payments since September 2008. (Def. 56.1 ¶6)

9

III.    **PROCEDURAL HISTORY**

Karen Fragin commenced this action on December 18, 2009 naming as defendants Mr. Mezei, Mr. Friedman, Catherine Ilardi, EGG and Repotex and alleging violations of the federal securities laws, fraud, fraudulent inducement, negligent misrepresentation, conversion and breach of contract.[2] (Dkt. #1)  On April 26, 2010, Defendants answered the Complaint and asserted claims against Third-Party Defendant Gary Fragin.  (Dkt. #25)  Gary Fragin answered the Third Party Complaint on May 13, 2010.  (Dkt. #30)  On September 8, 2010, Karen Fragin voluntarily dismissed her claims against Ms. Ilardi, and Ms. Ilardi dismissed her third-party claims. (Dkt #49)

In approximately August 2010, prior to the close of discovery, Karen Fragin moved for partial summary judgment on her breach of contract claim, arguing that the Notes constituted contracts and that Repotex had breached the contracts by failing to make monthly interest and principal payments.  (Dkt. #33, 35)  Defendants opposed the motion.  (Dkt. #48)  On February 14, 2012, Judge Gardephe denied the motion, finding that questions of fact remained regarding whether or not there was a meeting of the minds.  (Dkt. #62 at p. 11)

This case was transferred to the undersigned on February 15, 2012, and Defendants brought the instant motion on April 16, 2012.

IV.    **DISCUSSION**

The Complaint asserts the following causes of action: (1) violation of Sections 5 and 12(a)(1) of the Securities Act of 1933 through the issuance of unregistered securities to the Trusts; (2) violation of Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, by making untrue statements of material fact and omitting a material

---

[2] Ms. Markovitch was not joined as a plaintiff to this action until April 11, 2012.  (Dkt. #41)

fact in connection with the sale of securities to the Trusts (the "Rule 10b-5 claim"); (3) common law fraud and fraudulent inducement on the basis of the same untrue statements and omission of material fact underlying the Rule 10b-5 claim; (4) negligent misrepresentation on the basis of the same untrue statements underlying the Rule 10b-5 claim; (5) common law conversion based on the misuse of the Trusts' funds; and (6) breach of contract based on Repotex's failure to make monthly payments since September 2008.

Defendants deny liability and assert claims of contribution, indemnity and fraud against Gary Fragin who they brought in as a third-party defendant.

For the reasons that follow, the Court finds that (A) Plaintiffs' registration claim under the Securities Act of 1933 is time-barred; (B) Plaintiffs' Rule 10b-5 claim may proceed to the extent it is limited to Mr. Mezei's alleged misrepresentation regarding the nature of the investment and Mr. Mezei's alleged omission regarding Compass' risk of foreclosure; (C) Plaintiffs' fraud and fraudulent inducement claims may also proceed if they are similarly limited to the aforementioned alleged misrepresentation and omission; (D) Plaintiffs' negligent misrepresentation claim may also proceed if limited to the aforementioned alleged misrepresentation; (E) Plaintiff's conversion claim may proceed against Mr. Mezei and EGG but summary judgment is granted on this claim as alleged against Repotex; (F) summary judgment is denied on Plaintiffs' breach of contract claim in light of existing questions of fact; (G) summary judgment is granted on all aiding and abetting claims against Mr. Friedman because no reasonable jury could find that he had the requisite knowledge of wrongful conduct; (H) Plaintiffs' claims on behalf of the Samuel Eliezer Nussbaum Trust are not limited to the $60,000 wired directly from the Samuel Eliezer Nussbaum Trust account; and finally, (I) summary judgment is denied on Defendants/Third Party Plaintiffs' claims against Gary Fragin.

A.   **Plaintiffs' Registration Claim Under the Securities Act of 1933 is Time-Barred**

The Court grants summary judgment as to Plaintiffs' claim under the Securities Act of 1933 because it is time-barred. Plaintiffs allege that Mr. Mezei and Repotex violated Sections 5 and 12(a)(1) of Securities Act of 1933, 15 U.S.C. §§ 77e and 77l(a)(1), by issuing unregistered securities to the Trusts. (Cmplt. ¶ 59) 15 U.S.C. §77l(a)(1) makes liable any person who offers or sells a security in violation of §77e, and §77e prohibits the offer or sale of securities for which there is no registration statement. Claims brought under §77l(a)(1) must be brought "within one year after the violation upon which it is based." *See* 15 U.S.C. § 77m. Courts therefore interpret the statute to bar claims filed more than one year after the purchase of the securities at issue. *In re Merrill Lynch Auction Rate Sec. Litig.*, 2012 WL 1994707, at *4 (S.D.N.Y. 2012) (citing cases); *Teva Pharm. Indus. Ltd. v. Deutsche Bank Sec. Inc.*, 2010 WL 6864006, at *2 (S.D.N.Y. 2010); *Zola v. Gordon*, 685 F.Supp. 354, 362 n. 8 (S.D.N.Y. 1988).

It is undisputed that the Trusts' money was wired to EGG in June 2008 (Def. 56.1 ¶5), that the Notes are dated June 1, 2008 (1st Mezei Decl. Ex. 13), and that the Trusts received the Notes on or about July 8, 2008 (K. Fragin Depo 107:18 – 108:19). However, this action was not commenced until December 18, 2009 – more than one year after issuance of the Notes. Plaintiffs' claims pursuant to 15 U.S.C. §§ 77e and 77l(a)(1) are therefore time barred, and Defendants' motion for summary judgment is granted as to this claim.

## B.    Plaintiffs' Rule 10b-5 Claim May Proceed, But Is Limited

Beyond the Securities Act of 1933 claim discussed above, Plaintiffs also assert a claim for securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. (Cmplt. ¶60) *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. In order to establish a claim for securities fraud under Rule 10b-5, a Plaintiff must demonstrate that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused plaintiff injury." *Rothman v. Gregor*, 220 F.3d 81, 89 (2d Cir. 2000). Plaintiffs allege that Mr. Mezei violated Rule 10b-5 by falsely representing that the available investment opportunity was to directly purchase part of Gottex's position and by falsely stating that he had sufficient investors to buy out Gottex. (Cmplt. ¶¶ 15, 17) Plaintiffs further allege a Rule 10b-5 violation based on an omission; namely, Mr. Mezei's failure to disclose that Compass was at risk of foreclosure by Gottex. (Cmplt. ¶ 18)

In support of their motion for summary judgment on Plaintiffs' Rule 10b-5 claim, Defendants argue (1) that the Trusts' investment is not a security; (2) that Mr. Mezei cannot be held liable for the alleged misrepresentations because, pursuant to *Janus Capital Group Inc. v. First Derivative Traders*, 131 S.Ct. 2296 (2011), he was not the "maker" of any such statements; (3) that Mr. Mezei's statement that he had sufficient investors to buy out Gottex is not actionable because it was true when made; (4) that, as a matter of law, Karen Fragin cannot establish reasonable reliance because neither she nor Gary Fragin conducted any due diligence before investment of the Trusts' money; (5) that Plaintiffs cannot establish indirect reliance on any such statements because Karen Fragin did not rely on what Mr. Mezei purportedly said; and (6) that

13

Plaintiffs cannot establish that the alleged misrepresentations were material or caused the Trusts' loss.

The Court agrees that there is no genuine issue of material fact as to whether Mr. Mezei's statement about having sufficient investors to buy out Gottex was true when made, and therefore grants Defendants' motion for summary judgment on Plaintiffs' Rule 10b-5 claim to the extent it is based on this statement.

However, the Court otherwise denies Defendants' motion for summary judgment on Plaintiffs' Rule 10b-5 claim because (1) the Trusts' investment is a security; (2) if the alleged misrepresentation regarding the nature of the investment was made, Mr. Mezei is the "maker" thereof; (3) Karen Fragin is not foreclosed, as a matter of law, from establishing reasonable reliance; (4) there are questions of fact relating to what Karen Fragin relied on in deciding to invest the Trusts' money; and (5) there are questions of fact as to whether Mr. Mezei's alleged misstatement regarding the nature of the investment and Mr. Mezei's alleged omission regarding Compass' risk of foreclosure were material or caused the Trusts' loss.

### 1.    The Trusts' Investment is a Security

As a threshold matter, Defendants argue that Plaintiffs' Rule 10b-5 claim must fail because the Trusts' investment, however it is characterized, is not a security. The Court disagrees.[3]

Any note with a term of more than nine months is presumed to be a security unless it resembles one of the several judicially-enumerated instruments that are not securities. *Reves v. Ernst & Young*, 494 U.S. 56, 65 (1990). These judicially-enumerated instruments include the

---

[3] The question of whether an instrument is a security is a question of law for the court. *See McNabb v. S.E.C.*, 298 F.3d 1126, 1130 (9th Cir. 2002); 4-82 *Modern Federal Jury Instructions* – Civil, ¶82-3, Comment, n. 13. In any event, in reaching this conclusion, the Court relies only on undisputed facts.

note delivered on consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, a note which simply formalizes an open-account debt incurred in the ordinary course of business, or notes evidencing loans by commercial banks for current operations. *Id.* at 65.

Resemblance to these instruments is evaluated using the Second Circuit's "family resemblance" test adopted by the Supreme Court in *Reves*. Under this test, the Court should examine: (1) the motivations that would prompt a reasonable seller and buyer to enter into the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the securities laws unnecessary. *Id.* at 66-67. "If an instrument is not sufficiently similar to an item on the list, the decision whether another category should be added is to be made by examining the same factors." *Id.* at 67.

Defendants neither argue that the Trusts' investment fits squarely within the judicially-enumerated list of instruments that are not securities, nor compare the Trusts' investment with any of these instruments. Instead, Defendants move directly to discussion of the four *Reves* factors, arguing that these factors indicate that the Trusts' investment is not a security. Whether or not the Court interprets this as an argument that a new category of instruments should be added to the judicially-enumerated list of non-securities, the Court disagrees with the Defendants' application of the *Reves* factors and finds no reason to disturb the presumption that the Trusts' two-year notes are securities.

15

### a)      Motivations of Buyer and Seller

The Court first "examine[s] the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it." *Reves*, 494 U.S. at 66.  "If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'" *Id.*  By contrast, if the note is issued in connection with some commercial (as opposed to investment) purpose, then the note is less likely to be described as a "security." *Id.*  Characterizing the Notes as participations in the Senior Repo, Defendants argue that the financing underlying the $50 million transaction was nothing more than a loan to solve "immediate cash needs" and, therefore, any participation interests in the transaction are not securities.  (Mot. 8, 11)  The Court disagrees.

First, Defendants incorrectly cite *Banco Espanol de Credito v. Security Pacific National Bank*, 973 F.2d 51 (2d Cir. 1992) for the proposition that where the underlying instrument is not a security, the same is automatically true of a participation therein.  (Opp. 11)  In fact, the Second Circuit came to the opposite conclusion: "as the district court noted, a participation in an instrument might in some circumstances be considered a security even where the instrument itself is not." 973 F.2d at 54.  Indeed, while the Second Circuit considered both the participation at issue and the underlying instrument and ultimately concluded that neither was a security, the Second Circuit went on to "recognize that even if an underlying instrument is not a security, the manner in which participations in that instrument are used, pooled or marketed might establish that such participations are securities." *Id.* at 56.

Moreover, Defendants' attempt to characterize the underlying instrument at issue here (*i.e.*, the Senior Repo) as a traditional commercial loan to overcome cash-flow difficulties, and

therefore a non-security, is unavailing.  Instead, the record demonstrates that the Senior Repo

was part of a complex, multi-tier financing operation with numerous lenders receiving varying

interest payments on varying levels of priority.  (Def. 56.1 ¶¶ 15, 18, 19, 52, 53, 59-61, 62-62)

Moreover, the record demonstrates that this web of financing was used "to finance substantial

investments," *i.e.*, the $50 million purchase of assets thought to be worth at least $150 million

through servicing and liquidation.  (*Id.*; Mezei Depo. 70:22 – 71:8)  Thus, the record suggests

that the Senior Repo is not simply a commercial loan.

      Finally, facts comparable to those in the instant action supported the conclusion in both

*Reves* and *Private Corporate Advisors, Inc. v. Heard*, 1995 WL 66647 (S.D.N.Y. Feb. 17, 1995)

that the notes at issue were securities.  For example, in *Reves*, the Supreme Court found

persuasive the fact that notes were purchased in order to earn a profit in the form of interest.  494

U.S. 67-68.  Here, Karen Fragin's decision to invest the Trusts' money was similarly motivated

by a desire to supplement her children's income through interest earned on the investment, (K.

Fragin Depo. 75:18 – 76:16) – a fact that Defendants do not dispute, (Opp. 11).

      In *Private Corporate Advisors*, the court analyzed a note issued by the defendant as part

of a web of transactions meant to raise money to be used as collateral for a loan that would then

be used by the defendant to acquire securities in several companies.  1995 WL 66647 at *1-2.

The court was persuaded by the fact that, like the issuance of the Notes in the instant action, the

issuance of the note in *Private Corporate Advisors* was not an isolated transaction but was

instead part of a complex financing operation involving multiple lenders.  *Id.* at *8.  Moreover,

the parties to the transaction in *Private Corporate Advisors* were motivated by a desire to raise

money "to finance substantial investments" and to earn a profit in the form of interest, *id.*;

motivations that are present here as well.  In light of the structure and purpose of the underlying

17

$50 million transaction, Karen Fragin's stated motivation for investing the Trusts' money, and the decisions in *Reves* and *Private Corporate Advisors*, the Court finds that this factor ways in favor of finding that the Notes are securities.

### b)    Expectations of the Investing Public

The next factor involves an assessment of the expectations of the investing public.  As the Supreme Court stated in *Reves*, "[w]e have consistently identified the fundamental essence of a 'security' to be its character as an 'investment.'"  494 U.S. at 68-69.  Thus, this factor is an objective test that turns on whether a reasonable purchaser would have perceived the Notes to be an investment.  *Id.*  The Court finds that it would be reasonable for a prospective purchaser to view a Repotex note as an investment because the Repotex notes themselves refer to the note holders as "investors" and refer to the purchase of a note as an "investment."  (Greenberger Decl. Ex. 4; 1st Mezei Decl. Ex. 13)

Moreover, Defendants have identified no "countervailing factors" that would lead a reasonable person to question the characterization contained in the very language of the Notes. *See Reves*, 494 U.S. at 69.  Although Defendants assert that "the participants" reasonably expected to purchase part of the Senior Repo, Defendants fail to explain why this expectation indicates that "the participants" would not consider such a purchase to be an investment.  (Mot. 3)  In the absence of  "countervailing factors," it would be reasonable for a prospective purchaser to view the purchase of Repotex notes as an investment.

### c)    The Plan of Distribution

Next, the Court considers how, and to whom, the Repotex notes were sold.  Generally, if notes are offered and sold to a broad segment of the public or are instruments that are commonly traded for speculation or investment, then this factor suggests that the notes are securities.  *Reves*,

18

494 U.S. at 66.  However, even notes that are not publicly traded can still qualify as a security.
*See Private Corporate Advisors, Inc.*, 1995 WL 66647, at *8 (note that was part of a larger
financing operation was not an isolated transaction and could be characterized as a security even
though not publicly traded).  Moreover, a note can be a security even when this factor weighs
against such a conclusion.  *See Jaquith v. Newhard*, 1993 WL 127212, at *10 (S.D.N.Y. Apr. 20,
1993).

As Defendants point out, the Repotex notes were not sold to a broad segment of the
public – they were offered only to friends and business associates of Mr. Mezei.  (Mezei Depo.
107:23 – 108:17)  However, while the offering certainly is not comparable to publicly traded
stocks, it also is not the equivalent of an isolated transaction with a single investor.  Rather, the
Repotex notes were offered to individuals and institutions alike and were issued to over eleven
such investors.  (2nd Mezei Decl. ¶¶ 14-18, Ex. B; K. Fragin Aff. Ex. A-E).  Moreover, as
detailed above, *supra* § B.1.a, the Repotex notes were part of a complex financing operation with
a breadth of participation positions.  Finally, not only is there is no indication that resale of the
Notes is prohibited, but the facts of this case demonstrate the myriad ways in which
participations in the underlying transaction can be segmented and resold, suggesting that the
possible scope of purchasers of Repotex notes extends beyond these initial eleven parties.

Ultimately, the Court finds that while this factor does not strongly support the conclusion
that the Notes are securities, it does not require a contrary conclusion.

### d)   Existence of Risk Reducing Factors

Finally, the Court considers whether "some other factor such as the existence of another
regulatory scheme significantly reduces the risk of the instrument, thereby rendering application
of the [federal securities laws] unnecessary." *Reves*, 494 U.S. at 67.  Given that Defendants

19

point to no such risk-reducing factors, this aspect of the family resemblance test weighs in favor of finding that the Notes are securities.

***

Having considered each of the *Reves* factors and in light of the presumption that notes with terms of nine months or more are securities, the Court holds that the Trusts' investment is a security under the federal securities laws. The Court therefore turns to the other aspects of the Defendants' challenge to this claim on summary judgment.

### 2. Mr. Mezei's Alleged Statement Regarding the Buyout of Gottex Was Not False When Made And Therefore Cannot Form the Basis of Plaintiffs' Rule 10b-5 Claim

Putting aside, for the moment, Defendants other arguments for summary judgment on Plaintiffs' Rule 10b-5 claim, the Court considers Defendants' argument that no liability can be premised on Mr. Mezei's statement that he had sufficient investors to buy out Gottex because the statement was true when made. In order for a statement to give rise to a Rule 10b-5 claim, the statement must be false when made. *See* 17 C.F.R. § 240.10b–5(b); *Rothman*, 220 F.3d at 89. However, the record demonstrates that this representation was true when made and, therefore, it cannot support Plaintiffs' Rule 10b-5 claim.

In approximately April 2008, Paradigm indicated its intent to buy out the remaining Gottex position. (D. 56.1 ¶95) Paradigm conducted due diligence of the potential deal over the following months. (D. 56.1 ¶96) The Trusts invested their money on or about June 2, 2008, and Paradigm did not back away from the Gottex buyout until a month or two later. (D. 56.1 ¶¶ 5, 137, 97) Because there is no genuine dispute that Mr. Mezei's representation was true when made, summary judgment is granted to the extent that Plaintiffs' Rule 10b-5 claim is based on this statement. The remainder of Defendants' arguments are considered only with regard to Mr.

20

Mezei's alleged misrepresentation regarding the nature of the investment and Mr. Mezei's alleged failure to disclose that Compass was at risk of foreclosure by Gottex.

### 3.     If the Alleged Misstatement Was Made, It Was Made By Mr. Mezei

For the reasons stated *supra* §B.2., to the extent that Plaintiff's Rule 10b-5 claim is based on an alleged misrepresentation, it is limited to Mr. Mezei's alleged statement that the available investment opportunity was to directly purchase part of Gottex's position.  (Cmplt. ¶ 14; Opp. 1) Defendants assert that *no* statements by Mr. Mezei can form the basis of a Rule 10b-5 claim because Mr. Mezei never made any statements directly to the Trusts or to Karen Fragin.  (Mot. 17-19)

> Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful
>
> for any person, directly or indirectly ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Pursuant to this section, the Securities and Exchange Commission promulgated Rule 10b–5, which makes it unlawful for any person "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b–5.  Relying on the Supreme Court's decision in *Janus Capital Group Inc. v. First Derivative Traders*, 131 S.Ct. 2296 (2011), Defendants argue that, for purposes of Rule 10b-5, Mr. Mezei was not the "maker" of any statements to the Trusts (*i.e.*, Karen Fragin) because he never spoke directly with them about the investment.  The Court cannot agree without contorting the meaning of *Janus*, and therefore finds that Mr. Mezei was the maker of the alleged misrepresentation.

In *Janus*, the plaintiff sought to hold liable an investment advisor and administrator for misstatements contained in prospectuses created by a separate entity. 131 S.Ct. at 2299, 2301. The Supreme Court held:

> For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed. This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said.

*Id.* at 2302. The Supreme Court found that under this rule, the investment advisor did not "make" the misstatements because it was the other, separate entity that was responsible for creation of the prospectuses. *Id.* at 2304-5. In reaching this conclusion, the Court rejected the argument that the person who receives the false or misleading information and puts it into a statement is the "maker" of the false statement, finding instead that it is the person who originally provided the false or misleading information who is the "maker." *Id.* at 2303-04.

Defendants misconstrue *Janus* when they argue that Mr. Mezei is not the "maker" of the alleged misstatements because only Gary Fragin communicated with Karen Fragin. (Mot. 19) The Supreme Court explicitly rejected the notion that the person who incorporates misleading information into a statement, rather than the person who initially provides the misleading information, is the "maker" of that statement. *Id.* at 2303-04. Thus, it is entirely consistent with *Janus* to find that Mr. Mezei can still be held liable for these alleged misrepresentations even if they passed through an intermediary.

Moreover, to the extent that Defendants are arguing against liability for statements that originated with Gary Fragin and not with Mr. Mezei (*i.e.*, statements over which Mr. Mezei

22

arguably had no control), they make an unnecessary point.  The only operative misrepresentation

is that noted above, *supra* p. 21, which is clearly alleged to have originated with Mr. Mezei.

(Cmplt. ¶15; G. Fragin Depo. 138:25 – 139:4, 141:12-24)  There is no indication that Plaintiffs

seek to hold Defendants liable for representations that originated with Gary Fragin.

　　　　In sum, the Court finds that Mr. Mezei is the "maker" of the alleged misrepresentation

that the available investment opportunity was to directly purchase part of Gottex's position and

therefore rejects Defendants' argument that *Janus* requires dismissal of Plaintiffs' Rule 10b-5

claim.

### 4.　　Karen Fragin Is Not Foreclosed From Demonstrating Reasonable Reliance

　　　　Defendants also move for summary judgment arguing that Plaintiffs cannot, as a matter

of law, demonstrate reasonable reliance.  (Mot. 20-22)  An investor's reasonable reliance on the

defendant's misrepresentation or omission is a necessary element of a Rule 10b-5 claim.

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 195 (2d Cir. 2003).

Defendants argue that Karen Fragin could not have reasonably relied on the alleged

misrepresentation or omission because (1) neither Gary Fragin nor Karen Fragin conducted any

due diligence prior to the Trusts' investment and (2) Gary Fragin is a sophisticated investor.

(Mot. 21)  While the undisputed record demonstrates that neither Gary Fragin nor Karen Fragin

conducted due diligence, (D. 56.1 ¶ 176), the Court disagrees that, as a matter of law, this

forecloses Plaintiffs from establishing reasonable reliance.

　　　　To start, Defendants acknowledge that Karen Fragin is not a sophisticated investor, (Def.

56.1 ¶136), but cite no cases for the proposition that an unsophisticated investor is obligated to

perform due diligence prior to making an investment.  Instead, in each of the cases cited by

Defendants as establishing such an obligation, the plaintiffs were sophisticated investors. *See Crigger v. Fahnestock and Co., inc.*, 443 F.3d 230, 236 (2d Cir. 2006) ("Each of the plaintiffs had substantial and varied experience with millions in investments."); *Terra Sec. Asa Konkursbo v. Citigroup, Inc.*, 450 Fed. Appx. 32, at *2 (2d Cir. 2011) ("Plaintiffs—a bank, two insurance subsidiaries, and a successor to a brokerage firm—are clearly sophisticated investors."; *HSH Nordbank AG v. UBS AG*, 2012 NY Slip Op 02276 (1st Dep't Mar. 27, 2012) (Plaintiff was a German commercial bank); *Afra v. Zamir*, 905 N.Y.S.2d 77 (1st Dep't 2010) (Plaintiffs were "sophisticated businesspeople").

Moreover, while Defendants also argue for summary judgment on the grounds that Gary Fragin is a sophisticated investor, they provide no basis for the assertion that the sophistication of a third-party, even a third-party relied upon by the investors in making their investment decisions, is determinative as to the reasonableness of the investor's (*i.e.,* Karen Fragin's) reliance on a defendant's misrepresentation or omission.

Consequently, the Court rejects Defendants' argument that summary judgment should be granted on Plaintiffs' Rule 10b-5 claim based on the contention that Plaintiffs cannot, as a matter of law, establish reasonable reliance.

### 5.   Questions of Fact Remain As to Actual Reliance

The Court next considers Defendants argument that summary judgment must be granted on Plaintiffs' Rule 10b-5 claim because Karen Fragin was "not told and did not rely on what Mr. Mezei purportedly said." (Mot. 23).  It is true that "reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148, 159 (2008).  It is also undisputed that Karen Fragin did not directly speak with Mr. Mezei about the Trusts' investment prior to wiring the

24

Trusts' money to EGG.  (D. 56.1 ¶¶ 158, 159)  However, Plaintiffs do not allege that Karen
Fragin directly relied on Mr. Mezei's purported statements; rather, they allege indirect reliance,
*i.e.*, that Karen Fragin relied on a statement regarding the nature of the investment which was
made by Mr. Mezei to Gary Fragin and then communicated by Gary Fragin to her.  (Opp. 17-19)

    As Defendants acknowledge, indirect reliance is established if "(1) the plaintiff received
the information from someone who had received it from the defendant, and (2) the defendant
intended the misrepresentation to be conveyed to [the plaintiff]."  *Amusement Indus., Inc. v.
Stern*, 693 F. Supp. 2d 327, 348 (S.D.N.Y. 2010).  Defendants assert that Plaintiffs cannot satisfy
either prong of this test because there is no evidence that Karen Fragin was told what Mr. Mezei
purportedly said or that Mr. Mezei intended for his communications to be conveyed to the
Trusts.  (Mot. 23-24).  However, the record indicates otherwise.

    First, there is evidence to support Plaintiffs' contention that Mr. Mezei described the
investment to Gary Fragin as a piece of Compass' debt to Gottex, (G. Fragin Depo. 138:25 –
139:4, 141:12-24), and that this was communicated to Karen Fragin, (K. Fragin Depo. 79:22 –
80:11).  Second, there is also evidence that Mr. Mezei was aware, prior to the wiring of the
Trusts' funds, that the investment was being made on behalf of the Trusts and that Gary Fragin
was discussing the investment with Karen Fragin.  (Mezei Depo. 135:4 – 136:12; G. Fragin
Depo. 129:12 – 130:2, 146:13-21)  In light of these disputed facts, summary judgment on this
point is not warranted.

### 6.    Questions of Fact Remain As to Materiality and Causation

    Finally, Defendants argue that Plaintiffs cannot establish the materiality of Mr. Mezei's
alleged misrepresentation regarding the nature of the investment because the investment that the
Trusts' received (*i.e.*, the Notes) is equivalent to what they thought they were buying (*i.e.*, a

direct participation in the Senior Repo), and therefore any loss sustained by the Trusts was not caused by their receiving the Notes rather than a direct participation. To quote Defendants: "The Trusts were delivered the economics of owning a participation interest in the Senior Repo, so that the Trusts are no worse off then: (i) if the entire Gottex piece had been bought out; and/or (ii) if the transaction had not been structured with Repotex as the direct purchaser of Gottex' piece and then administrating Senior Repo payments to the Repotex note holders in proportion to their contribution to Repotex." (Mot. 26)

However, this is in fact a deeply contested point. In particular, there is significant disagreement as to Gottex's powers and rights and, consequently, there is significant disagreement as to what the Trusts' powers and rights would be had they directly purchased part of Gottex's position. (*Compare* Mezei Depo. 105:4-10, 145:13-25 *with* G. Fragin Depo. 125:1-24; *see also* G. Fragin Depo. 154:1-21) Moreover, key documents such as the Master Repurchase Agreement or any document detailing Gottex's position vis-à-vis Silar are not part of the record before the Court, making resolution of the dispute impossible at this stage of the litigation. In light of these disputed facts, the Court cannot and does not conclude that Plaintiffs are unable to establish materiality or causation as a matter of law.

Defendants' papers deal almost exclusively with Plaintiffs' misrepresentation-based theory of liability. Other than a general reference to "omissions" in the context of articulating the "materiality" standard, Defendants do not specifically address Plaintiffs' omission-based theory of liability (*i.e.*, that Mr. Mezei failed to disclose that Compass was at risk of foreclosure by Gottex). In any event, the Court would reach the same conclusion because the same parts of the record discussed vis-à-vis Mr. Mezei's alleged misrepresentation also demonstrate a dispute over whether or not Gottex did, or even could, foreclose on Compass.

\*\*\*

In light of the foregoing, Defendants' motion for summary judgment on Plaintiffs' Rule 10b-5 claim is granted to the extent it is premised on Mr. Mezei's alleged statement regarding the buyout of Gottex but is denied to the extent it is based either on Mr. Mezei's alleged statement regarding the nature of the investment or on Mr. Mezei's alleged failure to disclose that Compass was at risk of foreclosure by Gottex.

### C.   Plaintiffs' Fraud and Fraudulent Inducement Claims May Proceed If Properly Limited

Plaintiffs also assert claims for common law fraud and fraudulent inducement on the basis of the same allegedly untrue statements and omission of material fact that underlie their Rule 10b-5 claim and that are discussed above.  Defendants  move for summary judgment on these claims for the same reasons discussed *supra* §§ B.2, 4-6.

The Court agrees that summary judgment is appropriate to the extent these claims are based on Mr. Mezei's alleged statement regarding the Gottex buyout.  Like a Rule 10b-5 claim, actions sounding in fraud require the plaintiff to demonstrate, *inter alia*, the falsity of the misrepresentation at the time it is made.  *See Chanayil v. Gulati*, 169 F.3d 168, 171 (2d Cir. 1999) (essential elements include a false representation).  As the Court explained, *supra* § B.2., Plaintiffs cannot demonstrate that Mr. Mezei's statement regarding the buyout of Gottex was false when made.  Consequently, summary judgment is granted on Plaintiffs' fraud and fraudulent inducement claims to the extent they are based on this statement.

However, as stated *supra* § B.4-6, Defendants articulate no basis for granting summary judgment on Plaintiffs' claims to the extent they are based either on Mr. Mezei's alleged representation regarding the nature of the investment or on his alleged failure to disclose that

Compass was at risk of foreclosure by Gottex. Consequently, like Plaintiffs' Rule 10b-5 claim, Plaintiffs' fraud and fraudulent inducement claims may proceed on these limited bases.

### D. Plaintiffs' Negligent Misrepresentation Claim May Proceed If Properly Limited

Plaintiffs seek to hold Mr. Mezei liable for negligent misrepresentation on the basis of the two alleged misrepresentations discussed *supra* §§ B and C. (Cmplt. ¶84) As an initial matter, like Rule 10b-5, fraud, and fraudulent inducements claims, a negligent misrepresentation claim requires the plaintiff to demonstrate, *inter alia*, falsity of the misrepresentation at the time it is made. *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000). For the reasons already stated, *supra* § B.2., Plaintiffs cannot establish that Mr. Mezei's statement regarding the buyout of Gottex was false when made and, therefore, this statement cannot form the basis of a negligent misrepresentation claim. The question then is whether Plaintiffs' negligent misrepresentation claim may proceed based on Mr. Mezei's alleged misrepresentation regarding the nature of the investment.

Defendants seek summary judgment on Plaintiffs' negligent misrepresentation claim arguing that Plaintiffs cannot establish privity of contract with any of the Defendants. (Mot. 28) However, Plaintiffs are not required to establish privity of contract – their claim may proceed if they establish "*either* privity of contract between the plaintiff and the defendant *or* a relationship so close as to approach that of privity." *Sykes v. RFD Third Ave. 1 Assoc., LLC*, 15 N.Y.3d 370, 372 (2010) (emphasis added). Such a relationship can be established by demonstrating that (1) the defendants were aware that the representations were to be used for a particular purpose; (2) in furtherance of which a known party was intended to rely; and (3) there was some conduct evincing the defendants' understanding of that party's reliance. *Id.* at 372 (citing *Credit Alliance*

28

*Corp. v Arthur Andersen & Co.*, 65 N.Y.2d 536, 551 (1985)).  There is evidence in the record to support each of these elements.

As Plaintiffs state in their papers and as discussed *supra* p. 25, there is evidence that Mr. Mezei solicited the investment by describing it to Gary Fragin as purchasing a piece of Compass' debt to Gottex, (G. Fragin Depo. 124:6-18, 127:18 – 128:1, 138:25 – 139:4, 141:12-24); that Mr. Mezei was aware, prior to the wiring of the Trusts' funds, that the investment was being made on behalf of the Trusts and that Gary Fragin was discussing the investment with Karen Fragin, (Mezei Depo. 135:4 – 136:12; G. Fragin Depo. 129:12 – 130:2, 146:13-21); and that at the time of the Trusts' investment, it was understood that they were purchasing "Compass USA 18% Paper," (Greenberger Decl. Ex. 12).  Viewing this evidence in the light most favorable to Plaintiffs, as is required on summary judgment, a reasonable jury could find that Plaintiffs had established the required elements articulated in *Sykes* and *Credit Alliance Corp*.  Consequently, the Court denies Defendants' motion for summary judgment on Plaintiffs' negligent misrepresentation claim as limited herein.

### E.    Summary Judgment Is Denied As To Plaintiffs' Conversion Claim

Next, the Court considers Defendants' motion for summary judgment on Plaintiffs' conversion claim.  "Conversion is the unauthorized exercise of dominion or control over specifically identified property which interferes with the owner's rights." *Hoffman v. Unterberg*, 780 N.Y.S.2d 617, 619 (2d Dep't 2004) (citing *Gilman v. Abagnale*, 235 A.D.2d 989, 991 (3d Dep't 1997); *Republic of Haiti v. Duvalier*, 211 A.D.2d 379, 384 (1st Dep't 1994)).  "Money may be the subject of conversion if it is specifically identifiable and there is an obligation to return it or treat it in a particular manner." *Id.* (citing *Republic of Haiti*, 211 A.D.2d at 384).

Defendants argue that, as an initial matter, no conversion claim may lie because EGG was authorized to exercise dominion over the Trusts' funds. (Mot. 29)  However, "when funds are provided for a particular purpose, the use of those funds for an unauthorized purpose constitutes conversion." *Id.* (citing *Meese v. Miller*, 79 A.D.2d 237, 243 (4th Dep't 1981)); NYJUR CONVERSION § 23 (citing *Hecht v. Components Intern., Inc.*, 867 N.Y.S.2d 889, 2008 N.Y. Slip Op. 28439 (N.Y. Sup. Nov. 06, 2008)).  Because the parties hotly contest whether the Trusts' $800,000 was used for an authorized or unauthorized purpose, summary judgment on this claim in its entirety is not warranted.

However, Defendants also seek summary judgment to the extent that conversion is alleged against defendants other than EGG (*i.e.*, Mr. Mezei or Repotex). [4]  Defendants argue (1) that only EGG exercised dominion over the funds and (2) that EGG is "a separate corporate entity owned by a trust [and] no defendant has a beneficial interest in the trust." (Mot. 28)

It is well accepted that officers and agents of corporations are personally liable for their own acts that bring about a conversion of a third part's property.  *See* 2 NY PJI3d 3:10, at 122 (2012); NYJUR BUSINESREL § 777; *Aeroglide Corp. v. Zeh*, 301 F.2d 420, 422 (2d Cir. 1962). Not only is it undisputed that Mr. Mezei is the president of EGG, (D. 56.1 ¶147), but there is also evidence that Mr. Mezei was personally involved in the Trusts' transaction with EGG (*e.g.*, directing that Repotex notes be drafted for the Trusts), [5] (Friedman Depo. 50:10-23).  Thus, regardless of whether Mr. Mezei has an ownership interest in EGG or the trust that owns EGG,

---

[4] The Court construes this as an argument on behalf of Mr. Mezei and Repotex because the Complaint alleges primary liability for conversion against EGG, Mr. Mezei, Repotex, and Catherine Ilardi, and Plaintiffs have voluntarily dismissed Ms. Ilardi from this action. (Dkt. # 49)  The Complaint alleges aiding and abetting liability against Mr. Friedman, which is discussed *infra* §G.

[5] The Court notes that neither party has suggested that the details of Mr. Mezei's involvement are entirely clear or undisputed.

he may still be held liable for conversion to the extent that he personally participated in the conversion. Accordingly, Defendants' motion for summary judgment as to Mr. Mezei's liability for conversion is denied.

By contrast, there is no allegation that Repotex is an officer or agent of EGG. Moreover, it undisputed that EGG "kept the funds," (Def. 56.1 ¶¶ 140, 144; P. 56.1 ¶¶ 140, 144), meaning that Repotex did not exercise dominion over the funds. For this reason, Defendants' motion for summary judgment as to Repotex's liability for conversion is granted.

### F.    Summary Judgment Is Denied As To Plaintiffs' Breach of Contract Claim

Defendants also move for summary judgment on Plaintiffs' breach of contract claim, arguing that the only contract alleged is the Notes and that, in ruling on Plaintiffs' earlier motion for summary judgment, Judge Gardephe held that the Notes are not enforceable agreements. (Mot. 29-30) Defendants further assert that even if the Notes are enforceable, there has been no breach. The Court disagrees that Judge Gardephe's opinion requires granting summary judgment in favor of Defendants and further finds that there remain questions of material fact surrounding what contract terms, if any, Plaintiffs may enforce. Consequently, Plaintiffs' breach of contract claim may proceed as an alternative to their fraud-based claims.

Of central importance to this case as a whole is the question of whether the Notes are equivalent to what Karen Fragin thought was being purchased – *i.e.*, Compass USA 18 Percent Paper (also referred to as a direct participation in the Senior Repo). Defendants assert that the two investments are economically equivalent and, therefore, that the Trusts got what they paid for. (Mot. 26-27, 30 n.10; Def. 56.1 ¶ 197) Plaintiffs assert that the two investments are not the same and that the Trusts did not receive the investment that they paid for. (Opp. 23; G. Fragin Depo. 154:1-21)

31

As a result of Plaintiffs' argument that the Trusts did not get what they paid for, Judge Gardephe denied Plaintiffs' earlier motion for summary judgment on their breach of contract claim. (Dkt. #62 at 11)  That is, as long as there remained a question regarding whether the Trusts received the investment they thought they were purchasing, Plaintiffs could not conclusively establish a meeting of the minds, and summary judgment was not appropriate.  (*Id.*)

As noted above, this state of affairs has not changed because this central question remains unresolved.  Should the evidence at trial demonstrate that the Trusts *did* receive the investment they expected, then Plaintiffs will be entitled to argue that there was a meeting of the minds and to pursue their breach of contract claim.  If, however, the evidence at trial demonstrates that the Trusts *did not* receive the investment they expected, then Plaintiffs will be foreclosed from recovering on their breach of contract claim.

Moreover, if Plaintiffs are able to pursue their breach of contract claim, the jury will have to determine whether the guaranteed monthly interest payments provided for by the terms of the Notes, (*see* K. Fragin Aff. Exs. A-E), was part and parcel of the parties' agreement.  Defendants suggest that the only agreement between the parties, if any, was for the Trusts to purchase a direct position in the Senior Repo. (Mot. 30)  However, Karen Fragin stated at her deposition that she understood such an investment to include guaranteed monthly payments. (K. Fragin Depo. 93:9-11; 103:12 – 104:2)  Thus, even if the Trusts received the investment that they paid for, as Defendants suggest, there remain questions of fact surrounding the terms of that investment.

For the foregoing reasons, Defendants' motion for summary judgment on Plaintiffs' breach of contract claim is denied.

### G.    Summary Judgment Is Granted As To All Claims Against Mr. Friedman

Mr. Friedman moves for summary judgment on all claims asserted against him. Plaintiffs allege that "Mr. Friedman aided and abetted Mr. Mezei in [the] unlawful and undisclosed diversion of the Trusts' funds to purchase Compass' debt indirectly through Repotex rather than directly by the Trusts." (Cmplt. ¶34) Under New York law, a claim for aiding and abetting requires: (1) the existence of wrongful conduct by the primary wrongdoer; (2) knowledge of the wrongful conduct on the part of the defendant; and (3) substantial assistance of the defendant in achieving the wrongdoing. *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001); *Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 493 (S.D.N.Y. 2003). In support of his motion for summary judgment, Mr. Friedman argues, *inter alia*, that there is no basis in the record to conclude that he knew of Mr. Mezei's alleged torts. (Reply 7) The Court agrees.

Plaintiffs admit that Mr. Friedman was not a party to the conversation between Mr. Mezei and Gary Fragin around Memorial Day 2008 and that Mr. Friedman did not speak with Gary Fragin about the $800,000 investment until after the funds were sent by the Trusts to EGG. (Def. 56.1 ¶226) Moreover, Plaintiffs provide no other factual basis for concluding that Mr. Friedman knew what was said, or not said, between Mr. Mezei and Gary Fragin. No reasonable jury could, on this record, conclude that Mr. Friedman knew about Mr. Mezei's alleged fraudulent misrepresentation or omission.

Plaintiffs further admit that the first time Karen Fragin spoke with Mr. Friedman regarding the Trusts' investment was several months after the Notes had been issued. (Def. 56.1 ¶225) Karen Fragin stated at her deposition that this was the last and only conversation she had with Mr. Friedman and that it related to a miscommunication over a payment that Karen Fragin thought had not been received but had in fact been received. (K. Fragin Depo. 131:8 – 132:19)

33

In light of these undisputed facts and given that Plaintiffs provide no other factual basis for concluding that Mr. Friedman knew that EGG's use of the Trusts' funds was unauthorized, no reasonable jury could, on this record, reach such a conclusion.

For these reasons, Mr. Friedman's motion for summary judgment is granted as to all claims against him.

### H.   Plaintiffs' Claims On Behalf Of The Samuel Eliezer Nussbaum Trust Are Not Limited To the $60,000 Wired Directly From the Trust's Account

Plaintiffs' claims on behalf of one of the Trusts, the Samuel Eliezer Nussbaum Trust, encompass both $60,000 that was transferred to EGG directly from the Samuel Eliezer Nussbaum Trust's account and $10,000 that Karen Fragin transferred from her personal checking account to EGG on the trust's behalf.  (Def. 56.1 ¶137)  Defendants move for summary judgment on all claims brought on behalf of the Samuel Eliezer Nussbaum Trust to the extent that the claims encompass the latter $10,000.  Defendants argue that, pursuant to the Supreme Court's decision in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-567 (1992), the Samuel Eliezer Nussbaum Trust has no standing to sue on this particular $10,000 because it was paid by Karen Fragin personally and, therefore, the Samuel Eliezer Nussbaum Trust has suffered no injury-in-fact.  (Mot. 31-32)

However, Defendants have pointed to no evidence in the record demonstrating that the Samuel Eliezer Nussbaum Trust does not owe this money to Karen Fragin or will not be required to repay it.  Moreover, Defendants have cited no cases for the proposition that such a debt would not confer standing on the Samuel Eliezer Nussbaum Trust.  Consequently, Defendants' motion for summary judgment on all claims that encompass the $10,000 transferred from Karen Fragin's personal checking account to EGG is denied.

34

## I.      Summary Judgment Is Denied As To All Claims Against Gary Fragin

Finally, Defendants, as third-party plaintiffs, move for summary judgment on their fraud, contribution, and indemnification claims against Gary Fragin.  In support of their motion, Defendants: (1) cite two cases explaining the concept of indemnity; (2) cite a case holding that a tortfeasor who is sued individually may implead others who have contributed to the plaintiff's injury and (3) argue that Gary Fragin should be held liable based on "simple fairness."  (Mot. 32) Defendants offer no other argument for granting summary judgment against Gary Fragin on these claims.  This is insufficient to warrant a grant of summary judgment, and the motion is denied with respect to these claims.

## V.      CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Defendants' motion for summary judgment is GRANTED as to Plaintiffs' claim for violations of Sections 5 and 12(a)(1) of Securities Act of 1933, 15 U.S.C. §§ 77e and 77l(a)(1);

ORDERED that Defendants' motion for summary judgment is GRANTED as to Plaintiffs' claims against Mr. Friedman;

ORDERED that Defendants' motion for summary judgment is GRANTED as to Plaintiffs' fraud, fraudulent inducement and Rule 10b-5 claims to the extent that they are based on Mr. Mezei's alleged statement that he had sufficient investors to buy out Gottex, but that Defendants' motion for summary judgment is DENIED as to Plaintiffs' fraud, fraudulent inducement and Rule 10b-5 claims to the extent that they are based on either Mr. Mezei's alleged misrepresentation regarding the nature of the investment or on Mr. Mezei's alleged failure to disclose that Compass was at risk of foreclosure by Gottex;

35

ORDERED that Defendants' motion for summary judgment is GRANTED as to Plaintiffs' negligent misrepresentation claim to the extent that it is based on Mr. Mezei's alleged statement that he had sufficient investors to buy out Gottex, but that Defendants' motion for summary judgment is DENIED as to Plaintiffs' negligent misrepresentation claim to the extent it is based on Mr. Mezei's alleged misrepresentation regarding the nature of the investment;

ORDERED that Defendants' motion for summary judgment is GRANTED as to Plaintiffs' conversion claim against Repotex, but that Defendants' motion for summary judgment is DENIED as to Plaintiffs' conversion claim against Mr. Mezei and EGG;

ORDERED that Defendants' motion for summary judgment is DENIED as to Plaintiffs' breach of contract claim;

ORDERED that Plaintiffs' claims on behalf of the Samuel Eliezer Nussbaum Trust are not limited to the $60,000 wired directly from the Samuel Eliezer Nussbaum Trust account and may include the $10,000 transferred to EGG by Karen Fragin on the trust's behalf;

ORDERED that Defendants'/Third-Party Plaintiffs' motion for summary judgment is DENIED as to Defendants'/Third-Party Plaintiffs' fraud, contribution and indemnification claims against Gary Fragin;

ORDERED that the Parties submit all required pretrial materials to the Court at or before **5:00 PM** on **September 5, 2012**; and

ORDERED that trial counsel for all parties appear for a final pre-trial conference before the Court, which is RESET from September 4, 2012 to **September 7, 2012** at **4:00 PM** in Courtroom **17B** of the United States District Court for the Southern District of New York, 500 Pearl Street, New York, New York.  Trial is scheduled to commence on **September 10, 2012**; and it is finally

36

ORDERED that counsel shall engage in at least one hour of good faith settlement discussions prior to the final pretrial conference on September 7, 2012.


SO ORDERED.


Dated: August 22, 2012
      New York, New York

ALISON J. NATHAN
United States District Judge

37